IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,              )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )
                                       )
SYLVIA HOFSTETTER,                     )          No. 3:15-CR-27-TAV-CCS
THEODORE McCRARY,                      )
COURTNEY NEWMAN, and                   )
CYNTHIA CLEMONS,                       )
                                       )
            Defendants.                )

**MEMORANDUM AND ORDER**

All pretrial motions in this case have been referred to the Magistrate Judge pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate.  This case is before the Court on the following pretrial motions:

(1)  Defendant's Motion for Change of Venue and Motion for Pre-
     Voir Dire Jury Questionnaire [Doc. 52], filed by Defendant
     Hofstetter on March 14, 2016;

(2)  Motion for Bill of Particulars [Doc. 115], filed by Defendant
     Newman on May 19, 2017;

(3)  Defendant Sylvia Hofstetter, Cynthia Clemons, and Courtney
     Newman's Motion *in Limine*  to Compel the Government to
     Produce Original Patient Files Pursuant to Federal Rule of
     Evidence 1002 [Doc. 151] , filed on May 5, 2017;

(4)  Defendant Courtney Newman's Motion to Join in Previously
     Filed Motion to Change Venue [Doc. 52] and Motion in the
     Alternative to Select a Jury Panel Outside of the Eastern District
     of Tennessee [Doc. 152], filed on May 5, 2017;

(5)  Defendant's Joint Motion to Suppress Statements of Alleged
     Co-Conspirator or in Alternative Motion for a[n] Enright
     Hearing [Doc. 156], filed on May 5, 2017;

(6) Defendant's Joint Motion to Distribute Juror Questionnaire [Doc. 158], filed on May 5, 2017;

(7) Defendant's Motion to Correct the Record [Doc. 173], filed by Defendant Newman on May 19, 2017;

(8) Joint Motion for a Witness List [Doc. 175], filed on May 19, 2017;

(9) Joint Motion for Designation of Specific Evidence the Government Intends to Use in its Case-in-Chief [Doc. 177], filed on May 19, 2017;

(10) Motion for Severance of Defendants [Doc. 178], filed by Defendant Clemons on May 19, 2017;

(11) Defendant Cynthia Clemons' Motion for F.R.Cr.P. Rule 7(f) Bill of Particulars [Doc. 182], filed on May 19, 2017;

(12) Defendant's First Specific Brady Motion for Disclosure of Specific Items of Impeaching Information [Doc. 184], filed by Defendant Clemons on May 19, 2017;

(13) Defendant Courtney Newman's Motion to Join in Co-Defendant Cynthia Clemons['] Motion to Sever [Doc. 252], filed on August 21, 2017; and

(14) Motion of Defendant McCrary to Adopt Co-Defendant Cynthia Clemons' Motion to Sever [Doc. 255], filed on August 21, 2017.

The parties appeared on June 7, 2017, for a hearing on all pending pretrial motions. Assistant United States Attorney Tracy L. Stone appeared on behalf of the Government. Attorneys Charles C. Burks, Jr., and Michael P. McGovern[1] represented Defendant Hofstetter. Attorneys Donald A. Bosch and Ann C. Short, represented Defendant McCrary. Attorney Christopher J. Oldham

---

[1] Attorney Loretta Cravens was substituted [Doc. 270] for Mr. McGovern on October 25, 2017.

represented Defendant Newman. Attorney Randall E. Reagan represented Defendant Clemons. Defendants Hofstetter, McCrary, and Clemons were also present for the hearing.[2]

For the reasons discussed below, the Court finds that the Third Superseding Indictment provides sufficient notice of the charges, a change in venue and a pretrial hearing on the existence of the alleged drug conspiracy is not warranted in this case, the motion for a juror questionnaire is premature, and that the Defendants have access to the patient files. Due to the filing of two superseding indictments and the addition of six new codefendants, the Court finds that the requests for a witness list, specific designation of the Government's proof, and severance should be deferred and reargued at the motion hearing scheduled for May 2, 2018, at 9:30 a.m. Finally, the Court finds the motion to correct the record regard to the timing of the filing of the expert report of Dr. Blake is moot.

## I.      BACKGROUND

On March 4, 2015, Defendant Sylvia Hofstetter was indicted [Doc. 3] with conspiracy to distribute oxycodone, conspiracy to commit money laundering, and seven counts of money laundering. On October 4, 2016, the Grand Jury returned a Superseding Indictment [Doc. 70] charging Defendant Hofstetter and five codefendants, Richard Larson,[3] Alan Pecorella, Theodore McCrary, Courtney Newman, and Cynthia Clemons, with conspiring to distribute and dispense controlled substances outside of the scope of professional practice and without a

---

[2] Attorney Creed Daniels, who represents Defendant Pecorella, also attended the hearing but does not have any motions pending before the Court.

[3] Charges against Defendant Richard Larson were dismissed [Doc. 110] and the proceedings against him abated due to his death on December 14, 2016.

legitimate medical purpose from January 2009 to March 2015. Defendant Hofstetter is also charged with conspiring to commit money laundering and several[4] substantive counts of money laundering. Defendant Hofstetter is charged with three counts and the other codefendants are charged in two counts of maintaining a drug-involved premises. Defendants Hofstetter and Cynthia Clemons are charged with one count each of distributing controlled substances outside the scope of professional practice and without a legitimate medical purpose. Defendants Hofstetter and Clemons are also subject to a potential enhanced penalty for the alleged death of a patient with regard to two counts, which increases the punishment for those counts from a statutory maximum of twenty years to a statutory mandatory minimum of twenty years and a maximum of life imprisonment.

Approximately one month after the June 7 motion hearing, the Grand Jury returned a Second Superseding Indictment [Doc. 224], that removed Defendant Larson and added Defendants Holli Womack, Clyde Tipton, and Maynard Alvarez. The Second Superseding Indictment retained the same charges for the instant Defendants,[5] with the exception of removing two of the substantive money laundering charges (former Counts Three and Four) for Defendant Hofstetter. The Second Superseding Indictment also changed the start date for the drug conspiracy in Count One (from January 2009 to November 2010) and the money laundering conspiracy in Count Two (from January 2011 to March 2011). Following the filing of the Second Superseding Indictment, the

---

[4] Defendant Hofstetter was charged with seven counts of money laundering in the Superseding Indictment and is charged with five counts of money laundering in the Second and Third Superseding Indictments.

[5] The Second Superseding Indictment added two counts of conspiracy to defraud the United States by soliciting kickbacks and a money laundering conspiracy for new Defendants Tipton and Alvarez. It also added Defendant Womack to the drug conspiracy and to one count of maintaining a drug-involved premises.

undersigned continued the trial to October 16, 2018, and gave the parties a new motion deadline of March 5, 2018, to file motions in light of the new charges. The Court also gave the new codefendants time to join in the existing, pending pretrial motions, but none did so.

On January 4, 2018, the Grand Jury returned a Third Superseding Indictment [Doc. 278] in this case. This Indictment added three new codefendants: Luca Sartini, Luigi Palma, and Benjamin Rodriguez. The Indictment also no longer charges Defendants Pecorella, McCrary, Tipton, and Alvarez,[6] although they still named therein. The Third Superseding Indictment charges Defendant Hofstetter with participating in a RICO conspiracy (new Count One) with Defendants Sartini, Palma, and Rodriguez. Defendants Hofstetter, Newman, and Clemons remain charged with conspiring to distribute and dispense controlled substances, outside the scope of professional practice and without legitimate medical purpose (new Count Two). However, the drug conspiracy is alleged to have begun in April 2009, and Codefendants Sartini and Palma are added to this count. Moreover, the drug conspiracy now alleges an enhanced penalty for Defendant Hofstetter for the deaths of five people, rather than one person, as was alleged in the prior Indictment. Other than renumbering the counts, changes to some dates,[7] and the addition of the new codefendants, the remaining charges against Defendants Hofstetter, Newman, and Clemons are the same crimes alleged in the Second Superseding Indictment.

---

[6] Defendants Pecorella, McCrary, Tipton, and Alvarez have entered into plea agreements [Docs. 285, 287, 289, & 290].

[7] Count Three, which charges a money laundering conspiracy, is alleged to have begun on April 2009, rather than March 2011. Count Ten, which charges that Defendants Sartini, Palma, Rodriguez, and Hofstetter maintained a drug involved premises at Comprehensive Healthcare Systems on Gallaher Road, now alleges a start date of January 2011, rather than January 2012.

On January 19, 2018, the Government filed the signed plea agreement [Doc. 289] of Defendant McCrary.  In his plea agreement, Defendant McCrary acknowledges that he is giving up his right to a jury trial and the right to have the Government prove his guilt beyond a reasonable doubt.  Thus, the Court finds that the Motion of Defendant Theodore McCrary to Adopt Co-defendant Cynthia Clemons' Motion to Sever [**Doc. 255**] is **DENIED as moot** and the other pending pretrial motions, in which Defendant McCrary has joined, are **MOOT** as to him.

## II.    ANALYSIS

Defendants Newman and Clemons, joined by Defendant Hofstetter, request [Docs. 115 & 182] a bill of particulars, arguing that the instant charges are insufficient to permit them to prepare a defense, to avoid surprise at trial, and to protect against a future double jeopardy violation. Defendants Hofstetter, Newman, and Clemons ask the Court for additional discovery in the form of a witness list [Doc. 175], the specific designation of evidence that the Government intends to use at trial [Doc. 177], the disclosure of impeaching information [Doc. 184], and for a pretrial hearing to establish the existence of a conspiracy [Doc. 156].  Defendants Hofstetter, Newman, and Clemons also ask [Doc. 151] for access to the original patient files at trial.  Defendants Newman and Clemons ask to be severed [Doc. 178] for a separate trial from that of the other codefendants.  Defendants Hofstetter, Newman, and Clemons ask for a change of venue [Doc. 52] or, alternatively, to empanel a jury from another district [Doc. 152], due to prejudicial pretrial publicity.  The Defendants also ask [Docs. 52 & 158] to submit a questionnaire to potential jurors. Finally, the Defendants move [Doc. 173] the Court to correct the record with regard to the Government's expert disclosures.  The Court will examine each of these motions herein.

## A.  Bill of Particulars

Pursuant to Federal Rule of Criminal Procedure 7(f), Defendants Newman [Doc. 115] and Clemons [Doc. 182] ask the Court to order the Government to provide a bill of particulars alleging the specific conduct by which they allegedly violated the charged statutes.  They contend that the Indictment merely alleges the language of the cited statutes, without relating facts about the Defendants' alleged involvement in the charged drug conspiracy.  Additionally, they argue that the voluminous discovery does not "shed any direct light" on the charges.  Specifically, the Defendants do not know which of the six thousand patients the Government is claiming received prescriptions for controlled substances that were outside of the scope of professional practice or not issued for a legitimate medical purpose. Defendant Newman seeks particularization of the unindicted coconspirators, the overt acts the Government claims she performed in furtherance of the conspiracy and in maintaining a business for illegal drug distribution, the standard of professional practice that the Government claims applies in this case, and the property subject to forfeiture in Count Two.[8]  Defendant Clemons asks for particularization of the unindicted coconspirators, her alleged overt acts in furtherance of the conspiracy, the amounts of controlled substances for which she is directly and/or vicariously liable, the admissibility of any co-conspirator statements, and the details regarding any evidence the Government intends to offer pursuant to Federal Rule of Evidence 404(b).[9]  The Defendants contend that a Bill of Particulars

---

[8] Defendant Newman lists twenty-five (25) items for particularization [Doc. 115, pp.4-8], which fall into these four general categories.

[9] Defendant Clemons also requests twenty-five (25) items for particularization [Doc. 182, pp.1-3], which fall into these five general categories.

is necessary to allow them to prepare their defense, to avoid surprise at trial, and to avoid a future double jeopardy violation.

At the motion hearing, Mr. Oldham argued for a more detailed explanation of the charges. He stated that the Superseding Indictment was devoid of any overt acts and the case involved six thousand patient files seized from the clinics in question. Mr. Oldham stated that it was impossible for the Defendants to be prepared to defend the treatment in all six thousand files at trial. He asked that the Government at least narrow the number of patient files at issue. Mr. Reagan said the Defendants needed to know the identities of the unindicted coconspirators in order to be prepared to face statements by these individuals at trial. He asked the Court to order the Government to identify whether the unindicted coconspirators are limited to the one hundred defendants in the related cases, who have entered into plea agreements. Mr. Burks stated that Defendant Hofstetter joined in the motions for bills of particulars by Defendants Newman and Clemons.[10]

AUSA Stone responded that the Superseding Indictment properly notifies the Defendants of the charges. He argued that a bill of particulars is not intended to outline the Government's evidence at trial, such as which witnesses it would call. Moreover, he would not know which witnesses or patient files the Government will use at trial, until he begins intensive trial preparation in the months immediately preceding the trial. AUSA Stone clarified that the six thousand patient files were taken from the Lenoir City and Lovell Road clinics and that no files were seized from the Gallaher View Road clinic. He stated that the Defendants have access to information that

---

[10]At the motion hearing, Mr. Bosch stated that Defendant McCrary also joined in the motions for bills of particulars by Defendants Newman and Clemons. However, as discussed in section I. above, Defendant McCrary has entered into a plea agreement, is no longer proceeding to trial, and his joinder in the instant motions is now **MOOT**.

narrows the number of patient files potentially at issue, such as the Government's expert reports, which discuss certain patients by name, and the identities of individuals who were indicted in the related cases.

AUSA Stone said that the "and elsewhere" in the Indictment refers to Florida and a medical facility in Georgia, where patients were referred for imaging tests. He stated that only Defendant Hofstetter had a connection to Florida. With regard to the timeframe of the medical providers' involvement in the conspiracy, AUSA Stone agreed that it was generally during each Defendant's employment at the pain clinics at issue. He stated that the exception to this would be 404(b) evidence for a couple of the Defendants who had previously worked at other pain clinics.

"The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1). As a general rule, an indictment passes constitutional muster if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (quoting *Hamling*). An indictment may allege the charges using the words of the statute itself as long as it gives all the elements of the offense "fully, directly, and expressly[.]" *Hamling*, 418 U.S. at 117 (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)); *Landham*, 251 F.3d at 1079. Moreover, the statutory language "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117-18 (quoting *United States v. Hess*, 124 U.S. 483, 487(1888)); *Landham*, 251 F.3d at 1079.

Federal Rule of Criminal Procedure 7(f) states that "[t]he court may direct the government to file a bill of particulars" and that "[t]he government may amend a bill of particulars subject to such conditions as justice requires." "A bill of particulars is meant to be used as a tool to minimize surprise and assist defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes. It is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial." *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993). The granting of a bill of particulars is within the court's discretion. *See id.* (holding that the appellate court reviews the denial of a bill of particulars for an abuse of discretion). The level of detail in the indictment can be a basis for denying the motion for a bill of particulars. *Id.* Additionally, "a defendant is not entitled to a bill of particulars with respect to information which is available through other sources." *United States v. Paulino*, 935 F.2d 739, 750 (6th Cir. 1991), *superseded on other gnds by statute, United States v. Caseslorente,* 220 F.3d 727 (6th Cir. 2000) (on sentencing issue).

First, the Court observes that, with the exception of the request for the Government to particularize the standard of care that applies in this case, the Defendants do not allege any deficiency in the Indictment's statement of the elements of the offenses charged. Instead, the Defendants' motions primarily relate to the sufficiency of the facts alleged in the Indictment. After the Defendants filed and argued the motions for bills of particulars, the Government superseded the charges twice. Both the Second and the Third Superseding Indictments contain a "General Allegations" section that provides an additional explanation of the charges and the people involved in the alleged drug conspiracy. Moreover, the Third Superseding Indictment is a "speaking indictment" that contains twenty-seven paragraphs describing the crimes and those involved. The Defendants seek particularization of (1) the standard of professional practice to be applied in this

case, (2) the identities of the unindicted coconspirators, (3) the overt acts the Government claims the Defendants performed in furtherance of the conspiracy and in maintaining a business for illegal drug distribution, (4) the amounts of controlled substances for which they are each directly and/or vicariously liable, and (5) the co-conspirator statements and 404(b) evidence that the Government intends to offer at trial. The Court examines the need for particularization as to each of these categories of information requested by the Defendants.

*(1) Standard of Professional Practice*

The Defendants ask the Court to order the Government to state in detail the standard of professional practice to applied in this case, the alleged violation of which is the basis of the charges in the drug conspiracy and the charges of maintaining a drug-involved premises. Count Two of the Third Superseding Indictment charges that the Defendants "distributed and dispensed, or caused to be distributed and dispensed, [controlled substances] outside the scope of professional practice and not for a legitimate medical purpose[.]" Counts Nine through Eleven of the Third Superseding Indictment allege that the Defendants named therein maintained a pain clinic "for the purpose of illegally distributing and dispensing Schedule II controlled substances outside the scope of professional practice and not for a legitimate medical purpose[.]"

The undersigned has already determined [Doc. 275, Report and Recommendation, pp.15-16] that the Superseding Indictment (which contains this same language) does not fail to state an offense:

> The Court turns first to the legal standard that the Government must prove, in order to show that a medical practitioner, licensed to prescribe controlled substances, has done so in violation of the Controlled Substances Act ("CSA"). Title 21,

United States Code § 841(a)(1) provides "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"  Although certain licensed medical professionals are authorized to prescribe controlled substances, a "prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).[11] Thus, "[i]n order to support a violation of the CSA, the jury ha[s] to find that the [medical professionals] knowingly and intentionally acted 'outside the course of professional practice' and without 'a legitimate medical purpose.'"  *United States v. Chube II*, 536 F.3d 693, 697 (7th Cir. 2008).

The Supreme Court determined, over forty years ago, that doctors could be charged with violating § 841(a)(1), despite the fact that they are authorized to prescribe controlled substances.  *United States v. Moore*, 423 U.S. 122 (1975).  In *Moore*, the Court unanimously held that "registered physicians can be prosecuted under § 841 when their activities fall *outside the usual course of professional practice*" because "only the lawful acts of registrants are exempted."  *Id.* at 124, 131 (emphasis added).  The Supreme Court upheld the application of the CSA to Defendant Moore, who prescribed methadone to patients in large amounts without an "adequate physical examination," directions for use, regulating the dosage, or taking precautions to prevent misuse or resell of the drug. *Id.* at 124.  Dr. Moore also ignored test results and charged graduated fees based upon the amounts of drugs prescribed, rather than the services performed.  *Id.*  According to the Supreme Court, "[i]n practical effect, he acted as a large scale 'pusher' not as a physician." *Id.*

The Court noted that

---

[11] "Every person who dispenses, or who proposes to dispense, any controlled substance, shall obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him."  21 U.S.C. § 822(a)(2).  "Persons registered by the Attorney General under this subchapter to manufacture, distribute, or dispense controlled substances or list I chemicals are authorized to possess, manufacture, distribute, or dispense such substances or chemicals (including any such activity in the conduct of research) to the extent authorized by their registration and in conformity with the other provisions of this subchapter."  21 U.S.C. § 822(b).  Thus, medical professionals authorized to issue prescriptions must do so in compliance with the regulations issued by the Attorney General.

> "[t]he Sixth Circuit has upheld the application of § 841(a)(1) to medical professionals in the face of a vagueness challenge. *United States v. DeBoer*, 966 F.2d 1066, 1068-69 (6th Cir. 1992). "[T]he language in § 841(a)(1) and 21 C.F.R. § 1306.04(a) clearly defines the [medical professional's] responsibilities that give rise to conduct that constitutes an unlawful distribution of a prescription drug." *Id.* at 1069. The court determined that the evidence was sufficient to show "that the defendant acted outside the scope of his profession." *Id.*

[Doc. 275, p.17 n.9] Here, the Third Superseding Indictment accurately states the elements of the offenses, as well as stating 21 C.F.R. § 1306.04(a) [*see* Doc. 278, ¶6]. Accordingly, the Court finds no need for additional particularization of the standard of care.


### (2) Identities of Unindicted Coconspirators

The Defendants ask the Court to order the Government to identify all of the unindicted coconspirators to the drug conspiracy alleged in Count Two (formerly Count One). They also ask for the names and addresses of anyone present at each allegedly illegal drug transaction. It is well settled in this circuit that the Government is not required to furnish in a bill of particulars the names of coconspirators or other persons present when the defendants allegedly participated in the conspiracy. *United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991); *see also United States v. Page*, 575 F. App'x 641, 643 (6th Cir. 2014) (observing that "the government is not obliged to provide the names of a defendant's alleged co-conspirators"). In this respect,

> [a] defendant may be indicted and convicted despite the names of his co-conspirators remaining unknown, as long as the government presents evidence to establish an agreement between two or more persons, a prerequisite to obtaining a conspiracy conviction. As long as the indictment is valid, contains the elements of the offense, and gives notice to the defendant of the charges against him, it is not essential that a conspirator know all other conspirators. "It is the grand jury's statement of the 'existence of the conspiracy agreement rather than the identity of those who

agree' which places the defendant on notice of the charge he must
be prepared to meet."

*Id.* (internal citations omitted) (quoting *United States v. Piccolo*, 723 F.2d 1234, 1239 (6th Cir. 1983)). Thus, the Government is not required to reveal the names of unindicted coconspirators. *United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004). Nor is it obliged to reveal a list of its witnesses. *See United States v. McCullah*, 745 F.2d 350, 353 (6th Cir. 1984) (holding that the Sixth Circuit "has firmly established that defense counsel is not entitled to know in advance of trial who will testify for the government").

In the instant case, however, the Court finds that the Government has revealed the names of numerous unindicted coconspirators. The Government has stated that over one-hundred individuals, whom it indicted in the related cases, are coconspirators in this case. The Court finds that further specification of the names of unindicted coconspirators is not necessary for the Defendants to understand the charges in this case. The Court will address the Defendants' request for a list of the Government's witnesses in its analysis of the Defendants' joint motion for a witness list.

*(3) Overt Acts*

The Defendants also asks the Court to order the Government to particularize their roles in the alleged drug conspiracy and in maintaining a drug-involved premises. They ask the Government to specify the date, time, place, and persons present at any overt acts that the Government alleged they performed in furtherance of the conspiracy. They argue that they are not able to defend against the charges without this information because neither the Indictment, nor the discovery provided by the Government, reveal their role in the alleged crimes. The Government

responds that it is not required to prove, much less charge, an overt act in furtherance of the drug conspiracy alleged in this case.

The Court observes that "a defendant is not entitled to discover all the overt acts that might be proven at trial." *Salisbury*, 983 F.2d at 1375. A request for a bill of particulars likewise may not be granted if the purpose "is to obtain a list of the Government's witnesses or to discover all of the overt acts that might be proven at trial." *United States v. Musick*, 291 F. App'x 706, 724 (6th Cir. 2008). With respect to a conspiracy charged under 21 U.S.C. § 846, "'an overt act need be neither charged nor proved[.]'" *United States v. Dempsey*, 733 F.2d 392, 396 (6th Cir. 1984) (quoting *United States v. Umentum*, 547 F.2d 987, 991 (7th Cir. 1976)). Accordingly, because there is no requirement that the Government charge an overt act in a drug conspiracy under § 846, there is likewise no need to particularize an indictment that fails to do so.

However, in this case, the Second and particularly the Third Superseding Indictments allege facts regarding the Defendants' involvement in the drug conspiracy. Paragraphs 1 through 7 of the Third Superseding Indictment allege generally how the drug conspiracy worked. Paragraphs 8 through 27 describe the entities and Defendants involved in the drug conspiracy, including Defendant Hofstetter (paragraph 20), Defendant Newman (paragraph 23), and Defendant Clemons (paragraph 24). Paragraph 46 alleges that Defendant Hofstetter pressured the medical providers employed at the pain clinics to see large numbers of patients and that the medical providers did not provide individualized treatment to patients but, instead, prescribed large amounts of opioids to all patients.

The Defendants seek particularization of which patients received prescriptions outside of the scope of professional practice and without a legitimate medical purpose. The Third

Superseding Indictment lists a few patients, by their initials, in paragraphs 54, 61-66, and 85. The Government avers that further narrowing of the patients as requested by the Defendants[12] is not possible because it claims that none of the patients received legitimate treatment.

The Defendants also seek particularization of the dates of their involvement in the conspiracy and the locations making up "and elsewhere" in Count Two. The Third Superseding Indictment alleges the dates of Defendants Newman and Clemons' involvement in the conspiracy (see paragraphs 23 & 24). At the June 7 hearing, AUSA Stone stated that the conspiracy occurred in Florida and Georgia, as well as in the Eastern District of Tennessee. The Third Superseding Indictment further identifies the activity that occurred in those locations. Accordingly, the Court finds that the Third Superseding Indictment sufficiently particularizes the charges to permit the Defendants to prepare a defense and avoid surprise at trial.

### (4) Amounts of Controlled Substances Illegally Prescribed or Dispensed

The Defendants seek particularization of the amount of Schedule II controlled substances they are alleged to have conspired to distribute. They also seek the amounts of controlled substances for which they each have vicarious liability and the amounts that constitute their foreseeable conduct in the conspiracy pursuant to the United States Sentencing Guidelines.[13] The Third Superseding Indictment alleges that each of the medical providers working at the Lenoir

---

[12] In their motion for a bill of particulars, the Defendants ask the Government to specify those patients who received illegal prescriptions. At the motion hearing, the Government essentially replied all of them. Whether the Government should specify which of those six thousand patients it will use as evidence at trial is the subject of the Defendants' Motion to Designate Evidence.

[13] The scope of conduct for which a coconspirator is liable under the Sentencing Guidelines is not coextensive with that conduct for which she is vicariously liable under conspiracy law. United States v. Swiney, 203 F.3d 397, 402-04 (6th Cir.), cert. denied, 530 U.S. 1238 (2000).

City pain clinic and the Lovell Road pain clinic prescribed "hundreds of thousands of opioid pain killers and other narcotics[.]" [Doc. 278, ¶¶21-25] Although the Indictment does not state a total amount of controlled substances attributed to the conspiracy, the Court finds that this information is available to the Defendants from other sources. At Defendant Hofstetter's March 2015 detention hearing, Special FBI Agent Andrew Chapman testified that the Tennessee clinics managed by Hofstetter issued twelve million prescriptions for opioids, saw one thousand patients per clinic monthly, and earned a profit of approximately seven million dollars over four years. [Doc. 28, pp.17, 19-20] Additionally, at the time of the June 7 motion hearing, the Government was in the process of creating a DOMEX report, collating statistics related to the six thousand patient files seized from the pain clinics. From this report, the individual medical practitioners should be able to discern the number of prescriptions they each allegedly wrote. Finally, the amount of controlled substances for which a Defendant faces sentencing exposure is not a fact necessary to understand the charges or to prevent surprise at trial. Accordingly, the Court declines to order the Government to provide a bill of particulars for amounts of illegally prescribed controlled substances attributable to each Defendant.

*(5) Property of Each Defendant Subject to Forfeiture in Count Two*

The Defendants, particularly Defendant Newman, ask the Court to order the Government to specify what amount of money and to designate the items of their property that are subject to forfeiture as a part of the drug conspiracy. The Third Superseding Indictment already provides this particularization in paragraph 69. The Defendants also ask that the Government state how each item of property was obtained and used to commit or facilitate the offense. This request is tantamount to asking for the overt acts in relation to the drug conspiracy, which the Court discussed in section (3) above.

*(6) Coconspirator Statements and Other Acts Evidence*

The Defendants also ask the Court to order the Government to file a bill of particulars that specifies the substance of all coconspirator statements, along with the identity of the individual making the statement and when, where, and to whom the statement was made. They also request that the Government particularize all 404(b) extrinsic evidence that the Government will see to offer at trial, to include the substance of the act, the date and place where it occurred, the persons present, and the purpose for which the Government will offer this evidence. Court need not dwell much on these final requests because, as noted above, a bill of particulars is not a vehicle by which a defendant may discover a detailed list of the evidence the Government will present at trial. *Salisbury*, 983 F.2d at 1375. Moreover, the Court has already ordered the Government to disclose coconspirator statements and Rule 404(b) evidence in its Order on Discovery and Scheduling [Doc. 8, ¶B(3) (papers and documents that the Government intends to use in its case-in-chief), ¶I (Rule 404(b) evidence at least seven days before trial), ¶O (strongly encouraging pretrial disclosure of Jencks materials)]. The Court finds that a bill of particulars is not the proper vehicle for the disclosure of discovery.

*(7) Conclusion*

In summary, the Court finds that the requested particularization is not necessary in this case. Accordingly, the Defendants' joint motions for a bill of particulars [**Docs. 115 and 182**] are **DENIED**.

B. **DISCOVERY**

The Defendants bring five motions asking for pretrial disclosure of discovery: (1) a Motion *in Limine* to Compel the Government to Produce Original Patient Files Pursuant to Federal Rule of Evidence 1002 [Doc. 151]; (2) Defendants' Joint Motion to Suppress Statements of Alleged Co-Conspirator or in Alternative Motion for a[n] Enright Hearing [Doc. 156]; (3) Joint Motion for a Witness List [Doc. 175]; (4) Joint Motion for Designation of Specific Evidence the Government Intends to Use in its Case-in-Chief [Doc. 177]; and (5) Defendant's First Specific Brady Motion for Disclosure of Specific Items of Impeaching Information [Doc. 184]. The motions for access to patient files and for disclosure of impeachment evidence are moot. The Defendants' request for an *Enright* hearing is denied. The Court defers ruling on the two remaining discovery motions, finding that they should be reargued at the motion hearing on May 2, 2018.

*(1) Access to Patient Files*

Pursuant to Federal Rule of Evidence 1002, Defendants Hofstetter, Newman, and Clemons ask [Doc. 151] for access to the original patient files at trial. They state that law enforcement seized approximately six thousand (6,000) patient files from the three pain clinics at issue in this case. Defendants note that in discovery, defense counsel received a hard drive containing digital images of the contents of these files, most of which are in black and white. They contend that the original files contain notations in multiple colors of ink. Accordingly, they argue that the original files are the best evidence of the patient treatment at the clinics. The Defendants' request immediate access to the actual patient files during trial and for the Defendants, defense counsel, defense experts, and defense investigators to be able to inspect the actual files.

The Government responds [Doc. 187] that it has provided electronic copies of the patient files to all parties and that it is willing to make a reasonable number, which it defines as less than one hundred, of color copies for the Defendants upon their request of certain files. The Government asserts that if the color of the ink used on the files is important, then color copies of the patient files would suffice. It notes that even if the original files are used at trial, the Court will convert those exhibits to electronic form for the jury to view on the JERS system. Thus, the Government maintains that no genuine issue about the authenticity of the files exists and the use of color copies at trial is fair. Moreover, the Government contends that the Court should hold the issue of whether the original or copies must be used at trial in abeyance until trial, because it may be moot by then.

At the motion hearing, Mr. Oldham stated that copies of the patient files are not sufficient. He argued that the patient files are central to this case and that the Defendants have received black-and-white electronic copies of the six thousand patient files. He said that Dr. Richard Larson, who supervised the nurse practitioners at the clinics, always wrote on the patient charts in red ink, while the treating medical practitioners wrote in blue ink. He said he needed to be able to show the jury the original patient files to prove this system and that he wanted the actual patient files to be available for his use at trial.

AUSA Stone objected to a requirement that the Government bring the six thousand original patient files to trial. He said the files are voluminous and are contained in four hundred fifty banker's boxes. He related that the Government would permit the Defendants to inspect the original files, but the time and manner of the inspection must be reasonable and the Defendants must sign written chain of custody waivers. AUSA Stone stated that this is not a discovery issue but an evidentiary issue, which should be resolved at the time of trial.

The Defendants' motion actually requests two forms of relief: (1) for the Defendants, defense counsel, and defense experts and investigators to have pretrial access to the original patient files seized from the two clinics[14] and (2) for the Government to produce all six thousand original patient files at trial. The Court finds that the first request for access is not in dispute. The Government agrees to allow the Defendants and members of the defense team to inspect the original files under reasonable conditions, including that they waive any chain of custody issues. The Court finds that the parties should be able to work out the details of the inspection of patient files without the Court's involvement. Accordingly, the Court finds that the Defendants' request for the Court to order the Government to permit them to inspect the original patient files is moot, because the Government already agrees to do so.

The disputes is over whether the Government must produce all six thousand original patient files for use at trial. Federal Rule of Evidence 1002 provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." However, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit a duplicate." Fed. R. Evid. 1003. The Defendants argue that it would be unfair to permit the Government to substitute copies of the patient files, in lieu of the originals, because it would preclude them from proving the author of various notations on the files by the color of the ink used. The Court finds that the Defendants have not shown why a color copy of a particular file would be insufficient for the jury to see that colored ink was used on the file. However, the Court agrees with the Government that this issue is premature. As the case draws near to trial, the

_____

[14] At the June 7 motion hearing, AUSA Stone said that no files were seized from the clinic on Gallaher View Road, which had closed at the time of the execution of search warrants in March 2015.

parties will have a better idea of those patient files at issue. The parties at that time may agree that certain original files, or color copies of those files, will be used at trial. Accordingly, the Court finds that the Defendant's request that the Court order the Government to bring the six thousand patient files to trial for use by the parties therein should be denied as premature.

Defendant Sylvia Hofstetter, Cynthia Clemons, and Courtney Newman's Motion *in Limine* to Compel the Government to Produce Original Patient Files Pursuant to Federal Rule of Evidence 1002 [**Doc. 151**] is **DENIED as both moot and premature**, without prejudice to raise the issue of production of the original files at trial again as a motion *in limine*. The Defendants may file a second motion on this issue, after the deadline for plea negotiations has expired, if the parties have tried and been unable to resolve the issue themselves.

*(2) Impeaching Information*

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Giglio*, 405 U.S. 150 (1972), and their progeny, the Defendants move [Doc. 184] the Court to order the Government to provide exculpatory and impeaching information. They list eleven categories of information, some with multiple subparts, which they contend are the types of exculpatory and potentially impeaching information that they seek. Generally, they seek information on witness benefits; false or inadequate witness identifications; prior inconsistent witness statements; the criminal histories of witnesses, including arrests and bad acts; the mental, physical, and substance abuse history of witnesses; witness polygraph results; and witness bias. The Government responds [Doc. 190] that, to the extent that the information requested constitutes *Brady* information, which it does not concede, it has either already disclosed that information, will disclose the information as Jencks Act materials at the appropriate time, or the information is not in the Government's possession.

At the June 7 motion hearing, Mr. Reagan said that, in particular, he was seeking statements by patients seen by Defendant Clemons, who did not implicate her in the illegal activities at the pain clinics. AUSA Stone responded that the Government had turned over all discovery, with the exception of discovery covered by the Jencks Act, which would be disclosed at the appropriate time. He argued that it was not the responsibility of the prosecution team to search through the discovery and identify exculpatory material. Mr. Reagan agreed that the patient interviews were Jencks material. Mr. Burks stated that Defendant Hofstetter joined in this motion, which was originally filed by Defendant Clemons. The Court also permitted Defendant Newman to join in this motion.[15]

The Supreme Court has held that the government violates due process when it withholds from the defendant favorable evidence that is "material either to guilt or punishment." *Brady*, 373 U.S. at 87. *Giglio* extends the rule of *Brady* to evidence in the government's possession which tends to impeach or discredit the government's witnesses. *Giglio*, 405 U.S. at 154-55. The Court's Order on Discovery and Scheduling addresses the Government's obligation in this regard:

> The government shall reveal to the defendant and permit inspection and copying of all information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Agurs*, 427 U.S. 97 (1976) (exculpatory evidence), and *United States v. Bagley*, 473 U.S. 667 (1985) (impeachment evidence). Timing of such disclosure is governed by *United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988).

[Doc. 8, ¶E] Thus, the Court finds that it has already ordered the Government to turn over exculpatory and impeaching materials. The Government acknowledges this obligation and states

---

[15] At the motion hearing, the Court granted Defendant McCrary's motion [Doc. 197] to join in this motion. However, the Court will not analyze this motion as to Defendant McCrary, who is no longer proceeding to trial.

that it has already disclosed all qualifying information in its possession, with the exception of materials covered by the Jencks Act.

The Jencks Act provides in pertinent part as follows:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500; see also Fed. R. Crim. P. 26.2. The Court of Appeals for the Sixth Circuit has upheld the government's right under this statute to withhold witness statements or reports, even those that would be favorable to the defendant's defense, until after the witness testifies: "The clear and consistent rule of this circuit is that the intent of Congress expressed in the Act must be adhered to and, thus, the government may not be compelled to disclose Jencks Act material before trial." *Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988).

Although the Jencks Act permits the government to wait for disclosure until after the witness testifies, the Sixth Circuit has encouraged the government to provide the information earlier in appropriate cases in order to prevent delay at trial. *See United States v. Minsky*, 963 F.2d 870, 876 (6th Cir. 1992). Additionally, this Court's Order on Discovery and Scheduling [Doc. 8, ¶O] also encourages the early production of Jencks materials "as soon as possible and well before the testimony of the government witness in order to avoid undue interruptions of trials." However, the Sixth Circuit recognizes that in some cases the government may have a substantial reason for waiting until after the witness's testimony to disclose the Jencks material. *See United States v. Algie*, 667 F.2d 569, 572 (6th Cir. 1981). At the June 7 motion hearing, AUSA Stone stated that he would keep in mind the broader issues of fairness to the Defendants, as well as protecting fragile witnesses, when making the Jencks disclosures in this case.

Accordingly, the Defendants' First Specific Brady Motion for Disclosure of Specific Items of Impeaching Information [**Doc. 184**] is **DENIED as moot**, because the Court has already ordered the general relief requested.  However, given the potential for a large amount of Jencks material in this case, the motion is denied without prejudice to file a motion for the early disclosure of Jencks materials by the deadline for concluding plea negotiations, which is presently set for **August 31, 2018.**

*(3)  Pretrial Enright Hearing on Existence of Conspiracy*

Defendants Hofstetter, Newman, and Clemons also ask [Doc. 156] the Court to require a pretrial hearing, pursuant to *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978), at which the Government must prove that the conspiracy existed before it may introduce coconspirator statements in its case-in-chief at trial.  They argue that a pretrial hearing to establish the existence of the conspiracy is the most effective method to determine the admissibility of coconspirator statements, while protecting against unfair prejudice from inadmissible hearsay and to protect their Sixth Amendment right to confront the witnesses against them.  The Government opposes [Doc. 189] a pretrial hearing, contending that admission of coconspirator statements at trial, subject to a later demonstration of their admissibility, is a practice that is approved by the Sixth Circuit, traditionally employed in this District, conserves judicial resources, and has not heretofore caused mistrials or other adverse effects.

At the motion hearing, Mr. McGovern argued that, although the traditional practice in this district is to permit the Government to introduce coconspirator statements subject to its proving the conspiracy by the close of its case-in-chief, a different approach is warranted here, because this is an exceptional case.  He stated that this case involved hundreds of declarants and thousands of

statements. Moreover, the majority of the Government's evidence is statements by alleged coconspirators. Mr. McGovern argued that due to the unusual circumstances of this case, the potential for a mistrial arising from the use of the traditional option was great. AUSA Stone stated that although this is a big case, it is a single drug conspiracy with a simple mode of operation: people went to the clinics and got prescriptions. He maintained that the circumstances of this conspiracy do not warrant a pretrial hearing.

The Federal Rules of Evidence require that for a statement of a coconspirator to be admissible non-hearsay, the statement must be "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The Sixth Circuit has approved three potential procedures for resolving the admissibility of alleged coconspirator statements: (1) holding a pretrial hearing, (2) requiring at trial that the government present evidence of the conspiracy before presenting the coconspirator's statement, and (3) allowing the government to present the statement before proving the conspiracy at trial but instructing the jury that the government must prove the conspiracy before it can consider the statement. *United States v. Vinson*, 606 F.2d 149, 152-53 (6th Cir. 1979) (citing *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978)). The Defendants ask for the first of these options, a pretrial or *Enright* hearing. The Court observes that it is the historical practice in this district to use the third of the three options, which the Court will refer to as the provisional admission option. The Defendants argue that in light of the particular circumstances of this case, which involves thousands of potential coconspirator statements, a pretrial hearing is the most efficient way to protect their right to due process and to confront the witnesses against them.

Our Court of Appeals for the Sixth Circuit has observed that pretrial *Enright* hearings have the disadvantage of being "burdensome, time-consuming and uneconomic." *Vinson*,

606 F.2d at 152 (footnote omitted).  Nevertheless, "a trial judge, in the exercise of his discretion, may choose to order the proof in this manner if the circumstances warrant."  *Id.*  The decision of which of the three *Vinson* options to use falls squarely within the district judge's sound discretion.  *United States v. Robinson*, 390 F.3d 853, 867 (6th Cir. 2004) (stating the decision is "the trial court's prerogative").  A change from the historical method is not warranted when the proponents of the pretrial hearing offer only "general and vague objections" that "demonstrate no specific prejudice" resulting from the use of the provisional admission option.  *United States v. Martin*, No. 3:07-CR-51, 2008 WL 152900, at *3 (E.D. Tenn. Jan. 14, 2008).

In the instant case, the Defendants argue that presenting the statements of coconspirators without first showing that they participated in a conspiracy with the other alleged coconspirators would taint the jury with hearsay evidence.   The Court finds that the Defendants taint or spillover objection could be raised in every case in which a conspiracy is charged.  The Defendants essentially argue that if the Government fails to prove that they participated in the charged conspiracy, then their right to confrontation would be violated by the admission of a coconspirator statement that is not admissible under Rule 801(d)(2)(E).  The Defendants argue they would be prejudiced by the admission of inadmissible evidence.  The Defendants argue that such prejudice is specifically or particularly likely in this case due to the large number of potential coconspirator statements.  However, the Court finds the sheer number of potential coconspirator statements to be an insufficient reason to require a pretrial *Enright* hearing, particularly when all parties appear to agree that the Government cannot, as a practical matter, use all of the defendants in the related cases and/or all of the unindicted patients.

The Court has considered the Defendants' arguments and finds no reason to depart from the traditional provisional admission approach in this case.  Because the Defendants' motion

relates directly to trial procedures and/or the admissibility of evidence at trial, the Court defers to the historical practice employed in this district of permitting the Government to present the statement before proving the conspiracy and then instructing the jury that the Government must prove the conspiracy before it can consider the statement. Accordingly, the Defendants' Joint Motion to Suppress Statements of Alleged Co-Conspirator or in Alternative Motion for a[n] Enright Hearing [**Doc. 156**] is **DENIED**.

*(4) Witness List and Specific Designation of Government's Evidence*

Defendants Hofstetter, Newman, and Clemons also ask the Court to order the Government to provide a list of witnesses at least thirty days before trial [Doc. 175] and to designate that evidence in discovery that it will use in its case-in-chief [Doc. 177]. The Defendants argue that a witness list and the specific designation of the Government's evidence is necessary in this case for defense counsel to be able to provide an adequate defense. They assert that the discovery in this case is massively voluminous, consisting of well over a terabyte of data, approximately fifty compact discs containing audio and video recordings, and numerous imaged computer hard drives. The Defendants contend that the Government alleges that none of the six thousand patients received proper treatment or legitimate prescriptions and that it is impossible for defense counsel to be prepared to defend all six thousand patient files at trial. Additionally, they assert that they pose no danger to the Government's witnesses, in that they have no criminal history or record of violence and have been released pending trial. Accordingly, they assert fundamental fairness requires that the Government designate those patient files, patient witnesses, and other witnesses, who will be at issue at trial.

The Government [Docs. 188] strenuously objects to the pretrial disclosure of its witnesses or trial strategy.  It argues that the instant Defendants know the identities of the patients who went to the clinics and that its expert disclosures have narrowed the list of patients who are most likely to be called at trial.  Moreover, it contends that the majority of its witnesses, the clinic patients, are particularly vulnerable to intimidation.  Thus, the Government maintains that requiring it to produce a witness list or to designate that evidence it will present at trial is not necessary in this case.

At the June 7 motion hearing, AUSA Stone stated that the Defendants would have a "pretty good idea" of the Government's witnesses by reviewing those clinic patients named in the Government's expert disclosures.  Additionally, he said that the defendants in the related cases[16] and the staff members who worked at the clinics with the Defendants are another pool of potential witnesses.  AUSA Stone said that until he began intensive trial preparation and reinterviewed his witnesses in the months before trial, he would not know for sure whom the Government would call.  With respect to the uncharged clinic patients, AUSA Stone characterized these individuals as particularly vulnerable.  He said that many of these former patients were still suffering from drug addiction or in the recovery process.  He said these people react badly to stress, which can cause their addition to relapse.

AUSA Stone stated that the Government was in the process of preparing a DOMEX report, which would summarize the information contained in the six thousand patient files seized from the clinics.  He said that perhaps the DOMEX report would help the Defendants narrow the number

_____

[16] The undersigned notes that at a hearing in September 2017, AUSA Stone provided the Court and defense counsel present with a list of attorneys who had represented defendants in the related cases but whom the Government considered to be eligible to be co-counsel for Defendant Hofstetter, because the Government did not plan to call their prior clients as witnesses at trial.  This list effectively excludes a subset of potential witnesses.

of patient files, for which they must be prepared to defend at trial. The Government did not state when the DOMEX report would be ready.

The Court is concerned about the Defendants receiving an adequate defense, if their counsel must be prepared to defend against six thousand patient files at trial. On the other hand, the Government has narrowed the possible witness list somewhat by indicating certain categories of witnesses (those whose files were examined by the Government's experts, the defendants in the related cases, and the Defendants' coworkers) that it would be likely to call. Additionally, the Court observes that it must be cognizant of the potential for witness intimidation and the need to respect Government work product. At the time of the June 7 hearing, the DOMEX report was not yet complete, nor its effect on this issue known.[17] Accordingly, the Court defers ruling on these two motions and **DIRECTS** the parties to reargue these motions at the **May 2, 2018** motion hearing, with particular reference to the status of and the effect of the DOMEX report and the Third Superseding Indictment on the issue. The Court will expect the Government to present a proposal for further narrowing of the patients whom it may call and the patient files it may seek to use and/or introduce at trial. The Defendants may file supplemental briefs on their Motion for a Witness List [Doc. 175] and Motion for Designation of Specific Evidence the Government Intends to Use in Its Case-in-Chief [Doc. 177] on or before the **March 5, 2018** motion deadline. The Government may file a responsive supplemental brief by the **April 2, 2018** response deadline.

---

[17] The Court observes that the Defendants' access to the DOMEX report played a major role in the Court's ruling on identical motions filed in another pain clinic case in this district. *See United States v. Walter Blankenship*, et al., No. 3:14-CR-124 (E.D. Tenn) [Doc. 117].

## C. Severance

Pursuant to Federal Rule of Criminal Procedure 14, Defendant Clemons moves [Doc. 178] the Court to sever her for a separate trial from that of her codefendants. She argues that a joint trial exposes her to the risk of guilt by association or "spillover prejudice." She also contends that some of the codefendants have made statements, which would be admissible against them at trial, but would violate her rights under the Confrontation Clause, pursuant to *United States v. Bruton*, 391 U.S. 123 (1968). In this regard, she asks to Court to order the Government to provide all statements of her codefendants that it intends to use as evidence for *in camera* inspection. She believes that one or more of her codefendants would provide testimony exculpatory to her at a separate trial but could not be compelled to testify via subpoena at a joint trial. In addition to prejudice under Rule 14, Defendant Clemons also argues that the money laundering counts, with which she is not charged, were wrongly joined pursuant to Federal Rule of Evidence 8(b). Defendant Newman asks [Doc. 252] to join in this motion.[18]

The Government opposes [Doc. 191] severance. It maintains that the Defendants are properly joined for trial under Rule 8(b) because they are alleged to have participated in the same drug conspiracy. It asserts that the policy in favor of joint trials is even stronger when defendants are charged with participating in the same conspiracy. In order to be severed for separate trials, the Defendants must show a serious risk that a joint trial would compromise a specific trial right or prevent a reliable verdict. It contends that the Defendants' arguments about exculpatory testimony are illusory—whether at joint or separate trials, either the codefendant testifies and is subject to cross-examination or the codefendant cannot be compelled to testify based upon his or

---

[18] The Court has already permitted [Doc. 247] Defendant Newman to join in this motion. Defendant McCrary also asks [Doc. 255] to join in the motion to sever. As discussed in part I above, this request is moot, because Defendant McCrary has entered into a plea agreement and is no longer proceeding to trial.

her Fifth Amendment rights. It maintains that severance is not necessary simply because of inconsistency in defenses or an alleged "spillover" effect. In a supplemental brief [Doc 192], the Government acknowledges that Defendant Clemons made a statement that contains comments about Defendants Hofstetter and Newman. However, it contends that any *Bruton* problem can be cured by redacting Defendant Clemons' statement to remove the sentences that mention Defendants Hofstetter and Newman.

At the June 7 motion hearing, Mr. Reagan asked the Court to sever Defendants Clemons and Newman for a separate trial from the other codefendants. He argued that Defendant Hofstetter is charged with money laundering and the forfeiture allegations against her list numerous items of jewelry and refer to gambling junkets. He stated that Newman and Clemons, on the other hand, worked for a salary and are not charged with money laundering. He contended that the spillover prejudice from a joint trial with Defendant Hofstetter, who was living the high life, would be significant. Mr. Burks stated that while Defendant Hofstetter was not asking for a severance, she had no objection to the motion to sever Defendants Clemons and Newman.

AUSA Stone argued that the Defendants failed to meet the high bar required for severance. He argued that the Defendants were all interconnected and that the medical providers were hired by Defendant Hofstetter, managed by Hofstetter, and that Hofstetter often superseded Dr. Larson's decisions. He maintained that there exists no logical reason to sever Defendants Newman and Clemons from the trial of Defendant Hofstetter. AUSA Stone acknowledged the existence of codefendant statements that mentioned other defendants, but stated that these could be redacted. He provided the unredacted written statements as a sealed exhibit to the hearing. AUSA Stone stated that there is also an audio recording of a statement by Defendant Hofstetter to the Lenoir City police chief. He said that he did not think Hofstetter mentioned any of the codefendants but

she may have mentioned Dr. Larson in passing. The Court directed the Government to file the proposed redacted written statements by June 13, 2017, and to file the audio recording along with a transcript with redactions by June 27, 2017. On June 13, 2017, the Government filed [Docs. 209, 215] three redacted statements of codefendants under seal. On June 26, 2017, the Government filed [Docs. 217, 219] unredacted and redacted transcripts of an audio recording under seal.

One month after the motion hearing, on July 7, 2017, the Government brought a Second Superseding Indictment that added three new Defendants and new charges. At an August 17, 2017 motion hearing to continue the trial, the Court gave the new codefendants the opportunity to join in the pending pretrial motions, including the motion to sever, and gave all parties [Doc. 251] the opportunity to file supplemental briefs with regard to the severance issue. None of the new Defendants joined in the motion. As stated above, Defendant Newman moved [Doc. 252] to join the motion to sever. Neither Defendant Clemons, nor Defendant Newman, filed a supplemental brief.

On January 4, 2018, the Government brought a Third Superseding Indictment [Doc. 278] which adds three more new Defendants, two of whom are charged in the drug conspiracy, and does not charge four of the prior codefendants, two of whom were charged in the drug conspiracy. Two of the new codefendants have not yet appeared in the case. When these new Defendants appear, they will be given a motion deadline and an opportunity to join in or to oppose the Motion to Sever. In light of the changes to the charges and the addition of new codefendants, the Court finds that a ruling on the motion to sever [Doc. 178] should be deferred. Defendant Newman's Motion to Join in Co-defendant Cynthia Clemons Motion to Sever [**Doc. 252**] is **GRANTED**, and she is hereby allowed to join in the Motion to Sever. The Court **DIRECTS** the parties to reargue this motion at the **May 2, 2018** motion hearing. Defendants Clemons and Newman are **DIRECTED** to file a

supplemental brief, either jointly or separately, on or before **March 5, 2018,** addressing in particular the Defendants from whom they wish to be severed and the reasons for severance. Alternatively, they may move to withdraw their motion to sever. If Defendants Clemons and/or Newman persist in the motion to sever, the Government is **DIRECTED** to file a responsive supplemental brief by the **April 2, 2018** response deadline, addressing in particular whether the submitted statements still present a *Bruton* issue and whether any other statements must be considered in the *Bruton* analysis.

### D. Venue and Jury Questionnaire

The Court next turns to the Defendants' joint[19] Motion for Change of Venue and for Pre-Voir Dire Jury Questionnaire [Doc. 52], Motion in the Alternative to Select a Jury Panel Outside of the Eastern District of Tennessee [Doc. 152], and Defendants' Joint Motion to Distribute Juror Questionnaire [Doc. 158]. The Defendants ask the Court to move the trial of this case outside of the Eastern District of Tennessee or, alternatively, to select a jury in another district, because negative pretrial publicity regarding Defendant Hofstetter and the opioid crisis prevents a fair and impartial trial with jurors from this district. They argue that extensive and inflammatory media coverage make it impossible to select an unbiased jury here. The Defendants contend that following Defendant Hofstetter's arrest in March 2015, local and national print, televised, and internet-based media issued numerous articles on Defendant Hofstetter and the dozens of defendants in related cases. They assert that these articles contain inflammatory descriptions of Defendant Hofstetter, link Hofstetter to "organized crime" through three Florida men dubbed "the

---

[19] The Court has previously granted [Docs. 167 & 247] the Defendants' motions to join in these motions. However, the Court will not analyze this motion with respect to Defendant McCrary, who is no longer proceeding to trial.

Italians," and state that multiple individuals died as a result of the alleged drug conspiracy. They argue that due to the large number of defendants in the related cases, the memorable nature of the continuing media coverage, and the relatively small jury pool, the Court should presume prejudice in this case. The Defendants also ask to submit questionnaires before voir dire, to assess the potential jurors' exposure to pretrial publicity without risking taint to the entire jury pool.

The Government responds [Docs. 53] that the Defendants have not shown presumed prejudice in this case. It contends that presumed prejudice is only appropriate when "the trial atmosphere has been utterly corrupted by press coverage," *Murphy v. Florida*, 421 U.S. 794, 798 (1975), or when the publicity about a case has created a "circus-like atmosphere," *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007), *cert. denied*, 553 U.S. 1068 . The Government argues that the main media coverage in this case lasted for one to two weeks in 2015, was fact-based rather than inflammatory, and was not especially memorable or prejudicial. It contends that in the absence of presumed prejudice, the solution to pretrial publicity is to permit a thorough voir dire to detect actual prejudice.

The parties appeared for a hearing on the venue issue on August 12, 2016. Former defense counsel for Defendant Hofstetter argued that a change of venue is necessary in this case because the prosecution and the media have portrayed Defendant Hofstetter as a "mastermind" who purposely targeted Knoxville as the location for her pain clinics in order to poison the people here. Defense counsel maintained that because the people of Knoxville are, in essence, "the victims" of Defendant Hofstetter's alleged crimes, it is impossible to select an impartial jury from this district. Defense counsel submitted twenty-five articles and videos about this case and the defendants in the related cases, the last of which is from April 20, 2016. AUSA Stone argued that his argument at the detention hearing was based upon evidence presented at that hearing. He asserted that a

prospective juror's general familiarity with a case does not equate with impartiality. Instead, he maintained that numerous big news stories have eclipsed the early reporting on Defendant Hofstetter and that publicity in this case does not rise to a level that requires a change of venue.

In May 2017, the Defendants filed a motion [Doc. 152], providing additional reasons for either a change of venue or empaneling a jury from outside this district. They characterize the continued media coverage of this case as "relentless" and assert that this media coverage has likely biased the community against them in a way that cannot be overcome by instructions from the Court. Additionally, they argue that the six thousand patients who received treatment at the clinics managed by Defendant Hofstetter primarily lived in Knox, Anderson, Blount, Roane, Loudon, Morgan, and Scott Counties in Tennessee. They maintain that it will be impossible to empanel a jury from this district who will not know or recognize some of the patients. Furthermore, they note the logistical hurdle of questioning potential jurors about whether they know or are related to any of the six thousand patients. They contend that a change of venue, or at least empaneling a jury from outside of the district, is necessary to ensure a bias-free jury in this case.

At the June 7 motion hearing, Mr. Burks stated that this community is barraged daily with news about the opioid crisis. Moreover, he said the six thousand patients from the clinics in this case are potentially the friends or family members of the jury pool. He proposed selecting a jury from West Tennessee, who would have no connection with the pain clinics in East Tennessee. Mr. Burks argued that although the publicity about this case had diminished from what it was initially, he expected that it would ramp back up with the litigation of motions. Mr. Reagan referenced a recent article on the opioid epidemic in East Tennessee that contained a photograph of agents walking into the East Knoxville Healthcare Services clinic (the Lovell Road clinic) in this case.

Mr. Oldham stated that he feared losing jurors from the smaller communities due to their knowledge of one of the six thousand patients in this case.

AUSA Stone argued that the opioid crisis is everywhere and is not worse in this district than in other places. He said that a fair jury can be empaneled from the more than one million people in this area. He proposed that any bias could be discerned during voir dire by asking the potential jurors about their exposure to publicity in this case and whether they know anyone who has been to one of these pain clinics. He stated that by the time of trial, the parties would have a much smaller list of the patients who would be mentioned at trial and that the names of those patients could be reviewed with the potential jurors.

*(1) Venue*

The Constitution provides that a defendant has a right to be tried where the crime was allegedly committed. U.S. Const. art. III. This provision is interpreted to mean in the district where the crime is alleged to have occurred, unless a statute or rule directs otherwise. *See* Fed. R. Crim. P. 18. In the instant case, the Defendants are alleged to have conspired to distribute and dispense controlled substances outside the scope of professional practice and not for a legitimate medical purpose at pain clinics located in the Eastern District of Tennessee.[20] Accordingly, venue in this case properly lies in the Eastern District of Tennessee. The Sixth Amendment guarantees a defendant the right to a trial by an impartial jury. U.S. Const., amend. VI. This right is effectuated by impaneling a jury of impartial, "indifferent" jurors who render a verdict based on evidence adduced at trial. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). If pretrial publicity

---

[20] The Third Superseding Indictment alleges that the crimes occurred in this district "and elsewhere." The Government has explained that "elsewhere" refers to activities in Florida and possibly in Georgia.

jeopardizes a defendant's right to a fair trial by an impartial jury, the trial court should grant the defendant a change in venue. *Id.* at 722-24.

Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs where an inflammatory, "circus-like atmosphere" pervades both the courthouse and the surrounding community. *Ritchie v. Rogers*, 313 F.3d 948, 956 (6th Cir. 2002), *cert. denied*, 540 U.S. 842 (2003). Prejudice from pretrial publicity is rarely presumed. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998); *cert. denied*, 526 U.S.1075 (1999). However, a court will presume prejudice if defendant can show that his case falls within a narrow category of cases where the influence of the news media is such as to have created an inherently prejudicial environment. *See Murphy*, 421 U.S. at 798-99 (holding that prejudice is presumed where a "trial atmosphere ... utterly corrupted by press coverage ... has pervaded the proceedings").

If pretrial publicity is deemed not presumptively prejudicial, the trial court must then determine whether the publicity rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. In the Sixth Circuit, the primary tool for discerning actual prejudice is a searching voir dire of the prospective jurors. *Id.* "The court must review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant." *Foley*, 488 F.3d at 387. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality. *Nevers*, 169 F.3d at 366-67. "[M]ere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a

presumption of jury taint." *DeLisle*, 161 F.3d at 382. The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. *Irvin*, 366 U.S. at 723; *Ritchie*, 313 F.3d at 962. With this framework in mind, the Court turns to the Defendants' motion.

The Defendants argue that the Court should presume prejudice in this case because of the "relentless" media coverage of this case and the opioid crisis. A "juror's exposure to news accounts about the crime charged, standing alone, does not presumptively establish that the defendant was denied a fair trial." *United States v. Goins*, 146 F. App'x 41, 47 (6th Cir. 2005) (citations omitted). In *Skilling v. United States*, the Supreme Court examined three factors in determining whether to presume prejudice: (1) "the size and characteristics of the community in which the crime occurred"; (2) the quantity and nature of the media coverage, including whether it was "memorable" or "blatantly prejudicial"; and (3) the time that has elapsed between the media coverage and the trial. 561 U.S. 358, 382-83 (2010).

The first factor from *Skilling* weighs against presuming prejudice in this case. In *Skilling*, the Supreme Court contrasted the impact of pretrial publicity in a small town, for example the parish of 150,000 in *Rideau v. Louisiana*, 373 U.S. 732 (1963), with that in a large, diverse population, such as the 4.5 million people eligible for jury duty in Houston, Texas. *Skilling*, 561 U.S. at 382. The Court found that "[g]iven this large, diverse pool of potential jurors [in Houston], the suggestion that 12 impartial individuals could not be empaneled is hard to sustain." The Government states that the jury in this case will be drawn from a district population of approximately one million people. The jury pool will be comprised of jurors from thirteen counties in addition to Knox County. The undersigned finds that this is a sufficiently large and diverse population from which to draw twelve to fourteen jurors.

With regard to the second factor, the quality and nature of the pretrial publicity, the Court has reviewed all of the exhibits introduced by the Defendants and finds they do not support a presumption of prejudice. The Court disagrees with the Defendants' claim that the publicity about this case has been relentless. After a flurry of articles at the inception of the case, the Court perceives the news coverage of the case to be rather minimal. The twenty-seven articles[21] presented by Defendant Hofstetter as exhibits to her initial motion and at the August 12 hearing were all published within fourteen months of her Indictment on March 4, 2015. At the June 7 motion hearing, the Defendants did not present any additional articles on this case. While the Court agrees with the Defendants that general publicity about the opioid crisis in Tennessee and nationwide is pervasive, this type of general publicity about a societal issue is not the type of unfair publicity that taints the venire. The Court also finds that the specific articles from three years ago also provide no taint.

The Court also finds the quality or nature of the media coverage on this case is not particularly memorable or "blatantly prejudicial." Defendant Hofstetter points out references to her as a "drug-dealing grandmother" and a "pill-mill queen" and insinuations that this case is connected to organized crime or that she was specifically targeting this area for her alleged crimes as evidence that prejudice should be presumed. However, in *Skilling*, the Supreme Court's example of blatant prejudice, which it characterized as "information of the type readers or viewers could not reasonably be expected to shut from sight," was the "dramatically staged admission of guilt," in the *Rideau* case, which "was likely imprinted indelibly in the mind of anyone who

---

[21]Defendant Hofstetter filed eight articles as an exhibit to her motion [Doc. 52] and presented twenty-five articles as an exhibit at the August 2016 hearing. The exhibit to the hearing included all but two of the previous eight articles.

watched it." *Skilling*, 561 U.S. at 382-83.  In *Rideau*, the Supreme Court held that "prejudice to the defendant must be presumed because the community had been 'repeatedly' and 'pervasively' exposed 'to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged.'"  *Goins*, 146 F. App'x at 47 (citations omitted).  In the instant case, the Court finds that none of the publicity which the Defendants have brought forward rises to the level of a recorded confession that has been broadcast to two-thirds of the relevant population.  *Compare Rideau*, 373 U.S. at 724-26.

Finally, *Skilling* examined the time that has elapsed between the media coverage and the trial.  561 U.S. at 383.  As noted above, the case-specific publicity cited by the Defendants occurred in 2015 and early 2016.  The Government noted that there were a few articles that followed guilty pleas or sentencings of the defendants in the related cases.  The trial of this case is presently set for October 16, 2018, more than three years from the main publicity in this case.  The Court finds that the Defendants have failed to demonstrate that the pretrial publicity in this case creates a presumption of prejudice.  Accordingly, the general rule regarding change of venue applies, and this Court must look to whether or not the instant Defendants have suffered actual prejudice.

The Court perceives the Defendants' argument that potential jurors from this district will be biased because they will be related to or know of one of the six thousand patients from the pain clinics at issue to be an argument that actual prejudice exists in this case.  The way to determine the existence of actual prejudice is to conduct a thorough voir dire of the potential jurors.  *See United States v. Johnson*, 584 F.2d 148, 154 (6th Cir. 1978).  The test is whether a potential "juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court."  *Irvin*, 366 U.S. at 722-23.  The Defendants raise the practical problems associated with questioning the potential jurors about their relationship to such a large pool of

patients.  However, the Court finds that more general questions, like whether the juror has ever been or known someone who has been a patient at a pain clinic or the particular pain clinics involved in this case, will suffice to expose this type of bias.  Moreover, the fact that a potential juror has known someone who was treated at a pain clinic does not alone mean that individual would favor the prosecution or cannot be fair and impartial.  Accordingly, the Court sees no reason to depart from the time-honored method of ferreting out actual prejudice by questioning the potential jurors to determine the extent of their exposure to publicity or to pain clinics and the effect, if any, it has had upon them.  *Id.*  The Court finds that actual prejudice must be determined shortly before the jury is empaneled.  Thus, the Defendant's motions for a change in venue [**Doc. 52**], or in the alternative, to bring in an outside jury due to pretrial publicity [**Doc. 152**] are **DENIED**.

### *(2) Jury Questionnaire*

The Defendants also ask [Docs. 52 and 158] the Court to submit a jury questionnaire to prospective jurors before voir dire.  They argue that a jury questionnaire is necessary in this case to cull out efficiently those potential jurors who know one of the one hundred plus defendants in the related cases and to permit jurors to answer potentially sensitive questions about whether they or their family members have ever received treatment at one of the pain clinics at issue and/or used prescription pain killers.  The Government initially responded [Doc. 53] that it "would not object to a procedure that would permit both parties to review and respond to proposed jury questionnaires to the extent doing so would assist the Court in the jury selection process."  At a motion hearing on August 12, 2016, the Court permitted counsel for Defendant Hofstetter to submit a proposed jury questionnaire.

On September 2, 2016, Defendant Hofstetter filed a Proposed Procedure for Administering Pre-voir Dire Jury Questionnaire and Jury Selection [Doc. 67 (*see also* Doc. 68, duplicate filing)], attaching a proposed fifteen-page jury questionnaire. The Government responded [Doc. 69] in opposition to the proposed questionnaire, characterizing it as self-serving, duplicative of the Court's standard questionnaire, and essentially argument in the form of questions. Defendants Hofstetter, Newman, and Clemons do not seek to use the previously submitted jury questionnaire but, instead, state that they intend "to prepare a juror questionnaire, share it with the Assistant United States Attorneys handling the case, and then work together toward a juror questionnaire that will be acceptable to both sides."[22] [Doc. 158, p.1] The Government responds [Doc. 196, p.1] that the matter of a jury questionnaire has already been argued and that it "does not want to get into a position of reviewing multiple, proposed jury questionnaires until the defendants hit on one the Court might approve." In this regard, it asserts that the Court's standard questionnaire and voir dire on the issues more specific to this case will suffice and asks the Court to deny the Defendant's motion for a jury questionnaire.

The United States Supreme Court has held that Rule 24(a) of the Federal Rules of Criminal Procedure grants federal judges "ample discretion in determining how best to conduct voir dire." Mu'Min v. Virginia, 500 U.S. 415, 423 (1991). Thus, as a general rule, matters relating to the selection and seating of jurors are within the sound discretion of the trial judge. The Court finds that the issue of the distribution of a jury questionnaire is more properly addressed to the Chief District Judge closer in time to the actual trial. The Defendants' Joint Motion to Distribute Juror Questionnaire [**Doc. 158**] is **DENIED as premature**, without prejudice to refile the motion with

---

[22] At the June 7 hearing, Mr. Burks said that defense counsel would confer and determine, within a couple of weeks, whether they wanted to submit a new proposed jury questionnaire. However, Defendants did not submit a proposed questionnaire following that hearing.

a proposed juror questionnaire and distribution procedure attached by no later than **one month before trial**.

## E. Correction of the Record

Defendant Newman, joined by Defendants Hofstetter and Clemons, ask [Doc. 173] the Court to order the Clerk to correct the record in this case. The Defendants contend that the Government filed the expert report of Dr. John Blake [SEALED Doc. 137-12] on May 17, 2017, and that the report was signed by Dr. Blake on that same day. However, the date stamp on the report shows a filed date of "04/17/17." The Defendants argue that this stamp is clearly incorrect and they ask that it be corrected in the event that this document were to come into question at trial or on appeal.

The Government disputes [Doc. 195] that the record is incorrect. It explains that Dr. Blake's full report was not complete by the April 17, 2017 deadline for the Government's expert disclosures, so it, instead, filed a summary of Dr. Blake's chart reviews to that date. The Government states that it included a footnote in its expert summary [Doc. 137, p.5 n.2], stating that AUSA Stone anticipates receiving Dr. Blake's full report within thirty days and will determine whether any party objects to the Government supplementing its expert disclosures with that report. The footnote continues that in the event of an objection, the Government will seek leave of Court to file the report.

The Government states that it received Dr. Blake's full report on May 17, 2017, and filed the report [Doc. 169] along with a motion to seal [Doc. 168] on that day. The Government admits that in its haste to file the report, AUSA Stone forgot to determine in advance whether any party would object to the supplemental filing. The Government contends that following the Court's

granting [Doc. 170] of the motion to seal, the Clerk docketed Dr. Blake's report as SEALED Document 137-12, which is the document number for the previously filed chart summary. It points out that the text entry on both Document 169 (the provisionally sealed full report by Dr. Blake) and Document 137-12 (the sealed attachment to the Government's April 17, 2017 expert disclosures) clearly state that the exhibit was added on May 18, 2017, pursuant to the Court's sealing Order [Doc. 170]. Accordingly, the Government maintains that there is no need to correct the record.

The Court makes the following factual findings with regard to the expert report of Dr. John Blake: On October 27, 2016, the Court set [Doc. 100] the Government's deadline for expert disclosures pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) for April 17, 2017. Although the Court modified [Doc. 123] some deadlines on March 13, 2017, it expressly did not change the April 17, 2017 deadline for the Government's expert disclosures. On April 17, 2017, the Government filed the Government's Notice of Expert Testimony Pursuant to Rule 16 of the Federal Rules of Criminal Procedure and this Court's Order Entered on October 27, 2016 [Doc. 137]. In this Notice, the Government lists Dr. John Blake as one of its experts, provides a summary of Dr. Blake's qualifications, and quotes a two-page summary of Dr. Blake's anticipated testimony. The Government attached the curriculum vitae [Doc. 137, Exh. 3] of Dr. Blake to its Notice and stated that it "will supplement this Notice with a full report by Dr. Blake upon receipt." [Doc. 137, p.5]. In its April 17, 2017 Notice, the Government included the following footnote:

> The United States anticipates receiving the full report from Dr. Blake within 30 days of this filing, and will try to determine whether any party objects to its being filed as a supplement before filing it. If any party objects, the United States [will] seek leave of Court to file the report. It is anticipated, however, that the defendants will want more specificity as to Dr. Blake's opinions before he testifies, not less.

[Doc. 137, p.5 n.2]

The Court finds that on May 17, 2017, the Government filed a Motion for Leave to File Document Under Seal [Doc. 168], along with a provisionally sealed document [Doc. 169], which was Dr. Blake's full expert report, signed by Dr. Blake on May 17, 2017.  The Government asked to seal this document due to the sensitive nature of its contents and stated that it is a supplement to its Notice of April 17, 2017.  On May 18, 2017, the undersigned granted [Doc. 170] the Government's motion to seal Dr. Blake's report and directed the Clerk of Court to file the proposed sealed document (Dr. Blake's report) under seal and to provide copies to counsel for all Defendants.  The docket entry for the provisionally sealed Document 169 (Dr. Blake's report) states that this document was "(refiled as Doc. [137-12]) SEALED[.] . . . . (Entered: 05/17/2017)." The docket entry for Exhibit 12 to Document 137 states "(Additional attachment(s) added on 5/18/2017: # 12 Exhibit Sealed pursuant to Order [Doc. 170])[.]"  The Court finds that this docket entry clearly reveals that Sealed Exhibit 12 to the Government's Notice was added on May 18, 2017.

The Court additionally finds that when opened, Exhibit 12 (Dr. Blake's report) bears a footer stating, in pertinent part, "Filed 04/17/17".  The Court finds that this date stamp is automatically generated by the electronic filing system because the document to which it is attached (the Government's Notice [Doc. 137]) was filed on that date.  The Court finds that a printout of Dr. Blake's report [137-12] bears the incorrect footer "Filed 04/17/17."  The Court finds that the date stamp on the footer of Dr. Blake's report is incorrect and is automatically generated by the electronic filing system.  The Court also finds that although the Government did not determine whether the Defendant's objected to the Government's supplementation of its

Notice with Dr. Blake's full report, the Government has at all times admitted and conceded the untimeliness of the report and that it filed the report on May 17, 2017.

The Court further finds that at the June 7, 2017 motion hearing, it denied [Doc. 206] the Defendants' motion to exclude Dr. Blake's report as untimely and in turn granted the Defendants' request for additional time to make defense expert disclosures. The undersigned has now continued the trial to October 16, 2018, and reset the dates for expert disclosures and for motions challenging experts.[23] Accordingly, the Court finds that the late filing of Dr. Blake's expert report is of no moment. Although Exhibit 12 to Document 137 bears an incorrect date of April 17, 2017, on the footer that is automatically generated by the Court's electronic filing system, the text entries relating to that exhibit clearly state that it was filed on May 17 and 18, 2017. Accordingly, because the timing of the filing of Dr. Blake's report is no longer a matter in controversy and because the docket text clearly states the correct filing date, the Court finds that Defendants' Motion to Correct the Record [**Doc. 173**] is **DENIED as moot**. The Clerk of Court is **DIRECTED** to add a reference to this Memorandum and Order in the docket text of Document 137, Exhibit 12.

### III.     CONCLUSION

For the reasons stated herein, the Court **ORDERS** as follows:

(1) The Motion of Defendant Theodore McCrary to Adopt Co-defendant Cynthia Clemons' Motion to Sever [**Doc. 255**] is **DENIED as moot** and the other pending pretrial motions, in which Defendant McCrary has joined, are **MOOT** as to him;

(2) The Defendants' joint motions for a bill of particulars [**Docs. 115 and 182**] are **DENIED**;

---

[23] The Court notes that it has held the Defendants' Joint Motion to Exclude Reported Expert Opinions [Doc. 157] in abeyance until the new deadline for motions challenging experts in order to determine whether the Government will still seek to use the experts challenged therein.

(3) Defendant Sylvia Hofstetter, Cynthia Clemons, and Courtney Newman's Motion *in Limine* to Compel the Government to Produce Original Patient Files Pursuant to Federal Rule of Evidence 1002 [**Doc. 151**] is **DENIED as both moot and premature**, without prejudice to raise the issue again as a motion *in limine*;

(4) The Defendants' Joint Motion to Suppress Statements of Alleged Co-Conspirator or in Alternative Motion for a[n] Enright Hearing [**Doc. 156**] is **DENIED**;

(5) The Defendants' joint First Specific Brady Motion for Disclosure of Specific Items of Impeaching Information [**Doc. 184**] is **DENIED as moot** without prejudice to refile in the form of a motion for the early disclosure of Jencks materials by the deadline for concluding plea negotiations, which is presently set for **August 31, 2018**;

(6) The Court defers ruling on the Defendants' joint Motion for a Witness List [Doc. 175] and Motion for Designation of Specific Evidence the Government Intends to Use in Its Case-in-Chief [Doc. 177] and **DIRECTS** Defendants Hofstetter, Newman, and Clemons and the Government to reargue these motions at the **May 2, 2018** motion hearing. The Court will expect the Government to present a proposal for further narrowing of the patients whom it may call and the patient files it may seek to use and/or introduce at trial. The Defendants may file supplemental briefs on these motions on or before the **March 5, 2018**. The Government may file a responding supplemental brief by the **April 2, 2018** response deadline;

(7) Defendant Newman's Motion to Join in Co-defendant Cynthia Clemons Motion to Sever [**Doc. 252**] is **GRANTED**;

(8) The Motion to Sever [Doc. 178] is deferred. The Court **DIRECTS** Defendants Clemons and Newman and the Government to reargue this motion at the **May 2, 2018** motion hearing. Defendants Clemons and Newman are **DIRECTED** to file a supplemental brief, either jointly or separately, on or before **March 5, 2018,** addressing in particular the Defendants from whom they wish to be severed and the reasons for severance. Alternatively, they may move to withdraw their Motion to Sever. If Defendants Clemons and/or Newman persist in the Motion to Sever, the Government is **DIRECTED** to file a responsive supplemental brief by the **April 2, 2018** response deadline, addressing in particular whether the submitted statements still present a *Bruton* issue and whether any other statements must be considered in the *Bruton* analysis;

(9)  The Defendant's motions for a change in venue [**Doc. 52**], or in the alternative, to bring in an outside jury due to pretrial publicity [**Doc. 152**] are **DENIED**;

(10)  The Defendants' Joint Motion to Distribute Juror Questionnaire [**Doc. 158**] is **DENIED as premature**, without prejudice to refile the motion with a proposed juror questionnaire and distribution procedure attached by no later than ***one month before trial***; and

(11)  Defendants' Motion to Correct the Record [**Doc. 173**] is **DENIED as moot**.  The Clerk of Court is **DIRECTED** to add a reference to this Memorandum and Order in the docket text of Document 137, Exhibit 12.

**IT IS SO ORDERED.**

ENTER:

_____s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge