IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
v.                                 )
                                   )          No. 3:15-CR-27-TAV-DCP
SYLVIA HOFSTETTER and              )
CYNTHIA CLEMONS,                   )
                                   )
                Defendants.        )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the district court

as may be appropriate. This matter is before the Court upon Defendant Sylvia Hofstetter's Motion

to Suppress (Spoiliation) and for Adverse Inference Jury Instruction [Doc. 405], filed on January

7, 2019, as amended on January 10, 2019 [Doc. 410]. Defendant Cynthia Clemons moved to join

in the motion. [Doc. 409]. The Government filed a response in opposition to the motion. [Doc.

423]. An evidentiary hearing on the motion was held on February 13, 2019. Assistant United

States Attorneys Tracy L. Stone and Kelly K. Pearson appeared on behalf of the Government.

Attorneys Charles C. Burkes, Jr. and Loretta G. Cravens represented Defendant Hofstetter, who

was also present. Attorney Randall E. Reagan appeared on behalf of Defendant Clemons, who

was excused from attending the motion hearing. [Doc. 428].[1] At the conclusion of the hearing,

the Court took the suppression motion and related filings under advisement.

---

[1] Several motions were scheduled for hearing on this date, and while not joining in this
particular motion, Attorney Christopher J. Oldham was present representing Defendant Newman,
whose attendance at hearing was excused [Doc. 427], and Attorney Christopher Rodgers appeared
on behalf of Defendant Womack, who was present.

## I. POSITIONS OF THE PARTIES

Defendants Hofstetter and Clemons seek to suppress all evidence of the treatment of patients at the Urgent Care and Surgery Center's Hollywood Clinic ("Hollywood Clinic") associated with patient files ("the Records") that were seized by the Drug Enforcement Administration ("DEA") on December 13, 2010, and later destroyed without having been produced to Defendants in discovery. Defendants argue that the Government "intentionally destroyed critical evidence that cannot be obtained from other sources when the exculpatory value of that evidence was or should have been apparent to the government," which thereby violated their due process right to access exculpatory evidence. [Doc. 405 at 6]. In the alternative, Defendants request a curative instruction to the jury providing for an inference that the Records would have been exculpatory for Defendants and unfavorable to the Government. [*Id.*].

The Government argues that no due process violation occurred because the destroyed Records were not materially exculpatory, and the Government did not fail to preserve them in bad faith, as they were destroyed in accordance with DEA policy. [Doc. 423 at 1]. Further, the Government maintains that the Federal Bureau of Investigation ("FBI") attempted to preserve the Records but was unsuccessful in preventing their destruction due to ineffective communication between multiple agencies in different states. [*Id.*]. The Government notes that upon learning of the destruction, steps were taken to mitigate any harm, including asking the DEA to stop destroying the Records; making arrangements to collect the undestroyed Records from the DEA and to collect duplicate evidence from a former DEA Task Force Officer; and obtaining similar evidence in an effort to replicate some of the destroyed evidence. [Doc. 423 at 2].

## II. PROCEDURAL AND FACTUAL BACKGROUND

The Fourth Superseding Indictment [Doc. 320] ("Indictment") alleges twenty-one counts against Defendant Hofstetter and others. Defendant Hofstetter is charged with a conspiracy under the Racketeer Influenced and Corrupt Organization Act ("RICO"), two conspiracies to distribute and dispense controlled substances illegally, two money laundering conspiracies, five counts of money laundering, three counts of maintaining a drug-involved premises, and six counts of illegally distributing and dispensing controlled substances. [*Id.* at ¶¶ 29, 60, 71, 73, 82, 84, 88, 90, 92, 94, 99, 104, 109, 114, & 119]. In Count One, Defendant Hofstetter is charged under RICO with engaging in a conspiracy in violation of 18 U.S.C. § 1962(d). As a part of that charge, the Indictment sets out that "[f]rom in or about April 2009 through in or about January 2011, medical providers at the Hollywood Clinic prescribed opioids and other controlled substances to thousands of purported pain patients in exchange for grossly excessive fees. The Hollywood Clinic did not accept insurance for pain patients. The majority of the prescriptions were unreasonable and medically unnecessary." [*Id.* at ¶ 9]. Defendant Hofstetter is charged with involvement in a criminal organization known as the Urgent Care & Surgery Center Enterprise ("UCSC enterprise") that operated pain clinics in Florida and Tennessee and engaged in "drug trafficking, money laundering, and wire fraud." [*Id.* at ¶¶ 8, 29]. The Indictment charges that the "UCSC enterprise would service customers by distributing mass quantities of narcotics via the Pain Clinics. Thus, the 'Urgent Care and Surgery Centers' were, in reality, pill mills." [*Id.* at ¶ 30].

Defendant Clemons is also charged in the Indictment with two counts of conspiracy to distribute and dispense controlled substances "outside the scope of professional practice and not for a legitimate medical purpose," two counts of maintaining a drug-involved premises, and four counts of illegally distributing and dispensing controlled substances. [*Id.* at ¶¶ 60, 73, 88, 92, 99,

3

104, 114, & 119]. However, unlike Defendant Hofstetter, Defendant Clemons is not alleged to have been involved with the operations of the Hollywood Clinic and is not charged with a RICO conspiracy under Count One. Defendant Clemons states that she moves to join [Doc. 409] in the instant Motion to Suppress (Spoiliation) regarding the Records, because despite not being charged under Count One, there are factual allegations against her in that count. [See Doc. 446 at 193]. During the motion hearing, the Court raised the issue of whether Defendant Clemons has standing, due to her lack of involvement in the Hollywood Clinic, which will be analyzed in Section III, part A below.

At the evidentiary hearing, the Government presented the testimony of three witnesses: Kris Mynatt ("Mynatt"), a detective with the Roane County Sheriff's Office and assigned to the FBI Drug and Violent Crime Task Force in Knoxville; Timothy Wroblewski ("Wroblewski"), a special agent with DEA; and Dana Doklean ("Doklean"), a current detective with the City of Hollywood, Florida Police Department, who was formerly assigned to the DEA task force known as the Tactical Diversion Squad ("TDS"). Defendants presented no witnesses. The following facts are taken from the testimony at the suppression hearing as well as records introduced into evidence.

In May of 2009, Doklean was assigned to the TDS pursuant to a Memorandum of Understanding between her local agency, the Hollywood Police Department, and the DEA. [See Doc. 446 at 126, 165]. The TDS was responsible for a new initiative involving the investigation of pharmaceutical crimes in South Florida. [Id. at 99–100]. She explained that at that time, the State of Florida did not have a prescription monitoring program, so there was an increase in the number of pain clinics "within our jurisdiction in a period of just a few years." [Id. at 100]. Doklean stated that people were traveling from Ohio, Kentucky, West Virginia, and Tennessee to

4

South Florida to "doctor shop around" and get prescription opioid pills. [*Id.*]. She testified that they were able to leave South Florida "with thousands of dose units per individuals quite frequently" because without a prescription monitoring program, there was no way to track the prescribed dose units. [*Id.*]. Individuals were able to go to multiple doctors and receive prescriptions for controlled substances as there was no way of knowing another doctor had issued a prescription "other than the patient[s] themselves being truthful. . ." [*Id.* at 101].

In early 2010, Doklean became involved with an investigation of the Hollywood Clinic, located at 3500 Hollywood Boulevard. [*Id.* at 102]. She testified that at that time, the TDS was investigating "dozens of clinics" in South Florida [*Id.* at 103] with nearly "a hundred officers or agents with the whole operation." [*Id.* at 104]. There were over twenty task force officers, along with officers flown in from all across the country, for special operations—such as conducting undercover visits. [*Id.*]. Doklean testified that with respect to the Hollywood Clinic, there were complaints coming from medical boards, as well as complaints from law enforcement in the Appalachian areas that were seeing prescriptions from the Hollywood Clinic in those areas. [*Id.* at 105]. In investigating the Hollywood Clinic, Doklean stated that several techniques were utilized, such as surveillance, undercover officers, traffic stops, consensual encounters, and different types of reports, including ACROS,[2] concerning the number of dose units being dispensed. [*Id.*].

---

[2] Automation of Reports and Consolidated Orders System (ARCOS) is an automated drug reporting system "which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution" and accumulates the information into summarized reports for use by federal and state government agency investigators to identify potential criminal violations. *See Background: What is ARCOS and What Does it Do?*, U.S. DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT AGENCY—DIVERSION CONTROL DIVISION, http://www.deadiversion.usdoj.gov/arcos/index.html (last visited April 3, 2019).

5

Surveillance of the Hollywood Clinic revealed "a lot of young people...that [were not] typical to a legitimate pain management facility." [*Id.* at 107]. In addition, there were a lot of people from outside areas such as Kentucky, Ohio, West Virginia, and Tennessee. [*Id.* at 106]. Oftentimes, individuals at the clinic had a "sponsor," which Doklean described as the driver of a vehicle bringing two or three people to the clinic together as patients. [*Id.* at 106–07]. There were also four undercover agents utilized in the investigation, who made covert audio recordings of their patient visits. [*Id.* at 108–09]. Patients who were interviewed coming out of the Hollywood Clinic reported being prescribed "the same cocktail of medications...oxycodone for...24-hour dosage, which would be typically the 30-milligram...a breakthrough with either Percocet or 15-milligram oxycodone, and then they had the cocktail of either the Soma and the ibuprofen, and then the Xanax, two milligrams," regardless of their height and weight. [*Id.* at 111–12]. Further, the interviews indicated that patients of the clinic were not being offered "other types of modalities," or options such as referrals to a surgeon or physical therapy; as "the only thing that the doctor did was write...prescriptions." [*Id.* at 112].

The investigation of the Hollywood Clinic continued for approximately one year, and at the conclusion of the investigation, a search warrant was served on the clinic in December of 2010. [*Id.* at 113]. Further details of the investigation are detailed in Doklean's Affidavit in support of the Application for a Search Warrant [Exh. 8]. Doklean testified that she was involved in the execution of the search warrant. [*Id.* at 114–15]. The evidence collected from the Hollywood Clinic is set forth in the DEA Acquisition of Nondrug Seizure forms [Exh. 9]. Doklean testified that, as indicated on the return of the search warrant, all of the patient files inside of the Hollywood Clinic were seized, which totaled approximately 1900 files. [*Id.* at 127]. She explained that while all of the patient files were taken from the clinic, only the undercover agent files were pulled and

6

reviewed. [*Id.* at 128]. Doklean testified that she did not look at the 1900 patient files and did not know what was inside those files. [*Id.*]. At that time, Doklean did not know whether or not the prosecutor would be going through the files or an expert would be performing a sampling of the patient files. [*Id.* at 127–28].

At some point following the execution of the search warrant, Doklean presented the case regarding the Hollywood Clinic to the U.S. Attorney's Office in Fort Lauderdale. [*Id.* at 116]. She explained that it was not a formal presentation, but rather a discussion about "the undercovers, what was occurring, what had taken place" due to "so many cases that were being presented at the same time because of the epidemic we were having there." [*Id.*]. Doklean testified that the case was not accepted for prosecution because the U.S. Attorney's Office was "overwhelmed with cases. And so certain cases would jump rank...because of the fact that it is so manpower and so labor intensive, that only those case[s] that were the most egregious with deaths and things...were being taken at the time." [*Id.* at 118–19].[3]

After U.S. Attorney's Office declined to prosecute the case, the DEA put the Hollywood Clinic case into inactive status, but the file was not closed. Doklean explained that a case cannot be closed out "until all the evidence and everything is officially destroyed." [*Id.* at 119]. She further explained that with investigations of clinics where patient files are collected, "there was an understanding that there was a [State of Florida] medical board requirement for five years from the date of our seizure for destruction of the patient files." [Doc. 446 at 119–20].

---

[3] Doklean initially stated that there had been "maybe less than 20" deaths of patients from Hollywood Clinic. [*Id.* at 142]. However, Doklean later clarified that this number resulted from calculating a death index from "within a short period of time," where patients died within days of "being prescribed or seeing the doctor at urgent care." [*Id.* at 175–76]. Doklean stated that she later investigated more than twenty deaths of clinic patients within a longer period of time. [*Id.* at 175].

7

While the Hollywood Clinic case remained in inactive status, the FBI began an investigation in 2013 or 2014 into clinics operating in Tennessee. [*Id.* at 8, 12]. Mynatt, a detective with the Roane County Sheriff's Office and assigned to the FBI Drug and Violent Crime Task Force in Knoxville, was assigned to that the investigation leading up to the indictment in the instant case. [*Id.* at 8]. Mynatt testified that he had knowledge that there had been some investigation by DEA in Florida of the Hollywood Clinic, owned by Defendants Sartini, Palma, and Rodriguez, the same ownership group of the Tennessee clinics under investigation by the FBI. [*Id.* at 11]. He was also aware that the DEA had executed a search warrant at the Hollywood Clinic in December of 2010. [*Id.*].

When Mynatt learned of the Hollywood Clinic with the same ownership group, he began making calls to several DEA offices in Miami to track down the squad that was in charge of the investigation. [*Id.* at 13]. He eventually made contact with Doklean. Mynatt testified that he communicated with Doklean about the matter through at least two or three phone calls, as well as email correspondence. [*Id.* at 13–14]. Specifically, Mynatt had an email communication with Doklean on November 13, 2015, in follow up to telephone conversations regarding his efforts to access the DEA case file in Florida. [*Id.* at 14–15, & Exh. 1]. Mynatt testified that Doklean was very cooperative and "excited that we might have an interest in this case because…apparently, it wasn't prosecuted in her district due to just the sheer volume of clinic cases they had there at the time." [*Id.* at 15].

At that time, Mynatt understood Doklean to be the agent in charge of the file concerning the Hollywood Clinic investigation. [*Id.* at 43]. While Mynatt and Doklean had not "gone into specifics about what all was in the file," Mynatt testified that Doklean understood he wanted to review the entire file. [*Id.*]. He stated that the November 13, 2015 email reflected Doklean's

8

"attempts to put some of the file onto a disc to send to us to start a preliminary review." [*Id.* at 16]. In addition, Mynatt testified that they "were also trying to coordinate times for an investigative team to come down to Florida and actually review the files there at DEA in Miami." [*Id.*]. While trying to schedule the trip, Mynatt explained that there were delays in the communication with Doklean, because at this same time, he was involved with a murder investigation in Roane County, which involved travel to Hawaii and Guam for a period of time to bring back a prisoner. [*Id.*]. They agreed "to reconnect after the holidays sometime in 2016." [*Id.* at 18].

Mynatt testified that when he began trying to reconnect with Doklean, neither his telephone calls nor e-mails were returned. [*Id.*]. After some period of time without having received a response from Doklean, Mynatt reached out to the DEA again and eventually learned that Doklean was no longer with the DEA. [*Id.* at 19]. While not having mentioned her circumstances to Mynatt when he first contacted her concerning the Hollywood Clinic file, Doklean testified at the hearing that she started transitioning out of the DEA task force and back to work for her base agency, the Hollywood Police Department, in the summer of 2015. [*Id.* at 120]. She explained that on July 10, 2015, she had lost her husband due to a sudden cardiac death. [*Id.* at 120, 163]. Because of her small children, Doklean started transitioning back to the Hollywood Police Department in order to have a more flexible work schedule. [*Id.* at 120].

Doklean's transition back to the Hollywood Police Department took some time in order to work through the Memorandum of Understanding between the DEA and the local agency regarding her removal from the task force position, so she was "still officially with the DEA until . . . May of 2016." [*Id.* at 126, 165]. She explained that while she was not working in the DEA office during the transition time, she still had her DEA credentials. [*Id.* at 127–28]. She clarified

9

that as she tried to "clean up some things" and go through emails, she would have to be physically at the DEA office, especially to use the DOJ email account. [*Id.* at 165]. She explained that she continued to go in to the DEA office "once every two, three weeks . . . for a little bit." [*Id.* at 170].

Doklean testified that between the time of her husband's death and her official departure from the DEA in 2016, she was not handling any cases, including the Hollywood Clinic case, and that all of her files were transferred out to other agents. [*Id.* at 143]. The Hollywood Clinic file was transferred to Wroblewski, who joined TDS "towards the end of 2015, beginning of 2016." [*Id.* at 56–57]. Wroblewski testified that he had no involvement with the investigation of the Hollywood Clinic, and that after being assigned the case, he never reviewed any of the evidence or read any reports associated with the Hollywood Clinic. [*Id.* at 58]. He stated that his boss, Paul Toner, told him to "close this case out," because it had been five years. [*Id.* at 59]. Wroblewski explained that closing a case out meant "you look through and see what exhibits need to be destroyed, do the paperwork to get the exhibits destroyed." [*Id.*].

On January 27, 2016, Wroblewski completed several 48-A forms, which are used to begin the records destruction process within the DEA. [Doc. 446 at 60]. [Exhs. 5, 6, and 7]. Wroblewski testified that prior to that date, he never had an occasion to talk with Doklean about the Hollywood Clinic case. [*Id.* at 63]. Doklean confirmed that she never briefed Wroblewski on the case [*Id.* at 121] or documented her contact with Mynatt in the Hollywood Clinic file [*Id.* at 166]. Doklean testified that she was aware that the end of the five-year retention period for the file was coming up in December 2015 [*Id.* at 168], but she did not make Mynatt aware of this when he contacted her in late 2015 requesting to review the file in relation to the investigation in Tennessee. [*Id.* at 143-144, 168]. When asked on cross-examination whether she thought it would be important to let whoever is taking over the file know not to destroy it because "Knoxville, Tennessee might

10

need it," Doklean responded that at that point she was "in survival mode," as she was going through a "very traumatic period personally." [*Id.* at 167, 174].

With respect to effectuating this destruction and closing the Hollywood Clinic case, Wroblewski testified that in doing so, he comported with the DEA policies and procedures in place in 2016. [*Id.* at 63]. He stated that he started the destruction in January of 2016, before knowing that a case in Knoxville was being investigated. [*Id.* at 75]. He completed a set of Form 48-As in January 2016 [Exh. 5], another set in March 2016 [Exh. 6], and a final set in August 2016 [Exh. 7]. Wroblewski was first contacted by Mynatt about the case in Knoxville in June 2016 [Doc. 446 at 72–73], after the approximate 1,900 patient files had been destroyed on March 9, 2016. [*See* Exh. 6.]. He stated that he had no knowledge of what was going on in Tennessee with respect to an FBI investigation prior to Mynatt reaching out to him. [Doc. 446 at 64].

Mynatt testified that after finding out Doklean was no longer with the DEA, he was ultimately put in contact with Wroblewski about the Hollywood Clinic file by Robert Bella ("Bella"), a special agent with the DEA Miami. [*Id.* at 19]. Bella advised Mynatt that Wroblewski, who was an actual DEA agent and not a task force officer, had been assigned to the case. [*Id.* at 20]. In an email on June 16, 2016, from Bella to Mynatt, Bella advised, "I believe that Special Agent Tim Wroblewski is taking care of the case and it appears the case is in the process of being closed." [Doc. 446 at 20–21; *see* Exh. 2]. Mynatt testified that he took this information to mean only that the case "wasn't being worked any longer," and that it did not trigger in his mind that some evidence might be destroyed. [Doc. 446 at 21–22].

After receiving Wroblewski's contact information, Mynatt began communicating with him through phone calls and emails for the purpose of trying to access the DEA file. [*Id.* at 23–24]. On June 21, 2016, Mynatt sent an email to Wroblewski following up from a previous phone call

11

discussion about a review of the case. [*Id.* at 24; *see* Exh. 3]. Wroblewski responded the next day, stating that he had spoken with his boss and Doklean, and that there was no problem with Mynatt reviewing the case. [Exh. 3]. He further advised that Doklean was no longer with the DEA and provided her new contact phone number to Mynatt. [Doc. 446 at 24–25; Exh. 3]. Mynatt understood Wroblewski's role to be "just the logistics" in providing access to the file because Doklean, who was no longer with the DEA, did not have access to the file. [Doc. 446 at 25]. He further understood that because Wroblewski was not involved in the investigation, Doklean would be reviewing the case file with him. [*Id.*].

During his communications with Wroblewski concerning review of the case file, Mynatt stated that Wroblewski never indicated to him that files were being destroyed. [*Id.* at 26]. He testified that Wroblewski was willing to be helpful and accommodating [*Id.* at 24], and made recommendations to assist him in potentially accessing the electronic portions of the file through the DEA office in Knoxville. [*Id.* at 26]. Mynatt explained that the electronic portion of the file would include documentation that was in the DEA system, such as the DEA investigative report, known as a "DEA-6," but would not include the evidence or anything that had not been scanned into the electronic system. [*Id.* at 27]. In the email communication string between Mynatt and Wroblewski at the end of June 2016, Mynatt advised that he planned to travel to Miami the following month to "review records and possibly talk to anyone who might be helpful." [Exh. 3]. Mynatt further stated that he would reach out to Doklean and "see if she will be available to guide me through the case since she appears to be the most knowledgeable," while acknowledging that Wroblewski would have to coordinate their access to the file, since Doklean was no longer with the DEA. [*Id.*]. There was no further evidence presented at the hearing concerning additional communications between Mynatt and either Wroblewski or Doklean. Wroblewski acknowledged

12

that he authorized further file destruction, including hard drives and DVDs on August 30, 2016, [*see* Exh. 7], even after becoming aware in June 2016 that agents in Knoxville wanted to review the files. [Doc. 446 at 74]. When asked on cross-examination the reason for that, he replied, "I guess my boss wanted the case closed, so I closed it out." [*Id.*].

Approximately six months after his last email communication with Wroblewski, Mynatt connected with DEA Special Agent James Blanton ("Blanton") in Knoxville in an effort to access the electronic file locally. [*Id.* at 27–28]. In an email dated January 5, 2017, Mynatt advised Blanton of the superseding indictment against Defendant Hofstetter, which included a conspiracy period covering the time she was employed at the Hollywood Clinic, and noted that the files would need to be turned over in discovery. [*Id.* at 28; Exh 4]. Blanton expressed to Mynatt some concerns regarding what information he would be allowed to share per internal DEA rules, so Mynatt put Blanton in touch with AUSA Stone for further discussion of the matter. [Doc. 446 at 29–30]. This was the last involvement by Mynatt in the efforts to access the Hollywood Clinic file. [*Id.* at 29]. Mynatt later rotated off of the prosecution investigative team, and, at some point, learned that some of the Hollywood Clinic files had been destroyed. [*Id.* at 31, 33].

## III. ANALYSIS

Defendants Hofstetter and Clemons claim that their due process right to access exculpatory evidence was violated, because the Government intentionally destroyed the Records when the exculpatory value of the Records was or should have been apparent to the Government and that the information contained in the Records cannot be obtained from other sources.

The Court will first address Defendant Clemons's standing to raise a due process challenge with regard to the Records. Then, the Court will analyze the due process claim.

13

## A. Standing

Defendant Clemons asks [Doc. 409] to join in Defendant Hofstetter's Motion to Suppress (Spoiliation) and for Adverse Inference Jury Instruction, despite not being charged under Count One (the RICO conspiracy count). During the motion hearing, the Court raised the issue of standing regarding Defendant Clemons, due to her lack of involvement in the Hollywood Clinic. However, Defendant Clemons stated that the factual allegations against her in the RICO charge of the indictment provide standing to adopt the motion filed by Defendant Hofstetter.

First, the Court must analyze whether Defendant Clemons has a recognized privacy interest—or what is commonly known as "standing"—in the Records from the Hollywood Clinic in order for her to assert a due process violation based on their destruction. *See United States v. Ellis*, 125 F. App'x 691, 695 (6th Cir. 2005) (holding that it is "incumbent" upon the Court to determine whether a party has "standing to challenge the constitutionality of the officers' actions[,]" even when the issue of standing is not raised by the parties).

The Sixth Circuit has found that "because Fourth Amendment rights are personal, suppression of evidence as 'the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'" *United States v. Powell*, 847 F.3d 760, 768 (6th Cir.) (quoting *United States v. Padilla*, 508 U.S. 77, 81–82 (1993) (per curiam)), *cert. denied*, 138 S. Ct. 143 (2017). In the instant case, Defendant Clemons did not work at the Hollywood Clinic, nor is she charged in RICO count. Thus, although her name is mentioned in the RICO count of the Indictment, Defendant Clemons has "no special standing" to challenge the introduction of records seized, and ultimately destroyed, from the Hollywood Clinic. *See, e.g., Alderman v. United States*, 394 U.S. 165, 171–72 (1969) (holding that "[c]o-conspirators and

14

codefendants have been accorded no special standing" to challenge the violation of others' Fourth Amendment rights)). Accordingly, Defendant Clemons clearly could not join a Fourth Amendment challenge by Defendant Hofstetter to the seizure of the Records from the Hollywood Clinic. Here, however, Defendant Hofstetter raises a Fifth Amendment due process challenge to the evidence obtained from the Hollywood Clinic.

A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499 (1975). As a general rule, third-party standing is disfavored: "'Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party.'" *Singleton v. Wulff,* 428 U.S. 106, 114 (1976) (quoting *Barrows v. Jackson,* 346 U.S. 249, 255 (1953)). In *Powers v. Ohio,* the Supreme Court summarized the "limited exceptions" to the fact that a litigant "cannot rest a claim to relief on the legal rights or interests of third parties," by requiring "three important criteria [to be] satisfied:"

> The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

499 U.S. 400, 411 (1991) (internal citations omitted).

Although Defendant Clemons claims that factual allegations against her in the RICO count constitute standing to assert a due process violation, she does not possess third-party standing to assert this constitutional claim, because she cannot meet the criteria the Supreme Court set out in *Powers.* First, Defendant Clemons cannot show that she has suffered an "injury in fact" from the destruction of the Records from the Hollywood Clinic. Defendant Clemons is mentioned four times in Count One, all in relation to her prescribing narcotics to two patients (S.B. and an

15

undercover agent), while working at the Tennessee clinics in 2014 [*see* Doc. 320, 54.70, 54.73, 56 (special sentencing factor), & 56(d) (special sentencing factor)]. Presumably, Defendant Clemons wants to challenge these allegations, because she is charged with drug trafficking offenses that encompass this conduct and with a special sentencing factor relating to S.B. in Counts Two and Sixteen. However, because she did not work at the Hollywood Clinic and is not charged or mentioned with regard to any conduct occurring at the Hollywood Clinic, Defendant Clemons does not have a "sufficiently concrete interest" in the outcome of the due process challenge to the destruction of the Records to join in the motion.

Moreover, Defendant Clemons also fails to fulfill the remaining two *Powers* criteria. She does not stand in close relationship to Defendant Hofstetter, who was her former employer and/or coworker. More importantly, Defendant Hofstetter is able to protect her own interests with regard to the destruction of the Records and, in fact, endeavors to do so by filing the motion in which Clemons seeks to join. Accordingly, a review of the three *Powers* criteria shows that Defendant Clemons lacks a sufficient interest in the Records from the Hollywood Clinic and fails to demonstrate the inability of Defendant Hofstetter to assert her own constitutional rights.

Similarly, in *United States v. Jones*, the Sixth Circuit found that a defendant could not challenge "her coconspirators' adverse testimony for unspecified violations of their constitutional rights, suggesting that the government compelled their confessions, guilty pleas, and testimony against her. . . because she fails to demonstrate both a sufficient interest in her coconspirators' rights and their inability to exercise them[, and, thus], she lacks third-party standing to advance these claims." *United States v. Jones,* 558 F. App'x 557, 561 n.1 (6th Cir. 2014). In the instant case, the Court finds that Defendant Clemons cannot assert a due process challenge to the spoliation of the Records from the Hollywood Clinic, because she lacks third-party standing.

16

## B. Due Process Violation Based on Failure to Preserve Evidence

The constitutional guarantee of due process[4] requires that criminal prosecutions be fundamentally fair. *California v. Trombetta,* 467 U.S. 479, 485 (1984). Fundamental fairness requires that the "criminal defendant be afforded a meaningful opportunity to present a complete defense." *Id.* In *Trombetta*, the Supreme Court found that the Due Process Clause requires the government to preserve material exculpatory evidence on behalf of defendants to safeguard their right to present a complete defense. *Id.* Different tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation, depending on whether the subject evidence is materially exculpatory or only potentially useful to the defendant. *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001). If the exculpatory value of evidence that the government failed to preserve is "material," then the defendant must show that the exculpatory significance of the evidence was apparent before it was destroyed and that the defendant is unable to obtain comparable evidence by other reasonably available means.

---

[4] In *Trombetta*, the Court examined the Due Process Clause of the Fourteenth Amendment, which requires, in pertinent part, that "[n]o State . . . shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV; *see Trombetta*, 467 U.S. at 485 (analyzing state law enforcement's failure to preserve breath samples of suspected drunken drivers). In the instant case, Defendant Hofstetter argues that federal law enforcement officers from the DEA and FBI (including Doklean, in her capacity as a federal task force officer) failed to preserve the Records from the Hollywood Clinic. Thus, Defendant Hofstetter's arguments implicate the Due Process Clause of the *Fifth Amendment*, which prohibits federal authorities from depriving an individual of "life, liberty, or property, without the due process of law." *See* U.S. Const. amend. V. However, the Supreme Court in *Trombetta* relied upon case law analyzing Fifth Amendment due process and "'the area of constitutionally guaranteed access to evidence.'" *Id.* at 485 (quoting *United States v. Vanlenzuela-Bernal*, 458 U.S. 858 (1982) (examining whether the federal government violated due process under the Fifth Amendment by deporting a defense witness)). Accordingly, the Court finds that the due process analysis in *Trombetta* applies in the instant case.

17

*Trombetta*, 467 U.S. at 488-89 (1984). "The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith." *Wright*, 260 F.3d at 571.

On the other hand, if the exculpatory value of evidence that the government failed to preserve is only "potentially useful" or "indeterminate," then the defendant must show bad faith on part of the government to support a due process violation. *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988)). Where the government is "negligent, perhaps even grossly negligent," in failing to preserve potentially exculpatory evidence, the bad faith requirement is not satisfied. *See United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996). The defendant not only must demonstrate that the government acted in bad faith in failing to preserve the evidence, but also must show that the exculpatory value of the evidence was apparent before its destruction and that the nature of the evidence was such that comparable evidence cannot be obtained by other reasonably available means. *See id.* at 218–19.

In determining whether *Trombetta* or *Youngblood* governs the analysis of the Defendant's due process challenge, the import of the destroyed materials must first be considered. To invoke the test from *Trombetta*, a defendant must demonstrate that the destroyed evidence was materially exculpatory. *Trombetta,* 467 U.S. at 489. However, to trigger the *Youngblood* test, all that is required is a showing that the government destroyed "potentially useful evidence." *Youngblood*, 488 U.S. at 58. "Potentially useful evidence" is that "of which no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Id.* at 57 (emphasis added).

Here, there is no evidence that the Records were materially exculpatory. Mynatt and Wroblewski both testified that they had not reviewed the Records. Mynatt never finalized his arrangements to review the Records before they were destroyed, so he had no opportunity to see

18

their contents. Wroblewski, who facilitated the destruction of the Records as part of the DEA's file closure process, testified that after being assigned the case, he never reviewed any of the evidence or read any reports associated with the Hollywood Clinic. Finally, Doklean, who had been involved in the investigation of the Hollywood Clinic and supplied the affidavit in support of the search warrant resulting in the seizure of the Records, testified that the only files from the Records that she pulled and reviewed were the ones pertaining to the undercover agents. With no one having fully reviewed the Records prior to their destruction, there is no evidence that the Records were materially exculpatory. At best, the Records may have offered only potentially useful evidence for the defense. Accordingly, the Court applies the rule of *Youngblood* to the analysis rather than that of *Trombetta.*

As discussed above, the *Youngblood* test, requires the defendant to show:

> (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means."

*Jobson*, 102 F.3d at 218. The first two elements of this three-part test are interrelated, because the "'presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *Jobson,* 102 F.3d at 218 (quoting *Youngblood*, 488 U.S. at 56-57 n.*). Accordingly, the Court examines first whether the exculpatory value of the Records was apparent to law enforcement before they were destroyed.

Although Defendant Hofstetter argues that the Records were clearly exculpatory, the evidence presented at the evidentiary hearing does not bear this out. As Defendant Hofstetter acknowledged during the hearing, no one can say whether the Records had exculpatory value or

not, because none of witnesses ever looked at the files. Defendant Hofstetter points to the fact that the Hollywood Clinic case was not accepted for federal prosecution by the U.S. Attorney's Office in Florida as an indication that the Records contained some potentially exculpatory evidence and that the exculpatory nature of that evidence was apparent at the time. This arguable inference is insufficient to meet the Defendant's burden of establishing that law enforcement was aware that the Records were potentially useful for her defense. Doklean, who presented the Hollywood Clinic case to the U.S. Attorney's Office for review, testified that it was her understanding that the case was not accepted for prosecution, because of the overwhelming number of cases under investigation, noting that only the most egregious cases in terms of death totals were being accepted at the time. Absent some evidence indicating a reasonable possibility that law enforcement was aware that the records were potentially useful, the first prong of *Youngblood* has not been met.

Further, as to the bad faith prong of *Youngblood*, while the Court is critical of the DEA's handling of the Records, the Court cannot conclude, based on the evidence presented, that the DEA agents acted in bad faith in destroying the Records. To establish bad faith, a defendant must prove "'official animus'" or a "'conscious effort to suppress exculpatory evidence.'" *Jobson*, 102 F.3d at 218 (quoting *Trombetta*, 467 U.S. at 488). Here, there is no evidence that anyone in the DEA or the U.S. Attorney's Office suspected the Records were exculpatory. The Records were not destroyed as a result of malice. Instead, the Records were ordered destroyed by Wroblewski as part of the DEA's standard file closure process, after the Hollywood Clinic case had been inactive for five years.

The case became inactive sometime after the U.S. Attorney's Office in Fort Lauderdale declined to prosecute, and it remained in inactive status for at least a couple of years leading up to

20

2013 or 2014, when the FBI began its investigation into the Tennessee clinics. While it is unclear when Mynatt first started his efforts to track down the Records, his first communications with Doklean began around the time of his November 13, 2015 email to her, regarding his request to review the file. Doklean, who had been responsible for the Records during the active investigation of the Hollywood Clinic, had already started transitioning out of the DEA task force at the time of Mynatt's initial contact with her, but for unknown reasons, she did not explain to him that she was no longer responsible for her files, which were transferred out to other DEA agents. Instead, she engaged in discussion with Mynatt regarding efforts to coordinate times for an investigative team to travel to Florida to review the file at the DEA office in Miami, and indicated that she would attempt to put some part of the file onto a disc to send to Mynatt so he could begin a preliminary review. All the while, Doklean was aware that the end of the five-year retention period for the file was coming up in December but failed to mention this information to Mynatt. Doklean further failed to document her contact with Mynatt in the Hollywood Clinic file and to brief Wroblewski on the case when the file was transferred to him around the end of 2015.[5]

While Mynatt put his quest for the Records on hold during the 2015 holiday season and then became occupied with another unrelated investigation, Wroblewski was assigned the case and directed by his supervisor to close the file, because the five-year retention period had expired. Wroblewski initiated the closure process by completing several 48-A record destruction forms in January 2016, which was well before he had any knowledge of the investigation in Tennessee. It was not until June 2016 when DEA Agent Bella put Mynatt in contact with Wroblewksi regarding

---

[5] The Court cannot help but note that Doklean's communication to someone within the DEA regarding Mynatt's contact with her would have been prudent practice, given that she was no longer responsible for her files, and would likely have avoided the problem presented here.

21

his renewed efforts to review the Records. It was then that Bella informed Mynatt that the case was in the process was being closed. Unfortunately, Mynatt only took that to mean that the case was not being worked and did not realize that evidence would be destroyed. By the time that Agent Bella put Mynatt in contact with Wroblewski, the 1900 patient files, which are primarily at issue, had been destroyed in March 2016. For unexplained reasons, Wroblewksi did not advise Mynatt that some of the Records had already been destroyed but continued his communications with Mynatt and appeared to accommodate Mynatt by facilitating Mynatt's review of the file. Wroblewski provided Mynatt with Doklean's new contact telephone number and made recommendations to assist Mynatt in accessing the electronic portions of the file through the DEA office in Knoxville.[6]

Thus, although the Court observes that the DEA was negligent, perhaps even grossly negligent, in failing to preserve the Records, there is no evidence that it acted in bad faith. *Jobson*, 102 F.3d at 218; *see also United States v. Femia,* 9 F.3d 990, 993–94 (1st Cir. 1993) (holding that government's destruction of tape recordings of conversations between defendant and alleged coconspirators did not violate due process, despite government's gross negligence in failing to preserve the tapes). Moreover, the record is devoid of evidence that the DEA agents knew the Records contained exculpatory material. Defendant Hofstetter's contention that the Records may have given her an opportunity to defend herself by supporting a claim that the Hollywood Clinic patients were arguably receiving valid treatment is no more than "mere speculation." *Jobson*, 102 F.3d at 219 (citing *Jones v. McCaughtry,* 965 F.2d 473, 479 (7th Cir. 1992) (observing that the

---

[6] The Court finds it perplexing that Mynatt mentioned to Wroblewski his plans to travel to Miami the following month to review records, because Wroblewski would have to coordinate access to the file, but there was no further evidence presented regarding this planned travel or any subsequent communications between Mynatt and Wroblewski.

22

destruction of evidence of only speculative exculpatory value constitutes no violation of due process)). As discussed above, there is no evidence of any kind that the Records would contain such exculpatory information, as no one ever reviewed them. Where "[t]here is no indication that there was anything exculpatory" about destroyed evidence, due process has not been violated. *United States v. Braggs,* 23 F.3d 1047, 1051 (6th Cir.), *cert. denied,* 513 U.S. 902 (1994). While Defendant Hofstetter argues that the declination of the U.S. Attorney's Office to prosecute the Hollywood Clinic indicates there was potentially exculpatory evidence in the Records, the Court finds such argument too attenuated and unsupported.

As an alternative basis for the Court to find bad faith on the part of federal law enforcement in destroying the Records, Defendant Hofstetter argues that the nature of the Records, with some potentially being substance abuse treatment records, required the Government to seek a court order authorizing the destruction of the Records, pursuant to 42 C.F.R. § 2.19. Defendant Hofstetter further contends that the DEA's failure to seek a court order before destroying the Records shows that it acted in bad faith under the *Youngblood* test. Defendant cites no case law addressing this specific issue. The Government responds that a law enforcement investigating agency does not qualify as a "program," as defined in the regulations, *see* 42 C.F.R. § 2.11, and, instead, is specifically allowed to investigate substance abuse treatment providers under 42 C.F.R. § 2.66. Nonetheless, the Government argues that in seeking the search warrant to seize the Records from the Hollywood Clinic, the Government also complied with § 2.66, which requires law enforcement to apply for an order authorizing the disclosure of substance abuse treatment files, out of concern that there might be some substance abuse treatment records maintained at the clinic. The Government emphasized, however, that § 2.66 does not apply to pain patient records.

23

In essence, Defendant Hostetter asserts that the Government's alleged failure to follow appropriate procedure, which she claims is imposed by a federal regulation, in destroying the Records warrants a *per se* finding of bad faith. However, even a failure to follow proper procedure is insufficient to support a finding of government bad faith absent some proof of ill-will. *United States v. Christian*, 302 F. App'x 85, 87 (3d Cir. 2008); *see also United States v. Farmer*, 289 F. App'x 81, 86 (6th Cir. 2008) (finding police destruction of radio communications under department policy without knowledge of preservation order did not alone demonstrate bad faith). Here, even if the Court found that the DEA breached an obligation under the federal regulations in destroying the Records,[7] such breach would have to stem from some established ill-will, and the Records would have to be shown to be potentially exculpatory in order to support a due process violation. The record is void of evidence as to either of these requirements.

In the present case, the Defendant has not carried her burden of demonstrating bad faith. There is no suggestion in the evidence that Doklean or Wroblewski believed the Records contained exculpatory material. Moreover, the conduct of the government agents was, at most, gross negligence, but it was not in bad faith. Accordingly, the Court finds that the destruction of the Records was not in bad faith and that law enforcement was not aware of the possibility that the Records contained exculpatory value.

The final prong of the *Youngblood* analysis is whether "the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Jobson*, 102 F.3d at 218. This prong of the *Youngblood* test examines whether the defendant still has the ability to present his defense or contest an issue without the missing

---

[7] The Court agrees with the Government that 42 C.F.R. § 2.19 applies to the disposition of records by the treatment program and that the DEA is not a "program" under 42 C.F.R. § 2.11.

24

evidence. *See Kordenbrock v. Scroggy*, 919 F.2d 1091, 1103 (6th Cir. 1990), *cert. denied*, 499 U.S. 970 (1991) (holding that the defendant was not prevented from presenting his defense of diminished capacity by the failure of the police to preserve and test a bottle of pills sitting in front of the defendant during his interrogation). In the instant case, the Defendant argues that she cannot show that the patients at the Hollywood Clinic received legitimate prescriptions for controlled substances, because she no longer has access to the patient files from the time she was associated with the clinic.

The Government responded that in January 2018, a second search warrant was executed at the Hollywood Clinic, resulting in a seizure of patient files for the time period of December 2010 to December 2015. The Government asserted that these patient files, while not identical evidence, represent basically the same patient population that was at the Hollywood Clinic at the time of the December 2010 search warrant. The Government argued that the Defendant has access to these patient files and that they should be more favorable to the Defendant than the original, destroyed patient files, because the treatment of the patients was likely more conservative, after the execution of a search warrant in December 2010. The Government maintained that the prosecution had been able to salvage similar, if not identical, evidence for virtually everything destroyed by the DEA.[8]

Defendant Hofstetter asserted that no other reasonable means exists to look at the Hollywood Clinic patient files and to use them to show that the patients were receiving appropriate treatment. The Defendant stated that it is not only the patient files that are lost but also business records, insurance information, patient payment invoices, patient sign-in logs, supplier information, prescription logs, and the Suboxone logbook. Defendant Hofstetter argued that

---

[8] AUSA Stone stated that the only Hollywood Clinic evidence that was both destroyed and for which no comparable evidence exists is the forensic images of four computers.

25

without the destroyed evidence, she does not have a meaningful opportunity to present a complete defense.

In the instant case, the Court finds that the destruction of the evidence seized from the Hollywood Clinic in December 2010 does not prevent Defendant Hofstetter from presenting the defense that the Hollywood Clinic was a legitimate pain management clinic during the time that she worked there. The Fourth Superseding Indictment alleges that Defendant Hofstetter was employed at the Hollywood Clinic in 2009 or early 2010 and that she opened a pain clinic in Tennessee in January 2011 [Doc. 320, ¶¶ 54.4, 54.22]. Doklean testified that law enforcement executed a search warrant at the Hollywood Clinic and seized patient files in December 2010. [Exh. 8]. She acknowledged that the Hollywood Clinic continued to operate, after the execution of the search warrant, under the same owners but that it was eventually sold. The Court finds that the files seized in 2018, some of which date back to December 2010, when the clinic was still under the same ownership and, at least for a brief period, while Defendant Hofstetter may have still worked there, would be comparable evidence to the patient files that were destroyed. Moreover, the Government indicates there is comparable, if not duplicate, evidence to the other destroyed evidence, which it was able to obtain from various sources. Thus, the Court finds that the Defendant "still has the ability to present [her] defense or contest an issue without the missing evidence." *See Kordenbrock*, 919 F.2d at 110.

Based on the foregoing analysis, the Court finds that none of the three prongs of the Youngblood test have been met. Therefore, there is no establishment of a due process violation warranting a suppression of the Records.

In the alternative to the suppression of the Records, Defendant Hofstetter requests a curative instruction that "the jury shall infer by the intentional destruction of such evidence creates

26

an inference that these records would have been exculpatory for the defendants and unfavorable to the government in this case." [Doc. 410 at 7]. In *United States v. Boxley*, the defendant requested that the jury be instructed that the government's failure to preserve fingerprint evidence creates a rebuttable presumption that the missing evidence would have been favorable to him. 373 F.3d 759, 762 (6th Cir.), *cert. denied,* 543 U.S. 972 (2004). Our appellate court observed that "[s]poiliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction." *Id.* (citation omitted). The Sixth Circuit defined intentional destruction "not as knowing and willful removal of evidence, but as removal with the purpose of rendering it inaccessible or useless to the defendant in preparing [his] case; that is, spoiling it." *Id.* (citation and internal quotation marks omitted). The *Boxley* court held that the instruction was not warranted, because "the police did not act with any intention to destroy evidence." *Id.* As discussed above, with regard to the bad faith prong of the *Youngblood* test, the Court does not find any evidence of ill-will on the part of the DEA in destroying the Records in this case. Accordingly, the Court finds that the requested curative instruction does not appear to apply.

In summary, the Court **FINDS** that Defendant Clemons lacks proper standing to join in Defendant Hofstetter's motion to suppress and for adverse inference jury instruction and accordingly **RECOMMENDS** that her motion to join in this motion be **DENIED**. Additionally, the Court **FINDS** that Defendant Hofstetter failed to meet her burden of demonstrating that the Government destroyed the Records in bad faith and that the Records contained potentially useful evidence in order to establish a due process violation and **RECOMMENDS** that Defendant's motion to suppress and in the alternative for adverse inference jury instruction be **DENIED**.

## IV. CONCLUSION

For the reasons stated above, I **RECOMMEND**[9] that Defendant Hofstetter's motion to suppress and for adverse inference jury instruction [Docs. 405 & 410] be **DENIED** in its entirety and that Defendant Clemons's motion to join [Doc. 409] be **DENIED in part,** in that Defendant Clemons may not join in the instant suppression motion.

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).