IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:15-CR-27-TAV-DCP |
| | ) | |
| SYLVIA HOFSTETTER, | ) | |
| CYNTHIA CLEMONS, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to

28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the

District Court as may be appropriate. This case is before the Court on the Motion to Strike

Prejudicial Surplusage from the Indictment [Doc. 398], filed by Defendant Sylvia Hofstetter on

January 7, 2019. Defendant Cynthia Clemons moves [Doc. 409] to join in this motion. The

Defendants ask the Court to strike three passages from the Fourth Superseding Indictment because

they are unnecessary, irrelevant, and prejudicial. The parties appeared before the undersigned for

a hearing on this motion on February 25, 2019.[1] Assistant United States Attorney Tracy L. Stone

appeared on behalf of the Government. Attorneys Charles C. Burks, Jr., and Loretta G. Cravens

represented Defendant Hofstetter. Attorneys Randall E. Reagan and Cullen Michael Wojcik

---

[1] The parties first appeared on February 13, 2019, for a motion hearing on all pretrial motions
relating to the Fourth Superseding Indictment or to new discovery. At the end of that hearing, the
parties requested time to confer with regard to the instant Motion to Strike to determine whether
they could agree on at least a partial resolution. The motion hearing was continued to February 25
to give counsel time to meet with regard to this and other motions. At the February 25 motion
hearing, counsel informed the Court that they had not reached a resolution.

1

appeared on behalf of Defendant Clemons.[2]  After hearing the parties' arguments, the Court took this matter under advisement.

Based upon the Court's review of the Fourth Superseding Indictment, the parties' briefs and arguments, and the relevant case law, the undersigned finds that two of the passages challenged by the Defendants—the reference to 700 patient deaths (paragraph 35) and the reference to two clinic patients dying in an automobile accident (paragraph 54.51, second sentence)— are neither necessary, nor relevant, and are prejudicial.  Thus, the Court finds that these passages are surplusage and that they should be stricken from the Indictment.  However, the Court finds the reference to certain codefendants holding themselves out as belonging to a criminal organization (paragraph 40(e)), while not an essential element of the RICO conspiracy, is relevant to the charge.  Accordingly, the Court recommends that this passage remain in the Indictment.  In summary, the Court recommends that the Motion to Strike Prejudicial Surplusage from the Indictment [Doc. 398] be granted in part, in that paragraph 35 and the second sentence of paragraph 54.51 be stricken, and denied, in part, in that paragraph 40(e) remain.

## I.        BACKGROUND AND POSITIONS OF THE PARTIES

Defendant Hofstetter is charged [Doc. 320][3] with a RICO conspiracy (Count One), two conspiracies to distribute and dispense controlled substances illegally (Counts Two and Four), two money laundering conspiracies (Counts Three and Five), five counts of money laundering (Counts Six through Ten), three counts of maintaining a drug-involved premises (Counts Eleven

---

[2] Attorney Christopher J. Oldham represented Defendant Courtney Newman, and Attorney Christopher Rodgers appeared along with Defendant Holli Womack.  Defendants Newman and Womack have not joined in this motion.

[3] The instant charges are from the Fourth Superseding Indictment [Doc. 320], which was filed on May 1, 2018.

2

through Thirteen), and six counts of illegally distributing and dispensing controlled substances (Counts Fourteen through Nineteen). A sentencing enhancement is charged for Defendant Hofstetter in Counts One, Two, Four, and Fourteen through Nineteen, based upon the death or serious bodily injury, allegedly resulting from the use of controlled substances, of clinic patients.

Defendant Clemons is charged [Doc. 320] with two conspiracies to distribute and dispense controlled substances illegally (Counts Two and Four), two counts of maintaining a drug-involved premises (Counts Eleven and Thirteen), and four counts of illegally distributing and dispensing controlled substances (Counts Fifteen, Sixteen, Eighteen, and Nineteen). A sentencing enhancement is charged for Defendant Clemons in Counts Two, Four, Fifteen, Sixteen, Eighteen, and Nineteen, based upon the death or serious bodily injury, allegedly resulting from the use of controlled substances, of clinic patients.

These charges arise out of the operation of a pain management clinic in Hollywood, Florida, and three pain management clinics in East Tennessee [Doc. 320, ¶¶8-11]. The Indictment states that the Urgent Care & Surgery Center enterprise ("UCSC enterprise") operated these clinics, which were actually "pill mills" that provided "unreasonable and medically unnecessary" prescriptions in exchange for "grossly excessive fees" [Doc. 320, ¶¶8-11]. The Indictment alleges that between May 2011 to March 2015, Defendant Hofstetter administered and managed two of the Tennessee clinics and owned, managed, and administered the third Tennessee clinic [Doc. 320, ¶20]. Prior to coming to Tennessee to operate the Tennessee clinics, Defendant Hofstetter is alleged to have worked at the Florida clinic [Doc. 320, ¶20]. The Indictment alleges that Defendant Clemons was employed as a nurse practitioner at two of the Tennessee clinics from November 2013 through March 2015 [Doc. 320, ¶24]. In this capacity, she is alleged to have prescribed

3

narcotics to clinic patients "outside the scope of professional practice and without a legitimate medical purpose" [Doc. 320, ¶24].

The Defendants argue [Doc. 398] that three passages in the Fourth Superseding Indictment [Doc. 320] are unnecessary and prejudicial. First, they object to the following language from paragraph 35, in the "**Background**" section of Count One (the RICO conspiracy), relating to 700 patient deaths, which are not charged as a sentencing enhancement:

> Approximately 700 UCSC enterprise patients are now dead. A significant percentage of those deaths, directly or indirectly, were the result of overdosing on narcotics prescribed by the UCSC enterprise. The narcotics prescribed by the UCSC enterprise contributed to the deaths of another significant percentage of those patients.

[Doc. 320, ¶35]. Second, the Defendants object to the following language in paragraph 40(e), in the "**Purposes of the Enterprise**" section of Count One, stating that one of the purposes of the UCSC enterprise was that Codefendants Luca Sartini and Luigi "Jimmy" Palma intentionally created the appearance that they were connected to a criminal organization:

> As to **LUCA SARTINI** and **LUIGI PALMA, a.k.a. "Jimmy Palma,"** intentionally creating the appearance of having connections to criminal organizations in order [to] operate UCSC enterprise pill mills in a profitable manner."

[Doc. 320, ¶40(e)]. Third, the Defendants challenge the following language from paragraph 54.51, in the "**RICO Overt Acts**" section of Count One, which alleges that after consuming opioids prescribed by Theodore McCrary (a physician's assistant at two of the Tennessee clinics [320, ¶22]), J.G. recklessly drove her car while intoxicated and wrecked, killing her two passengers, who were also patients of the clinics:

> Later that day, after filling McCrary's prescription and consuming some of the prescribed opioids, J.G. recklessly operated her automobile while intoxicated on the prescribed opioids, wrecked her

4

automobile on Lovell Road in Knoxville, Tennessee, and killed both of her passengers, who were also patients at the UCSC clinics.

[320, ¶54.51]. The Defendants contend that these three passages are not relevant to the charges and are highly prejudicial, because they imply that the Defendants are guilty of a broader scope of criminal activity than is actually alleged.

The Government [Doc. 422] responds that the three passages cited by the Defendants are not surplusage, because the Government's theory of prosecution supports the disputed language and it intends to prove this information in its case-in-chief. The Government contends that while the language at issue, like the entire Indictment, is prejudicial to the Defendants, it is not unfairly prejudicial. Alternatively, the Government contends that even if the Court deems the three passages to be surplusage, whether the admission of this evidence is unfairly prejudicial, pursuant to Federal Rule of Evidence 403, is a matter that should be addressed by the District Judge within the context of the trial. In other words, even if this information is stricken from the Indictment, the Government should still have the opportunity to prove these allegations at trial.

## II.    ANALYSIS

Our Constitution requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment by a grand jury[.]" U.S. Const. amend. V. Thus, "a trial may be held in a serious federal criminal case only if a grand jury has first intervened" and issued an indictment or presentment. *Russell v. United States*, 369 U.S. 749, 760-61 (1962). Rule 7 of the Federal Rules of Criminal Procedure provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). Upon motion of the defendant, "the court may

5

strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). The Advisory Committee's notes to the rule explain that "[t]his rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." *Id.* at Advisory Committee Note to Subdivision (d).

Whether to strike surplus language from an indictment is a matter within the sound discretion of the trial court. *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974), *cert. denied*, 419 U.S. 1124 (1975). Rule 7(d) "is properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors." *Id.* "A court should grant a motion to strike surplusage 'only where it is clear that the language is irrelevant and prejudicial.'" *United States v. Allen*, No. 3:12-CR-90-TAV-HBG, 2014 WL 3579373, *2 (E.D. Tenn. July 21, 2014) (quoting *United States v. Musgrave*, No. 3:11–cr–183, 2012 WL 4051942, at *4 (S.D. Ohio Sept. 13, 2012)). The Sixth Circuit has held that "'if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant).'" *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) (quoting *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989)). With these principles in mind, the Court turns first to the question of whether Defendant Clemons has standing to challenge the three passages from Count One, the RICO conspiracy, with which she is not charged. Next, the Court examines the three passages to determine whether they are surplusage.

**A. Defendant Clemons's Standing to Challenge Factual Assertions in Count One**

The Motion to Strike Prejudicial Surplusage from the Indictment [Doc. 398] asks to strike three passages, all within Count One, which alleges a RICO conspiracy between Luca Sartini, Luigi "Jimmy" Palma, Benjamin Rodriguez, and Sylvia Hofstetter. Although Defendant

6

Clemons is mentioned[4] in Count One, she is not charged in that count. Thus, the Court is presented with the issue of whether Defendant Clemons may move to strike language in a Count of the Indictment in which she is not charged. *See e.g., United States v. Tanner*, 471 F.2d 128, 139-40 (7th Cir.) (holding that coconspirators lacked standing to challenge count in which they were not charged)*, cert. denied,* 409 U.S. 949 (1972); *United States v. Bennett*, 190 F. Supp. 181, 182 (S.D.N.Y. 1958) (ruling that the defendant "has no standing to demand dismissal of a count in which he is not charged with commission of an offense"). Unlike *Tanner* and *Bennett* involving a matter of standing to dismiss an actual count in the indictment, the question here is whether Defendant Clemons is a proper party to raise the claim of irrelevant and prejudicial language and to seek the remedy of striking prejudicial surplusage.

As an initial matter, the Court notes that there is no question that Defendant Hofstetter is a proper party to raise the claims of prejudicial surplusage in Count One as she is charged with a RICO conspiracy. Further, as explained more fully below, the Court finds that because the Government will use the information in the challenged passages to prove an element of the drug conspiracies, Defendant Clemons also has standing to raise the claims of prejudicial surplusage.

General standing to sue requires an adversarial interest in the outcome of the litigation by each party. This is distinguished from specific standing to raise certain issues within a lawsuit. "The fundamental aspect of standing is that it focuses on the party seeking to get his

---

[4] Defendant Clemons is mentioned four times in Count One [*see* Doc. 320, ¶¶54.70, 54.73, & 56]. She is mentioned twice in the "**RICO Overt Acts**" section of Count One with regard to prescribing opioids at a Tennessee clinic [*see* Doc. 320, ¶¶54.70 & 54.73 ]. Defendant Clemons is also mentioned twice in paragraph 56 in the "**NOTICE OF SPECIAL SENTENCING FACTORS FOR COUNT ONE,**" with regard to an overdose death.

complaint before a federal court and not on the issue he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968). In a criminal case, the adversarial interest element is met when the criminal charge has been brought, and then, the issue of specific standing to raise a certain issue becomes relevant. *Id.* at 102 (explaining that to establish specific standing to raise certain issues within a lawsuit there must be shown "a logical nexus between the status asserted and the claim sought to be adjudicated").

Here, Defendant Clemons can show a personal stake in the outcome of the motion to strike surplusage, which provides a sufficient nexus to support her specific standing. Count One alleges that drug trafficking offenses are a part of the racketeering activity that comprises the RICO conspiracy [Doc. 320, ¶53(a)]. The Indictment charges Defendant Clemons with two drug trafficking conspiracies and four substantive counts of drug distribution. The Government has made it clear that it intends to prove the information in two of the three challenged passages of Count One to show the intent of Defendants, including the medical providers, to participate in the drug conspiracies. Thus, the Court finds that Defendant Clemons has specific standing to join in the Motion to Strike Surplusage. The Court recommends that Defendant Clemons's Motion to Adopt Specific Motions of Co-defendant [Doc. 409] be granted in part, in that Defendant Clemons should be permitted to join in the Motion to Strike Prejudicial Surplusage from the Indictment [Doc. 398].

**B. Surplusage**

The Court next turns to whether the three challenged passages of the Indictment are surplusage, that is whether they are "nonessential allegations that could prejudicially impress the jurors." *Kemper*, 503 at 329. In order to be stricken, the language must be both prejudicial and

8

irrelevant, so the Court examines each passage in light of its relevance and prejudice. *See Allen*, 2014 WL 3579373, at *2.

*(1) Seven Hundred Patient Deaths*

Defendants Hofstetter and Clemons contend that paragraph 35, which alleges that narcotics prescribed at the pain clinics resulted in or contributed to 700 patient deaths, is unnecessary and highly prejudicial. They argue that the Indictment charges the overdose deaths of ten (10) individuals[5] in relation to enhanced penalties for some of the charges. The Defendants assert that the 700 overdose deaths alleged in paragraph 35 are not essential to the elements of the charged offenses. Moreover, they maintain that even if the Government could show that the allegations in paragraph 35 are relevant, the probative value of this evidence is substantially outweighed by a danger of unfair prejudice, confusing or misleading the jury, undue delay, and/or waste of time, pursuant to Rule 403 of the Federal Rules of Evidence.

The Government responds that paragraph 35 is relevant to its theory of prosecution, which is that "the clinics operated as sources of supply of highly addictive, deadly drugs" [Doc. 422, p.2]. The Government states that approximately 112 people died, while they were patients at the clinics, and that "documentary evidence and testimony will show that clinic personnel were aware that patients were dying at a rate that should have been alarming" [Doc. 422, p.2]. It asserts that from this evidence, the jury could infer "[c]allous intent" on the part of those

---

[5] The Defendants' motion alleges that the Indictment charges the overdose deaths of seventeen (17) individuals in relation to the enhanced penalties. However, the Indictment actually alleges the overdose deaths of ten people, seven of whom are listed in relation to the enhanced penalty for two or more charges. Additionally, thirteen overdose deaths are specifically alleged in the **RICO Overt Acts** section of Count One. Five of the overdose deaths specifically alleged as overt acts are also alleged in relation to enhanced penalties. Thus, the Court finds that the Indictment alleges the overdose deaths of eighteen individuals in relation to the Florida and Tennessee clinics, ten of which are alleged in relation to an enhanced penalty.

9

Defendants, who were aware of the deaths, yet continued to participate in the drug conspiracy. The Government asserts that the jury could infer constructive knowledge for providers, who failed to review the patient charts and to discover their patients were dying. It maintains that this constructive knowledge of the deaths is "highly relevant and probative of guilt" with regard to whether the providers were distributing controlled substances outside the scope of professional practice and without a legitimate medical purpose.

The Government acknowledges that the remaining 588 patients, who died after leaving the clinics, present a closer question. However, it argues that overdose deaths from high dosages of highly addictive and deadly opioids were foreseeable. It maintains that "[t]o the extent that the defendants disregarded [this foreseeable outcome], the results are not unfairly prejudicial" [Doc. 422, p.3].

At the February 25 motion hearing, Mr. Burks argued that the statement in paragraph 35 is immaterial and does not go to the elements of any count alleged in the Indictment. He maintained that this passage is highly prejudicial. He noted that the reference to 700 deaths in the Indictment has been repeated in news reports and will increase the difficulty in selecting an impartial jury. In this regard, Mr. Reagan added that, since the filing of the Fourth Superseding Indictment, the 700 patient deaths have been in the lead sentence in every article about the case in the Knoxville News Sentinel.

Mr. Burks argued that paragraph 35 will confuse or mislead the jury about the number of overdose deaths—whether there are 10 or 700—relevant to the enhancements. He asserted that the language that the 700 deaths "directly or indirectly, were the result of overdosing on narcotics" from prescriptions provided at the clinics also confuses the standard that the jury is to apply with regard to the sentencing enhancements. Finally, he argued that the Government's

10

proof of the 700 "uncharged" overdose deaths will needlessly delay an already lengthy trial. Mr. Burks argued that paragraph 35 should not be a part of the charges or the trial, and he asked the Court to strike paragraph 35 as surplusage.

AUSA Stone argued that all three of the passages to which the Defendants object are not surplusage, because they are part of the "fabric" of the Government's theory of prosecution. He asserted that, thus, the Government is entitled to present this evidence. However, he argued that regardless of whether the passages should be redacted from the Indictment, the Court should not preclude the admissibility of this evidence at this time. Instead, AUSA Stone contended that the Defendants should raise the question of whether this evidence is unfairly prejudicial under Rule 403 at trial.

Mr. Reagan responded that although AUSA Stone says he intends to prove the 700 patient deaths at trial, he has not provided 700 death certificates or autopsy reports in discovery. AUSA Stone replied that the Government is prepared to prove the 700 patient deaths at trial but that not all of the deaths are overdose deaths. He argued that the issue of how the Government will prove these deaths is "getting the cart ahead of the horse." AUSA asserted that all the Court must determine now is whether paragraph 35 is surplusage, which it is not.

Mr. Burks objected that whether the 700 patient deaths are overdose deaths or not goes to the heart of the Court's determination that paragraph 35 is unfairly prejudicial. He maintained that hearing about non-overdose deaths and uncharged overdose deaths, along with the ten[6] charged overdose deaths, will be confusing to the jury. Mr. Burks contended that the language

---

[6] Mr. Burks referenced seventeen overdose deaths charged in the Indictment. As discussed in note 5 above, the Indictment actually charges the overdose deaths of ten people in relation to the enhanced penalties, seven of whom are alleged twice.

11

in paragraph 35 is not essential to the charges and is highly prejudicial. He argued that now is the time to remove this language, before the jury is exposed to it.

The Court observes that the information that "a significant percentage" of 700 now-deceased clinic patients died "directly or indirectly" as a result of overdosing on narcotics prescribed at the clinics in this case or those narcotics contributed to their deaths is clearly prejudicial to the Defendants. While it is within the Government's province to determine what charges to bring and how to charge them, information about other crimes or bad acts, not a part of the particular charges, bears special scrutiny. *See* Fed. R. Evid. 404(b)(1) (prohibiting the introduction of evidence of a crime, wrong, or act, other than those charged, to prove the defendant's bad character in order to show that the defendant acted in conformity with that bad character on a specific occasion).

Moreover, in the instant case, Defendants Hofstetter and Clemons are charged with sentencing enhancements arising from the overdose deaths of specific individuals. In order to apply this enhancement, the Government must prove that the illegally prescribed substance was the actual and legal cause of the individual's death, meaning that, in order to show the death "resulted from" the unlawfully distributed drug, the Government must show "but-for causality." *Burrage v. United States*, 571 U.S. 204, 210-16 (2014) (observing that but-for causality requires proof that the conduct in question—consumption of the illegal drugs—"'is an antecedent but for which the result in question would not have occurred'"). In so holding, the Supreme Court specifically rejected the government's argument that showing that the ingestion of the illegal drug contributed to the individual's death should suffice: "The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed." *Id.* at 216. In the instant case, the undersigned finds the

12

language in paragraph 35 that drugs illegally prescribed by the clinics *indirectly* resulted in or *contributed* to "a significant percentage" of 700 deaths would be confusing to the jury, which must find with regard to the ten individuals listed in the sentencing enhancements, the higher standard of but-for causality. Thus, the Court finds that paragraph 35 is highly prejudicial[7] to Defendants Hofstetter and Clemons.

In *United States v. Moss*, our appellate court held that information in the indictment that the government intends to prove at trial is not surplusage, "no matter how prejudicial it may be," as long as the information is legally relevant. 9 F.3d at 550 (internal quotation omitted). The Government acknowledges paragraph 35 is prejudicial to the Defendants but contends that paragraph 35 is relevant and will be part of its proof at trial. "Evidence is relevant if: (a) it has a tendency to make a fact more or less probable that it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. In the instant case, the Government contends that it plans to prove numerous deaths of clinic patients and former patients, beyond the ten deaths that are charged in the special sentencing factors, in order to show the Defendants' intent to conspire to provide prescriptions for controlled substances outside the scope of professional practice and without a legitimate medical purpose. It argues that the Defendants continued to work in the clinics, despite their knowledge (actual or constructive) that patients were dying "at an alarming rate," and that this is evidence of their "[c]allous intent" [Doc. 422, p.2]. With regard to the 588 former patients, whom the Government asserts died after leaving the clinics, the Government argues that "it was clearly foreseeable that providing high dosages of highly

---

[7] As discussed in footnote 9, in finding the allegation in paragraph 35 to be highly prejudicial to the Defendants, the Court makes no finding as to whether this allegation is *unfairly* prejudicial under Federal Rule of Evidence 403.

13

addictive and deadly opioids to thousands of people would result in a steady stream of deaths for years to come" [Doc. 422, p.3].

"'[I]n order to establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Geralt*, 682 F. App'x 394, 404 (6th Cir. 2017) (quoting *United States v. Powell*, 847 F.3d 760, 780 (6th Cir. 2017)) (other internal quotations omitted). The Court finds that knowledge and intent are elements of the drug conspiracies charged in the Indictment and, thus, "fact[s] . . . of consequence in determining the action." *See* Fed. R. Evid. 401(b). The question is whether the allegation of the 700 patient deaths makes the Defendants' intent to participate in the drug conspiracies more or less probable.

A defendant's "guilty knowledge and voluntary participation [in a conspiracy] may be inferred from surrounding circumstances.'" *United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014) (emphasis removed). In *Sadler*, the court found evidence that the owner and operator of a pain clinic paid bills from the distributors of the opioids and set patient quotas was evidence of his participation in the conspiracy to distribute pain pills illegally. *Id.* Evidence that the defendant continued to operate two branches of the clinics after other clinic branches were closed by law enforcement and after a search of his home and office also revealed his guilty knowledge and voluntary participation. *Id.* In the instant case, the Government intends to prove the Defendants' guilty knowledge and voluntary participation in the drug conspiracies by showing that 700 clinic patients and former patients died, directly or indirectly, from the use of controlled substances. However, the Court finds that only the 112 deaths of current patients are potentially relevant to the Defendants' guilty knowledge, because only those patients who died while the

14

Defendants were operating or employed by the clinics were a part of the "surrounding circumstances." Moreover, only those patient deaths about whom the Defendants had knowledge would be relevant to their intent.[8] The jury could not infer a Defendant's intent to participate in the conspiracy from her continued work in or operation of the clinic(s), unless the Defendant knew about a patient death or deaths. In other words, there can be no "callous disregard," unless there is knowledge to disregard.

The Government contends that even if a Defendant did not have actual knowledge of a patient's death, she had constructive knowledge. [Doc. 422, p.2]. It maintains that because the providers had a duty to review patient charts and the clinic operator had a duty to be informed "of critical events at the clinics, such as patients dying," intent can be inferred from this constructive knowledge [Doc. 422, pp.2-3]. This argument assumes that the deaths of patients were somehow reported to the clinic and recorded in the patients' charts. The argument also assumes that a provider should know what is happening with regard to all clinic patients, not just the ones she treats, and that a clinic administrator should review patient charts. The Court finds that the multiple assumptions required with regard to the Government's constructive knowledge argument render it of little value with regard to an inference of a Defendant's intent.

Based on the information before it, the undersigned finds that only evidence of patient deaths of which the Defendants had actual knowledge, which is perhaps some subset of the 112 people who died while they were patients at the clinic, is potentially relevant to the

---

[8] The Government asserts that it has "documentary evidence and testimony [that] will show that clinic personnel were aware that patients were dying at a rate that should have been alarming" [Doc. 422, p.2]. However, the Government does not specify that Defendants Hofstetter and Clemons were among the clinic personnel with this knowledge. The Government's inclusion of a constructive knowledge argument suggests that they were not.

15

Defendants' intent to participate in the drug conspiracies. Accordingly, the Court finds that paragraph 35, which alleges 700 patient deaths, is surplusage and should be stricken, because, *as alleged*, it is not legally relevant to the charges.[9] Because paragraph 35 is not relevant and is highly prejudicial, the undersigned finds it to be surplusage and recommends that it be stricken from the Indictment. *See Kemper*, 503 F.2d at 329.

### (2) Connection to Criminal Organizations

The Defendants also ask the Court to strike paragraph 40(e), which alleges that Codefendants Luca Sartini and Luigi "Jimmy" Palma intentionally created the appearance that they were connected to a criminal organization in order to operate the UCSC clinics profitably. The Defendants argue that this paragraph contains nonessential allegations that are prejudicial to the Defendants, because they suggest that the Defendants are involved in a broader scope of illegal activity than is charged in the Indictment. At the motion hearing, Mr. Burks argued that although Codefendants Sartini and Palma are charged in the Indictment, they will not be tried with the remaining Defendants, because they have not been extradited from Italy. Mr. Burks maintained that evidence that Sartini and Palma held themselves out as being a part of a criminal organization is irrelevant to the other Defendants and to the charges.

---

[9] The Court's finding that the *specific allegations* in paragraph 35 are not legally relevant to the charges in the Indictment does not preclude the Government from introducing evidence of the deaths of clinic patients, in addition to the ten patients listed in the enhancements, at trial. Nor does this finding prevent the Defendants from arguing, either in a motion *in limine* or at trial, that the proof of other patient deaths is inadmissible under Federal Rule of Evidence 403 or other evidentiary rules. Although the Defendants ask the Court to exclude this evidence pursuant to Rule 403 at this juncture, the Court finds that to do so, it would have to imagine some relevant evidence about uncharged patient deaths and then assess whether that imagined evidence is unfairly prejudicial. In other words, such an analysis would be wholly speculative.

16

The Government contends that it will offer testimony from several witnesses to prove the allegation in paragraph 40(e). It asserts that this evidence is relevant to the legitimacy of the clinics and, thus, is also relevant to the Defendants' "decisions to involve themselves with illegitimate clinics." [Doc. 422, p.4] However, the Government acknowledges the lesser relevance of this evidence in a trial without Sartini and Palma. Thus, it asks the Court to reserve any ruling on the admissibility of this evidence until trial. At the motion hearing, AUSA Stone argued that paragraph 40(e) is not surplusage, because it is part of the Government's theory of prosecution. As a result, he maintained that the Government is entitled to present this evidence. However, he argued that if the Court disagrees, it should not find this evidence to be inadmissible at this juncture but should reserve that ruling for trial.

The Court finds that the allegation that Codefendants Sartini and Palma held themselves out as members of a criminal organization in order to increase the profits of the clinics is somewhat prejudicial to Defendants Hofstetter and Clemons, to the extent that it suggests that the entire enterprise was illegitimate. However, as discussed above, relevant evidence that the government intends to prove at trial is not surplusage, even if it is prejudicial. *Moss*, 9 F.3d at 550. The Court finds that the allegation that Codefendants Sartini and Palma held themselves out as members of a criminal organization to make the illegitimate pain clinics operate profitably, is relevant to Defendant Hofstetter's knowledge of the illegitimate nature of the pain clinics, as a long-time employee[10] of Codefendants Sartini and Palma. Based upon Defendant Hofstetter's

---

[10] The Indictment alleges that Codefendants Sartini, Palma, and Benjamin Rodriquez "employed" Defendant Hofstetter to work in their Hollywood, Florida, clinic in 2009 or early 2010 [Doc. 320, ¶54.4]. Defendant Hofstetter is alleged to have opened pain clinics in Tennessee with Codefendants Sartini and Palma and to have continued to work for them there. [Doc. 320, ¶¶54.22-54.24, 54.34]. Because Defendant Hofstetter appeared to work closely with Defendants Sartini and Palma [Doc. 320, ¶¶54.23 (discussing business of Tennessee clinics), 54.29 (firing of medical

17

continued service for and apparent trusted status with Sartini and Palma, her knowledge of their acts, such as holding themselves out to be members of a criminal organization, can be inferred. Accordingly, the Court finds that as relevant information the Government intends to prove, this allegation is not surplusage.

### (3) Deaths of Two Clinic Patients in Automobile Accident

Third, the Defendants ask the Court to strike the second sentence of paragraph 54.51, which alleges that after consuming opioids prescribed by Theodore McCrary (a physician's assistant at two of the Tennessee clinics), J.G., recklessly drove her car while intoxicated and wrecked, killing her two passengers, who were also patients of the clinics. They contend that this statement, which is alleged as one of the overt acts in the RICO conspiracy, is irrelevant to the instant charges, because the deaths of the two passengers cannot be attributed to Defendants Hofstetter or Clemons and do not address any elements of the charges in the Indictment. At the motion hearing, Mr. Burks argued that the two deaths alleged in paragraph 54.51 are not alleged as a sentencing enhancement to any of the charges against Defendants Hofstetter or Clemons. He maintained that this allegation is not only irrelevant to the charges, but is also unfairly prejudicial to the Defendants and will be confusing to the jury. Mr. Reagan argued that the alleged deaths from an automobile accident in paragraph 54.51 are not relevant to the prescribing practice of Defendant Clemons.

---

director of Tennessee clinics), 54.32 (opened bank account), 54.34 (sending daily sales reports of clinics), 54.65 (negotiating purchase of additional clinics); and 54.92 (facilitating partner distributions)], the Indictment contains a basis to infer that she knew they held themselves out as members of a criminal organization.

18

The Government argues that it intends to prove the allegations in paragraph 54.51, through the testimony of J.G., a clinic patient, in order to show the Defendants' intent to continue working at the clinics, despite information that clinic patients were dying. It contends that

> J.G. will testify at trial about her experiences at one of the clinics, which culminated in the vehicular deaths of two other clinic patients. The vehicle crash and deaths were covered by the news media and, through reasonable inferences, should have been known to clinic personnel. Like the other deaths, this event should have influenced the mindset of Hofstetter and providers alike.

[Doc. 422, pp.4-5] The Government notes that Defendants Clemons, Newman, and Womack were not employed at the clinics in April 2013, when this event occurred. However, it maintains that the fact that they did not work there at the time goes only to the weight of the evidence against them, not its admissibility. Accordingly, the Government asserts that the allegation of the deaths of two clinic patients in paragraph 54.51, like the allegation of the 700 deaths in paragraph 35, are relevant.

As discussed in section (1) above, allegations regarding the deaths of clinic patients, other than the ten charged in the sentencing enhancements, are highly prejudicial to the Defendants. Thus, the Court focuses on the relevance factor. Like with the allegation of the 700 patient deaths in paragraph 35, the Court also finds the relevance of the allegation in paragraph 54.51 that two clinic patients died in an automobile accident when another clinic patient was driving while intoxicated to be extremely tenuous, if not nonexistent. First, the Court finds no relevance with regard to Defendant Clemons, who did not even work at the clinics at the time of the alleged deaths in April 2013. The suggestion that Defendant Clemons had a duty to review the old patient files of another provider after she came to work at the clinics seems spurious.

19

With regard to Defendant Hofstetter, even though she worked as a manager of the Tennessee clinics in 2013, the Court questions the Government's contention that she would have heard or read news reports about this wreck and recognized that J.G. or the deceased passengers were patients of the clinics. Also, it is not assured that the news reports would have indicated that J.G. was driving while intoxicated from prescription pain medication (as opposed to alcohol or non-prescription drugs). In other words, like with paragraph 35, the Court finds that the second sentence of paragraph 54.51, *as alleged*,[11] is not legally relevant and is surplusage. Moreover, the Court finds that this "nonessential allegation . . . could prejudicially impress the jurors," and should be stricken. *See Kemper*, 503 F.2d at 329.

### III. CONCLUSION

After carefully considering the language of the Indictment, the parties' briefs and arguments, and the relevant legal authorities, the Court finds that paragraph 35 and the second sentence of paragraph 54.51 are clearly irrelevant and prejudicial. Accordingly, the Court finds them to be surplusage and **RECOMMENDS** that they be stricken from the Fourth Superseding Indictment. However, the undersigned finds that paragraph 40(e) is not surplusage. Accordingly, the undersigned respectfully **RECOMMENDS** that the Motion to Strike Prejudicial Surplusage from the Indictment [Doc. 398] be granted in part and denied in part, as set out above.[12] The Court

---

[11] As discussed in footnote 9 above, the Court makes no finding on whether the proposed testimony from J.G. would be admissible at trial.

[12] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report

20

also recommends Defendant Clemons's Motion to Adopt Specific Motions of Co-defendant [Doc. 409] be granted in part, in that she be permitted to join in the Motion to Strike Prejudicial Surplusage from the Indictment [Doc. 398].[13]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

[13] The undersigned previously recommended [Doc. 474] that Defendant Clemons's motion to join [Doc. 409] be denied in part in that she not be permitted to join in certain motions to suppress evidence relating to the Florida pain clinic [Docs. 405 & 410]. Defendant Clemons filed no objection to this Report and Recommendation, which District Judge Varlan accepted [Doc. 523] in its entirety.

21