UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No.: 3:15-CR-27-TAV-DCP |
| | ) |
| SYLVIA HOFSTETTER, | ) |
| CYNTHIA CLEMONS, | ) |
| COURTNEY NEWMAN, and | ) |
| HOLLI WOMACK, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM OPINION AND ORDER

The Court has before it the government's motion [Doc. 774] to introduce an email between defendant Sylvia Hofstetter and co-defendant Chris Tipton and evidence of uncharged deaths of patients of the Tennessee clinics. Defendants Hofstetter, Newman, and Clemons responded [Doc. 788], and the parties have otherwise addressed these and related issues in several other briefs [Docs. 577, 587, 615, 625, 632, 646, 648]. The Court likewise has previously addressed the issue of the admissibility of uncharged deaths in its October 11, 2019 order [Doc. 672].[1] The Court will first address the admissibility of the email before turning to the admissibility of evidence of uncharged deaths of patients of the Tennessee clinics. For the reasons discussed herein, the government's motion [Doc. 774] is **DENIED in part** and **GRANTED in part**.

---

[1] The Court presumes familiarity with this case. A more exhaustive recitation of the facts and issues relevant to this opinion can be found in the Court's October 11, 2019 order [Doc. 672].

## I. Email Between Defendants Sylvia Hofstetter and Chris Tipton

The government seeks to introduce an email between defendant Hofstetter and Chris Tipton, a government witness and co-defendant in this case [Doc. 774 p. 9–12]. The email, which is marked Government's Exhibit 2044, is a chain of communications between defendants Hofstetter and Tipton regarding particularly heinous crimes that were committed by an active patient of defendants' clinic on Gallaher View Road and the decision to subsequently discharge that patient.

The government argues that the email is admissible under Rule 403, analogizing this situation to *United States v. Lang*, 717 F. App'x 523, 539 (6th Cir. 2017) (admitting news articles found in defendant Lang's desk that discussed the federal indictment against a pain clinic involving several patients of Lang's and a co-defendant's clinic because the evidence was not *unfairly* prejudicial and suggested—on a wholly proper basis—that the defendant "knew her clinic was a pill mill, but that she continued operating it anyway"), and *United States v. Schwartz*, 702 F. App'x 748, 756 (10th Cir. 2017) (admitting evidence of patient deaths to show that the defendant "knew that the clinic's patients were misusing their prescriptions, yet the practice continued to prescribe opioids in irresponsible ways."). The government argues that the email demonstrates defendant Hofstetter's "awareness of criminality on the part of patients at the clinic" and the fact that she had "power over whether or not patients were able to stay in the clinic."

Defendants counter that the email is inadmissible under Rule 403 of the Federal Rules of Evidence as unfairly prejudicial and contend that *Lang* and *Schwartz* are distinguishable [Doc. 788 p. 4–5].

As an initial matter, the Court recalls that on October 30, 2019, before bringing the jury in for continued direct examination of Tipton, the government sought to introduce this email into evidence. The government presented the same or similar arguments as it presents in it written motion. Specifically, the government argued that the evidence is highly probative of defendant Hofstetter's *mens rea*, namely her knowledge that patients were drug-seeking and not legitimate pain patients. Defendants also presented the same or similar arguments as they present in their written response to the government's motion. After hearing argument from the parties, the Court found that the evidence cleared the low bar for relevance but was inadmissible under Rule 403.

Now, in the instant motion, the government again seeks to introduce this email into evidence. Having already ruled on this request, the Court interprets this portion of the government's motion as a motion to reconsider its prior ruling. The Rules of Federal Criminal Procedure do not provide for such motions. Thus, courts adjudicating motions to reconsider in criminal cases typically evaluate such motions under the same standards applicable to a civil motion to reconsider. *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010) (citing *United States v. Healy*, 376 U.S. 75 (1964)).

Motions to reconsider an interlocutory ruling are governed by Rule 54(b) of the Federal Rules of Civil Procedure. The Sixth Circuit has held that district courts have the authority to afford relief pursuant to Rule 54(b) "as justice requires." *Rodriguez v. Tenn. Laborers Health & Welfare Fund.*, 89 F. App'x 949, 959 (6th Cir. 2004); *see also McClendon v. United States*, 892 F.3d 775, 781 (5th Cir. 2018) ("Rule 54(b) . . . permits the district court to reconsider and reverse its decision for any reason it deems sufficient."

(citation omitted)). Traditionally, relief from an interlocutory ruling is appropriate "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez*, 89 F. App'x at 959 (citation omitted). A motion to reconsider under Rule 54(b) "may not 'serve as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion of which reconsideration was sought.'" *Madden v. City of Chattanooga*, No. 1:08-cv-160, 2010 WL 670107, at * 2 (E.D. Tenn. Feb. 19, 2010) (quoting *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 48 F. Supp. 2d 885, 888 (D. Minn. 1999)).

Here, the Court is not persuaded that its prior ruling on the admissibility of this email was in error, and the government has not presented new evidence or otherwise established that circumstances exist mandating relief under Rule 54(b). The Court continues to be of the opinion that this evidence is relevant but presents a significant risk of unfair prejudice and confusing the issues, particularly as it relates to the provider defendants, who the government acknowledges neither prescribed this patient or worked at the clinic where he was a patient. While the government did not argue some of the specific analogies it makes in its written motion when the Court first heard argument on this issue on October 30, 2019, the thrust of the government's argument remains the same: the evidence demonstrates defendant Hofstetter's *mens rea*. In particular, the government again argues that the evidence indicates knowledge of and, given that "her only response

4

was [to] just discharge him," her indifference to patients' drug-seeking behavior.[2] In its motion, therefore, the government does not present new evidence or identify a change in the law necessitating reconsideration. It also raises no arguments that were not already addressed or could not have been raised previously, and the Court again concludes that Rule 403 considerations should preclude admission of the evidence in question. The government's motion will therefore be **DENIED** in part: the government may not, pursuant to the Court's original, oral ruling, introduce this email (Government's Exhibit 2044) into evidence.

## II. Uncharged Deaths of Patients of the Tennessee Clinics

The government next seeks to introduce evidence of uncharged deaths of patients of the Tennessee clinics,[3] which it defines as "[a]ny death that occurred during the conspiracy (in or about 2010 to on or about March 10, 2015)" [Doc. 774 p. 1]. The government provides examples of what forms this evidence takes. The government states that the evidence includes various notations on patient files indicating that a patient was deceased, as well as evidence, presumably from those patient files, that "some of these deceased patients were previously seen by the provider defendants" [Doc. 774 p. 9]. The government states that the evidence also includes: (1) specific patients' responses to drug

---

[2.] Real Time Trial Tr. at 9, Oct. 30, 2019.

[3.] There are several clinics which have been collectively referred to as the "Tennessee clinics." Those clinics were at three locations in East Tennessee: one in Lenoir City and two in Knoxville, one on Gallaher View Road and the other on Lovell Road. The provider defendants mostly worked at the Lovell Road clinic with some providers also working at the Lenoir City clinic. It is undisputed that none of the provider defendants worked at the Gallaher View Road clinic.

5

abuse screening tools ("DAST") that suggested potential addiction issues or that indicated the patient may be drug-seeking; (2) patient charts indicating that those same patients were seen by a specific provider defendant, who, in some cases, apparently reviewed the patient's DAST and still prescribed the patient high-dose opioids; and (3) evidence that the patient died shortly thereafter. And lastly, the evidence includes patient forms which the government argues must have been "pre-filled out," meaning forms for specific patients' appointments that are filled out even though the patient never went to the appointment for which the form is filled out as evidenced by the fact that the patient died before the appointment.

The government cites its overarching intended purpose in introducing this evidence: to rebut defendants' defense of good faith (i.e., that the defendants did not know that the patients were drug-seeking and thought they were legitimate pain patients). In particular, the government argues that notations on patient charts indicating a particular patient was deceased suggest that the defendants "knew or should have known that their patients were dying" [Doc. 774 p. 9]. Notice that clinic patients were abusing their prescriptions, overdosing, and dying, the government argues, contradicts defendants' assertions that they were unaware the patients were drug-seeking or that the clinics were pill mills, which rebuts their defense of good faith [*Id.* at 8 (analogizing this use of uncharged-deaths evidence to that offered in *Schwartz*)]. Evidence suggesting defendants knew patients were dying in combination with evidence that the practices of the clinic—and more specifically, the prescribing practices of the defendants—did not change, the government argues, shows that the providers were not actually treating patients. The government asserts that this too

6

contradict defendants' assertions that they were not overprescribing opioids to drug-seeking patients but were treating legitimate pain patients. The "pre-filled out" patient forms, the government argues, also undermines the defendants' defense of good faith. The government also notes another intended purpose in introducing this evidence: to explain why various patients have not been presented as witnesses.

Defendants assert that by virtue of questioning the government's witnesses they have not raised a defense of good faith and argue that the government's intended use of evidence of uncharged deaths of patients of the Tennessee clinics is distinct from that affirmed in *United States v. Lang*, 717 F. App'x 523 (6th Cir. 2006) [Doc. 788 p. 2–3]. Defendants also argue, for reasons set forth in their response to the instant motion and other related briefs, that evidence of uncharged deaths of patients of the Tennessee clinics is inadmissible under Rule 403 of the Federal Rules of Evidence. The probative value of such evidence, they argue, is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury, especially in light of the government's burden to prove the patient deaths charged in the indictment [*Id.* at 2, 4].

In this Court's October 11, 2019 order addressing defendants' motion *in limine* to exclude evidence of uncharged patient deaths [Doc. 672], the Court denied defendants' motion in part, holding that defensive use of specific evidence of overdose deaths of patients was admissible to impeach or rebut a defense of good faith [*Id.* at 19–20]. The legal authority cited by the Court in support of this finding was *United States v. Lang*, 717 F. App'x 523 (6th Cir. 2006). In *Lang*, the Sixth Circuit affirmed the introduction of evidence of a specific patient's overdose death to impeach a defense witness, a nurse at

7

defendant's illicit pain clinic, who testified that her patients were legitimate pain patients. *Id.* at 539 (holding that this evidence was properly admitted to attack the witness's credibility and posed a minimal risk of prejudicing the defendant). The government argues that the proffered evidence is admissible pursuant to the portion of the Court's order addressing the use of evidence of uncharged patient deaths as it was used in *Lang*. The Court finds, however, that the government's evidence of some uncharged deaths and the manner in which it seeks to introduce it are more analogous to *Schwartz* and *United States v. Bourlier*, 518 F. App'x 848 (11th Cir. 2013), than *Lang*.

As discussed in greater detail in the Court's October 11, 2019 order [Doc. 672 p. 10–14], *Schwartz* and *Bourlier* upheld the admission of evidence of uncharged patient deaths. In particular, the evidence offered in those cases involved uncharged deaths of specific patients who were either prescribed by a specific defendant, *Bourlier*, 518 F. App'x at 855–56 (holding that evidence of three uncharged deaths of patients who had been prescribed by the provider defendant was admissible), or prescribed at the clinic operated by a specific defendant. *Schwartz*, 702 F. App'x at 755–56 (holding that evidence of two uncharged deaths of patients of the clinic that defendant managed was admissible).

The specific evidence of four uncharged deaths of patients discussed in the government's motion[4] is similar to that admitted in *Schwartz* and *Bourlier*. Specifically, this evidence, like that in *Bourlier*, connects a provider defendant's practice to a deceased

---

[4.] The Court is referring to the evidence related to the deaths of C.B., J.W., K.H., and P.S., including any notations on their patient files indicating that they were deceased or any "pre-filled out" forms for appointments which were upcoming at the time of their death.

8

patient: a specific patient received a prescription from a particular defendant and thereafter (in this case, within thirty (30) days after the appointment) died. And similar to *Schwartz*, the examples discussed by the government connect defendant Hofstetter, the owner or operator of the clinic visited by the patients, to the specific deceased patients who were prescribed at her clinic.

The Court notes, however, that the government's request is broad and encompasses evidence of uncharged deaths that do not share the similarities between the government's examples and the cases discussed. The government seeks to introduce "[a]ny death" that occurred during an approximately five-year-long conspiracy [Doc. 774 p. 1]. In doing so, the government again takes its analogy to *Schwartz* and *Bourlier* too far—especially when considering that the provider defendants worked at the various clinics for just a fraction of that time.[5]

As the Court discussed in its previous order [Doc. 672 p. 12–16 (distinguishing evidence of uncharged deaths of Hollywood clinic patients from the evidence of uncharged deaths offered in *Schwartz* and *Bourlier*)], *Schwartz* and *Bourlier* are only instructive with respect to evidence of uncharged deaths of patients prescribed by a defendant or at the clinic the defendant operated [*Id.* at 12, 14 ("[E]vidence of deaths of patients of clinics where a particular defendant never treated patients has no value in determining that

---

[5.] The indictment alleges that defendant Newman was employed at the Lenoir City and Lovell Road clinics from in or about October 2013 through in or about March 2014; defendant Clemons was employed at the Lenoir City and Lovell Road clinics from in or about November 2013 through in or about March 2015; and defendant Womack was employed at the Lovell Road from in or about August 2013 through in or about July 2014 [Doc. 320 p. 9–10].

9

defendant's guilt of unlawful distribution of controlled substances or conspiracy thereof.")]. The case law therefore provides guidance in determining the admissibility of uncharged deaths of Tennessee clinic patients during the conspiracy as to defendant Hofstetter, who owned and/or operated each of the Tennessee clinics throughout the conspiracy. But evidence of *any* death of a patient of the Tennessee clinics includes evidence of uncharged deaths that, as to the provider defendants, is more similar to evidence of uncharged deaths of Hollywood clinic patients, which the Court excluded, than to the evidence of uncharged deaths in *Schwartz* and *Bourlier* [*Id.* at 14 ("In contrast, here, the provider defendants did not treat patients at the Hollywood clinic and were not otherwise involved with or employed by that clinic. The Court finds, therefore, that unlike the evidence in *Schwartz* and *Bourlier*, evidence of uncharged deaths of Hollywood clinic patients is of no probative value as to the provider defendants.")].

Nor is evidence of these deaths offered in a context similar to *Lang*, which affirmed the introduction of evidence during cross-examination of a defense witness for purposes of impeachment on the issue of the witness's good faith in prescribing patients at the defendant's pill mill. Here, the Court finds that the government seeks to introduce evidence of uncharged death in its case-in-chief to not only rebut claims of good faith like in *Lang* in the context of impeachment but also to affirmatively establish an element of the offenses charged: the defendants' *mens rea* [Doc. 774 p. 9].

Given the distinctions between these two categories of uncharged deaths of patients of the Tennessee clinics, the Court must analyze them separately. The Court will first address evidence of those uncharged patient deaths which, like the examples set forth in

10

the government's order and like the evidence of uncharged deaths offered in *Bourlier*, have a direct connection to a provider defendant, meaning the deceased patient was prescribed by a provider defendant and died shortly thereafter, often before their next appointment or within thirty (30) days.

First, the Court finds that evidence of such uncharged deaths is relevant and therefore admissible under Rule 402 of the Federal Rules of Evidence. *See* Fed. R. Evid. 401, 402. Rule 402 provides that only relevant evidence, which Rule 401 of the Federal Rules of Evidence defines as evidence having "any tendency to make a fact [of consequence in determining the action] more or less probable," is admissible. Fed. R. Evid. 401, 402. The Court agrees that such evidence of uncharged patient deaths has some tendency to suggest that a provider defendant knew or was deliberately ignorant of the fact that patients might be misusing prescriptions and overdosing. *Schwartz*, 702 F. App'x at 756 ("Evidence of patient deaths . . . showed that [the defendant] knew that the clinic's patients were misusing their prescriptions . . . ."); *Bourlier*, 518 F. App'x at 855 ("[E]vidence of these patients' deaths could be considered by the jury when determining whether [the defendant] knew that his patients were misusing his prescriptions."); *see also United States v. Kostenko*, No. 5:16-CR-00221, 2017 WL 1395500, at *2 (S.D. W. Va. Apr. 17, 2017). The Court also finds that defendants' knowledge that patients were misusing prescriptions is "one factor that may suggest that [the defendants] distributed controlled substances without a legitimate medical purpose and outside the usual course of professional practice." *Bourlier*, 518 F. App'x at 855 (citing *United States v. Joseph*, 709 F.3d 1082, 1104 (11th Cir. 2013)); *see also Kostenko*, 2017 WL 1395500, at *2.

Accordingly, the Court finds that such evidence is relevant and thus admissible under Rule 402.

The Court now turns to the question of the admissibility of this category of uncharged-deaths evidence under Rule 403 of the Federal Rules of Evidence. Rule 403 requires that the Court balance the probative value of the proffered evidence against its prejudicial effect and other dangers posed, including confusing the issues and misleading the jury. Fed. R. Evid. 403. The rule favors admission: "only when the risk of prejudice is both *unfair* and *substantially weightier* than any probative value does the court have discretion to exclude the evidence." *Lang*, 717 F. App'x at 531. Rule 403 is an "extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." *United States v. Taylor*, No. 1:04-cr-160, 2006 WL 3359280, at *1 (E.D. Tenn. Nov. 17, 2006) (quoting *United States v. Meester*, 762 F.2d 867, 875 (11th Cir. 1985))

First, the Court notes its previously announced agreement with the case law of other circuits on this issue, which indicates that evidence of deaths of patients prescribed by a particular defendant is highly probative of that defendant's state of mind [Doc. 672 p. 12 (citing *Schwartz*, 702 F. App'x at 756; *Bourlier*, 518 F. App'x at 856; *Lang*, 717 F. App'x at 538–39)]. Evidence that defendants' patients were dying is probative of whether defendants knew or were deliberately ignorant of the fact that patients were not legitimate pain patients but were seeking pain pills and misusing their prescriptions. Moreover, because this particular category of evidence is defined by a direct and temporal connection

12

between a particular defendant's practice and a specific patient's death, the Court finds that this evidence is of exceptional probative value.

Second, the Court finds that the high probative value of such evidence is not substantially outweighed by the danger of unfair prejudice. To be sure, as the Court stated in its prior order, evidence of patient deaths has the potential to be significantly prejudicial [Doc. 672 p. 15 (citing *Bourlier*, 518 F. App'x at 856; *United States v. Kumar*, No. 4:17-CR-5-FL-1, 2019 WL 346395, at *9 (E.D.N.C. Jan. 28, 2019); *Kostenko*, 2017 WL 1395500, at *2)]. But the Court finds that in light of the Rule's favoring admission and the high probative value of this type of uncharged-deaths evidence, the Court does not find that the danger of prejudice posed by this evidence substantially outweighs the probative value. *See Schwartz*, 702 F. App'x at 756 ("[I]t is not unfairly prejudicial for the jury to know the consequence of a defendant's criminal behavior, especially when the district court gave a limiting instruction before and after trial, thereby alleviating any prejudicial effect."); *Bourlier*, 518 F. App'x at 856.

The Court also recognizes that, because the government has charged each defendant in this case with causing specific patient deaths, this evidence poses some risk of confusing the jury. *See Kostenko*, 2017 WL 1395500, at *2 (noting "the risk of conviction based on association in cases with many related charges—that a jury will see a pattern of behavior and convict for individual counts that were not properly proved" (citing *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1141 (4th Cir. 1994))). *But see Bourlier*, 518 F. App'x at 850–51, 53, 55–56 (affirming the admission of evidence of uncharged patient deaths in a case that charged defendant with dispensing controlled substances resulting in death).

13

The Court is of the opinion that this risk does not substantially outweigh the high probative value of this category of evidence of uncharged patient deaths. *See Bourlier*, 518 F. App'x at 56.

Moreover, the Court finds that the risk of confusion and unfair prejudice can be mitigated to some extent by a limiting instruction. *See id.* (holding "concerns about the prejudice [of evidence of uncharged patient deaths were] mitigated . . . by the three jury instructions the district court gave to the jury"); *Schwartz*, 702 F. App'x at 756; *cf. United States v. Asher*, 910 F.3d 854, 862 (6th Cir. 2018) (noting that, in the context of Rule 404(b) evidence, a limiting instruction can mitigate the risk of prejudice). Accordingly, the Court will instruct the jury on the permissible purposes for which they may consider the evidence in an effort to mitigate Rule 403 concerns. The Court includes the instruction that it intends to give the jury in note below and invites the parties to submit any comments on or proposed edits to this instruction.[6]

In sum, the Court finds that specific evidence of uncharged deaths of patients who were prescribed by a defendant and died shortly thereafter is admissible. *See Bourlier*, 518

---

[6.] The Court's intended instruction is as follows:
The indictment charges defendants with causing the overdose deaths of specific patients. Those are what I will refer to as "charged deaths." You will receive more instructions with respect to determining culpability for charged deaths. In addition to evidence of charged deaths, the government may introduce evidence of other patients' deaths, deaths which are not charged in the indictment. Those are what I will refer to as "uncharged deaths." Defendants are not charged with the deaths of such patients. Accordingly, you may only consider evidence of uncharged patient deaths to determine whether a defendant or defendants knowingly and intentionally prescribed controlled substances outside the usual course of professional practice and without a legitimate medical purpose or conspired thereto.

14

F.App'x at 855–56. The government, therefore, may introduce evidence of the uncharged deaths of C.B., J.W., K.H., P.S., and other uncharged patient deaths of similar example, including any notations on those patients' charts indicating they are deceased and any forms which may have been "pre-filled out" for those patients' appointments which were upcoming at the time of their death.

The Court notes the limited nature of this ruling: the Court has not ruled on the admissibility of evidence of any death of a patient of the Tennessee clinics other than those specific patients (and those similarly situated) which the government offers to introduce in its motion. Like evidence of uncharged deaths of Hollywood clinic patients, which the Court found to be inadmissible under Rule 403 [Doc. 672 p. 12–14 (distinguishing evidence of uncharged deaths of Hollywood clinic patients from evidence of uncharged deaths offered in *Schwartz* and *Bourlier*)], evidence of uncharged deaths of patients of Tennessee clinics who were not treated by a provider defendant could potentially, for similar reasons, pose a danger of unfair prejudice, confusing the issues, and misleading the jury as to the provider defendants. The Court will again **DEFER** ruling on the admissibility of such evidence, again noting that "admissibility of this evidence depends greatly on the context in which the government may seek to introduce the evidence at trial" [*Id.* at 20].

## III. Conclusion

The Court hereby **DENIES in part** the government's motion [Doc. 774] to the extent that the Court previously found that the email between defendants Hofstetter and Tipton (Government's Exhibit 2044) is inadmissible; the Court will not reconsider that ruling. The motion is **GRANTED in part** to the extent that the government is permitted

15

to introduce specific evidence of the deaths of C.B., J.W., K.H., and P.S., and other similarly situated patient examples. The Court **DEFERS** ruling on the admissibility of other evidence of uncharged deaths of patients of the Tennessee clinics.

IT IS SO ORDERED.

<pre>
                              s/ Thomas A. Varlan
                              UNITED STATES DISTRICT JUDGE
</pre>