UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No.: 3:15-CR-27-TAV-DCP |
| SYLVIA HOFSTETTER, CYNTHIA CLEMONS, COURTNEY NEWMAN, and HOLLI WOMACK, | ) | |
| Defendants. | ) | |

# **ORDER**

Defendants moved in open court on December 9, 2019, to strike the testimony of witness Michael Carter, or in the alternative for a limiting instruction. The government opposes defendants' motion. The Court will **DENY** the motion.

Defendants argue that the witness "opined, or at least tried to" that certain prescriptions at issue in this trial "were not for legitimate medical purpose in the usual course of professional practice," while at the same time, the witness admitted that he "didn't know anything about pain management," had minimal familiarity with the Intractable Pain Act, "did not know any of the federal standards, did not know any of the DEA policies, did not know any of the things that go into . . . the issue of prescribing." Trial Transcript for December 9, 2019, at 284–85. Additionally, the witness could not speak to "what levels of drugs were high levels" for lack of knowledge, and he prescribed these drugs only infrequently as a practitioner. *Id.* at 288. Defendants contend that the

witness cannot opine on "the ultimate issue . . . of legitimate medical purpose here for these prescriptions and in the usual course of professional practice without having the knowledge that [the witness] clearly lacks." *Id.* at 285. "It's simply outside the scope of his . . . expertise." *Id.*

The government disagrees that the witness testified outside the scope of his expertise. Rather, it argues that the witness "specifically tailored his testimony" to the "practice of a nurse practitioner and the standard of care employed in treating patients . . . standards that Tennessee has adopted and that are nationwide." *Id.* at 286. Admitting that the witness may have discussed the Intractable Pain Act in response to specific questions on cross, the government contends that the witness's opinions on direct were "specifically tailored" to whether the prescriptions issued by nurse provider defendants met the Tennessee and national standard of care associated with treating patients, a standard which does not change across specialties. *Id.* at 287. The government noted that the witness has forty-five (45) years of experience in a variety of disciplines "treating patients, charting patients, dealing with these four tenets that he described." *Id.* For these reasons, the government opposes striking the testimony and believes a limiting instruction unnecessary because the witness's testimony and the government's questioning were very clear. *Id.*

The Court agrees with the government that it would be inappropriate to strike the witness's testimony or to provide a limiting instruction. Having reviewed the trial transcript, the Court finds that the government's questions and the witness's responses on

direct support the government's argument that it confined the witness's testimony to his expertise area, the practices of nurse practitioners across specialties and, specifically, the nurse practitioner standard of care.

The witness's testimony establishes that he is qualified to testify to the standard of care for nurse practitioners across specialties. The witness testified to his numerous degrees in nursing science—a bachelor's in nursing and a master's degree in nursing science from the University of Arkansas, a doctor of nursing science from Boston University, a post-master's degree from the University of Tennessee as a geriatric nurse practitioner, and a doctor of nursing from the University of Tennessee in Memphis. Trial Transcript at 3. The witness discussed the coursework these degrees involved, including coursework in pharmacology and extensive clinical experience. *Id.* at 3–9. Then, the witness testified to his professional experiences as an army nurse in orthopedics, running a free clinic in Arkansas, teaching at the University of Arkansas, working at the Bedford Veterans Administration hospital, starting the first family nurse practitioner program at the University of Colorado school of nursing, providing medical care at a Salvation Army-operated adult drug and alcohol treatment program, acting as the medical director of a city prison, acting as Dean of Nursing for the University of Tennessee, which included extensive inpatient care activities, and in his retirement, acting as the assistant medical director at a nursing home, volunteering at a free clinic, teaching at the University of Arkansas as a professor of geriatric medicine, and opening the first primary care nurse practitioner clinic in western Australia. *Id.* at 10–31. The witness also

3

testified to his possession of nurse practitioner licenses in Tennessee and Arkansas, a DEA license, which he gave up around 2014, and an Australian license qualifying him to prescribe drugs, as well his membership in various nursing associations, his Board of Nursing certifications as a family nurse practitioner and geriatric nurse practitioner, his certification by the National Medical Board for Medical Examiners, and his extensive publication history. *Id.* at 33–46. In particular, the witness testified that he is not only familiar with the rules of the Tennessee Board of Nursing for advanced nurse practitioners, but he also "helped with putting some of [the rules and regulations] together" at the time they were being written. *Id.* at 46.

Most of the witness's testimony consisted of opinions clearly within his specialty, namely the practices of nurse practitioners. A significant part of the witness's testimony addressed the practices of nurse practitioners generally, including what the standard of care is, how and where the standard of care is taught, how nurses formulate a diagnosis and develop a therapeutic plan for a new patient, how they become competent in a specialty area and maintain competence, the responsibility associated with having a DEA number, the Tennessee law requirement for nurse practitioners prescribing drugs to have a supervising physician, and how a nurse practitioner should conduct a follow-up visit. *Id.* at 46–68, 70–102. The government also elicited testimony about a registered nurse's general knowledge of prescribing controlled substances. *Id.* at 66–70. Finally, the witness testified regarding his application of the "new patient and the follow-up rubric" to ninety (90) patient files he reviewed from the clinics in this case. *Id.* at 102.

4

Regarding those files, the witness testified about the adequacy of the patient history, family history, past medical history, the description of the medications prescribed, notations regarding the examination of the patient and the practitioner's findings, descriptions of responses to previous therapies, notations regarding inconsistent drug screens, treatment goals, and follow-up regarding potential addiction issues and patient life events. *Id.* at 103–154, 156–95. Apparently summing up the prior testimony, the government asked at one point, "[A]re any of those prescriptions in the usual course of professional practice, when I say that, are they meeting the standard of care?" *Id.* at 169. The witness responded, "I found none of the 90 some records that I reviewed that met the standard of care requirement for Tennessee board or the national requirement to have adequate history, adequate physical, adequate assessment and an adequate plan." *Id.* All this testimony falls within the "practice of a nurse practitioner and the standard of care employed in treating patients . . . standards that Tennessee has adopted and that are nationwide," as the government argues. *Id.* at 286.

While the government did repeatedly ask the witness whether there was a legitimate medical purpose for prescriptions in certain medical files, the context of the witness's testimony made clear that he was testifying to whether the content of the files offered a basis for a legitimate prescription. These exchanges occurred as follows:

- The government asked the witness, "So with respect to this individual and the prescriptions issued by any of the nurse practitioners, was there any legitimate medical purpose?" *Id.* at 147–48. And, the witness answered, "I found no legitimate medical purpose supported by this record. This is not a medical record." *Id.* at 148.

5

- The government asked, "And with respect to the prescriptions issued in this case, were they without a legitimate medical purpose?" *Id.* at 163. No answer is recorded in the transcript. *Id.*
- The government asked, "Were any of the prescriptions contained in this file by a nurse practitioner with a legitimate medical purpose?" *Id.* at 168. And, the witness answered, "I can find no legitimate purpose for any of these. There was - - no, there is just nothing." *Id.*
- The government asked, "[F]or every prescription that was written by a nurse practitioner in this file, was there any legitimate medical purpose for it?" *Id.* at 183–84. The witness responded, "I found none." *Id.* The government responded, "Okay. And was it outside the usual course of professional practice?" *Id.* at 184. The witness responded, "It was." *Id.*
- The government asked, "And with respect to some of the prescriptions written by any nurse practitioner in the file, were they without a legitimate medical purpose and outside of the scope of professional practice?" *Id.* at 184. And, the witness responded, "They were." *Id.*
- A near identical exchange occurred with respect to two other patient files. *Id.* at 186, 194.

The context of these questions and responses makes clear that the government was not eliciting opinions from the witness as a pain management expert, which he admittedly is not, but rather asking him to testify to whether he could identify a legitimate medical purpose for the prescription based on the content of the files. Each exchange took place immediately after the government took the witness through a specific file and asked him questions about the file's adherence to the standard of care. Thus, by testifying that he could not identify such a legitimate purpose for the prescription, the witness was testifying to a failure of the standard of care, i.e. an "[in]adequate history, [in]adequate physical, [in]adequate assessment and an [in]adequate plan." *Id.* at 169.

Moreover, Rule 702, of the Federal Rules of Evidence, which governs the admissibility of expert testimony, "should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *U.S. v. L.E. Cooke Co., Inc.*, 991

F.2d 336, 342 (6th Cir. 1993). Rule 702 states, "A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The Sixth Circuit has applied a four-prong test to uphold the admission of expert testimony: "(1) a qualified expert (2) testifying on a proper subject (3) which is in conformity to a generally accepted explanatory theory (4) the probative value of which outweighs its prejudicial effect." 991 F.2d at 342.

Defendants appear to challenge the witness's qualifications to testify regarding the legitimacy of prescriptions for chronic pain patients due to his lack of familiarity with the Intractable Pain Act and certain federal standards. Yet, an expert's "unfamiliar[ity] with pertinent statutory definitions or standards is not grounds for disqualification," affecting his "credibility, not his qualifications to testify." *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984). Additionally, "any weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility."[1] It is "up to opposing counsel to inquire into the expert's factual basis" for his opinion, and it is up to the jury to decide "whether an expert opinion should be accepted as having an adequate basis." *Id.* Here, defendants

---

[1]. The same reasoning applies to the following statements by the witness: The witness testified that a patient was taking drugs "at fairly high doses" in response to the government asking whether it was accurate that a drug plan included "a whole lot of drugs," *id.* at 161, and that "[t]here should have been no new prescription for drugs, in my opinion," when asked whether a negative drug screen should have been a red flag. *Id.* at 175.

thoroughly attacked the witness's credibility on cross examination and re-cross, and the Court will instruct the jury that they are to determine the weight and credibility to be given to an expert witness's testimony. *Cf. Davis*, 742 F.2d at 919 (upholding court's admission of expert testimony and noting that opposing counsel "took full advantage of the opportunity to challenge [the witness]'s familiarity with the ADEA and his credibility as an expert," and that the court instructed the jury "they were to determine the weight and credibility to be given the expert's testimony.").

Accordingly, the Court finds it inappropriate to strike the witness's testimony or to provide a limiting instruction. Fed. R. Evid. 702. The context of the witness's testimony made sufficiently clear that any testimony regarding the legitimacy of certain prescriptions rested on the witness's evaluation of the files' adherence to the standard of care, to which the witness was qualified to testify, and to the extent he did testify about the legitimacy of specific prescriptions, his unfamiliarity with the mentioned standards does not disqualify him as a witness. Defendants' motion is **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE