IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiff,              )
                                  )
vs.                               )     Case No.:  3:15-CR-27
                                  )
SYLVIA HOFSTETTER,                )
COURTNEY NEWMAN,                  )
CYNTHIA CLEMONS,                  )
HOLLI WOMACK,                     )
                                  )
          Defendants.             )
_____ )


**VOLUME XXXVIII (pp 1-238)**

**JURY TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**January 27, 2020**
**9:11 a.m. to 5:37 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          TRACY STONE, ESQUIRE
                                Assistant United States Attorney
                                United States Department of Justice
                                Office of the United States Attorney
                                800 Market Street
                                Suite 211
                                Knoxville, Tennessee 37902

                                KELLY K. PEARSON, ESQUIRE
                                DAMARE THERIOT, ESQUIRE
                                United States Department of Justice
                                Office of the United States Attorney
                                1301 New York Avenue NW
                                Washington, DC 20005


(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **FOR THE DEFENDANT:**<br>**SYLVIA HOFSTETTER** | CHARLES C. BURKS, JR., ESQUIRE<br>Justice, Noel & Burks<br>1816 West Clinch Avenue<br>Knoxville, Tennessee 37916 |
| | LORETTA G. CRAVENS, ESQUIRE<br>Cravens Legal<br>P.O. Box 396<br>Knoxville, Tennessee 37901 |
| **FOR THE DEFENDANT:**<br>**COURTNEY NEWMAN** | CHRISTOPHER J. OLDHAM, ESQUIRE<br>Gulley Oldham, PLLC<br>706 Walnut Street<br>Suite 302<br>Knoxville, Tennessee 37902 |
| | MARK E. BROWN, ESQUIRE<br>Menefee & Brown, LLP<br>9724 Kingston Pike<br>Suite 505<br>Knoxville, Tennessee 37922 |
| **FOR THE DEFENDANT:**<br>**CYNTHIA CLEMONS** | RANDALL E. REAGAN, ESQUIRE<br>Law Office of Randall Reagan<br>100 West Summit Hill Drive<br>Knoxville, Tennessee 37902 |
| | M. JEFFREY WHITT, ESQUIRE<br>Whitt, Cooper, Trant & Hedrick<br>607 Market Street<br>Suite 1100<br>Knoxville, Tennessee 37902 |
| **FOR THE DEFENDANT:**<br>**HOLLI WOMACK** | CHRISTOPHER RODGERS, ESQUIRE<br>Law Office of Kit Rodgers<br>P.O. Box 70764<br>Knoxville, Tennessee 36938 |
| **ALSO PRESENT:** | SYLVIA HOFSTETTER, DEFENDANT<br>COURTNEY NEWMAN, DEFENDANT<br>CYNTHIA CLEMONS, DEFENDANT<br>HOLLI WOMACK, DEFENDANT<br>MICK NOCERA, FBI AGENT<br>JOELLE VEHEC, FBI AGENT<br>JULIE PATTERSON, PARALEGAL<br>DAN SHERROD, INVESTIGATOR |

1                                    **INDEX**

2                                                              **PAGE**

3    Closing Argument by Ms. Pearson                            8

4    Closing Argument by Mr. Whitt                             97

5    Closing Argument by Mr. Reagan                          151

6    Closing Argument by Ms. Cravens                         176

7    Closing Argument by Mr. Burks                           192

8    Court's Ruling on Defendants' Rule 29 Motions           228

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496

1        (Call to Order of the Court)

2              THE COURT:  Good morning and welcome back, everybody.

3              Before we bring the jury in, are you ready to go

4    Ms. Pearson?

5              MS. PEARSON:  I'm ready.

6              THE COURT:  Okay.  Before we do, let me respond

7    quickly to the filing yesterday of Defendant Hofstetter's

8    objection to jury instruction, other acts.

9              Couple things, one, the -- first of all, to the

10   extent defendant is objecting to the admission of other acts,

11   evidence, as stated in the third paragraph of the objection,

12   the Court has previously ruled upon that, I think, in writing

13   and orally, and the Court would overrule that portion of the

14   objection.

15             To the extent in Paragraph 2, it states,

16   "Ms. Hofstetter objects on the grounds of thefts do not relate

17   to," and then it addresses the intent, motive, and/or knowledge

18   language that the Court previously used in its limiting

19   instructions to the jury when this evidence was introduced.

20             The Court does not disagree with that basis for the

21   objection.  The Court also does not disagree that the language

22   that was used in the limiting instruction of that phase goes,

23   quote, far beyond, closed quote, the language of the Sixth

24   Circuit pattern instruction.

25             The Court would also note for the record when the

                        UNITED STATES DISTRICT COURT

1    Court -- in the current draft of the jury instruction, the

2    limiting -- the language mirrors that used when the Court gave,

3    I think, on two -- at least two occasions a limiting

4    instruction language when the evidence was introduced, and

5    notes that there was no objections lodged at that time to the

6    use of that language.

7         Nonetheless, since the Court's bent typically is to

8    default to the pattern jury instructions for purposes of the

9    jury charge itself, the Court will change the language on

10   Paragraph 110, noting that it's already given that language

11   during the limiting instructions without objection, and that

12   language is maintained before the jury for purposes of the

13   ending charge itself.

14        The Court will utilize the language from Sixth

15   Circuit pattern criminal jury instruction number 7.13 and will

16   state basically you've heard testimony the defendant

17   committed -- the Defendant Hofstetter committed certain crimes

18   or bad acts other than the ones charged in the indictment.  If

19   you find the defendant did those crimes or bad acts, you can

20   consider the evidence only as it relates to the government's

21   claim on the defendant's intent, motive, and/or knowledge.  You

22   must not consider it for any other purpose.  Remember the

23   defendant is on trial here only for the crimes charged in the

24   superseding indictment, not for the other acts.  Do not return

25   a guilty verdict unless the government proves the crimes

UNITED STATES DISTRICT COURT

1    charged in the indictment beyond a reasonable doubt, period.

2           Any questions?

3           MR. STONE:  Your Honor, just let me put on the

4    record, just in case this issue is litigated on appeal, that

5    the government's position is -- just sort of go back to that.

6    Our position from the beginning was that proof was intrinsic

7    anyway, and so it would be a conservative fallback and note

8    that the Court has chosen to go from the conservative fallback

9    from our view, not necessarily the Court's view.  And so just

10   to make the record clear, we believe it was intrinsic and no

11   instruction would be appropriate.  So we just want to make that

12   on the record.

13          THE COURT:  Thank you.

14          If nothing else then, I believe we're ready to bring

15   the jury in and proceed with closing arguments in this case.

16       (Jury in at 9:15 a.m.)

17          THE COURT:  Thank you.  Everyone may be seated, and

18   good morning to our members of the jury.

19          THE JURY PANEL:  Morning.

20          THE COURT:  And welcome back.  I hope you enjoyed the

21   multiday break last week and your weekend.

22          Again, on behalf of everyone in the courtroom, the

23   parties, counsel, and representatives of the parties, we

24   appreciate the attention you paid during the evidentiary

25   portion of this trial.

UNITED STATES DISTRICT COURT

1         We are now ready for the closing arguments of the

2    parties.  As a reminder, I believe I told you way back when,

3    closing arguments are not evidence.  However, they are an

4    opportunity for counsel for the parties to present to you or

5    argue with you as to what they believe the evidence has shown

6    and how you should address that evidence during your

7    deliberations.

8         As a reminder, the government will go first with

9    opening closing argument, and then the defendants in turn will

10   have the opportunity for closing arguments, after which the

11   government will have the opportunity for a final closing

12   rebuttal argument.

13        I'm not -- I don't know that we'll get through with

14   all the closing arguments today.  It's been a long trial, and

15   there's been some breaks in the trial, so at request of counsel

16   for the various parties, I'm giving them ample time for their

17   closing arguments.  I'm also allowing those with multiple

18   counsel to split up that argument if they'd like.

19        The government is going to go first, and I believe

20   Ms. Pearson is going to present the opening closing argument,

21   and then Mr. Stone will present the rebuttal closing argument.

22        But we'll just take it -- we'll start today and see

23   how far we get and try to take our normal break.

24        So with that in mind, Ms. Pearson, you may proceed

25   with opening closing argument on behalf of the government.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    MS. PEARSON:  Thank you, Your Honor.  We will get

2    through me today.

3        Good morning.  On behalf of the United States, I just

4    want to thank you for the apparent attention you gave to this

5    case in taking in excess of three months out of your own lives.

6    So on behalf of the United States, thank you very much.

7        What I want to talk to you about is about this case

8    in the evidence.  I just want to start with an overview.  But

9    for well over a decade, the United States is in the middle of

10   an opioid epidemic.  And like a virus, that epidemic spread

11   from Florida and it came right up I-75 here to East Tennessee.

12   And it brought with it addiction, crime, and death.  It

13   destroyed entire communities with just a handful of tiny white

14   pills.

15       This epidemic arrived in Tennessee in the form of a

16   pill mill, which is what we've been discussing this entire

17   trial.  Really no different in form and function than a drug

18   house.  The pill mill allowed addicts and drug dealers fast and

19   easy access to extremely dangerous narcotics in exchange for

20   cash.

21       And the pill mills operated by this defendant,

22   Ms. Hofstetter and her coconspirators dealt thousands of

23   customers with millions of high-dose opioid pills in their over

24   four years of operation in Knoxville.

25       How many pills are we talking about?  11 million,

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1     over 11 million in just four years.  Two million of them

2     prescribed by these three defendants, Ms. Womack, Ms. Clemons

3     and Ms. Newman.  That's about 215,000 per month in a little

4     over four years.

5          But this case is not just about the pills.  It's

6     about the tens of millions of dollars in profits made by

7     Ms. Hofstetter and her partners on the backs of drug addicts

8     and drug dealers.  And this case is about the defendant taking

9     advantage of this epidemic and their decision to value a

10    paycheck over the fundamental tenets of medicine, first and

11    foremost to do no harm.  And this is about the choice to value

12    money over someone's well-being over that of the community.

13         This is a case about choosing the equivalent of about

14    130,000 a year in exchange for simply signing your name to a

15    piece of paper and not caring at all about your

16    responsibilities as medical caregiver.

17         What I want to do with you-all is, I want to take you

18    through the charges that are before you.  The Court will give

19    you a verdict form, which will detail them.  The things I have

20    via this PowerPoint are simply just for our discussion today.

21    And hopefully y'all can see it.

22         But with respect to Ms. Hofstetter, she's count --

23    she's charged in several counts that you're going to consider

24    in your deliberations.

25         Count 1 is RICO conspiracy in violation of

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  18 U.S.C. 1962.

2          Count 2 is a drug conspiracy, which we'll discuss at

3  length as we go forward.

4          Count 3 is a money laundering conspiracy associated

5  with Count 2.

6          Count 4 is another drug conspiracy that we'll talk

7  about in length as we go forward.

8          Count 5 is another money laundering conspiracy that

9  goes hand in hand with Count 4.

10          Counts 6 and 7 are what we call substantive counts.

11  They're substantive counts of money laundering in violation of

12  18 U.S.C. 1957.

13          And then Counts 11, 12, and 13 are what we call

14  maintaining a drug premises.  Those are associated with the

15  various clinics that we've discussed throughout the course of

16  this trial.

17          And Counts 14, 16, and 18 are what we call

18  substantive drug distribution counts.  Those are specific

19  prescriptions associated with a specific overdose.

20          With respect to Ms. Clemons, she's charged in

21  Counts 2, which is the drug conspiracy I referenced earlier,

22  Counts 4, Counts 11 and 13 and 16 and 18.  And we'll discuss

23  all these as we move forward.

24          Ms. Newman is charged in Counts 2 and 4, which,

25  again, are the drug conspiracies.  Counts 11 and 13, again,

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

 1    those are the maintaining the drug members.  And Counts 14 --

 2    and Count 14, which is distribution of a controlled substance.

 3           And, finally, Ms. Womack is charged in Counts 2 and

 4    4, which are the drug conspiracies before you, and Count 13,

 5    which is maintaining a drug involved premises.

 6           Okay.  I'm going to start -- I'm going to start with

 7    the drug conspiracies, but I want to tell you first, what I

 8    plan to do is go through some of the elements for each offense.

 9    I will tell you that the Court's instructions that he will give

10    you hopefully this afternoon or tomorrow morning do control.

11           I'm not going to review each and every instruction of

12    law that the United States anticipates the Court will get, but

13    I'm going to go over a few that may assist you in understanding

14    the argument that I intend to present.  We'll review each

15    element of the offense and some instructions that I just told

16    you about.

17           And we're going to start with the drug conspiracy

18    counts, as those counts encompass a vast majority of the

19    evidence that the United States has put forth for your

20    consideration.

21           We'll go over why each defendant before you is

22    guilty.  I'll explain each defendant's role and the things that

23    they personally did, the criminal acts that make them guilty

24    under the federal laws that we're going to talk about.  I plan

25    to review the evidence and explain how it kind of fits with the

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    law.

2           The Court will tell you that your collective

3    recollection controls, and that's absolutely true.  My

4    presentation is argument and that of the defense as well.

5           So let's start with Counts 2 and 4.  Counts 2 and 4

6    are the drug conspiracies that we talked about earlier.  All

7    four defendants are charged in both counts.  The difference

8    between the counts is Counts 2 deal with the Hollywood clinic,

9    the Gallaher View 1 clinic, and Lenoir City.  Counts 4 deals

10   with the Gallaher View 2 clinic and the Lovell Road clinic, all

11   of which the government asserts were pill mills in this case.

12          Let's talk about the elements.  Drug conspiracy

13   actually, despite the vast amount of evidence you heard, has

14   two elements.  One, and I'm paraphrasing the first element, but

15   the defendant conspired with one another and others to

16   distribute oxycodone, oxymorphone, and morphine.  And the

17   second element is, the defendants knowingly and voluntarily

18   joined the conspiracy.

19          So when we're talking -- I'm going to bring all three

20   elements in.  When we're talking about a drug distribution

21   conspiracy, the underlying substantive acts that we say that

22   the defendants agreed to do is to distribute or traffic in

23   narcotics.

24          So we got to talk about the elements of a drug

25   distribution.  So the first element, that the defendant

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    knowingly or intentionally distributed or caused to be

2    distributed a controlled substance.  Two, the defendant knew at

3    the time of the distribution the substance was a controlled

4    substance.  And, three, the defendant's act was not for a

5    legitimate medical purpose or in the usual course of

6    professional practice or was beyond the bounds of medical

7    practice.

8         So the controlled substances we're talking about were

9    the oxycodone, the oxymorphone, and the morphine.

10        A distribution is the equivalent of writing a

11   prescription.  You'll be instructed on that in the vast

12   instructions that the Court will give you.

13        So for the big picture here, when we're talking about

14   a drug conspiracy, we're talking about people that have agreed

15   to distribute narcotics.  The agreement for Counts 2 and 4 is

16   the essence of that crime.

17        Now, the one other thing I wanted to discuss with

18   drug conspiracy is kind of some of the things that revolve

19   around agreement.  And you'll be given several instructions

20   about how the government must go about proving that agreement.

21        One thing you'll be instructed on is the government

22   is not required to prove a formal agreement, a written

23   agreement, a contract.  That's what -- we're not required to

24   prove that.  We're also not required to prove that everyone

25   involved agreed to all of the details of the conspiracy.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1          However, the government must prove beyond a

2    reasonable doubt that there was a mutual understanding, either

3    spoken or unspoken.

4          We also may prove that by -- indirectly by facts and

5    circumstances.  That's the evidence.  That's the totality of

6    what's going on.  That's one of the ways the government may

7    prove that this conspiratorial agreement existed.

8          It also doesn't require under the law proof that the

9    defendant knew everything about the conspiracy or everyone

10   involved.

11         And, finally, the government is not required to prove

12   that everyone joined the conspiracy on day one.  Okay.  And

13   that's kind of an important point in this case, because we're

14   going the talk about some actions in 2009, 2010, '11, and '12,

15   as we get to these defendants who joined the conspiracy, some

16   of them in 2013 into 2014.

17         The big picture here is, in other words -- and we'll

18   start first with the three nurse practitioners before you.

19   Once they knew they were working at these places that were

20   trafficking narcotics which were pill mills for $65 an hour and

21   they kept right on going, they've joined these drug

22   conspiracies.

23         And, second, when they know, and then this -- in this

24   case, when they write those thousands of prescriptions that

25   we're going to be talking about, they're in.  And those

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    prescriptions that they write, once they know they're in this

2    conspiracy, they know what the purpose of the conspiracy is,

3    are not for a legitimate medical purpose or in the usual course

4    of professional practice.

5         Okay.  Let's talk a little bit about Count 2 and the

6    structure that was in place for this conspiratorial agreement.

7         First at the top of the food chain, for lack of a

8    better term, you had the owners.  Those are the Italian folks

9    we've been discussing through the course of this trial.  That's

10   Luca Sartini, Luigi Palma, Benjamin Rodriguez, and Chris

11   Tipton.  Those are the folks that provided capital investment

12   to get these pill mills moving in Tennessee.  That agreement,

13   with the exception of Mr. Tipton, started back in Florida with

14   the Hollywood clinic.

15        Mr. Tipton coordinated the Tennessee side of the pill

16   mill and was the owner on the ground.  In return, all of these

17   owners, Mr. Sartini, Palma, Rodriguez, Tipton received those

18   weekly disbursement checks as payment for their investment.

19        The next kind of level in the conspiracy was

20   Ms. Hofstetter.  Her role was to manage the day-to-day business

21   of each of the clinics.  And she was always, as you recall from

22   the evidence, pushing her staff to see more and more customers.

23   The reason she was doing that is patient volume equals money,

24   equals money for the partnership and for the Italians back in

25   Florida.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1          Also part of the conspiracy were the providers.  And

2     in this case, we're talking about these three defendants.

3     Their role in the conspiracy was to write prescriptions to as

4     many customers as they could see on a daily basis or in each

5     respective pill mill could fit into the schedule.  In exchange

6     they got above-average nurse practitioner salary.

7          And, finally, kind of the last part of this was you

8     need customers.  And you heard from some of the customers --

9     actually, I missed somebody.  Sorry.  You need office staff as

10    well.  You heard from some of those people, Ms. Lori

11    Crabtree-Gaston, Stephanie Puckett, Shannon Hill, other facts

12    that worked at the clinic.  They were there to make it

13    efficient, to move the paperwork, manage the patient files.

14         And then you have the customers.  You've heard from

15    about over a dozen customers, but as you recall from the

16    evidence, these pill mills had thousands of customers,

17    customers that flocked to these places to receive their

18    prescriptions for opioids.

19         And I want to talk a little bit about how long this

20    conspiracy went on.  So for Count 2, you started back in

21    Florida with the Italians, way back in 2009, where they opened

22    their pill mill in Hollywood, Florida.

23         Then there was the December 2010 DEA raid of their

24    clinic, but by that time, they had already made plans to come

25    up to Tennessee, and they'd already actually even opened their

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  first Gallaher View 1 clinic.

2          And December of 2010, Gallaher View 1 opens.  And

3  then in May 2011, the conspiracy expanded to that new pill mill

4  on Lenoir City.  And then if you recall on March 2012, Gallaher

5  View 1 closes because of all of those complaints and then

6  whatever customers were remaining there, were transferred over

7  to the Lenoir City location.  And the Lenoir City pill mill

8  stayed in operation until the FBI shut it down in March of

9  2015.

10          Now, the first type of evidence you heard with

11  respect to Count 2 in that conspiracy came in the form of

12  Mr. Tipton and Mr. Rodriguez.  If you recall, Mr. Rodriguez

13  called the Hollywood station -- Hollywood pill mill a Subway

14  station.  He also used the words "burn and churn."

15          Even before the DEA raid, because of the

16  profitability of the Hollywood clinic, these folks were looking

17  to expand.  As you recall, he testified that Mr. Palma was

18  already doing research and kind of had fixated on Tennessee as

19  the next place the conspiracy needed to go.

20          When they landed here, they brought Ms. Hofstetter up

21  with them to run their operation in Tennessee.  And even though

22  she stole from the trio in Florida, they brought her to

23  Tennessee.  Let that sink in for a minute.  They brought

24  somebody who they knew had stolen from them, up here to

25  Tennessee to run things.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1       Mr. Tipton was already here in Tennessee.  He was

2  familiar how to run clinics.  He knew, had connections to

3  providers in the area, so he became an integral part of the

4  conspiracy to open these clinics up here.

5       And Tipton, as he testified to you, he knew almost

6  immediately that he was running a pill mill.  But the reality

7  for him was that the money was too great to stop.

8       Their collective testimony, both Tipton and

9  Mr. Rodriguez, I would submit to you, was backed up by some of

10  the other evidence that you heard in the case.  They came into

11  the enterprise from different places, one from Florida with the

12  connection to the Italians, Mr. Tipton because he was here and

13  was familiar with kind of the framework up here in Tennessee to

14  run clinics.

15       But they both described the same structure, the same

16  titles, and same purpose as the defining feature of the UCSC

17  conspiracy, which were what these pill mills were.

18       Other witnesses, like Ms. Puckett and Ms. Hill, also

19  told you how the conspiracy was structured, that Ms. Hofstetter

20  was in charge, volume was important, and of course that these

21  places were pill mills.

22       And the financials demonstrated their motivation for

23  running these places.  And if you recall, these folks, like

24  Mr. Rodriguez and Mr. Tipton were getting weekly disbursement

25  checks in the thousands.  That's the kind of money we're

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   talking about, simply for opening these places up, and letting

2   Ms. Hofstetter run them.

3           And when I call these places pill mills, I would

4   submit to you that the totality of the evidence the government

5   put forward is what makes these places pill mills.

6           Don't get me wrong, I'm not asking you to like these

7   people, and I'm not asking you to make friends with them.  But

8   what I am asking you to do is evaluate their testimony in light

9   of the totality of the evidence that you heard from the

10  government.

11          So I've mentioned them, and I just want to remind you

12  what these places looked like.  So when we're talking about

13  Count 2, we're talking about the Hollywood pill mill, we're

14  talking about the Gallaher View 1 location, and then we're

15  talking about the Lenoir City location in Lenoir City.

16          Now, moving on, before we get into kind of the meat

17  of the evidence, let's talk about the separate and distinct

18  structure of Count 4.

19          So Lovell Road, what I call Lovell Road, although it

20  did include Gallaher View 2, had a different structure, if you

21  remember.  This was the offshoot by Ms. Hofstetter and

22  Mr. Tipton, because they watched what these Italian folks were

23  making in Lenoir City and Gallaher View 1, less investors, less

24  owners, more money.  So at the top of this conspiracy, you have

25  Ms. Hofstetter and Mr. Tipton.

UNITED STATES DISTRICT COURT

1    Then again, you have Ms. Hofstetter, she's actually

2 playing dual roles in this conspiracy. Right? She's the

3 owner, she's the investor, she's receiving those disbursements,

4 but she's also managing the day-to-day operation of that

5 clinic, first Gallaher View 2 and then Lovell Road.

6    Then you have the providers, again, Ms. Newman,

7 Ms. Womack, Ms. Clemons. And if you recall from the evidence,

8 they spent the majority of their time here. This is where they

9 spent the bulk of their employment period with this conspiracy

10 is at Lovell Road.

11    Again, you need office employees to run the clinic,

12 take care of the paperwork, make sure the patients are getting

13 in. And, again, it's the same folks we've heard about, Lori

14 Crabtree-Gaston, Stephanie Puckett, Shannon Hill, and others.

15    And, of course, finally, you need customers, and they

16 had them. And I would submit to you that as we go forward,

17 this is the worst of the worst. They had the most customers

18 and the highest volume.

19    So for Lovell, for Count 4, which is Lovell Road, you

20 have the agreement by Ms. Hofstetter and Mr. Tipton to open

21 that secret Gallaher View 2 clinic. That was the one opened in

22 secret from the Italians.

23    As time went on, to build that clinic, as you recall

24 specifically from Ms. Puckett, they used the discharged

25 patients to kind of get that secret clinic going. And that was

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    from Ms. Puckett's testimony.  And as time went on, they got --

2    it opened one day a week and then they had more days starting

3    in about June of 2012 at that secret clinic.

4          Ultimately, they landed on October -- early

5    October 2013.  They relocated from Gallaher View 2, which is in

6    that complex with that stand-alone business on Lovell Road.

7    And, of course, Lovell Road remained open until March of 2015,

8    churning out customers and thousands of prescriptions.

9          Okay.  And if we recall, this is the location of

10   Lovell Road between the Waffle House and the pornography store.

11         So I want to go back to the elements of distribution

12   now, because I want to talk to you about a couple more

13   instructions you're going to get in regard to that.

14         So if you recall, the first element is that knowingly

15   or intentionally distributed or caused to be distributed a

16   controlled substance.

17         Two, the defendant knew at the time of the

18   distribution that the substance was a controlled substance.

19         And, three, which I suspect we'll spend a lot of time

20   talking about, is the defendant's act was not for a legitimate

21   medical purpose or in the usual course of professional practice

22   or was beyond the bounds of medical practice.

23         There are a couple of instructions you'll be given,

24   I'm going to go through just a few of them, that kind of relate

25   to these elements, and specifically that third element.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    And the first one I want to talk to you, I call

2  deliberate ignorance.  I'm going to read it verbatim.  "No one

3  can avoid responsibility for a crime by deliberately ignoring

4  the obvious.  If you are convinced that a defendant

5  deliberately ignored a high probability that the controlled

6  substances, as alleged in these counts, were distributed

7  outside the usual course of professional practice and not for a

8  legitimate medical purpose, then you may find that the

9  defendant knew this was the case."

10    And the instruction continues.  "But you must be

11  convinced beyond a reasonable doubt that the defendant was

12  aware of a high probability that the controlled substances were

13  distributed outside the usual course of professional practice

14  and not for a legitimate medical purpose and that the defendant

15  deliberately closed her eyes to what was obvious.  Carelessness

16  or negligence or foolishness on her part are not the same as

17  knowledge and are not enough to find her guilty of any offense

18  charged under this law.  This, of course, is all for you to

19  decide."

20    And what's very important to remember about this

21  instruction is that this instruction does not apply to the

22  elements of conspiratorial agreement in Counts 2 and 4.  What

23  it does apply to is the Element 3 of drug distribution.

24    This instruction uses the word "ignorance," but in

25  reality, it talks about whether each defendant took specific

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    actions.  So we're talking about ignorance, but it's kind of

2    the opposite of that.  It's did these defendants take specific

3    actions to ignore knowing the truth?  In other words, when she

4    made the decision, as I'm going to submit to you that each

5    defendant in this case did on multiple occasions, to close her

6    eyes on the harsh reality of the pill mills and the activities

7    that were going on in those places, every day that she chose to

8    close her eyes and she chose to go to that pill mill and write

9    a prescription, that's what this instruction is talking about.

10   That's deliberate ignorance.

11          So when you talk about ignorance, it's not -- perhaps

12   it's inaction, but it's really a purposeful action to close

13   your eyes, to ignore what's going around -- what's going on

14   around you and just write that prescription.

15          And each provider, and I would submit that each

16   defendant in this case did do this, became a drug dealer under

17   the law when she chose to write the prescription and knew it

18   was not for a legitimate medical purpose or in the usual course

19   of professional practice, but yet masked those actions by

20   deliberately ignoring the truth.

21          And what I want you to do is keep that instruction in

22   mind when we talk about the evidence in the case, the red

23   flags, what the owners' investors told you, the office staff

24   told you, what the volume was like, the complaints by those

25   businesses, specifically in Gallaher View 1, the actual

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    customers that you heard from, what they told you, the other

2    providers, Ms. Fristoe, Ms. Chambers, and these defendants

3    themselves through some of the other evidence and the

4    inferences you can draw from that.

5          There's another instruction that kind of goes hand in

6    hand, but it's actually what I call the opposite of this

7    instruction.

8          And that's what I call good faith.  If a nurse

9    practitioner prescribes a drug in good faith in the course of

10   medically treating a patient, then the nurse practitioner has

11   prescribed the drug for a legitimate medical purpose in the

12   usual course of accepted medical practice.  That is, she has

13   prescribed the drug lawfully.

14         Good faith in this context means good intentions and

15   an honest exercise of professional judgment as to a patient's

16   medical needs.  It means that the defendant acted in accordance

17   with what she reasonably believed to be a proper medical

18   practice.

19         In considering whether a particular defendant acted

20   with a legitimate medical purpose in the course of the usual

21   professional practice, you should consider all the defendant's

22   actions and circumstances surrounding them.

23         Before we talk about the definition of "usual course

24   of professional practice," I want to focus on a couple key

25   parts of that instruction.  I'll bring it back.  And one of the

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    things I want to focus on is, you should consider all the

2    defendant's actions and circumstances surrounding them.  And

3    what I would submit to you, what that's telling you is, you

4    cannot look at their actions or activities, as we heard them

5    called, in a vacuum.  You must consider the surrounding

6    circumstances, unlike what Dr. Browder and Mr. McCoy told you.

7         And the keyword in this line is "reasonable," what

8    she reasonably believed to be proper medical practice.  We'll

9    discuss these concepts as we review the interactions with

10   customers at these pill mills.  But in the end, what I'm going

11   to argue to you and I'm going to submit to you is, this

12   instruction has absolutely no place in your deliberations based

13   on the totality of the evidence that's been put before you.

14        The last instruction I want to talk about with

15   distribution and a legitimate medical purpose is the usual

16   course of professional practice.  The term "usual course of

17   professional practice" means that the practitioner has acted in

18   accordance with a standard of medical practice generally

19   recognized and accepted in the United States.

20        A practitioner's own individual treatment methods do

21   not by themselves establish what constitutes a usual course of

22   professional practice.  In making medical judgments concerning

23   the appropriate treatment for an individual, however,

24   practitioners have discretion to choose among a wide range of

25   available options.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    Whether a prescription is made in the usual course of

2  professional practice is to be determined from an objective and

3  not a subjective viewpoint.

4    So what this instruction tells you is what the

5  government has submitted to you all along, is that the usual

6  course of professional practice is an objective, not a

7  subjective viewpoint, and that the practitioner's own

8  individualized treatment method, which we did not see in this

9  case, because everyone was getting the same thing, does not by

10  themselves establish this standard.

11    Now, we kind of -- those are the instructions I want

12  to discuss with you.  You'll be given many more, and I would

13  just tell you again that the actual instructions of the Court

14  we do this afternoon or tomorrow will control your

15  deliberations.

16    Now, let's talk about some of the evidence you heard.

17  Let's start with the red flags.

18    So you heard from Mr. Stan Jones, but you also heard

19  from a lot of other folks.  You heard from the clinic staff,

20  the other providers, and most importantly, the customers.

21    And we all called them kind of red flags of a pill

22  mill.  And they included cars full of people from far-away

23  counties and states, people faking a limp on the way in and

24  they're fine on the way out, drug sales and use in the parking

25  lot, party -- patients that are pill sick or nodding out, high

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    volume, long wait times, paper signage, weird rules, for lack

2    of a better term, require nonpatients to wait outside,

3    complaints from neighbors to law enforcement, garbage, public

4    urination in the parking lot, CSMD prescribing patterns, same

5    or like prescription, discharging patients when they become a

6    liability, no children ever present.

7          The other things you kind of heard was whether it was

8    cash-based.  There's mulch fires, no insurance.  But those are

9    the kinds of things Mr. Jones talked to you about and also some

10   of the other witnesses talked to you about.  And I think these

11   are the types of things that you could should consider, first,

12   whether or not they existed at these pill mills, which I submit

13   to you that they did, but also does this put folks on notice

14   who are working there?

15         So you've heard the term "window dressing" from

16   witnesses.  And they -- what I would submit to you, that even

17   with the window dressing that we're going to go through, these

18   red flags were glaringly obvious with each one of these pill

19   mills run by both conspiracies, whether it was UCSC pill mills

20   at Gallaher View 1 and Lenoir City or whether it was Lovell

21   Road.

22         And when the providers became aware of these red

23   flags, when they went to work every day, they walk in the door,

24   they're seeing one or some of these things, and they keep going

25   in, and they make the decision to ignore them, making not

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    inaction, but actually make the purposeful decision to ignore

2    them, walk in the door, write the prescriptions, they're in the

3    conspiracy.

4         So with respect to the Tennessee law changes, we just

5    talked about window dressing, and you heard a lot of discussion

6    and argument about Tennessee law changes.

7         So I want to talk about the applicable laws.  So

8    Dr. Blake kind of specifically kind of outlined some of these

9    to you, and one of the ones we talked about was the creation of

10   the CSMD or PMP.

11        If you recall his testimony, it was created back in

12   2002, came online in 2006.  It was a good thing, and the

13   Tennessee legislature meant it to be a good thing.  But I would

14   submit to you, the pill mills in both counts purported to check

15   the CSMD.  They might have done it for some patients, but you

16   would see that many times that information was just simply

17   ignored, yet they had their printouts.  A lot of times you saw

18   them in the file.  You heard testimony that they were in

19   folders in the clinics.  But they had them.

20        We'll talk about medical directors, the Tennessee

21   legislature endeavored to kind of set out some framework for

22   medical director in their role in the clinic, supervising the

23   nurse practitioners, reviewing files.

24        As you heard from these conspiracies, both Count 2

25   and 4, they had medical directors.  They ran through medical

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    directors.  Two of them are now since passed.  So they had

2    that, but I would submit to you that those medical directors

3    followed a very specific pattern, and we'll talk about that in

4    a minute.

5            Next, Tennessee state law, there was that prohibition

6    for accepting cash, and these clinics, these pill mills

7    certainly adapted.  They accepted cash.  When the law changed,

8    they took the cash equivalent, and then you recall seeing those

9    debit cards or those prepaid money cards that we discussed in

10   the testimony.  They certainly adapted, but I would submit that

11   didn't stop the sponsors and the drug dealers from bringing

12   those patients, those addicts to the pill mills.  They just

13   simply paid for them with their own debit card.

14           Then there was a Tennessee law in regard to doctor

15   ownership.  And when the Tennessee law changed, and you heard a

16   lot of testimony about this, Hofstetter and coconspirators got

17   that fancy law firm, Baker Donelson, I think the name of what

18   it was, and they created that nominee agreement.

19           And the nominee is kind of the appropriate word,

20   because the nominee agreement made the doctor the owner of the

21   pill mill on the paper; however, each doctor/owner really had

22   no power to do anything, hence the term "nominee."  Right?

23   Because they were nominated by the true owners of the pill

24   mills.  So they were nominated, but as you recall the

25   testimony, they could have just as easily been pushed aside and

UNITED STATES DISTRICT COURT

1    kicked out.

2         And this, I would submit to you, was most aptly

3    demonstrated by the financial structures.  Right?  Doctor is

4    getting a paycheck.  The Italians, Ms. Hofstetter, Mr. Tipton,

5    they're getting the proceeds.  They're getting a return on

6    their investment.  They're the true owners.  And that's why

7    it's called a nominee agreement.

8         And then there was the Tennessee law change dealing

9    with a dispensary on-site.  The dispensary is that vehicle,

10   much like a pharmacy, where you get your prescription on one

11   side of the pill mill and then you just walk right over and get

12   your pills in the other.  If you recall the testimony, at least

13   with Count 2, they contemplated doing that.  They were going to

14   do it.  The law changed, and this was ultimately abandoned, and

15   these pill mills didn't have a dispensary on site.

16        And then we talked a lot about the Intractable Pain

17   Act.  And that was present through the entirety of all these

18   conspiracies.  And I just want to talk about a few things in

19   the act.

20        First, there's nothing in the act -- you'll be given

21   instructions on this act.  But there's nothing in the act that

22   requires a doctor or nurse practitioner to write an opioid

23   prescription.  It's just not there.  It does allow patients to

24   decline other modalities, but there is no corresponding

25   provision saying if this patient declines over modalities, you

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    have to write them a prescription for opioids.

2           Second, the act didn't change the standard of care,

3    and you know that from Dr. Blake's testimony.  He's been

4    practicing, and the standard of care that he's utilized when he

5    sees his own patients has been in place for over ten years,

6    since he got out in 2009.  He was aware of that act.  He knows

7    what the act says, but it does not change the standard of care

8    that this Court will instruct you on.

9           And, third, there's a specific portion of that act

10   that if as a doctor or nurse practitioner you choose to treat

11   an addict or someone who has been addicted to drugs, there are

12   guidelines, there are things the act says you should consider

13   doing.

14          For example, you shall monitor the patient to make

15   sure they're not diverting their drugs.  You should consult

16   with a psychologist or an expert in addiction as appropriate.

17   I would submit to you that the totality of this patient

18   population, you heard from a couple of them, but I would submit

19   to you, based on all the evidence, the analytics of the CSMD,

20   this total population was high risk and had potential for

21   addiction, and there was an absolute disregard for any sort of

22   routine monitoring.

23          Fourth and finally, it's called the Tennessee Pain

24   Intractable Act, and I might have -- the Intractable Pain Act.

25   It's the Tennessee law, it does not trump federal law in this

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

 1   case.

 2           And then, finally, we had the 2014 pain treatment

 3   guidelines.  Those came kind of toward the end of the

 4   conspiracy.  As Dr. Blake told you, they had to promulgate

 5   these for primary care providers in this space.  But these guys

 6   weren't primary care providers.  They were pain management

 7   specialized.  That's what they held themselves out to be.

 8   They're in a different box insofar as the 2014 pain treatment

 9   guidelines.

10           In addition to superficially complying with all these

11   legislature moves, they also had compliance documents via Debra

12   Kimber.  If you remember her testimony, she was a bit early on

13   in the trial.  The reality, though, is what Ms. Kimber

14   testified to, that compliance was unimportant to

15   Ms. Hofstetter.  And if you recall, Ms. Kimber kind of

16   recounted that last meeting with Ms. Hofstetter, that final

17   in-person meeting where she told her she just wanted the damn

18   manual on the shelf.  The manual she's referring to is this

19   kind of fancy compliance document that Ms. Kimber had compiled.

20           So in addition, now we've talked about some of the

21   red flags, we've got the Tennessee state law and the

22   superficial compliance these pill mills.

23           But then let's talk about just briefly about the

24   shell companies.  Another way to appear legitimate is to have

25   official-sounding companies, and they had a bunch.  And I've

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    just named a few, Medfix, UCSC Management, LLC, Shadd

2    Management, ETHS, that's East Tennessee Healthcare Services,

3    East Knoxville Healthcare Services, Comprehensive Health

4    Systems, UCSC Management, Comprehensive Systems.  And I don't

5    think I've caught them all.

6         A shell company, when we call it a shell company, it

7    means they don't really have a purpose.  Say for, in this case,

8    a vehicle to launder money.  I haven't named them all.  These

9    companies provided a portion of the front.  They sound

10   official.  They sound like they're involved in health care.

11   But the reality is, they were just simply a front to make

12   everything look on the up-and-up with every pill mill operated

13   by both conspiracies.

14        So you've got the law changes, the shell companies.

15   We still have the pill mill red flags despite all this.

16        Let's move on to medical directors.  Tennessee law

17   required you to have medical directors.  They need a medical

18   director.  They start with Mark Blumenthal in November of 2010.

19   Gallaher View 1 right off the jump street is showing signs of a

20   pill mill.

21        The result of having him is that he starts to warn

22   Ms. Hofstetter to no avail.  As you recall from the testimony,

23   he's in trouble with the Tennessee Department of Health.  He

24   ultimately left one year after joining the conspiracy, and he

25   has since passed.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1          Let's talk about some of the warnings, though.  This

2     is from jump street a couple months into the conspiracy.  This

3     would be Exhibit 276 [sic].  And I've just gotten portions of

4     it in this, not the entirety of the exhibit.  Let's talk about

5     it.

6          So January 20th, 2011, we're barely 60 days in.  He

7     raised a concern about the safety and security of our

8     operation.  He talked about an "obvious junkie or drug dealer,

9     who became quite irate when I refused to prescribe him narcotic

10    medication and then flipped, quote, unquote, Steffie the bird.

11         "Moreover, I have read at least on one account of a

12    robbery or attempted robbery of a pharmacy every day for the

13    past two weeks in the Knoxville News Sentinel."

14         It says, "Finally, I recently discussed our practice

15    with my attorney.  He explicitly warned me that TBI, Knoxville

16    Police, Tennessee Board of Medical Examiners, and Tennessee

17    Board of Pharmacy are all working together to eliminate pill

18    mills and narcotic drug diversion."

19         And, finally, he said I am not -- "I am willing to

20    work my tail off to help get this practice going and keep it

21    going, but I am not willing to lay my life, reputation, license

22    or freedom on the line to do so."  So January 20th, 2011

23    e-mail.

24         Exhibit 2085, now we're on February 2nd, 2011,

25    another e-mail to Ms. Hofstetter.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1          "Also I consider it vital we upgrade our prescribing

2    [sic] methods.  It is extremely burdensome to see increasing

3    proportion of patients who are either doctor shoppers, pharmacy

4    shoppers, or dual diagnosis (psychiatry plus pain management)."

5          So even then, February of 2011, doctor shopping,

6    pharmacy shopping, those terms, we're talking 2011, eight years

7    ago, nine years ago now, those terms are prevalent in this

8    field.  Dr. Blumenthal knows that.  He's using them.

9          February 6th, 2011, Exhibit 2086, "Knox County has a

10   tremendous drug problem.  The legal authorities, pharmacy

11   authorities, and medical authorities are all up a tree about

12   what to do.  Everyone involved with schedule two [sic]

13   medications is under close scrutiny and inherently includes us.

14   We cannot afford even the appearance of impropriety.  I suggest

15   we do the following:  Tighten up our prescreening techniques.

16   We are simply seeing too many patients who represent a hazard

17   to our practice.  Patients are already beating down our door to

18   be seen, and I do not think we need to worry very much about

19   our growth rate."

20         And he kept going.  So we've got January, February 2,

21   2011, February 6, 2011.  Now, let's talk about May of 2011.

22   Again, another e-mail from Dr. Blumenthal to Ms. Hofstetter.

23   "Pain clinic bill aims to curb prescription drug abuse,

24   legislation called a no-brainer.  We are nowhere near

25   compliance with its intricacies.  Let's get on the stick.  No

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    BS."

2         The big picture here is, through these e-mails, he's

3    talking about being concerned about his reputation, his

4    license, and his life on the line.  He knows what a pill mill

5    is.  He knows what diversion is.  These aren't new concepts in

6    2011.  This is January, February 2011.  They're not new

7    concepts, addiction, doctor shopping, abuse, risk screening,

8    prescreening was talking about, all these things.  He talks

9    about Knox County having a tremendous drug problem.

10         This doctor knows it in 2011, and he's telling

11   Ms. Hofstetter, this is what's going down at your place.  He

12   signed up for this, he stayed a year, but even a doctor willing

13   to risk so much for this nonsense, her pill mill was over the

14   top, and ultimately left, and he has since passed away.

15         What I would submit to you at this point in time, the

16   Hollywood clinic has been raided in 2010.  She's been notified

17   by her doctor in 2011 via e-mail.

18         And recall the side scams, I want to talk about that

19   for a quick minute, ran by Hofstetter and Hollywood, moving

20   patients to the front, the things Mr. Rodriguez told you about,

21   which sounded the same, but we're about to hear about from

22   Ms. Puckett.

23         Warnings about Gallaher View 1 also came almost

24   immediately from the landlord, from the security officer, Mike

25   Daignault, and the other tenants in the building.  And we have

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    with these e-mails, we have written proof she's on notice.

2          Next was Dr. Valley, if you recall him.  Dr. Valley

3    was, in his own words, desperate for a job, and in

4    November 2011, he takes this position.  And the first thing he

5    does is he does a chart review and he authors a report kind of

6    outlining issues he saw with that chart review.

7          Okay.  Exhibit 498 on Page 262, he says, "In over

8    twenty years of reviewing chart compliance, I have never been

9    presented with such consistent and flagrant disregard of

10   charting conventions and opioid management."  In that same

11   exhibit, he says, "If not corrected, poses an immediate and

12   severe risk."

13         And then he keeps going, Exhibit 498, Page 262,

14   "Often, it appears the patient directed the treatment plan.

15   Often, the warning signs were ignored.  There were cases where

16   the patient had been discharged from other pain clinics, yet

17   the records from these clinics were not requested and the

18   situation was not addressed in the note."

19         Same exhibit, potential doctor shopping and the

20   medications were continued.  Patients were arrested for driving

21   while under the influence, patient, and the medications were

22   continued.  Patients often refused to supply medical records

23   supporting their condition.

24         And then the last thing he says, "There was one case

25   where the patient was on opioids and the spouse girlfriend

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    called stating he had beaten her.  The situation was not

2    addressed in an appropriate manner.  There was no documentation

3    that the medical director was notified."

4         Finally, same exhibit, Exhibit 498, he says, these

5    clinics fit all criteria for the definition of a pill mill.

6    And at this point in time, he's talking about Gallaher View 1.

7    We haven't even gotten to Lovell.  That's what he's talking

8    about, and that's language he's using.

9         Marc Valley, as you know, ended up leaving the

10   practice.  Exhibit 512, he sent an e-mail on May 30th, 2012 to

11   Ms. Hofstetter and Mr. Tipton where he said, "Patients that

12   I've ordered discharged for cause are not being discharged.  I

13   request that both of you spend a full day here to see what is

14   going on."

15        Ultimately, Dr. Valley quit in July of 2012.  If you

16   recall his testimony, he described a pill mill with a

17   meaningless chart and writing prescriptions for pain meds.  He

18   told you he regretted time at these places, but kind of the

19   reality of Dr. Valley is being part of these pill mills, he

20   contributed to the problem and he wasn't a good doctor.

21        And if you recall when Dr. Blake was asked if

22   Dr. Valley runs in the same professional circle as him, I think

23   he just had a one-word answer.  It was no.

24        He'll have to live with what he did here, but he's

25   the exact type of person these places were hired.  He was let

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   go from multiple previous jobs, willing to take a position

2   anywhere, and cared only about protecting his own skin, not

3   about the patients.  But even he, even this doctor had these

4   things to say about her first clinic here.

5           So what does this tell you?  Now we're in July of

6   2012, despite Valley's e-mails, Blumenthal's, Ms. Hofstetter is

7   committed to running these places as pill mills.  The money is

8   just too good to stop.

9           Next we had Dr. Blakely.  Again, we had an individual

10  that moved through several jobs, fell asleep during surgery,

11  lost his job, became the third medical director in August 2012.

12  And if you recall his testimony about the first day at the

13  clinic when he was outside, he overheard drug talk.  He knew

14  immediately that Lenoir City was a pill mill.  He spoke to you

15  about being under -- his medical authority being undermined

16  after 10 or 11 days.  He's gone.

17          Finally, we've got a combination that kind of works.

18  They found Dr. Larson.  He was a primary-care doctor by trade.

19  If you recall, he had some health issues, dialysis twice a

20  week, and he has since passed away after being indicted in this

21  case.

22          In June 2012, he became the medical director of

23  Gallaher View 2 secret location.  But then after Blakely quit,

24  he takes on Lenoir City, and ultimately he grabs Lovell Road as

25  well.  He knew nothing about pain management when he started.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    And I would submit to you by accounts of the witnesses, he was

2    asleep at the wheel.

3              The big picture of these folks tell you is that they

4    selected doctors they believed would either not recognize the

5    activity that's going on in the pill mills, because they

6    weren't specialists, or just ignore it.  And sometimes they

7    strike out, Valley and Blakely.  But in the end, they found the

8    right combination.

9              Now, we alluded to this earlier, let's talk about

10   some of the clinic staff.  And I know you-all remember

11   Ms. Puckett and Ms. Hill.

12             Ms. Puckett told you about a side scam, various side

13   scams developed in the clinic.  But what first what she told

14   you is all the red flags that we just discussed early in the

15   case were confirmed by both Ms. Puckett and Ms. Hill, the

16   security guards, first G4, Mike Daignault, and then

17   Ms. Hofstetter's boyfriend, Dion, the clientele, entire

18   families going in the pill mills, the complaints by local

19   businesses, volume of customers, actions by the clinic staff to

20   keep the pill mills efficient, patient file upkeep, and the

21   goal to keep the providers moving.

22             She also told you about the UDS side scam, where if

23   you had insurance as a customer, your urinary drug screen went

24   to one clinic, which generated kickback for Hofstetter's

25   coconspirators.  If you didn't have insurance, you went to the

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    cheaper lab.

2           Ms. Hill told you about removing UDS results from

3    customers' files for a fee.  And Ms. Puckett said, for a fee,

4    she moved you to the fastest, better providers.  And that

5    sounds familiar like what was going on in Hollywood clinic with

6    Ms. Hofstetter.

7           She could get away with it, because providers didn't

8    routinely check the PMP.  If you recall, you heard testimony

9    that she upped some of the prescriptions.  Because if they had,

10   they would have caught Ms. Puckett doing that.  And at the

11   direction of Defendant Hofstetter, she also called discharged

12   patients back to the clinic.  Both women also received bonuses

13   for patient volume because Hofstetter's goal was a hundred a

14   day.

15          I would submit to you that these women didn't pull

16   the wool over anyone's eyes.  The evidence doesn't support this

17   premises.  They functioned -- these clinics functioned as pill

18   mills before Puckett and Hill, during Puckett and Hill, and

19   after Puckett and Hill.  There are no outrage, save for an

20   audit you've heard about by Hofstetter, which I would submit to

21   you was meant to target Ms. Puckett, because she was mad that

22   some of the customers were flocking to KPC.

23          But it didn't change anything about the operations.

24   Puckett and Hill thrived because the pill mill environment

25   encouraged this type of criminal activity.  Everyone had a

                      UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  scam.

2          You had Mr. Tipton with his lab kickbacks in the pill

3  mills.  Of course you've got Gerritt Orrick sponsoring

4  patients, selling stolen goods in the parking lot.  Then you've

5  got all the other sponsors and drug dealers you heard about.

6          And if you recall Ms. Puckett's testimony about being

7  thrown right back in the fire, that same temptation from her

8  old days as a drug addict was there.  She was well familiar

9  with this patient population.  It should come as no surprise

10 that this is the kind of environment that you would find at a

11 pill mill.

12         And I'm saying again, you don't have to make friends

13 with these women.  You don't have to like them.  But I would

14 submit that their testimony was absolutely supported and

15 corroborated by the evidence in this case.

16         And you also heard from various clinic staff, such as

17 Lori Crabtree and Crystal Lattimore.  They were consistent on

18 one primary fact, this Defendant Hofstetter was in charge, and

19 she was focused on making money.  And this was seen one way, as

20 many customers as you could get in the door.

21         And let's move finally to the customers.  Customers,

22 I would submit to you, you've heard from a very small

23 percentage, but they represent this patient population.  They

24 were addicts and drug dealers who sold opiates on the streets

25 of East Tennessee.  And they heard about these pill mills

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    through word of mouth.  When they were discharged from one,

2    they would simply find another.  And they demonstrate the

3    purpose of both conspiracies and also give you, most

4    importantly, evidence that these three women knew what these

5    places were.

6            And so I want to start with Exhibit 928.  We talked

7    about word of mouth.  Who are they hearing this from?  Friends

8    and family in the same business.  Two or more customers came

9    from 866 addresses.  That's 1700 people.  Three or more

10   customers coming from 148 addresses.  And then we just keep

11   getting smaller numbers.  And you recall, we even had eight

12   patients from KARM, which is Knox Area Rescue Ministries.

13           So you've got them hearing about it from word of

14   mouth.  You've got that type of volume coming from the same

15   address.

16           So I've mentioned this once before, let's talk about

17   the discharging these pill mills did.  The discharges by these

18   defendants and Ms. Hofstetter on occasion protected the pill

19   mills.  It was not care of a patient or even treating a

20   patient.

21           Special Agent Vehec discussed what the United States

22   referred to as a discharge shell game.  All four of these women

23   discharged patients.  But the very fact that they discharged

24   patients and the reasons for the discharge demonstrate that

25   they knew who their customers were and what they were speaking

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    from these pill mills.

2            Exhibit 916, if you recall, this was kind of the

3    breakdown of four years of discharges.  Let's think about this

4    for a minute.  Over a thousand patients in just four years were

5    discharged for urinary drug screens.  A bad UDS range from

6    prescriptions for a UDS positive for unprescribed drugs,

7    negative for your prescription -- and we're talking about

8    positive for unprescribed drugs, we're also talking about

9    illicit drugs, heroin, cocaine, methamphetamines, amphetamines.

10   And that's not an inclusive list.  Dozens were discharged for

11   track marks and dozens more for pill count issues, doctor

12   shopping, and criminal activity.  And that's just to name a few

13   reasons.

14           These reasons speak to the patient populations when

15   seeking pills for addiction and sale on the street, not for the

16   treatment of pain.

17           And we call it a shell game for four reasons, first

18   of which, customers went from pill mill to pill mill, and that

19   didn't just include these family of clinics.  That included

20   places like Breakthrough, Chilhowee, Bearden.

21           The system allowed pill mills to purport to be

22   compliant and vigilant, so I'm going to discharge that person.

23   But the reality was, that person was just going to the next

24   pill mill.  It's almost like an ecosystem.

25           There's also the internal shell game that Agent Vehec

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   talked to you about.  The FBI identified over 280 what we

2   called re-admits.  But you also heard testimony from

3   Ms. Puckett that the files were sanitized.  280 is what the FBI

4   identified.  That is not the complete universe.

5          And, third, a discharge isn't treatment.  As

6   Dr. Blake told you, there are tons of other modalities that

7   exist outside of opioids.  If you have only one game, though,

8   money for an opioid pill, of course, they discharged people,

9   because it risked their business, as they had no other option

10  for treatment.  The ice, the stretching, the DME, that's part

11  of the window dressing.  They're not paying $300 a visit for

12  heat, ice, and stretching.

13         And, fourth, addicts draw the attention of law

14  enforcement.  All the pill mills are doing it.  Anyone who

15  wants to the -- who they believe brings too much attention has

16  to be discharged.  And, of course, these three defendants

17  discharged patients.

18         But what I want you to take away from Exhibit 918 is,

19  look at the discharge in relation to the patient visits.  And

20  we can take Ms. Clemons, for example.  She discharged 197

21  folks, but I would submit to you that when we're talking about

22  a discharge rate of 2.46 percent in relation to the 8,000

23  visits she had, that ain't anything to write home about.

24         You've heard -- and you've also heard instances where

25  these defendants discharged a patient and they just show right

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    back up at the sister clinic.  These discharges are evidence

2    that they know who these patients are, they're aware of it, and

3    this makes them coconspirators in both counts.

4             We also talked to you about the DAST.  And this is

5    just one example.  And we did not present the DAST, because it

6    matters whether or not it's an accurate drug-abuse screening

7    tool.  What we did do is present it to you because it just

8    shows the utter lack of care that these customers received at

9    these pill mills.  It was the only way that these pill mills

10   screened for abuse or addiction, literally the only way, this

11   one piece of paper.

12            Remember the consensus even back then, cross appeal

13   to pain management, that risk stratification assessment is

14   crucial to prescribing these high-dose, dangerous opioids or

15   any opioid, for that matter.  And pill mills here made this

16   decision to use this as lip service.  It's a one-sheet page of

17   paper.

18            And even when customers reported alarming behavior,

19   no one followed up or did anything, and a lot of times, they

20   just scored it wrong anyway.

21            So let's talk about Mr. Mason.  He's answering yes to

22   being arrested to illegal drugs.  No action.

23            We had Sean Richardson, if you recall Ms. Alred's

24   testimony, this was somebody that was in her drug group.  He

25   said yes to using drugs and -- other than those required for

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    medical reasons, yes, he felt bad about his drug use, yes to

2    friends or relatives know or suspect you abuse drugs, and yes

3    to withdrawal symptoms.  No actions.

4         You didn't hear from this customer, Jamie Samson, but

5    he answered yes to friends or relatives know or suspect you

6    abuse drugs, yes to lost friends because of your use of drugs,

7    yes to -- had a medical problem as a result of your drug use.

8    No action.

9         Chris Pique, you didn't hear from him.  But this

10   customer said yes to friends or relatives know or suspect you

11   abuse drugs, yes to drug abuse ever create a problem between

12   you and your spouse, yes to gotten into fights under the

13   influence of drugs, and yes to withdrawal symptoms.  No action.

14        Samantha Oody, if you recall Ms. Puckett's testimony,

15   I believe her entire family was going to one of these places.

16   She said yes to neglected your family or missed work because of

17   drug use, yes to withdrawal symptoms, and yes to medical

18   problems as a result of your drug use.  No action.

19        Jamie Brummitt, you didn't hear from this person.

20   But this person said yes to family members have sought help for

21   you regarding your drug abuse, yes to medical problems, and

22   yes, ever gone to anyone for help of your drug problem.

23        These are just a few of that exhibit.  No inquiry, no

24   inquiry into whether or not the medical problems these folks

25   are talking about could be an overdose or something more

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    serious, no inquiry into what kind of help they sought for drug

2    abuse, nothing.  When these three defendants ignored these in

3    the file, they chose to ignore the one piece of paper that

4    would tell them anything about this person and write the

5    prescription.  This is evidence that they know these

6    prescriptions are not for a legitimate medical purpose.

7         And the very folks that we presented to you, let's

8    start with the first premise that everyone has been arguing for

9    for three months, addicts and drug dealers lie.  They lie to

10   get the drugs that they seek to abuse or sell on the streets.

11   They lie about their pain and the conditions causing their

12   pain.

13        But I'm going to argue to you and submit to you that

14   the evidence demonstrates that any nurse practitioner would be

15   smacked in the face for the lies told by these customers.

16        If a defendant wanted to see the truth, it would have

17   smacked her in the face the minute the customer walked in the

18   room.  The lies are clear to a nurse practitioner who is

19   checking the PMP, reviewing a drug screen, conducting a

20   comprehensive patient history, exam, forming a diagnosis,

21   treatment plan, or even Looking at the DAST where some of these

22   folks are talking about problems they're having.

23        In other words, if you choose to do your job as a

24   nurse practitioner, you should know these folks are lying.

25   These lies are transparent.  Addiction and misuse aren't just

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    for opioids.  They've been common principles throughout the

2    course of medicine, alcohol, other drugs.  This is not a new

3    concept, and it certainly wasn't a new concept in 2014.

4         These customers were not masters in disguise, they're

5    not chameleons, and they're not on the Oscar nomination list.

6    There's a reason Blake and even Browder and McCoy don't

7    prescribe opioids on the first visit.  It's actually one

8    effective way of screening some of these folks out, and it's

9    advertising you're not a pill mill.

10        And when Ms. Womack, Ms. Newman, and Ms. Clemons made

11   the decision to overlook these lies, the appearance and even

12   the information on the charts, those prescriptions are not for

13   a legitimate medical purpose.

14        And on some occasions, like UC Sterns, Mr. Sterns, in

15   his undercover capacity, when Ms. Clemons covered up that lie

16   by saying, "I'll just put you're on vacation," that is one

17   instance where you can look at where she's taking deliberate

18   action to mask that truth.

19        Each defendant chose to write pills to customers

20   missing urinary drug screens.  They chose to write

21   prescriptions to customers with bad urinary drug screens in the

22   file.  They chose to ignore the medical director when he said

23   "high" on the file or indicated some sort of referral.

24        And she -- each defendant made the decision to forego

25   pill counts, a free version of monitoring to see if somebody is

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    actually using the drugs as prescribed.  And they made the

2    decision to not request medical records or previous pain clinic

3    records for numerous customers who reported it.  They chose not

4    to take any action other than writing that prescription for

5    opioids pills.

6          And these choices are most aptly demonstrated by the

7    second page of each patient visit where those pain levels

8    stayed the same, as clearly filled out by someone other than

9    the provider.  These charts are a joke.

10         And the window dressing used by these customers, the

11   lying, I'm in pain, was as thick as the window dressing as

12   those fancy nominee agreements and those shell companies

13   drafted by the owners, such as Mr. Rodriguez, Mr. Tipton, and

14   Ms. Hofstetter.  It's as flimsy as that.

15         And even then, dozens of DASTs, UDS screens missing

16   or aberrant, sitting in the file -- because not everyone is

17   paying Puckett and Hill, it's a small percentage of the

18   thousands of patients going to these places -- were purposely

19   disregarded by each of these three defendants.

20         This is all evidence that demonstrates prescriptions

21   written by these three defendants were not for legitimate

22   medical purpose.

23         And I'm just going to briefly run through some of the

24   things you heard from the patients.  This was a random defense

25   chart, randomly selected by some sort of numeric system.  He

                   UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   went to pill mills in Florida and Tennessee.  He was addicted,

2   word of mouth, he told you.  He was discharged from Lenoir

3   City.  Ultimately landed at Lovell.  Told you all these places

4   were the same, pill mills.  Through the course of all those

5   visits, all three defendants wrote him prescriptions at Lovell.

6           We had Ms. Elliott.  She started out being sponsored

7   by Jason Butler, she testified.  And at one point, she made

8   30,000 a month.  She told you Lovell was obviously a pill mill,

9   and she stayed at Lovell even after Ms. Puckett and Ms. Hill

10  left.  And then she attempted to follow Ms. Womack to her next

11  clinic and contacted her about coming over with another

12  customer about -- to keep getting opioids.  She told you she

13  was a drug dealer.  Ms. Clemons and Ms. Womack wrote her

14  prescriptions at Lovell.

15          And then there was Lee Jenkins.  He sponsored many

16  people, including his own family members, he testified.  And if

17  you recall his testimony, he said, what I could see, I'm sure

18  she could see, talking about the providers.  There are addicts

19  there, and he even talked about them not being able to hold

20  their heads up.  Ms. Puckett assisted him at Lovell.  He

21  testified Hofstetter was always raising Cain about patient

22  behavior.  He had 15 missing UDS results and still got his

23  pills.

24          You don't need a fancy medical license to figure out

25  what this means.  All three providers disregarded the medical

UNITED STATES DISTRICT COURT

1    director's directive.

2            The "high" notes are another example of the choices

3    to ignore the medical director.  These are specific choices you

4    make.  Three hundred is now the limit, as evidenced by the last

5    note on Mr. Jenkins, "MED too high."  All three defendants

6    wrote Mr. Jenkins prescriptions.

7            Then we had Scott Willis.  He was discharged for

8    methamphetamine.  He was called right back to Gallaher View.

9    He was discharged from there.  And then he finally landed at

10   Lovell.  His discharge papers and his probation paperwork were

11   in the file.

12           He talked about his track marks and the excuses he

13   gave for that, one of which was a chainsaw.  Testified he was a

14   junkie.  He was getting more meds than a cancer patient.  And

15   he called these places dope houses.  Both Ms. Clemons and

16   Ms. Womack wrote prescriptions to Mr. Willis.

17           Ms. Osborne, she traveled to pill mills in Georgia,

18   Florida.  She said they were all the same, including Gallaher

19   View 2 and Lovell.  Elliott told her about it.  She referenced

20   it was crowded.  And if you recall, she had a small amount of

21   Suboxone.  She still got her pills from Ms. Clemons.  All three

22   women on trial wrote prescriptions to Ms. Osborne.

23           Then there was Scott Stockton.  He was a customer at

24   Gallaher View and Lovell.  He said they were both like the

25   other pill mills he had been with.  He had a brief romantic

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    relationship with Ms. Newman.  He said a visit cost about a

2    thousand out of pocket.  He heard about it through word of

3    mouth.  And he told you he felt lucky to be alive, because he

4    was given enough pills to kill a horse.  All three defendants

5    wrote prescriptions to Mr. Stockton.

6         There was Gerritt Orrick.  He had been to pill mills

7    in Florida.  He had seven cars, jewelry.  He brought the staff

8    cupcakes, sponsored customers.  He said the Lovell waiting room

9    looked like the mission.  He showed up multiple times a month

10   on days he didn't have an appointment, and he sold stolen goods

11   in the parking lot.  He said Newman hit on him.  Providers,

12   they liked me, drug dealers like me.  All three defendants

13   wrote to this customer.

14        Then we have Randy Garrett.  He was a patient at

15   Breakthrough until it was shut down.  That paperwork was in the

16   Gallaher View 1 patient file.  He injected opioids for years

17   until he was arrested.

18        He was discharged from Lenoir City and then called to

19   come back to Gallaher View 2, ended up at Lovell.  And if you

20   recall Mr. Garrett, he had multiple excuses for track marks on

21   his arm, one of which was picking blackberries.  He told you he

22   went to Lovell pill sick and saw other pill sick customers that

23   were high.  There were needles in the parking lot.

24        And he said it was easier to get pills from these

25   clinics than off the streets.  And he stayed after Ms. Puckett

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    and Ms. Hill left.  He said nothing changed.  All three

2    defendants wrote this man a prescription.

3         Mr. Ledford, he was going with his wife.  Butler was

4    sponsoring him.  And he testified the exams felt like a

5    checklist, and that they would punish you with a reduction in

6    meds.  And he kind of analogized that to, well, a doctor

7    doesn't cut your insulin if you don't get a test done, and that

8    was the analogy he used.  All three defendants wrote to this

9    patient.

10        And then there was Ms. Watson.  She started at

11   Gallaher View 2.  She was 21 or 20.  She had been going to pill

12   mills in Florida.  During a visit with Ms. Womack, she referred

13   to Opanas as half moons.  She was told not to use street lingo.

14   Womack wrote her a prescription in the waiting room without

15   meeting her.  She lost over 15 pounds in four months.  I think

16   she lost over 20.  Nobody asked her about that.  All three

17   defendants wrote to Ms. Watson.

18        There was Danielle Ledford.  She had a fake MRI.  She

19   described the waiting room as rowdy.  She was addicted to

20   pills.  She talked about the weird rules.  She was often pill

21   sick.  All three defendants wrote to Ms. Ledford.

22        Then there was Heather Alred.  Her PMP showed

23   Suboxone treatment for over a year, and Ms. Newman accepted her

24   as a patient.  She testified that other pain clinics refused to

25   treat her.  Lovell had a good representation among her druggie

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  friends and typical little pill mill population red flags that

2  she described to you.

3          Her meds were increased by Ms. Womack upon her

4  request.  And she testified she was essentially treated worse

5  after claims of kidnapping and rape.  She was discharged for

6  drugs she claims she never took, yet her accused rapist

7  remained.  All three defendants wrote to Ms. Alred.

8          Then there was UC Matt Sterns.  He went for over a

9  year as an undercover patient.  And it's kind of luck of the

10  draw, he didn't have any kind of video visits with these other

11  two defendants, but he got Ms. Clemons four times.  You saw the

12  videos.  I don't need to relive them.

13          You know what passed for an exam.  You know she wrote

14  steady gait, despite in the video he's already seated.  And

15  then you remember the October 16th, 2000 visit where he says he

16  borrowed meds, and she said, "I'll just write you were on

17  vacation."  Ms. Clemons wrote to UC Stern.

18          And then there's Mr. Patterson.  He started going at

19  Gallaher View for somewhat legitimate reasons, but quickly

20  turned despite the -- his -- his inability, to use the word, it

21  turned into an addiction.  He had medical training.  It was

22  obvious to him that no real medical treatment was going on.

23  And on occasion, he waited five to six hours.  He described

24  everyone knew each other.  It wasn't like a normal doctor's

25  office.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1            And he didn't say the same thing as Stockton, that he
2     was getting off meds to kill a draft or a horse or whatever
3     Mr. Stockton used, but he said, where he was working with
4     cancer patients, that he wasn't even tempted to take their meds
5     because of what he was getting at these clinics.

6            The defendants ignored "high" notes for him on
7     multiple occasions, and his pain level 7, 9, 7 stayed that way
8     for the entire time. All three defendants wrote prescriptions
9     to Mr. Patterson.

10            Then we had Melissa Mulkey, another random defense
11     chart. She went to pill mills in Georgia. She said these
12     Tennessee places were no different. Just show up, get your
13     pills. She was an IV drug user. She was an addict. She went
14     to prison, is now clean. Ms. Clemons and Ms. Womack wrote
15     prescriptions to Ms. Mulkey.

16            There's Ernest Johnson, another random defense
17     patient chart. He got pills for pain, became addicted, bought
18     them off the street, started going to pill mills. Went to
19     several pill mills that all closed down before going to these
20     pill mills. He was initially taking them by mouth, and then he
21     started snorting and shooting them. All three defendants wrote
22     to Mr. Johnson.

23            There's Ms. Cantrell. None of these defendants saw
24     this woman, but she told you she was addicted to Roxicodone and
25     oxymorphone. She went to injecting them. Borrowed money from

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   her friends and her parents, because that's the reason they

2   don't have money anymore.  Easy to get pills from these pill

3   mills, and she's now clean.

4        Finally, there was Michael Canada, another random

5   defense chart.  He went to the pill mills in Florida and then

6   started going here, all the same.  He said a drug dealer would

7   call these places a trap house, a place people could come to

8   get drugs.  He was addicted.  He would go high to the pill

9   mills, and he's now clean.  Ms. Clemons saw Mr. Canada.

10        Finally, in addition to the customers, the red flags,

11   the window dressing, the DAST, we presented two providers that

12   worked at the clinics, specifically Kim Chambers and Gayle

13   Fristoe.

14        Gayle was a temp from Texas, and she came here to be

15   near her son.  Ms. Hofstetter told her, if you recall from her

16   testimony, it was a post surgical and wound clinic.  When she

17   showed up, she described her first day on the job, the only

18   soup kitchen open in Tennessee and everybody seems to be there.

19   She described it as very crowd.  She used the words life and

20   death for people who were starving.  She kind of -- she used

21   those analogies to talk about the customer base at the pill

22   mill.  And she also told you she couldn't even find a band-aid

23   in the place.

24        On the last day of her contract, she described people

25   yelling at her not to leave before you write my prescription.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  She talked about customers thought she was just going for

2  lunch, when in reality, she wasn't ever coming back. And at

3  noon, she left the clinic, and they chased her. Described it

4  like a riot. Went back to her hotel room and called the DEA.

5      She refused to be deliberately ignorant. She's

6  not -- as she told you, she's not stupid. She may be a little

7  slow, and those were own words, but the place didn't follow the

8  standard of care. She said it was a pill mill, and she was

9  ashamed of her prescriptions. Only 24 shifts in and she still

10  figured out somebody was manipulating the drug screens.

11      Then we had Ms. Chambers. Same thing, now we're six

12  months later. Fristoe is in the summer of 2012. Fast-forward,

13  now we're in February of 2013. She called it a pill mill. She

14  was employed in February 2013. She worked five shifts at

15  Lenoir City. She cut prescriptions, customers complained. She

16  saw a patient fake a limp and then walk normally, and she

17  decreased the patients meds, only to have Dr. Larson give him

18  the higher dose he was asking for.

19      And after this, she goes and sees Ms. Hofstetter and

20  Dr. Larson. And Ms. Hofstetter, she recalled this conversation

21  to you, basically told her she was too strict for their

22  clientele, and needed to think about it if he wanted to keep

23  her job. She e-mailed her resignation. And what it boiled

24  down to, that conversation was a get with the program. This

25  woman decided not to, and she quit. She refused to be

UNITED STATES DISTRICT COURT

deliberately ignorant when she was writing these prescriptions.

It didn't take these women long, and I want you to think about the raw emotion you saw, especially from Ms. Fristoe when they talked about working at these places years after the fact. Especially with Ms. Fristoe, you could tell she still felt that emotion from being even a small part in perpetuating these places. Guilt that you've never heard about from these three defendants.

We discussed decisions and choices. Ms. Chambers, five shifts, Ms. Fristoe, 24 shifts, Ms. Newman, five and a half months, Ms. Womack, 11 months, three of which she had her DEA license, Cynthia Clemons, 16 months.

So when we talk about the law, and you recall elements one of Counts 2 and 4 of the agreement to enter the conspiracy, recall that they don't have to enter on day one, day two, day three, day four, day five, but when you choose to deal drugs via these types of prescriptions, when you write the volume that we're about to talk about associated with these women, I would submit to you that all three defendants made the choice to join both conspiracies at issue with this case.

Ms. Chambers and Ms. Fristoe, they chose not to accept the paycheck because they knew what they were doing was wrong.

And finally, you heard from Dr. Blake and Dr. Carter. But actually, in reality, and I know these were the medical

UNITED STATES DISTRICT COURT

1   experts, and we spent a lot of time qualifying that, been

2   telling you about their impressive backgrounds.  But they

3   should have told you and confirmed to you what you know based

4   on all the other evidence in this case, that with respect to

5   Ms. Hofstetter, she never intended to treat pain at any of her

6   pill mills.  This is 300 to 350 a visit, per customer, per

7   month.  These defendants, Ms. Newman, Ms. Clemons, and

8   Ms. Womack, did not treat their customers.  They wrote

9   prescriptions, period.

10         The practice of medicine is more of just than a

11   patient coming in saying they have pain and being handed a

12   prescription.  There's no different or separate tenets of being

13   a nurse practitioner in pain management.  They've got to do a

14   history.  They've got to do a physical exam.  They've got to do

15   a diagnosis, and they've got to formulate a treatment plan and

16   follow-up.

17         If you choose, in addition to these, just four basic

18   things of being a nurse practitioner, if you choose to

19   specialize in a field like pain management, you just must stay

20   up to date in your field.  And that makes just common sense.

21   These fundamental tenet apply to every specialty in the medical

22   field.  They are taught it from the very beginning from nursing

23   school.

24         If the above is not true, if they're not required to

25   do these four things every time somebody walks in the door,

Closing Argument - Ms. Pearson

1  then why do we need a nurse practitioner?  A customer would not

2  need doctors for pain management or nurse practitioners.  You

3  would simply bypass the clinic, go to the pharmacy, tell them

4  you have pain, and receive opioids.

5       Dr. Blake and Dr. Carter, they're not the gold

6  standard.  They're telling you how it should work in any

7  medical practice.  They testified how the standard of care does

8  work and the fundamental basic steps in diagnosing and treating

9  a patient.

10       And if you recall Dr. Blake specifically, as he in

11  the field of pain management, he talked about how he approaches

12  these fundamental tenets and then how he evaluates why not to

13  use opioids, and he told you that because the risk of side

14  effects go dramatically up at a MED over 110.  He said the

15  risks are serious.

16       You have to worry about the psychological effects,

17  other medical conditions, and there are other modalities that

18  you can consider.  And he also said you don't start at the

19  highest dose like these places did.

20       And think about how that dovetails with

21  Dr. Mileusnic, the chief medical examiner of Knoxville.  But

22  when she got here in 2002, an explosion of overdoses.  And then

23  when the state -- when the county endeavored to figure out what

24  drug was leading drug-related deaths, it was oxycodone in 2010,

25  '11, '12, '13, '14, and '15 in this area.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    And that goes with what Dr. Blake is telling you.

2    Overdose, adverse reactions with other drugs, depression.

3    Opioids can mask other serious conditions you may have.  And

4    this was known over a decade ago from today.

5    He's been practicing the same since 2009.  And the

6    standard of care that he applied in his objective review of the

7    customer files is the same he used back then.  And most

8    important, when he's evaluating those files, when he's

9    evaluating his own customers, that risk assessment for

10   addiction abuse, that risk stratification is always in the

11   forefront.

12   And here's -- and here's what Dr. Blake told you that

13   truly makes this case horrific.  It's not that Newman, Clemons,

14   or Womack did not meet the gold standard.  It's not even the

15   fact they didn't come close to the standard of care.  They were

16   certified being nurse practitioners in Tennessee.  They've got

17   some regulations that go along with that, the Board of Nursing

18   guidelines, which outlines the basic tenets we described above.

19   They chose, and they actually made the decision to

20   cease being nurses at all.  A conscious choice they made not

21   once, but every customer visit and every prescription they

22   wrote at the pill mills.

23   And they made the decision to cease doing even the

24   fundamental things, the appropriate history, the physical exam,

25   the diagnosis, the treatment.  They were not doing an adequate

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    history, they were not doing an adequate physical exam,

2    diagnosis, or treatment.

3         And in addition to that, they coupled this choice

4    with the decision to ignore risk assessment and risk monitoring

5    for the use of these high-dose deadly opioid pills.  This

6    evidence demonstrates again and again their agreement to become

7    part of the conspiracy.  And when they wrote those

8    prescriptions, they were not for legitimate medical purpose in

9    the usual course of professional practice, and they knew it.

10         And in these pill mills, I would submit to you that

11   pain is irrelevant.  It was irrelevant whether a customer had

12   real pain, a serious condition, or was in true need of pain

13   medication.  No matter what the condition that customers said,

14   no matter what level of pain, they received the same thing,

15   high-dose, deadly opioids, almost always Roxicodone 30s, a drug

16   the defense's own expert called poison.

17         A similar result could be reached by simply just

18   walking out to a busy city street and handing out

19   prescriptions.  Perhaps somebody comes by and has pain.

20   Perhaps they come by and they're addicted, or perhaps they're a

21   drug dealer.  It's the exact same thing.  These three

22   defendants chose to act -- not to act as medical professionals,

23   and that's when they became drug dealers.

24         And what most aptly demonstrates that is

25   Exhibits 954, 959, and 966.  In these pill mills, they're in

UNITED STATES DISTRICT COURT

1    separate rooms seeing separate customers, but they have the

2    same common recipe, and that was a long-acting and short-acting

3    opioid, the blue being the long -- the short-acting.

4            These charts just speak for themselves.  They have

5    the same proportions.  Take a look at the "other" category.

6    You can't even see it because it's so small, because that's not

7    what they're there to do.

8            The evidence in this case, the prescription recipe

9    shown by the PMP data in these charts show that they generally

10   prescribed the same thing to each patient they saw.  The totals

11   tell you it's a pill mill.

12           Ms. Clemons had 741,923 oxycodone pills, 209,401

13   oxymorphone pills, and over 120,000 morphine pills during her

14   employment.  Ms. Newman had 462,000 oxycodone pills, over 138

15   oxymorphone pills, and over 54,000 morphine pills.  And

16   Ms. Womack, in the three months she had a DEA license, had

17   169,000 oxycodone pills, over 61,000 oxymorphone pills, and

18   over 16,000 morphine pills.

19           That's a grand total of approximately 655,000 for

20   Ms. Newman, over one million for Ms. Clemons, and over 247,000

21   for Ms. Womack, and we're just talking opioids.  These numbers

22   speak volume.

23           And if you recall, Dr. Browder's halfhearted attempt

24   to call these places primary-care practices, they're not

25   treating ear infections or colds or high blood pressure.  And

UNITED STATES DISTRICT COURT

1  they didn't even bother to prescribe other modalities of pain.

2  Oh, yeah, they checked some boxes, said heat, ice, and

3  stretching, but they handed out a common recipe of pills in

4  exchange for cash.  It's the end of the story.

5       And those same exhibits, let's just talk about the

6  volumes of prescriptions, every time they're putting that pen

7  to paper or using scripture.

8       Ms. Womack, over 1,600 prescriptions for oxycodone,

9  991 for oxymorphone, and 252 for morphine, all in three months.

10      Ms. Newman, over 4,000 for oxycodone, 2,000 for

11  oxymorphone, and 852 for morphine, and then you have

12  Ms. Clemons and her over year of employment, 7,800

13  prescriptions for oxycodone, 3,400 for oxymorphone and 1,900

14  for morphine.

15      At this volume, they are part of both Counts 2 and 4

16  conspiracies.  And as to Element 3 of drug distribution, these

17  aren't for a legitimate medical purpose and certainly not in

18  the usual course of professional practice.  They -- on their

19  worst day, they have made the decision to write those

20  prescriptions as a drug deal for approximately $65 an hour.

21  And on their best day, they're writing the script, being

22  deliberately ignorant.  There's no good faith or honest effort,

23  as demonstrated by any of these prescriptions.

24      And let's check an analogy to the clinic.  Here are

25  prescription summary charts for the clinic.  The ratios look

Closing Argument - Ms. Pearson

1    the same.  Sure, you have a little more benzodiazepines, but

2    that's from 2011, 2012.  Over 11 million pills, and there's

3    even, as you heard from Mr. West, about a dozen missing

4    providers from this amount.  These numbers are astronomical,

5    period.

6              So the patient files they filled in and their

7    inactions with the patients demonstrate their knowledge in

8    deliberate disregard for the environment they were in as

9    employees of pill mills.

10             And like I just said, this is the same exact

11   evidence, the CSMD analysis and all the things we've talked

12   about, that allow you to absolutely reject the premise that any

13   of these three defendants were operating in good faith, were

14   naive, or uneducated as pain management.  All three had some

15   sort of nursing experience, yet despite this experience, these

16   providers did not do any sort of adequate physical exam,

17   history, diagnosis, or treatment.

18             We spent days hearing from Dr. Blake about his review

19   of these customer patient files, and you even got to see those

20   four appointments with Ms. Clemons.  These aren't outliers.

21   These defendants did not care.  And even worse, they chose not

22   to use fundamentals of being a nurse.  And then like we said,

23   the astronomical amount of opioids.

24             So let's talk about some of the things Dr. Browder

25   and Mr. McCoy said.  There was kind of this argument put out

1    there that you could lie, the fall at the feet of Dr. Larson.

2    But the medical director, you heard, is not responsible for

3    their actions.  They routinely disregarded comments by him,

4    such as "high" and referrals.  It was because whatever he said

5    did not matter.  There was no repercussion for ignoring any

6    patient file comment by him, and you saw multiple examples of

7    that.  Medical director, like we've -- like I've said earlier,

8    is part of the window dressing.  To make a decision to

9    disregard the direction of your medical director, to say I'm

10   not going to do what he's saying to do in this file is an

11   absolute rejection of good faith and an honest effort.  But

12   it's also an indicator that you're in agreement to sell opioids

13   to drug dealers and addicts.

14        So you know they didn't treat these customers for the

15   following reasons:  Medical records from previous clinics were

16   not reviewed.  Think of Richard Gregory, Brandy Kreis, Jessica

17   Watson, Heather Alred, UDS results were missing, no action, UDS

18   results were aberrant, no action, a gross lack of pill counts,

19   a free way to check to see if customers are taking a

20   prescriptions as prescribed, a report of customers with medical

21   conditions, depression, et cetera, no action, medical tests

22   requested, no action, PMP sporadically reviewed, DAST answers,

23   and, of course, no exam history or treatment that was adequate.

24        Recall the resumes that Agent Vehec went over with

25   you from Ms. Newman, Ms. Womack, and Ms. Clemons.  Ms. Clemons'

Closing Argument - Ms. Pearson

1    resume professed to be an experienced nurse with 18 months of

2    individualized pain management.  In reality, she used questions

3    such as heat, ice, and questions about people to window dress

4    the files.  You know this because everyone got opioids.

5           Ms. Newman had previous pain clinic experience on her

6    resume, and her prescription patterns matter to Ms. Clemons.

7    And Ms. Womack had ICU nurse experiences.  Inevitably,

8    narcotics are used in an ICU, yet in this case, all of her

9    patients got the same prescription as Ms. Clemons and

10   Ms. Newman.

11          These providers requested blood tests, new MRIs, and

12   miscellaneous items that appeared via medical decisions.  But

13   in reality, they were just window dressing.  And there's no

14   evidence in the file from the witness testimony that any of

15   those things were followed up on.  Everyone is getting the same

16   thing.  This is not individualized care.

17          And they're not being tricked by some Randy Garrett

18   coming in saying he was picking blackberries.  The PMP would

19   have told them some of these folks were opioid naive.  Recall

20   Ms. Alred's Suboxone, the multiple discharges you saw in the

21   files.  They are making the decision to close their eyes to the

22   very facts that should have smacked them the face.

23          And, finally, we get to the defense experts,

24   Dr. Browder and Mr. McCoy.  I want to go back to this standard

25   for usual course of professional practice.  Whether a

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    prescription is made in the usual course of professional

2    practice is to be determined from an objective and not a

3    subjective viewpoint.

4           Both experts changed their opinion on the stand, and

5    both defense experts used the subjective standard.  Browder

6    told you he was trying to get in the head of each defendant and

7    find a good reason why they did it.  McCoy argued with me that

8    he could not see how it could be -- how it could not be a

9    subjective standard.

10          The jury instructions are going to tell you this is

11   an objective standard.  And you saw visible struggle by each

12   defense witness, Dr. Browder and Mr. McCoy, to do just that.

13          But in the end, two things were clear, they thought

14   the care was bad, and they had to individualize each visit,

15   each activity, as they called it, in order to justify the

16   prescription.  You could see Dr. Browder sigh, pause for a

17   minute, wring his hands just to get himself to a place where he

18   could say it was a legitimate medical prescription.  Think of

19   him changing the opinion after the break but then not being

20   able to tell you what subject his opinion was about.

21          And you can't look at each activity in a vacuum, as

22   Mr. McCoy and Dr. Browder would like you to do.  These -- this

23   is what they had to do to come here to testify, but it's

24   nowhere near the jury instructions the Court will give you.

25   It's not a single activity.  It's the totality of the picture

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    painted, which makes ordering tests or issuing prescriptions

2    legitimate in the usual course of professional practice.  You

3    have to take into account all the information available to a

4    medical provider, not just a particular action on its own.

5         Dr. Browder and Mr. McCoy's subjective opinions

6    played out on the stand and it just stands in stark contrast to

7    the evidence in this case.  And so on behalf of the United

8    States, I'm going to ask you to regard those, and I think you

9    should regard those opinions, which is entirely in your power

10   as jurors.

11        The revenue also tells you in addition to the PMP

12   analysis and in addition to all the things we've talked about,

13   the revenue tells you that these places were pill mills.

14        In the summer of 2011, Gallaher View 1 has a high of

15   $227,000.  This is Exhibit 893.  Lenoir City revenue, a high of

16   $163,000 in the winter of 2013, because now it's competing with

17   Gallaher View 2, unbeknownst to it.  And let's talk about the

18   big moneymaker, Gallaher View 2 and Lovell Road.  In May of

19   2014, a monthly take of 411,000 for a clinic sitting between

20   Waffle House and a pornography store.

21        Ms. Hofstetter told you it was all about the money

22   for her and volume.  If you recall Agent Nocera's testimony

23   with her goal of a hundred patients, and he demonstrated some

24   of the e-mails that showed you that.  One body in the door

25   equals 300 to 350 a month, and that's how this was thought of.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   And she told you in text messages that it was all about the

2   money.  And you can also see with Exhibit 652B, when she

3   responds to Enriquez, it's all about the money.

4           34 million total cash played and churned at just

5   Seminole and Cherokee.  A loss of 1.7 million just on slots, a

6   loss of 937,000 just on slots.  And her total clinic profits of

7   4 million.

8           This is the big picture.  For Ms. Hofstetter, you can

9   see from the chart the sheer numbers we're talking about.  This

10  is the big picture right here.  You see Dr. Valley's dip in

11  revenue here, if you recall his testimony, and you see that

12  411,000 in May of 2014.  This clinic was the worst of the

13  worst, and if you divide that 411,000 by 300, that will tell

14  you roughly how many customers were going about that time.

15  Dollars equal lives at this pill mill.

16          So just think about the owners here.  Just for

17  investing, Gallaher View 1 income, 7.1 million, Lenoir City,

18  5.39, Gallaher View 2 and Lovell Road, 8.5 million for clinics

19  on the side of the road.  This is why they did it.

20          Before we move on from the drug conspiracies, I want

21  to cover one last thing, and that's the overdoses in this case.

22  And I want to remind you, we've got the two drug conspiracies,

23  we've got drug conspiracy elements.  And I know this is a bit

24  repetitive.

25          But now what we're going to talk about is the

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    overdose elements.  So you've got your two drug conspiracies.

2    And in each drug conspiracy, there are two overdoses.  So with

3    respect to Count 2, there is Ms. Sandra Boling and Ms. Carolyn

4    Hayes, and with respect to Count 4, there's Ms. Anna

5    Vann-Keathley and Mr. Henry Reus.

6            And so there's a couple ways you can find in an

7    overdose resulted in a prescription.  Let me just go back.  I

8    told you about Counts 2 and Counts 4.  Counts 14, 16, and 18

9    are what we call the substantive counts that we associate with

10   those overdoses.  Ms. Hayes doesn't have a substantive count.

11   That dealt primarily with a prescription written by Dr. Larson.

12   So that's only in Count 2.  Whereas the other three overdoses I

13   wanted to discuss, Ms. Boling, Ms. Vann-Keathley, and Mr. Reus,

14   have substantive counts.

15           So there are two ways that the government can prove

16   an overdose death.  One in order to establish a death resulted

17   from a defendant's conduct, the government must prove the harm

18   would not have occurred in the absence of the defendant's

19   conduct.

20           It can be done two ways.  The first is called

21   independent sufficient causation.  Under this theory, the

22   government must prove beyond a reasonable doubt that the drug

23   or drugs standing alone were enough to cause the death.  That's

24   way one.  I'm going to call that independent causation.

25           The other way is but-for causation.  Under this

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  theory, the government must prove beyond a reasonable doubt

2  that the death would not have occurred but for defendant's

3  conduct. The government need not prove that the death was

4  foreseeable to the defendant, but the government must prove

5  beyond a reasonable doubt the death would not have occurred had

6  a mixture and substance containing a detectable amount of

7  controlled substance distributed by the defendant not been

8  ingested by the individual.

9         Evidence of the drug merely contributed to the

10  victim's death is insufficient. However, when the use of

11  controlled substance combines with other factors to produce

12  death and death would not have occurred without the incremental

13  effect of the controlled substance, but-for causation exists.

14         For example, if poison is administered to a man

15  debilitated by multiple diseases, the poison is a but-for cause

16  of his death, even if those diseases played a part in his

17  demise, so long as without the incremental effect of the

18  poison, he would have lived.

19         So that's a mouthful. Let's talk about how either

20  one or two independent causation or but-for causation applied

21  to the overdoses in this case.

22         If you recall Ms. Hayes, you heard specifically from

23  Debbie Shockley and Dr. Robbins. She died on September 11th,

24  2012. You had an autopsy and a toxicology report, and the

25  drugs that we're kind of focused on are oxycodone and

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    oxymorphone.  I would submit to you this is going to be one of

2    those but-for causations because Ms. Hayes already had a heart

3    condition.

4            If you recall Ms. Shockley, she was living with

5    Ms. Shockley.  She kind of went through that last day of

6    Ms. Hayes' life with you where she was at court, she ended up

7    in the hospital, then she came home, and they continued to

8    abuse drugs by snorting them that evening.  They all went their

9    separate ways for bed.  In the morning, she woke up, Ms. Hayes

10   was dead.

11           Also Dr. Robbins he was the ER doctor that saw

12   Ms. Hayes in the ER.  If you recall, he testified to Narcan and

13   the various steps he took her to bring her back from an

14   overdose.  And his note said patient stoned on prescription

15   meds.

16           If you recall Agent Nocera's testimony, he simply

17   took the Exhibit 920A.  He took the chart and kind of

18   summarized who were the individuals that saw Ms. Hayes before

19   her demise.  Two things I want to point out with Agent Nocera's

20   summary chart, the first of which is that they had medical

21   records in the chart indicating she had overdosed before in

22   2012.  And those records were received well before that last

23   prescription by Dr. Larson, yet nothing in the chart indicated

24   that anyone looked at those records.

25           And second, that the last prescription written to

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    Ms. Hayes was by Dr. Larson himself.  And as you recall, the

2    patient chart was Exhibit 441, there's Dr. Larson's

3    prescription for oxymorphone and oxycodone as well as Xanax to

4    Ms. Hayes.

5            And then you recall Dr. Lochmuller's opinion.  He was

6    the medical examiner that did the autopsy.  He opined her cause

7    of death was oxycodone, oxymorphone, both of which were

8    prescribed bring the clinic, and the manner of death, accident.

9    This supported by Ms. Shockley's testimony, who described

10   Mrs. Hayes' last day consisting of the pill mill visit, the

11   court appearance we just discussed, and the ultimate overdose

12   she discovered in the morning.  I would submit to you, she

13   didn't go to another clinic.  She got her drugs from Lenoir

14   City as a patient file indicates.  And this went uncontested by

15   the defense.

16           I would also ask you to recall the heart issue that

17   Dr. Lochmuller told you about and kind of how that would

18   interplay with an overdose.  Because she's got a heart

19   condition, her heart is already not getting a lot of oxygen

20   because of the blood flow.  Couple that with a respiratory -- a

21   CNS suppressant like an opioid, and this is absolutely

22   something that could happen to someone like Ms. Hayes.

23           I want to talk to you next about Ms. Boling.  If

24   y'all remember Randy Haynes, he flew in here from Oregon.  He

25   described her as going to pill mills for a year, including

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   Lenoir City.  Started with back pain.  She got addicted.  She

2   died on February 12.

3           They had a fight that day, but it was over how she

4   used her drugs.  The agreement was, she could party the day she

5   got her pills, and then they had a fight that evening, if you

6   recall, about where she slept, because she essentially kind of

7   landed on the floor and wouldn't get into the bed.  He also

8   told you that when she got that last script, she used to sell

9   some of her pills for Xanax.  You have an autopsy and a

10  toxicology to look at.  The drug we're talking about was

11  oxycodone.

12          So with respect to Ms. Boling, Agent Nocera prepared

13  a summary chart kind of indicating who saw her during the

14  course of her prescriptions there.  Couple things I want to

15  point out, she had tested positive for Xanax in the past.  And

16  on February 10, 2014, she told Ms. Clemons, she took a friend's

17  morphine.  And also contained in the clinic where there was no

18  action taken was a discharge letter from a previous pain place

19  for Methadone.

20          Again, Ms. Clemons wrote this prescription for

21  oxycodone and OxyContin to Ms. Boling, which she did fill,

22  pursuant to Mr. Hayne's testimony.

23          And then we have what happened to Ms. Boling.  She

24  had a 958 nanograms per millimeter of oxycodone concentration.

25  Then she had the metabolite, the oxymorphone.  Dr. Lochmuller

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    and Dr. Mileusnic opined the cause of death was oxycodone and

2    the manner of death accident, supported by Mr. Hayne's

3    testimony.

4           Yeah, they had a couple fights.  It was over drug

5    use.  They came to a resolution.  They fought about where she

6    slept that night.  This is no suicide, as Dr. Arden put

7    forward.  And he also admitted that more information may have

8    changed his opinion.  This was an addict.  She used too much in

9    her agreed-upon one and only party, and she overdosed.

10          Standing alone, the oxycodone, if you remember, from

11   Dr. Lochmuller, Dr. Mileusnic was sufficient to cause this

12   lady's death, even though she too had a heart condition.

13          Then we had Ms. Vann-Keathley.  She's in Counts 4 and

14   14.  She died on November 14th, 2013.  She had been going to

15   pill mills for years, including Lovell.  She had back pain.

16   She got addicted.  This -- again, this ain't a suicide.  It was

17   the opioids issued by this clinic.

18          If you recall testimony from Mr. Keathley, they had

19   that fight.  They go to bed.  She goes to bed, she wakes up in

20   the middle of the night, 2:30 a.m.  She comes back to bed.  One

21   doesn't start to overdose, and then wake up, go to the

22   bathroom, and continue the overdose.  What I would submit to

23   you is that she went into the bathroom, probably hit her elbow,

24   as Mr. Keathley testified, probably took some more pills, came

25   back, and of course she's found in the morning by her family.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1      Agent Nocera prepared a summary chart.  Again, you'll

2   notice the pattern we talked about with all these folks, a lack

3   of confirmation drug tests.  You can also see she's missing

4   more than she actually had.  And you can see the different

5   providers she saw in Agent Nocera's summary chart.

6      And, again, this is Ms. Newman who writes her a

7   prescription for oxymorphone and oxycodone shortly before her

8   death.  And then, of course, you had the autopsy and the

9   toxicology associated with Ms. -- with Ms. Vann-Keathley's

10  death.

11     Dr. Lochmuller and Dr. Mileusnic opined the death was

12  oxycodone intoxication, the manner of death, accident.  Again,

13  we just talked about Tony Keathley's evidence about her last

14  days, argument over her drug use and her last night alive.

15     She had been benzodiazepines in her system, but the

16  oxycodone, coupled with her heart disease, was more than enough

17  to cause her death.  And if you recall from the tox report, the

18  benzodiazepines were in the therapeutic range.

19     Finally, we have Mr. Reus.  He was charged as what we

20  call an enhancement in Counts 4 and 18.  And do you remember

21  Sarah and Chris Kinsey?  Sarah being his daughter and Chris who

22  took him to the clinic before he died.

23     Do you recall Sara talking about all the stops they

24  made and how her father was snorting drugs and the people he

25  was selling them to?  You recall how they were going out for

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   Chris' birthday, and they left Henry, both testified, very

2   high, and he was cloning out some sort of milk on the floor,

3   and they left him there.  When they showed back up, he had

4   died.

5           Agent Nocera, again, put together a summary chart

6   associated with patient files.  You can see which provider saw

7   Mr. Reus.  Again, you'll note, a lot of times he's testing

8   positive for benzos, which I would submit to you would put the

9   clinic on notice that this guy has an affinity for them or is

10  at least taking a prescription they should know about.

11          If you recall with Mr. Reus, Ms. Smith saw him, but

12  Ms. Clemons wrote the prescription.  And if you recall from all

13  the testimony, if you write that prescription, if you sign your

14  name to it, you own it.  It's your responsibility.

15          And then we didn't have an autopsy from Mr. Reus.  We

16  just had what I would submit to you was cardiac blood at

17  2400 nanograms per milliliter.  Postmortem redistribution,

18  which we talked about briefly, this is not the issue.  She used

19  an astronomical amount.

20          Dr. Bradley, Dr. Mileusnic opined the cause of death

21  was oxycodone, oxymorphone intoxication, the manner of death,

22  accident.  Dr. Arden had a different opinion on the manner of

23  death.  This isn't a suicide.  I mean, yeah, he had some stuff

24  in 2011, but this is the type of case where I'm asking you to

25  use your common sense.

Case 3:15-cr-00027-TAV-DCP  Document 885  Filed 04/09/20  Page 79 of 238  PageID #: 60833

Closing Argument - Ms. Pearson

1    He was out with his daughter.  He was cleaning up the

2  milk.  That's not where he decided to commit suicide.  It's

3  exactly how they told you.  He just took too much.  He partied

4  with too many customers, and he overdosed.  I would submit to

5  you that the oxy standing alone would be an independent cause.

6    With all four of these overdoses that we just

7  discussed, finally, you recall Dr. Blake's testimony,

8  testifying that none of the prescriptions in any of the files

9  were submitted for a legitimate medical purpose.

10    And, finally, we have Mr. Joseph Russell.  He's not

11  charged in any of the enhancement or any of the counts.  Okay.

12  And the reason we proved him up is not just to add another two

13  days to the case.  The reason we're going to talk about him, he

14  was deceased on November 8th.  It was specifically Ms. Hickey,

15  his sister, who kind of explained to you the drug problem her

16  brother had and kind of how it changed their family.  And she

17  also told you one important fact.  She actually called the

18  clinic.  And she told them that he and his girlfriend were

19  abusing the narcotics before he died.  There's clearly no

20  action taken on that.

21    And then let's talk about Agent Nocera's count --

22  chart.  Not a single drug screen in the entire file for seven

23  months.  He's taking benzodiazepines and opioids which

24  ultimately caused his death, but with substances.  And not a

25  single drug screen, not a single question.  And you've also got

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   his sister calling the clinic.  And, of course, Exhibit 921A,

2   Ms. Vanover is going to the same clinic.  That's his

3   girlfriend.  Agent Nocera testified she overdosed.

4          He just demonstrates the dangers of Benzodiazepines

5   and opioids, and he demonstrates the dangers of not treating

6   your patient and not caring about their well-being.  They were

7   on notice via Ms. Hickey, and instead of doing anything, they

8   kept writing him prescriptions.  And we all know what happened.

9   We can also see that Mr. Russell and Ms. Vanover were staging

10  their visits, as Agent Nocera described, to keep them flush

11  with medications.  And then this is foreseeable.  He's an IV

12  drug user, and he overdosed.

13         Those are the drug conspiracies.  Here's what the

14  government wishes for you to take away.  As a trained nurse

15  practitioner, licensed by the state of Tennessee and the DEA,

16  you have a duty to do no harm.  And unfortunately for these

17  people that died, these providers just didn't care.  And

18  because they didn't care, they fed the illegal drug market with

19  millions of opioids pills and hurt the very people, like these

20  folks, that they were there to help.

21         The good news is, with Counts 11, 12, and 13, it has

22  two elements, those are maintaining a drug premises.  First,

23  the defendant knowingly opened or used or maintained a place,

24  where permanently or temporarily.  Second, the defendant did so

25  for the purpose of distributing any controlled substance.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    What this boils down to is, if you believe these

2    places are pill mills and they're trafficking narcotics, then

3    they are drug premises.  And the defendants charged in each of

4    those counts are guilty.

5    Now, with respect to Counts 14, 16, and 18, those are

6    the substantive drug offenses.  So there's an overdose attached

7    to each one of those, but you can also find that the

8    distribution was criminal, not for legitimate medical purpose,

9    but find that the overdose was not a but-for independent cause

10   of that prescription or you can find both.  So you can either

11   find simply the prescription is criminal or the prescription is

12   tied either but-for or by independent cause to the overdose.

13   And so Count 14 is Defendants Hofstetter and

14   Ms. Newman.  It's oxycodone and oxymorphone.  It's the

15   enhancement for the death of Anna Vann-Keathley.

16   Count 16, this is going to be Ms. Boling.  This is

17   going to be Ms. Hofstetter and Ms. Clemons.  Oxycodone, the

18   enhancement of the death of Sandra Boling.

19   Finally, Count 18, that's going to be Mr. Reus.

20   That's going to be September 8th, 2014, Hofstetter and Clemons,

21   oxycodone, and of course Mr. Reus.

22   And, finally, I do want to talk to you just briefly

23   about the money laundering and the RICO conspiracy, and we're

24   almost done.

25   So with RICO conspiracy, this charges only Defendant

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    Hofstetter.  And, again, it's a conspiracy.  So it's the

2    agreement that's the crime, not the substantive offenses, but

3    just that agreement to do what these folks agreed to do.  And

4    it does not include the clinics run, Gallaher View 2 and Lovell

5    Road, by Mr. Tipton and Ms. Hofstetter.  It's simply those UCSC

6    clinics.

7            So the -- when we talk about RICO, we use the term

8    racketeering activity, which I'm going to talk to you about.

9    But that -- in reality, Racketeering Act is defined by federal

10   statute, just a bunch of crimes.  So in this case, we're going

11   to be talking about drug trafficking and money laundering.  So

12   it's got a fancy name, but the reality is, it's a type of crime

13   that the statute says is racketeering activity.

14           So the first element, I've got -- the United States

15   has to prove five elements.  The first element is that the

16   charged enterprise, the UCSC enterprise was or would be

17   established.

18           An enterprise can be a legal entity, much like a

19   corporation used to do bad things, but it can also be an

20   association in fact enterprise.  And that's what we have here.

21   It's an informal organization that has a purpose, relationships

22   among those associated with the enterprise, and lasts long

23   enough to permit those people to pursue the enterprise's

24   purpose.

25           In this case, the Urgent Care and Surgery Center

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

 1   enterprise was created by the Italians and Mr. Tipton and

 2   Ms. Hofstetter.  They ran pill mills to generate millions in

 3   illegal proceeds.  And based on all the elements, I would

 4   submit to you this isn't in dispute.

 5          The structure of the enterprise was the Italians,

 6   Ms. Hofstetter, and Mr. Tipton who was their Tennessee member.

 7   They had control of the hiring of various medical directors,

 8   sought legal guidance in order to keep the pill mills operating

 9   below the radar of law enforcement.  And then you have

10   Ms. Hofstetter running them on the boots of the ground.  And

11   then, of course, you had the providers who were writing the

12   prescriptions, the office staff managing the business.  This is

13   kind of an analogy of Count 2.

14          Element 2 is interstate commerce.  And that just

15   means that the enterprise was or would be engaged in or its

16   activities affected -- would affect interstate or foreign

17   customers.  This element really isn't in dispute.  They went

18   from Florida to Tennessee, and they distributed millions of

19   opioids pills that were manufactured and shipped to pharmacies

20   in both states.  So this element really isn't a dispute insofar

21   as the RICO.

22          Okay.  Element 3 is that the Defendant Hofstetter

23   knowingly agreed that a coconspirator would be associated with

24   the enterprise.  This just means that she agreed that somebody

25   would further the activity.  And in this case, the activities

Closing Argument - Ms. Pearson

1   we're talking about are drug trafficking and money laundering.

2          Not only did she agree to that, she actively

3   facilitating the drug trafficking and money laundering done by

4   the enterprise.  She ran the clinics in Florida, she ran them

5   in Tennessee, and she was the boots on the ground.  So I would

6   submit to you that this element has been proved beyond a

7   reasonable doubt.

8          Element 4 is that pattern of racketeering activity we

9   talked about, that she knowingly agreed that a coconspirator

10  would conduct or participate in the enterprise's affairs

11  through a pattern of racketeering activity.  So we talked about

12  those are simply the crimes that we're talking about.  It's

13  defined by federal statute.  And in this case, we're just

14  talking about operating those pill mills as drug trafficking,

15  maintaining drug houses, and the money laundering that went

16  along with it.

17         And the final element of a RICO conspiracy is that

18  she knowingly agreed that a coconspirator would commit at least

19  two acts of racketeering activity.  So you just -- it's

20  basically the agreement again that I -- that Ms. Hofstetter

21  agrees that at least two racketeering acts would occur.  And

22  you have to find a reasonable doubt that either she agreed that

23  she would do it or a coconspirator would do it.

24         These acts never had to be completed, however, in

25  this case, we talked about 11 million pills and weekly

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    disbursements to the owners.  So I would submit to you that not

2    only did they agree, but they did it again and again and again.

3         So what this -- what the RICO conspiracy comes down

4    to, and I'm just going to submit to you and the evidence shows

5    is that Hofstetter and the coconspirators agreed to operate

6    pill mills, and they meant to distribute high-dose opioid pills

7    to paying customers for millions the profit.

8         So I would submit to you the RICO conspiracy

9    dovetails with Count 2, and it's been proved beyond a

10   reasonable doubt.

11        And the final things I want to talk to you about are

12   Counts 3 and 5 which are the money laundering counts before

13   you.  These are intertwined with the drug trafficking.

14        So the bottom line is, if you believe these folks

15   were drug trafficking, then the proceeds from that -- the

16   moneys that the Count 2 took in, moneys that Count 4 took in

17   are what we call specified unlawful activity.  So if they're

18   drug trafficking, they're also money laundering with the things

19   that we're going to talk about next.

20        So Count 3 relates to the proceeds of specified

21   unlawful activity to violate the federal drug laws in Count 2.

22   So that's your Gallaher View 1, Lenoir City, Hollywood clinics.

23        Count 5 is the same thing, but now we're talking

24   about Gallaher View 2 and Lovell Road.

25        So there's different theories of money laundering,

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    and we've got three that are contained in both Counts 3 and 5.

2    Let me go back.  The first theory is promotion.  And what

3    promotion means is that you're using the moneys taken in from

4    drug trafficking to keep the conspiracy going.  In this case,

5    pay rent, hire providers, pay them, buy the supplies you need

6    to keep the drug trafficking moving.

7            The second theory, and these are the elements in the

8    second theory, we call concealment.  And that deals with once

9    you find your specified unlawful activity, what are they doing

10   to conceal the true nature of those proceeds?  And in this

11   case, as I'm going to demonstrate to some of the exhibit, we're

12   talking about those flow-through accounts, which have no

13   purpose other than to kind of launder the money to the

14   investors.

15           So Exhibit 807, as to Count 3, money laundering,

16   that's what we're talking about.  The use of the 9859 account

17   to move that money from the clinic accounts from the patients

18   who are paying for prescriptions to the investors for those

19   weekly disbursements.  And, again, Count 3, that's Gallaher

20   View 1, Lenoir City.

21           Same with 808, Count 5, money laundering.  It just

22   looks a little different.  But, again, you see the flow-through

23   account in Bank of America account 4433 using to take those

24   money from the clinics, from those patients, from those

25   customers paying for those visits to the investors.  And that's

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   Exhibit 808.

2           Counts 6 and 7, the final counts we're going to talk

3   about, are money laundering counts.  Those are substantive

4   offenses.  And that simply deals with taking money from a

5   specified unlawful activity, which is drug trafficking, and

6   using it to purchase something over $10,000.  And we presented

7   two purchases, one for the house, Exhibit 816, and one for a

8   Lexus, Exhibit 821.

9           So I just want to conclude briefly.  And I thank you

10  for your time and attention for my very lengthy presentation to

11  you.

12          But in the end, Ms. Hofstetter, she made millions and

13  she dealt as many pills as she could to willing dealers and

14  addicts, and the Knoxville streets were flooded, and we know

15  for at least 11 million pills from her mill pills.  Her goals

16  were obvious, and she was able to lead a lavish lifestyle and

17  gamble.

18          These three defendants contributed approximately

19  2 million pills to those 11 million.  Each made a comfortable

20  living by signing a piece of paper.  They should have done

21  their job right, because they had their patient's life at

22  stake.

23          And in this case with these facts, it doesn't take a

24  medical degree to know what each defendant was doing was

25  criminal as to the thousands of customers that came to their

UNITED STATES DISTRICT COURT

1    clinics.  They had a duty to do no harm, and that's not what

2    they did.  They did harm, and they didn't treat anyone.

3           This is what happens, this case, this three months of

4    evidence is what happens when a nurse practitioner chooses not

5    to do her job.  These defendants, all four, they became a

6    deadly and integral part of the opioid epidemic here in

7    Tennessee.  And they threw the gates wide open, and they

8    flooded the street with high-dose deadly opioids.  They did it

9    because they chose not to do the basic things any nurse of

10   medical professional knows from their schooling.

11          So I would submit to you, in the end, this case is

12   about choices and decisions.  That's really what this boils

13   down to.

14          Hofstetter, she made her choice from jump street,

15   money for lifestyle and gambling.

16          These three defendants made the decision that $65 an

17   hour was worth more than doing the job as taught.  And when

18   they all three chose not to be compassionate, and when they

19   valued their paycheck over someone else's well-being, and when

20   they chose not to care about their fellow man, they did harm.

21          And when they made these decisions, these choices,

22   every day they walked into that clinic and they wrote a

23   prescription, they became drug dealers.  And that's when they

24   joined the conspiracies in Count 2 and 4.

25          And in the end, all these four defendants had the

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  same priority, money over people, and they just had different

2  levels of profitability.

3       For that, the United States is asking you to find

4  them guilty of all the counts they're charged with in the

5  indictment.

6       Thank you, Your Honor.

7       THE COURT:  Thank you, Ms. Pearson.  We'll go ahead

8  and take our morning break.  That's concludes the opening

9  closing argument of the government.  And we'll proceed with the

10  defendants' closing arguments after our morning break.  The

11  jury is excused.

12       (Jury out at 11:13 a.m.)

13       THE COURT:  All right.  We'll stay in recess until

14  11:30.  Let me ask, you are you going to go first, Mr. -- is

15  Ms. Hofstetter --

16       MR. WHITT:  That would be me.

17       THE COURT:  Oh, it will be Mr. Whitt.  So how are

18  we -- everybody can sit down for just a moment.

19       MR. WHITT:  I've got a little -- I'll go ahead and

20  answer your question.  I've got something I need ask about an

21  exhibit.

22       THE COURT:  All right.  I'm sorry.  So it's going to

23  be Mr. Whitt and Mr. Reagan are going to go first and then

24  Mr. Burks and Ms. Cravens.

25       MR. BURKS:  Yes, Your Honor.  We had talked to

UNITED STATES DISTRICT COURT

1   Mr. Oldham, Mr. Rodgers to see if they wanted to follow in a

2   progression of nurse practitioners.  I don't think they want to

3   do that, but if they do, then we'll go at the end.

4           THE COURT:  That's fine.  But anyway, Mr. Whitt,

5   you're going to go up to about an hour.

6           MR. WHITT:  Roughly.

7           THE COURT:  So that will probably -- we'll do that,

8   and then we'll take a break.  And I'm flexible if you-all

9   change the order given.  But we'll -- depending on how long you

10  go, that will probably take the break.  And then we'll come

11  back, and Mr. Reagan can pick up after the lunch break.

12          MR. WHITT:  I need to be heard on something.  I'll

13  speak loud enough hopefully.  The chart -- there was some

14  summary charts that were proposed that were placed into that,

15  and I was asking Mr. Reagan, Mick and I originally, we talked

16  about these things, and these were regarding the death charts,

17  he's summarized each one of those visits there, and in my

18  cross-examination of him on those charts, I was showed the many

19  discrepancies that occurred on those.

20          He came back and said we wanted to clean those up,

21  perhaps, and we started talking about how to clean those up.

22  And then he came to something and he showed them to me, and I

23  came over and we had a discussion about that.

24          I said, "Well, you still don't need to put that one

25  on here."  I said, "You can get up again and I can

                    UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1    cross-examine you on it," I said, "but I can't agree to that."

2         I never spoke with anyone in any of the prosecutors

3    on this case about that.  And lo and behold, I realized that

4    the original ones that were submitted were not what was placed

5    before this jury.  They were the ones that had been corrected.

6         I don't know what major emphasis that will have or

7    what to do about it at this point, because as I was asking

8    Mr. Reagan, I wasn't here at one point, and I thought, well,

9    maybe they agreed that later on.  But my understanding is that

10   that was not an agreement, and that certainly it wasn't agreed

11   to by me, and we didn't have discussions with any of these

12   folks, I didn't, about that.  And I just have -- I have some

13   concerns about that.

14        MR. REAGAN:  Judge, what we're talking about is the

15   death charts.  They were originally numbered 923 whatever, and

16   then the charts that Mr. Nocera talked with Mr. Whitt about

17   were labeled, for instance, 923A, and it was the A charts that

18   were used in the closing, not the charts that were rendered

19   into exhibits.  I don't think the A chart -- the A charts were

20   ever introduced as exhibits.

21        MR. STONE:  I'll respond.

22        I'm pretty confused.  All I -- I guess I was told

23   there was an agreement.  Mr. Whitt and I didn't talk.  But at

24   least from my sitting here, I know Ms. Pearson was going very

25   fast.  I don't know to what effect anybody, if there was an

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  issue there, that anybody -- there's a lot of information in

2  those.  It seemed like Ms. Pearson gave a gloss or an overview

3  of those, spent a few seconds on each one.  Clearly, the jury

4  won't have this PowerPoint back with them.

5          So there's a misunderstanding, of course.  I

6  apologize.  I was told there was an agreement, and, you know,

7  Mr. Whitt and Mr. -- Mr. Nocera, of course, have a good

8  relationship, and I didn't know there was an issue.

9          THE COURT:  Well, the key seems to be, perhaps what

10  is -- what is in evidence and what's going back to the jury?

11  Maybe y'all can talk about that, and let's just make sure

12  there's no issue in that regard.

13          MR. STONE:  We'll make sure that's squared away.  If

14  there's not an agreement, there's not an agreement.  We'll deal

15  with that.

16          THE COURT:  Does this affect your closing at all?

17          MR. WHITT:  No, it doesn't.  That why I said I'm not

18  saying there's a huge emphasis or difference here.  It's

19  certainly not going to change what I'm getting ready to talk

20  about.  But at the same time, it's just -- it's concerning.

21          THE COURT:  Let's just make sure.

22          MR. STONE:  We'll deal with it.

23          THE COURT:  You're saying it's not -- you're saying

24  it's not the As that are in evidence, it's the originally

25  numbered exhibits.  And perhaps it was the As that were shown

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1  during the closing argument in brief fashion.

2       MR. STONE:  It wasn't part of mine.  So I'm not sure.

3  We'll figure it out.

4       THE COURT:  Y'all look into that.  Maybe over the

5  lunch break, we can clear it up.  Let's go ahead and take our

6  break, so we can come back.  I think it will work out

7  timing-wise.  The jury can hear from Mr. Whitt, and then we'll

8  take our lunch break.

9       THE COURTROOM DEPUTY:  All rise.  This honorable

10  court stands in recess until 11:30.

11      (Recess from 11:19 a.m. to 11:34 a.m.)

12       THE COURTROOM DEPUTY:  This honorable court is again

13  in session.

14       MR. REAGAN:  Yes, Your Honor.  We have an issue we

15  need to address to the Court.  During the government's

16  argument, Ms. Pearson stated, talking about Ms. Fristoe, talked

17  about her working there, said, I want you to think about the

18  raw emotion you saw, especially from Ms. Fristoe, when they

19  talked about working at these places years after the fact, you

20  can tell with Ms. Fristoe, she felt the emotion of being in a

21  small part, and then it says "in per pate waiting these

22  places," according with the realtime transcript.  That's not

23  what that said.  But the part I want to address is, immediately

24  after that, Ms. Pearson says, guilt you never heard about from

25  these three defendants.

Closing Argument - Ms. Pearson

1          That is clearly a comment on exercising our right not

2  to testify.  And we would ask the Court to declare a mistrial

3  in this case because of that prosecutorial misconduct.

4          THE COURT:  All right.  Response from the government?

5          MS. PEARSON:  Your Honor, that -- certainly in the

6  context -- we were talking about the evidence, we were talking

7  about the testimony, that was certainly not a comment on these

8  defendants not testifying.  It was not taken as such.  It was

9  dealing with Ms. Fristoe's testimony.  So I would submit a

10  mistrial is absolutely not appropriate.

11          MR. REAGAN:  Judge, she said guilt you never heard

12  about from these three defendants.

13          THE COURT:  What about that?  Respond specifically to

14  that statement.  I'll go back and review the testimony.  But

15  how do you respond --

16          MS. PEARSON:  I would have to reread the transcript.

17  What I meant by that is that their actions didn't demonstrate

18  any of the remorse Ms. Fristoe said.  I certainly did not

19  comment about them testifying, them -- the lack thereof of

20  that.  It was simply related to the evidence in this case and

21  the fact that they continued working there.  And that's the

22  context that that was in.

23          THE COURT:  Anything further?

24          MR. REAGAN:  It's pretty clear, Judge, guilt you

25  never heard about from these three defendants.  That's clearly

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Pearson

1   a comment on our exercising our right not to testify.

2          THE COURT:  I'll take the matter, motion under

3   advisement.  I'll review the testimony.  I'll take it all the

4   defendants are joining in that request.

5          Okay.  We're ready for our jury.  Just before we

6   bring them in, I know defendants have given time estimates on

7   closing arguments.  We didn't really pin down a specific time,

8   but generally speaking, I -- and I think it was a request from

9   Ms. Hofstetter, as well as the government, up to around two

10  hours for their opening -- for the closings or the opening

11  closings, so I've heard some 90-minute estimates.  But I'm not

12  going to cut you off, because generally speaking, I'm looking

13  at up to two hours for each defendant, just so you'll know.

14         MR. WHITT:  That's not going to be a problem for us.

15         THE COURT:  Doesn't mean you have to use it.  But

16  that's kind of what we're looking at, just to be fair to

17  everybody.

18         All right.  Let's bring our jury in.

19      (Jury in at 11:37 a.m.)

20         THE COURT:  Thank you.  Everyone may be seated.

21         Now the defendants have the opportunity for closing

22  arguments.  The counsel for the defendant, Ms. Clemons, is

23  going to present closing argument first.  Mr. Whitt is going to

24  go first on behalf of the Defendant Clemons.

25         And then that will probably take us to our lunch

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

 1    break.  And then Mr. Reagan will come back after lunch.  So,

 2    again, I'm allowing multi -- parties represented by multiple

 3    counsel to split up their closing arguments if they desire.

 4            Mr. Whitt, you may proceed with closing argument on

 5    behalf of the defendant, Ms. Clemons.

 6            MR. WHITT:  Thank you, Your Honor.

 7            Good morning.  On behalf of Ms. Clemons, I want to,

 8    first of all, just as the government did, I want to thank you

 9    for literally taking four months, what's been four months out

10    of your life to come here each day and sit through and then

11    have to go back there and sit and then come back.  It's a

12    difficult time.  It's -- you add the holidays to it, and I know

13    it's not easy.

14            But this is an important, important day for

15    Ms. Clemons.  It's an important day for all these defendants.

16    It's an important day, which is why her family, as you know,

17    her mother and father have been here every single day that we

18    have and have come here, and a lot of the balance of her family

19    is here today, because it is an important time.  It's a huge,

20    huge moment here in Ms. Clemons' life.

21            And I'm fortunate that we have -- and we're all

22    fortunate that we have a system where the words of the

23    prosecutor or the words of the defendant -- or as far as the

24    defense counsel, our words don't mean anything.  It's what you

25    hear from the witness stand that means something.  And that's

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1   important.  And that's important.  Because it's not the

2   argument.  It's the substance of what you hear.

3          And we're going to have a little dispute over what --

4   the way I heard some of this testimony and what the government

5   had brought forward just a moment ago.  So we're going to kind

6   of talk about that.

7          But the way I want to do, I'm going to get to a road

8   map here in a little bit.  I'm going to help a little bit with

9   you.  You're going to get some jury instructions that are going

10  to be really, really long.  It's going to take a long time to

11  listen to them and to look through them.  And they're kind of

12  difficult.

13         And I do think the government did a fairly good job

14  of showing you what some of those counts were.  And it's

15  difficult.  It's kind of difficult work, I guess, to go through

16  all those things.

17         I'm going to help you from the perspective of

18  Ms. Clemons.  But before I do that, I want to go through some

19  things.  I want to review some testimony, kind of going in a

20  different order than they did.  I want to start with the

21  importance of -- and before we get into that, the importance of

22  one thing, and that is, there's been a term that has been used

23  literally hundreds and hundreds and hundreds of times, over a

24  hundred times today so far, and I want to go ahead and get that

25  out of the way now and talk about that.

UNITED STATES DISTRICT COURT

1    And it's the term "pill mill." We heard this word

2    from the very first time when the very first witness got up,

3    and even before that, when the opening was done by the

4    government. They talked to you about pill mill. They said

5    pill mills here, pill mills there, pill mill, pill mill.

6    Then they get the -- Stanley Jones when he first

7    testifies, he tells you that -- the DEA expert tells you what a

8    pill mill is. And he told you that a pill mill was a pain

9    clinic that actually dispensed medication from their facility,

10   that that was a pill mill. But even after that, that was

11   clearly not the context that the government wanted.

12   And you have to ask yourself about the word "pill

13   mill." What's the reason for it? Must be a basis for it.

14   Maybe it's in the statute somewhere. Maybe it's in those sorts

15   of things. But it's not. It's not.

16   The reason why you hear pill mill over and over, and

17   the reason why you continued to hear that terminology is not

18   because they were trying to use it as a pain clinic. It's

19   because there's a negative connotation to that word. There's a

20   negative connotation to that word. And so why not refer to the

21   clinics as pill mills? That way, you can start with your

22   negative connotation in the beginning. And that's exactly what

23   they attempted to do.

24   Even though they had the definition of really what

25   one was, they expanded that definition to be a lot of things,

UNITED STATES DISTRICT COURT

 1   things with the red flags.  And that's where Mr. Jones talked

 2   about things that are red flags in a pill mills -- in pill

 3   mills.  What we're really talking about the pain clinics.  What

 4   we're really talking about is pain clinics.

 5            Pill mills are something that is defined after the

 6   point, after -- after all is said and done.  That's something

 7   to be said for later on, if you want to use that definition.

 8   But we know the clear definition is it's for a clinic that

 9   actually dispenses their medication.  We know this clinic never

10   did that.  We know this clinic never did that.

11            I do want to talk about, as far as Stanley Jones,

12   because it started early.  And it started with the fact that he

13   conceded several things that are very important.  And he came

14   in and he told you-all that -- in my question of him, that it

15   was in fact -- it's the DEA that releases -- that releases the

16   quotas of any drug that is -- involved controlled substance

17   medication.  It is the DEA that does that.

18            And he also conceded that during the ten-year period

19   leading up to the end of this -- at the end of this case, that

20   the percentage -- that the percentage of oxycodone had gone up

21   400 percent.  And what we mean "gone up" is, they had released

22   400 percent more of that medication into the United States.

23            Seems like a big number.  And the reason why he said

24   that is because the DEA had -- it recognized the need for that

25   medication.  The need for that medication, that's why they did

UNITED STATES DISTRICT COURT

1    it.

2            If you remember what he said, if they wanted to cut

3    it off at zero, they could have cut it off at zero.  They could

4    have cut oxycodone out if they wanted to.  DEA has that power.

5    But they didn't do that.  They upped it because there was a

6    recognized medical need for that medication.

7            So when we're talking about this, as we're going

8    forward -- going forth, there was this recognized need.  That

9    was the lens.  We're talking about the lens of today versus the

10   lens from ten years ago or eight years ago.  It is different.

11   We see things different now maybe than we did.

12           But it's our job here today and your job as the

13   jurors to see -- to see this case through lens of 2013, 2014,

14   which is when these -- these prescribers here, these providers

15   were actually working for these clinics.  It's important that

16   we do that.  Not from today, because we see things different

17   today.

18           Also, Mr. Jones talked about, which I thought was

19   very telling, he talked about how the changing with drug

20   dealers in their involved -- getting involved in diversion, and

21   that is getting involved in trying to figure out a way to make

22   money off prescription medication.  They had gotten money off

23   of the -- of normal, more recreational drugs, and he talked

24   about in his experience how they tried to adapt to be able to

25   take advantage.

Closing Argument - Mr. Whitt

1        And he said that was -- the reason why the drug

2   dealers did that, and we talked about these drug dealers from

3   the context of these people that were supporting people into

4   this clinic, you've heard actually from quite a few of those

5   people, these sponsors is what we're referring to, how they had

6   come in and they were taking great chances, they were taking

7   great risks, the risk of severe prosecution.  And the only

8   reason they would do that is for the money.  And that's what he

9   said.

10       They do that because the motivation for the amount of

11  money that they might be able to make is there.  And that's why

12  drug dealer would do that, is for the money.

13       And I want to talk to you about that, because I want

14  to talk to you about what the proof that you heard of what

15  Ms. Clemons made in the context of her employment at this

16  clinic.

17       She made $65 per hour.  They did not take taxes out

18  on her paychecks, which means she had to pay the taxes.

19  Ordinarily, if you have a job and they're actually taking

20  taxes, you're actually splitting that with them.  But when

21  you're a contract 1099 employee, you have to pay both taxes.

22  So it's -- you have to pay a higher tax rate.

23       Got no vacation days, no sick days, no retirements,

24  no health insurance, have to pay that yourself, no anything,

25  nothing.  Hardly the above-average compensation that the

UNITED STATES DISTRICT COURT

1   government said in their closing a minute ago when they said

2   they were paid at above higher grade.

3          The truth is, it's the exact opposite. They were

4   paid a lesser grade. They were not paid any incentives

5   bonuses. They were told, "Oh, if you see so many patients in a

6   day, we're going to give you an extra, you know, $500 this

7   week." That was not the proof. Did not happen. Didn't show

8   you a single check, a single payment, a single voucher, a

9   single nothing, because it didn't happen.

10          So to come to this jury today and say they were

11   making above average compensation is absolutely false and

12   inaccurate. It was less. And, therefore, it also was less

13   motivation, because as Stanley Jones told you, there's a high

14   risk. The punishment is high. You're going to do that, you're

15   going to do it for the money. And they clearly were not doing

16   it for the money.

17          When we get into the actual -- and I think -- I

18   think, ladies and gentlemen, you can pretty much figure out

19   what my role in this was, and that every doctor that testified,

20   I ended up being the one to cross-examine them.

21          So that was kind of the role that I played was

22   from -- and you're going to get some instruction where he talks

23   about opinion testimony. In state court, we call it expert

24   testimony, so I'm probably going to call it that, even though

25   that's what this court calls it, only because I've done it for

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    30 years and I can't stop.  So I'm going to refer to them that

2    way, because in a way, that's what they are.  But we'll refer

3    to them as opinion testimony.

4         But that was my role in this case.  In looking at

5    that, one of the first witnesses that really fit that was

6    Michael Carter.  Now, Michael Carter was an academian, as we

7    would call, had been around, retired, was a retired nurse

8    practitioner.  And there were a lot of very important things

9    that he said.

10         Of course, one of the things that he conceded, at

11   least seven times, I believe, in his testimony was this, that

12   he had no experience or knowledge or expertise in chronic pain

13   management.  And he was -- actually also said he wasn't even

14   familiar with the Tennessee Intractable Pain Treatment Act.

15         As a matter of fact, one of the, I believe,

16   paraphrasing a quote here, he said, "I'm not familiar with pain

17   management.  It's not my specialty.  So I don't know all the

18   ins and outs, but I can tell you about wound care."

19         And he could tell you about charting, and he could

20   tell you how to chart something from a classroom, from the

21   academic standpoint, but he clearly had no experience in pain

22   management.  He said he had never seen what even the files

23   looked like until he got them -- got here in this case.

24         And he also told you that it was his -- his

25   experience -- I hid my water from myself -- he said it was his

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1   experience that patients will come in and tell you about their

2   medication and that they're going to be very honest with you

3   about that.  That was his experience.

4          He also admitted that when he talked about the visits

5   he did concede the fact that you -- there's one responsibility

6   for a first time patient, and then there's a different

7   responsibility for a follow-up patient, that is that you

8   require -- a nurse practitioner is required to perform a

9   physical examination on a first-time visit, but is not required

10  to do that on follow-up visits.  We all knew that, but he

11  confirmed that.  So he certainly had an idea of what the duties

12  of a nurse practitioner are.

13         But he -- when he started looking at these files, and

14  he said that -- he admitted that there was an attempt, was his

15  words, there was an attempt to put most of these elements in

16  the files, but they didn't write enough in these charts to tell

17  the full story.

18         So he started discussing what he -- what standard of

19  care existed in -- on behalf of these nurse practitioners.  And

20  then before he started going through the files, he said

21  something very telling.  And he said, in assessing these files,

22  he defined his rubric, as referred to it, as basically a

23  measuring stick for did the feel meet his measured standard of

24  care.

25         And that's what he analyzed those based upon that.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    Did it measure up to his standard of care for files?  And we
2    know that he reviewed about 90 files, and we know that he said
3    absolutely none of those files met up to his measured standard
4    of care based on the rubric of his analysis.

5           We're going to get back to that in a minute, because
6    it's going to be pretty important when I bring that together
7    here in a moment.

8           He also indicated if you didn't write it in the
9    chart, it did not happen.  If you didn't write it in the chart,
10   it did not happen.  Well, he also says later on, though, that
11   there's no way you can write everything in the chart or you'd
12   never be able to practice actually medicine.  But if it's not
13   the chart, that it didn't happen.  So that was the purview by
14   which he was reviewing these files.  Wasn't in the chart,
15   didn't happen.

16          He had previously testified in one case before.  It
17   was a malpractice case.  Had never been a part of a criminal
18   case -- criminal proceeding before.  And none of his testimony
19   was directed at Ms. Clemons or the providers, because as you
20   recall, he said that he wasn't even told who they were the
21   names or anything else.  So he was really looking at this from
22   the perspective of just looking at the file versus who might
23   have been in the file or any of those things.

24          He did admit that many of the criteria that he was
25   looking at were best practice, because that's what every

UNITED STATES DISTRICT COURT

 1    provider should do.  He admitted that he did not know all the

 2    standards for visits to a pain clinic.  He said I can't speak

 3    to that.

 4              And then he went on, and he talked about some of

 5    the -- some of these visits.  And he talked one of the ones

 6    that comes to mind first, Mr. Burns, Danny Burns, he talked

 7    about that file, because he talked about the fact that

 8    ultimately Mr. Burns and his opinion was discharged from the

 9    clinic for benzos.

10              And then upon my cross-examination of him, I said,

11    "Well, that's actually not a benzodiazepine.  That's actually a

12    contributor of cocaine."

13              He said, "Well, yeah."

14              I said, "He was actually kicked out for cocaine."

15              He said, "Yeah, but he had been on benzos the whole

16    time."

17              Y'all may remember, I started going back through

18    those visits, and I said there's no benzos here, no benzos this

19    month, went back the next month, no benzos.  I said, "Want me

20    to keep going, or do you want me to tell you he never tested

21    positives for benzos during this time?"  I said, "You were just

22    wrong."

23              He said, yeah, he wrong.  He was wrong how he

24    assessed that file and how he missed -- I don't know exactly --

25    I can't really speak for him how he was wrong about that, but

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    the bottom line is that he was.

2         He also said on cross-examination, he said, I have to

3    keep telling myself -- we talked about this lens of today

4    versus a lens of yesterday.  He said he had to keep telling

5    himself to look at it from the lens of 2013 and 2014 because

6    the thinking today is much different about medication than it

7    was back then.  And that's important.  And that's important

8    because the thinking is different.

9         Dr. Blake testified.  Dr. Blake testified, and let's

10   talk about Dr. Blake.  Obviously a very intelligent -- he knows

11   pain management.  He's got a good, successful, driving business

12   in Chattanooga.  He focuses on all of the -- all of the various

13   modalities, the upper end modalities, we kind of call them,

14   that is like surgeries and the injections.

15        And he owns a clinic that actually does their own

16   physical therapy, as you recall.  They also had their own

17   psychologist at one time.  I think he had just lost them, but

18   they were looking for another one.  They do all their own

19   interoffice drug screens, whether it be the screens or

20   confirmations.  They do all of that inside that office.

21        And he obviously is a specialist and certified

22   specialist in pain management.  And so he talked about trying

23   to compare -- to compare what his clinic was to what a general

24   pain clinic is.  And they are obviously two different things.

25        He admitted that his toolbox -- we talked about a

UNITED STATES DISTRICT COURT

 1    toolbox.  His toolbox is much larger than the toolbox that a

 2    regular pain clinic that doesn't have all the specialties and

 3    modalities that his does has.  And I think that's common sense.

 4           But the government asked him if he was familiar with

 5    the standards of the case, as far -- as standards of care of --

 6    as it applied to chronic pain management.

 7           And he said, "Yes."

 8           And the government followed up and said, "So when

 9    you're testifying going forward, are you applying these

10    standards to your testimony?"

11           And he said, "Yes, ma'am."

12           And those standards of care that he were talking

13    about were things like the pill counts, they do the pill counts

14    every -- every time a patient comes in, they do their pill

15    counts.  He conceded the fact that there's no requirement by

16    law or rule that that happen, but he says and that's what his

17    office does, and therefore that's the standard of care.

18           He says they don't ordinarily issue pain medication

19    on the first time.  I believe Dr. Browder's office doesn't do

20    that either.  There's no rule that says don't do that or that

21    you can't do that.  But that's the way he practices in a best

22    practice standard.

23           He says they do background checks.  He thinks that is

24    the standard of care, to do criminal history checks, those

25    sorts of things.  But yet there's no requirement that any of

                    UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    those things happen.  But that's his standard of care is what

2    he had testified to.

3           The electronic records, he thinks is a standard of

4    care, because they had had them since, I think, 2000 -- well,

5    probably even before maybe he even went.  I don't think he got

6    out of school till 2009.  So they may have had them before

7    then, but -- and he talked about his exams and advanced exams

8    are the standard of care, the heightened standard.

9           And that's important, because once again, we're

10   talking about something called standard of care, quality of

11   care.  That's what Michael Carter talked about was standard of

12   care.  He talked about quality of care and best practices.

13          He went on to -- after he analyzed these files, he

14   came up with the same result of analysis that Michael Carter

15   had, in that these prescriptions, none of these prescriptions

16   in any of these files were with legitimate medical purpose in

17   the usual course of professional practice.

18          Now, when we cross-examined him, we talked about some

19   things that -- and he did admit that different doctors do

20   things different ways.  Different doctors may see when -- you

21   know, as it applies to pain management with -- as far as MED

22   levels, for instance.

23          And we know that, because he said that he admitted as

24   a partner, he and his partner had differences on that.  And he

25   said his partner has a different tolerance for high-dose

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

 1   opioids than he does, because his partner was trained in the

 2   1980s or before and felt way more comfortable with that than he

 3   did than when he was trained in the late 2000s.

 4          So we know there's a difference of opinion.  We know

 5   what his opinion was, and when he was giving his opinion, is he

 6   is someone that does not -- does not regularly prescribe

 7   high-dose MED levels.  But he conceded that he had a partner

 8   that saw things different.  And people do things, do see things

 9   different in that regard.

10          And we talk about how his partner was trained at a

11   different time.  I asked you to kind of look at that from the

12   scope of Dr. Larson.  Dr. Larson, who was a medical director of

13   these clinics, obviously was an older gentleman who would have

14   been trained at a different time, too, than what Dr. Blake was

15   and very well comfortable with higher levels than what

16   Dr. Blake would be comfortable with.

17          Different minds have different approaches.  There's

18   nothing wrong with that.  There's nothing illegal about that.

19   It's just a different way of viewing things.

20          There's a doctor -- I think we mentioned before,

21   there was a doctor when I was cross-examining him, there's a

22   doctor in Kentucky who had never given out pain prescriptions

23   before.  Never.  Because he chose to do it a different way.

24   Doesn't make him wrong.  It's just a different way of doing

25   things.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1      Now, he did make a fairly big deal about the language

2 being spoken between the clinic and Dr. Larson.  The government

3 has kind of jumped on that again today, saying that these

4 providers were intentionally, were intentionally disobeying his

5 request to reduce MED levels.  And they did that.

6      And if you recall, I think I had pointed out to

7 you-all once before that there are different -- when you look

8 at these charts, there are different writings on these charts

9 that Dr. Larson would do.

10      And I think you-all will remember this, because I did

11 this before.  He may say "300" and circle it, he may say "300

12 high" and circle it, or he may say "300 high" with an arrow.

13      When you look at these charts, you're going to see

14 that.  You're going to see what each of these means, and

15 Dr. Browder told you that it -- by reviewing those files, it

16 appeared that 300 high was his threshold level.  That's where

17 he thought that it -- that was the high point of what he

18 thought MED levels were.  That's why he didn't put the arrow.

19 If he put an arrow down, that was an indication to lower the

20 meds.

21      So all these times, all these times when they're

22 saying that these providers are intentionally, intentionally

23 disobeying his request, that's inaccurate.  That's wrong.  And

24 I'm going to show you one in a minute when we get into

25 Mr. Reus' chart.  You're going to see that the previous month,

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    it had said "300" and "high," and then it was Dr. Larson who

2    saw him the next month. He didn't lower it. He kept it at

3    300, because that was his threshold level. So if he was

4    telling them that high meant you needed to reduce it, then he

5    certainly would have had the opportunity to reduce it, but he

6    didn't do that. He kept it there, because he didn't put an

7    arrow. That was -- that's the key. It was the arrow for him.

8          So for them -- for the government to tell you that

9    that's what the communications from them were, is inaccurate.

10   They weren't disobeying him. They were doing exactly what he

11   told them to do. And that was the way in which he did it.

12         They also -- we talked about this before, too. They

13   said -- the government used this. They said Dr. Larson wasn't

14   on his game that day. They refer to him as being on his game

15   or maybe he was on his game that day, but wasn't on his game

16   another day. Every time they didn't like necessarily what

17   Dr. Larson did, they said he was off his game that day. And it

18   came from prosecution through the question. It really never

19   came from the witness. It just came from the prosecution.

20         But they would say that. And that's -- I think

21   that's a very disingenuous way of doing things. Because I

22   don't think it tells the tale of what Dr. Larson was doing or

23   not doing. You were just doing it -- seeing it through their

24   own eyes and not through anybody else's. That's a disingenuous

25   way, in my opinion, to reveal that communication.

UNITED STATES DISTRICT COURT

1    Also from the -- he talked about window dressing.  He

2  talked about these files were window dressing, that -- and then

3  when they came back as a rebuttal, he basically was telling you

4  that everything they did was window dressing.  I talked to him

5  about the drug screens.  What did he tell you about the drug

6  screens?  I said, "How many do you have to have a year?"

7    "Two."

8    "How many did they have?"

9    "Well, 10 to 12," I believe is what he said.

10    I said, "Now that would be window dressing if you

11  were only doing two a year, the very bare minimum.  Right?"

12    "No.  This is window dressing here because they're

13  doing too many."

14    Makes no sense.

15    I asked him, "Well, what about this window dressing

16  you're saying when Ms. Clemons on multiple occasions with

17  multiple patients asked for a full blood count panel to make

18  sure of how the organs were reacting?"

19    "That's window dressing."

20    "How is that window dressing if it's for the safety

21  of the patient?"

22    "Well, it's just for window dressing."

23    Couldn't give us an accurate answer to that.  He just

24  said it was window dressing.

25    I said, "And when they then -- when the person still

UNITED STATES DISTRICT COURT

1   wouldn't go get that blood panel test, all of a sudden then

2   there was the threat that they would actually reduce the

3   medication if they didn't get it.  Is that window dressing

4   too?"

5           He said, "Yeah."

6           That doesn't make any sense.  And then when

7   Ms. Clemons actually did reduce -- actually did reduce an MED

8   level for not getting that done, it was for the safety of the

9   patient.  There could be no other reason why that would do

10  that.  If this was what the government wanted you to think that

11  it was, she wouldn't have cared two whatevers, iotas about

12  that.  They wouldn't have.  She would have said, "Well, just

13  keep your medication then.  I'm not even going to -- I'm not

14  even going to try to -- it's no concern to me if you don't want

15  to take that test.  Don't take the test."

16          But that's not what was going on.  There was care

17  being given.  There was activities being given.  There were

18  referrals being given.  But every time we addressed one of

19  those, it was window dressing.  It was window dressing.  When

20  you kick -- when she kicked 200 -- or 200 or so people out of

21  the clinic, it was window dressing.  Just because to protect --

22  they were just protecting the clinic by kicking the people out

23  of the clinic.

24          I submit to you that that is just absolutely an

25  inaccurate argument.  That is not reflective of what was going

UNITED STATES DISTRICT COURT

1    on.  And it makes no common sense why you would kick hundreds

2    of people out of the clinic when you know how much it is -- I

3    mean, if this were just all about money, and clearly it wasn't

4    to them, they weren't making them money, if it was all about

5    money, then they would -- that's an extra $300 per visit times

6    200 people that she kicked out.  That's not what that was.

7              So we get into -- with -- oh, before I do this,

8    Dr. Blakely also had testified and he had talked about how the

9    300 MED level, that he had checked around the area, and that

10   seemed to be the standard area.  You'll recall his testimony

11   about that.  So there's a reason why that number also then

12   carried into Dr. Larson when he had taken over to the clinic.

13             Dr. Browder testified.  And Dr. Browder, also very

14   educated, had been around a long time.  I think retired back in

15   2018.  But had a lot of experience.  National award winning, as

16   you were told, pain management clinic.  We went through a

17   numerous amount of slides with Dr. Browder.  We talked about

18   how he then assessed the clinics.

19             And if you recall -- I'm here behind the screen where

20   I can't see it, so I'm going to move over here.  You recall the

21   clock that he gave you.  And the clock is what he used in an

22   effort to evaluate these cases.  And you evaluate on the issue

23   of legitimate medical practice in the usual course of --

24   legitimate medical purpose in the usual course of professional

25   practice.  And he did that.

Closing Argument - Mr. Whitt

 1          And we got a few of those slides here.  Well, I did

 2   have.  Oh, thank you.  Hiding.

 3          I want to go over a few of these that we talked

 4   about, and then we'll get back to the clock.  He talked about

 5   some general concepts.  We talked about the treatment

 6   modalities.  And so we've heard about those treatment

 7   modalities, and that is heat, ice, physical therapy, home

 8   stretching, durable medical equipment, for instance, TENS

 9   units, back braces, knee braces, those sorts of things,

10   nonopioids, which is NSAIDs, those sorts of things, opiates and

11   opioids, and then the more serious, more invasive maneuvers,

12   the basic injections, invasive procedures, surgical

13   intervention, those sorts of things.  Those are the modalities.

14          And what we know is, and this is kind of the back to

15   the difference in the toolbox that Dr. Browder and Dr. Blake

16   had this clinic didn't, is this clinic certainly offered heat,

17   ice, stretching.  You saw this throughout the charts,

18   throughout the charts.  Of course, it was window dressing to

19   Dr. Blake, but you saw it throughout the charts.  You saw TENS

20   units.  You saw braces.  You saw where people were either being

21   given other nonopioid medication, and, of course, the opiates

22   and opioids.

23          These things we know this clinic didn't offer, but

24   every other one that they did.  They didn't offer it, because

25   they were not -- they had no expert that could do those sorts

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1  of procedures.  So this is all that they had.  And they offered

2  all of those, and they actually administered all of those.

3        Also, he looked at legitimate medical purpose, and he

4  said that it is one or more generally recognized indications

5  for the use of a controlled substance prescribed for a

6  therapeutic purpose and used in the context of a

7  practitioner/patient relationship.

8        One or more generally recognized indications, that is

9  pain, for pain, is certainly a recognized understood case.  And

10  once again, and for the therapeutic purposes of fixing that

11  pain, of relieving the suffering, and used in the

12  practitioner/patient relative.  Clearly those things occurred

13  at this clinic.

14        Usual course of professional practice, individual

15  acting as a health-care practitioner engaged in health-care

16  activities to render medical treatment.

17        He talked about the activities.  He talked about the

18  things that were going on, and we're going to go through a

19  couple of these charts.  Bore you a little bit.  But he talked

20  about those things, those activities.

21        And -- but he also talked about the standard of care,

22  and we put this up at that time.  Standard of care is

23  distinguished from usual course of professional practice.

24  Standard of care is terminology affiliated with quality of

25  care.  That is inside or outside the standard of care generally

UNITED STATES DISTRICT COURT

1  relates to malpractice cases.  The usual course of professional

2  practice means doing the things a health-care practitioner

3  would generally do in accordance with the generally accepted

4  practices in place at the time of prescribing.  It does not

5  equate to the constant use of best practices or gold standard.

6          That's going to be important.  And the reason that's

7  important is because you're going to be receiving jury

8  instructions.  This Court is going to instruct you, and as a

9  part of instructing you, one of those issues is going to be on

10  standard of care.

11          And first of all, I do want to say this, you were

12  first showed earlier this morning, you were showed a slide here

13  by the government that shows for a particular crime is the

14  legitimate medical purpose in the usual course of professional

15  practice, and then it said, comma, or beyond the scope of

16  something medical practice or something like that.

17          Never seen that language before.  I don't believe

18  you're going to see it in any jury instruction from when this

19  Court instructs you.  I have not seen that language before.  I

20  believe all you're going to see is legitimate medical

21  practice -- I mean, legitimate medical purpose in the usual

22  course of professional practice.  That's what you're going to

23  see.  That's going to be the standard.

24          But what you're going to also be advised by the Court

25  is, the law is, you have heard the phrase standard of care used

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    during the trial by several witnesses.  When you go to see a
2    medical practitioner as a patient, the practitioner must treat
3    you in a manner that meets the applicable standard of care that
4    practitioners of similar training would have given to you under
5    the same circumstances.  If the practitioner fails to provide
6    you with that care, the practitioner may be found negligent in
7    a civil lawsuit.

8          This case is not about whether the defendants acted
9    negligently or whether they committed malpractice.  Rather, in
10   order to find a defendant guilty, you must find that the
11   government has proved to you beyond a reasonable doubt that the
12   defendants' actions were not for a legitimate medical purpose
13   in the usual course of professional practice.

14         So we told you when Dr. Browder, when he got up to
15   testify, that this is not a standard of care case.  And yet
16   Michael Carter got up and said this is a standard -- my
17   standard of care, as whether or not it meets the rubric of my
18   standard of care.  Dr. Blake testified over and over about his
19   concept or idea of what the standard of care was.

20         But yet standard of care, and we refer to that also
21   as quality of care, because some is higher than the others,
22   that's not what this case is about.  It's not about the
23   standard of care and whether or not somebody might have dipped
24   below on a particular chart or on a particular day, below the
25   standard of care.  That's not what this -- this is a criminal

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    proceeding.  This is not a civil case where -- of malpractice

2    or otherwise.  And you're being told that by this Court.

3            This is something entirely different.  This is when

4    you quit becoming a healer and you at some point become a

5    dealer.  That's what this case is about.  It is not about a

6    standard of care and that's exactly what the government's

7    witnesses testified from was the standard of care of what it

8    was, and that they violated the standard of care.

9            This is different.  And it should be different.

10   You're asking -- you're being asked to judge on a

11   criminal-standard basis, beyond a reasonable doubt, whether or

12   not Ms. Clemons has violated the law in that regard.  And you

13   should use the appropriate standard.  And that is, was it with

14   legitimate medical purpose, and was it in the use of -- in the

15   usual course of professional practice.

16           Also, in assessing that, there's another instruction

17   that follows that regarding the state of mind.  I believe

18   government may have referred to it briefly, but it says,

19   "Ordinarily, there is no way that another person's state of

20   mind can be proved directly, because no one can read another

21   person's mind and tell what that person is thinking.  But a

22   defendant's state of mind can be proven indirectly from the

23   surrounding circumstances.  This includes things like what the

24   defendant said, what the defendant did, how the defendant

25   acted, and any other factors, circumstances in evidence that

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1      show what was in the defendant's mind."

2              So what did Ms. Clemons -- when you saw her charts,

3      you saw her requesting multiple times for blood counts, you saw

4      her kicking patients out of this clinic, you saw her reducing

5      MED levels for various reasons because they didn't get the MRI,

6      because they wanted a new MRI, because they failed drug screens

7      obviously, she kicked them out without hesitation.  That's the

8      circumstances that we're dealing with.

9              And the government would have you believe that's

10     nothing but window dressing, nothing but window dressing.  It's

11     significantly more than window dressing.

12             I do also want to talk to you about the good faith

13     that the government has told you you should ignore.  I'll read

14     that one again.  "If a nurse practitioner prescribes a drug in

15     good faith in the course of medically treating a patient, then

16     the nurse practitioner has prescribed the drug for legitimate

17     medical purpose in the usual course of accepted medical

18     practice that she has prescribed that drug lawfully.

19             "Good faith in this context means good intentions and

20     an honest exercise of professional judgment as to a patient's

21     medical needs.  It means that the defendant acted in accordance

22     with what she reasonably believed to be proper medical

23     practice.

24             "In considering whether a particular defendant acted

25     with legitimate medical purpose in the course of usual

                    UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    professional practice, you should consider all the defendant's

2    actions and circumstances surrounding it."

3            It's exactly what we're talking about with

4    Ms. Clemons.  You should do exactly that.  You should see the

5    things that she was doing with these patients each and every

6    time that she met with them.

7            No defendant has to prove to you that she acted in

8    good faith.  Rather, the burden of proof is on the government

9    to prove to you beyond a reasonable doubt that the defendant

10   acted without a legitimate medical purpose outside the course

11   of professional practice.  We don't have to prove that she did.

12   The burden is on the government.  We don't have to prove

13   anything, but yet here we are.

14           And I'm telling you that good faith applies in this

15   case.  It clearly applies.  It is not something that you should

16   ignore.  The judge is going to instruct you to this, and it's

17   not something you should ignore.

18           I want to get into a few of the charts from the

19   standpoint of -- I'm going to kind of combine two things and do

20   it this way.  We're going to combine talking about some of

21   these death-related charts, and in that context, try to show

22   you and go through a little bit of what we've done with the --

23   with going through clock that Dr. Browder and Mr. McCoy had

24   gone through.

25           And I have missed out on talking about Mr. McCoy's

UNITED STATES DISTRICT COURT

1  testimony.  And one of the reasons why I wanted to save a

2  little bit of that, because Mr. McCoy was up here over the

3  course of a couple of days, and he testified about a lot of

4  things.  He testified that his analysis of these cases was

5  similar to Dr. Browder's, in that how he viewed and how he set

6  out to assess these cases.

7          But he was asked a few questions, and he was -- and

8  the government has brought up today this issue of subjective

9  versus objective.  And they tried to say, well, he's changed

10  his mind about this or he changed his mind about that.  I

11  submit to you, that if you listen to what he was saying, what

12  he was testifying to, the difference between subjective and

13  objective is, he was very clear to the fact that it was

14  objective from the standpoint he certainly had rendered an

15  opinion before ever met two of the defendants.

16          I know he told you he -- it was a chance meeting, it

17  wasn't a planned meeting, that he ran into them and he asked

18  them a couple of questions.  But he already rendered his

19  opinion well in advance before he ran into those -- ran into

20  the ladies that day.

21          But he said that subjective is because everything is

22  subjective when you kind of look at a chart.  And it kind of

23  makes sense when you think about it, that is that if you're a

24  provider or if you're a nurse or whatever and you're looking at

25  one of these charts, you're basing it on, obviously, the

UNITED STATES DISTRICT COURT

1  information that you're getting, but you're also basing it on a

2  radiologist's opinion who has given you something and you may

3  be getting a record from someone else, so it's subjective from

4  the standpoint -- or there's other opinions have been injected

5  into that process.

6        And then he's given -- and then he said, "Well, I'm

7  giving you my opinion.  So if it's my opinion, it's subjective.

8  It might be base on objectivity, but it's my subjective

9  opinion."

10        That's where it went south.  That's all that ever

11  was.  It meant nothing.  It was all the same standard.  It was

12  all an objective review.  It was all an objective review.

13        So -- but then they played, and they tried to end

14  with him by playing a little game on whether or not he had

15  called these -- called these clinics pill mills.  And you

16  wondered why they had to do that, because what happened is, is

17  they had gone back, and way back when in this case, and tried

18  to hire him to be the one to give analysis to you.  That's what

19  the government was doing.  And in that analysis or in that --

20  or in that request for analysis, he sent them an e-mail back

21  declining to do that.  And merely referenced what the

22  government had already referenced to him about the Hofstetter

23  pill mill case.

24        They didn't ask you that question, though.  That's

25  not the question they asked.  They presented that in a fashion

1    when they asked him, is, did you call -- you recall referring

2    to these places as pill mills?  Totally different question.

3    Totally different question.

4        Why did they do it?  Ask yourself, why did they do

5    that?  They wanted you to think that he at some point in his

6    time had called this places pill mills.  That's what they

7    wanted you to think.  No idea how they were going to pull that

8    off, and they didn't, but that's what they wanted you to think.

9    There's no other reason to bring that up.  Why even bring that

10   up?  Whey even bring up the fact that they had tried to hire

11   him on their side?  One of those things that makes no sense.

12       Another thing that makes no sense, the repetitiveness

13   of referring to talking about the Waffle House on one side and

14   the adult bookstore on the other side, which they would refer

15   to it -- call it the porn shop, or the porn store -- the porn

16   store.  No significance to that whatsoever.  No significance to

17   that whatsoever.  That happened to be the store that was next

18   door.

19       But yet you get flooded with that.  You get flooded

20   with that.  Remember what we talked about at first?  We talked

21   about, you know, how the -- that the superfluous use of pill

22   mills.  Pill mill, pill mill, pill mill, pill mill.  Porn

23   store, porn store, porn store.

24       It's this effort of the government to get you to try

25   to see something that it's not.  Almost subliminal to get you

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    to believe that this is negativity revolving around this area,

2    when it has nothing to do with anything.

3           It has absolutely nothing to do with anything, that

4    there was an adult bookstore next to this location.  Nothing.

5    Has nothing to do with legitimate medical purpose.  It has

6    nothing do with usual course of professional practice.

7    Nothing.

8           The charts -- the death-related charts that they

9    talked about -- the first one was Carolyn Hayes.  I'll be

10   relatively brief with Ms. Hayes, although I certainly have some

11   opinions on that.  Because Ms. Hayes passed away almost two

12   years before these ladies became involved in this clinic, year

13   and a half, two years, whatever it was.  However, I do want to

14   bring up a few of the things about the -- that particular case

15   that you may obviously remember.

16          And if you recall, Ms. Hayes was the lady that

17   went -- she had court on that particular morning, and she went

18   to court.  She had lived with Ms. Shockley.  But she went to

19   court, and she had some episode at court where she fell down or

20   almost fell down, almost passed out, or something.  That's kind

21   of unclear from the paperwork.  But then they took her to the

22   hospital.

23          And then Dr. Robbins came in and testified about how

24   he had given her Narcan, because she appeared to be out of it

25   when -- by the time that he had seen her.  And so they gave her

UNITED STATES DISTRICT COURT

1    the Narcan.

2           And you remember what he did, though?  He gave her

3    the Narcan, and then he instructed her -- and he instructed her

4    to use your medication, you know, go home and use your

5    medication as prescribed, and he underlined it twice.  And I

6    asked him why he underlined it twice.  Well, wanted her to know

7    to use it as prescribed.  But he told her to go ahead and use

8    that medication and go home.

9           Well, what we know, if you believe Ms. Shockley is,

10   of course, Ms. Shockley said that she made it home about noon.

11   Well, we all know that that wasn't right, because she was at

12   the hospital till four o'clock in the afternoon.  But

13   Ms. Shockley said she came home about noon.

14          Ms. Shockley said that she was given a ride home by a

15   man that she knew him to -- her to have drug activities with.

16   Yet the hospital record, if you saw, that it was a

17   sister-in-law, family member, a female family member is the one

18   that actually took her home.  So can't say who is telling the

19   truth.  None of us will ever be able to do that.

20          But here's what you can do.  You can, if she realized

21   that she got home, allegedly, she -- according to Ms. Shockley,

22   that they snorted pills when she got home.  And you know that

23   she was with -- you know that that's not the way they were

24   prescribed.  We know that.  But we also know that by the time

25   she gets home, she's been with a man that she had done drugs

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1   with, according to Ms. Shockley.  We don't know where those

2   pills came from.  We don't know where any of that medication

3   came from, that she was there.

4         And under the instruction, it has to be -- the

5   causation of death has to be the actual prescription, the

6   actual prescription.  There's no way in the world, kind of like

7   the Reus case we're going to talk in a minute, there's no way

8   in the world to know where those drugs came from.

9         Was that prescription from this clinic?  Was it

10  prescription from the other folks that are in that house, all

11  of which were admitted drug users who said that they regularly

12  traded back and forth?  Was it the man that had given her this

13  ride home, belonged to him?  Was it this -- the family member

14  who we don't really know was there at the hospital with her?

15  No way to know that.  No way to know that at all.

16        But the second case I want to talk about -- and the

17  government is right, they haven't -- they haven't used that as

18  a substantive count or anything here -- is the Joseph Russell

19  case.  And I bring that up because very clear, very clear what

20  happened in Mr. Russell's case, other than by taking medication

21  that didn't belong to him, and taking -- that he wasn't even

22  prescribed to with the benzos, but also there was a note --

23  there was a note on that -- on his nightstand.

24        If you remember the pictures, there was a picture of

25  the belt.  Showed you the picture of the body of Mr. Russell,

UNITED STATES DISTRICT COURT

1 and there was a belt there that would have been used to inject.

2 And we know in fact that he did -- that he was an IV drug user,

3 because Mr. -- Dr. Lochmuller testified, who did the autopsy of

4 Mr. Russell, that there were all sorts of sediments of stuff

5 that indicated, you know, IV use. So we know he was an IV

6 user.

7        But we know from that note on the nightstand that it

8 was -- the girlfriend had said, "Here's the Rs," the Roxies,

9 "please be careful." So we know where that medication came

10 from. So not that that one matters, it's not charged, but it

11 matters from the standpoint that this was the behavior, this

12 was the behavior of Mr. Russell, and it was not the medication

13 that was prescribed to him by the clinic.

14        I do want to talk about Anna Vann-Keathley. Now this

15 is where I'm going to kind of go into the clock a little bit.

16 I'm going to talk about Ms. Vann-Keathley relatively shortly.

17 Once again, Ms. Clemons never saw her. But I do want to use

18 this as the means by which, if I can, make this a little bit

19 smaller, to show what we -- what we were doing.

20        Now, Ms. Vann-Keathley was at the clinic a very short

21 period of time. Only made a few visits there. But what I want

22 to do, if you remember what Dr. Browder, and then had said, is

23 you start here at the physical -- I mean, at the history and

24 the physical evaluation, and we know from the -- and by the

25 way, this is Exhibit 922, I'm guessing, is what we've written

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    down here.  I hope that I'm right about that.

2            Anyway, on Page 6, so -- and like I said, we're not

3    going to go through this whole thing.  But this is an

4    indication of what you can do.  And this is what we've done --

5    or what I've done in this case.  There was a request for

6    medical records in there.  That's part of the history and

7    physical evaluation.

8            On Page 38 through 40, there's the initial patient

9    interview showing prior treatment modalities and the pain

10   history.

11           Page 41 is the MRI, so we know that we're -- a

12   history and a physical evaluation.  We know that these are the

13   things on there that are being performed.  They're being

14   performed.  There is the physical examination, you have to look

15   at actually the Pages 38 through 40 to see, but you'll see that

16   there was a physical examination being done, as would have been

17   required.  And so -- and once again, requests for medical

18   record and otherwise.

19           Then we get down to the risk assessment and treatment

20   plan.  There was two separate DASTs done.  But there's more

21   than DAST.  Risk assessment is more than that.  Okay.  It's not

22   just a DAST.  There's -- here, there was the pharmacy and

23   prescription drug profile done.  That's part of risk

24   assessment.  That's absolutely part of that.  And that was done

25   on Page 42.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    Then you have on Page 39, there's the initial

2    treatment plan, including the request for a new MRI in the

3    treatment plan.  And on Page 75 through 77, that's the new

4    patient drug screen, which means when that patient came in,

5    when Ms. Vann-Keathley came in, she was administered a urine

6    screen that would have then -- of course, almost all the time

7    they sent those off for confirmations.  Didn't always get them

8    back, and we'll talk about them here in a minute.

9    Then we refer to over here on the informed consent

10   and treatment agreement, we have two different ones here.  So

11   clearly, clearly that was a part that was engaged here in

12   this -- the activities here between the provider and the

13   patient.

14   The periodic review of the plan and ongoing risk and

15   monitoring.  And we talk about that here in 35, 36.  That's her

16   first follow-up.  She got the updated MRI for the treatment

17   plan from Methodist medical center.  First -- well, that's when

18   she got the MRI was -- 4/23 is the first follow-up visit.  And

19   she got her drug test, a PMP was checked.  Treatment plan was

20   gone over.

21   Also Dr. Larson sees the patient for following drug

22   tests reviewed, PMP marked as no data.  He notes, however,

23   osteophyte impinges on L4 nerve root as rational for opioid

24   use, continues the plan.  Once again, that's the basis, that's

25   the basis for which the pain medication was prescribed, was the

UNITED STATES DISTRICT COURT

1  client's description of pain, along with a very clear

2  radiologic support as well.

3         Patient pregnancy test was done on that occasion.

4  Patient advised that the clinic would no longer prescribe

5  benzos or Valiums to her.  So they cut -- that's when they just

6  eliminated those from her practice.  If you remember during

7  about this time, we saw multiple files where they were being --

8  where benzos were being removed.  I think we've heard from

9  several experts why they would do that.  They don't always act

10  as a good sandwich, if we remember that.  Sometimes it's a bad

11  sandwich.

12         So they removed her from the benzos.  Once again,

13  there's a safety issue.  Once again, it's medical decisions

14  that's being made by these providers to do that.  This is part

15  of the patient provider relationship here.  The activities that

16  we see that is part of medical decision-making to make these

17  decisions.  It's not just willy-nilly window dressing.  These

18  are decisions that are being made.

19         The use of referrals.  Here we had the referral for

20  the MRI.  Also in Page 45 through 47, there's a request for

21  TennCare, for prior authorization.  And then looking to place

22  patient on long-acting medication, and TennCare approved that.

23         The medical chart showing that provider relationship

24  that I was just talking about, that's the -- that's basically

25  the entirety of what's in there.  That's what I'm talking

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    about, this provider/patient relationship and all these things

2    that go together to combine.

3         Then we get up to the top.  So was there one or more

4    generally recognized indications for the use of a controlled

5    substance?  And clearly there was.  We knew there was touching

6    on the nerve root at the T4.  We know there was MRI, even a new

7    MRI from Methodist Medical Center to update that, and that

8    there was the claim of pain, and that's why she was given a

9    prescription.  And that is with legitimate medical purpose

10   acting in the usual course of professional practice.  That's

11   what it is.

12        Now, the government would have you believe that that

13   standard of care is lower than what their experts believe, but

14   the activities are there.  The practice is there.  The

15   decision-making is there.  The provider/patient relationship is

16   there.  All of those things are contained in there.  This is

17   not a malpractice case.  This is not a standard of care case.

18   This is legitimate medical purpose.  That's what this is in the

19   usual -- acting in the usual course of professional practice.

20        Ms. Boling -- only two more of these.  Ms. Boling

21   similarly -- that's hard to see, isn't it?  All right.  I'm

22   going to have to do fancy reading.  I don't even think these

23   glasses are going to magnify it to help me out here.

24        I'm going to start here.  I won't necessarily go

25   through each and every one of them.  But we start here with the

UNITED STATES DISTRICT COURT

1    history and physical evaluation.

2            Once again, the reason I'm doing this, the reason I'm

3    doing this is not to go back through the chart again.  The

4    reason I'm doing this is to show you the manner in which

5    Dr. Browder and Mr. McCoy assessed these files, which is

6    different and contrasted from the situation or from the

7    analysis that Michael Carter and Dr. Blake did.  Because it is

8    different.  And the reason it's different, because once again,

9    it's not a standard of care case.  It's not a malpractice case.

10   It's a criminal case.

11           So we got the history and physical evaluation,

12   request to prior pain provider to get records.  For request,

13   they had the prior imaging, lots of prior imaging from 2006,

14   2008, 2010, 2012.  Tear in shoulder, and that was verified by

15   the office.  The office went and verified that and marked it

16   was verified.  So it's not window dressing.

17           Initial patient interview showing the prior treatment

18   modalities and the pain history.  Talked about all those

19   things.  Once again, there was an examination that was

20   performed.  Physical examination, as would have been required.

21           Then we get to the risk assessment and treatment

22   plan.  There was a DAST, a pharmacy prescription drug profile

23   again that we got.  Once again, it goes towards that risk

24   assessment.  And then a treatment plan was showing extensive

25   counseling regarding her previous use of a drug.  And that was

Closing Argument - Mr. Whitt

1    actually in the treatment plan.

2           And they gave her a new drug test and a report.

3    Obviously, then she has also signed the informed consent and

4    treatment agreement.  And then they had a periodic review.

5           And one of the important things that -- in this

6    particular case, in this periodic review is they immediately --

7    on the first follow-up visit, they immediately began weaning

8    her off of the benzos.  She had been given previously at the

9    other clinic, she had been getting 60 of those a month.  After

10   that first month, they knocked her down to 30.  The very next

11   month, they moved it down to 15.  And the very next month, they

12   cut her off at zero.

13          Medical decision-making for the benefit of the client

14   to do no harm to the client.  You don't just ordinarily take

15   somebody off that quickly of benzos.  But you do that because

16   it can be dangerous.  Right?  We know that from what the

17   doctors have testified to.  So they took it and they cut it off

18   over the course of 90 days, and then they removed her from the

19   benzos.  There's nothing window dressing about that, folks.

20   Not one thing about that is window dressing.

21          Subsequent visits, talked about how morphine had

22   upset her stomach.  There was some changes being made.  Oh,

23   yeah, there's an important one, January 13 of -- visit.  She

24   saw Ms. Clemons and said that she had ran out of medication and

25   taken a morphine pill.

UNITED STATES DISTRICT COURT

1        And -- but as part of that provider relationship,

2  that patient/provider relationship, she was actually honest

3  about that.  And she told her that she had taken that

4  medication.  So it wasn't any surprise by her volunteering that

5  information that the following month's confirmation, when it

6  came back, showed there was morphine in there.  Well, she told

7  her it was going to be there.

8        So she came back, but then -- so came back in the

9  following month in February.  She sees Ms. Clemons.  That's

10  when she -- that's confirmed.  And here's what they're doing,

11  they're trying to help her find an orthopedic surgeon.  Talking

12  about her PCP is.

13        Because for the couple of months there, she's trying

14  to find with her BlueCare, I believe is what she had -- yes,

15  she's trying to find it with BlueCare, which was the Medicaid.

16  She was trying to find somebody that would do her surgery, her

17  shoulder surgery.  She's trying to find somebody to do that,

18  and was having some difficulties, somebody taking her

19  insurance.

20        So she was working, they were -- this coordination of

21  care that we talked about, how the clinic with the PCP and her

22  insurance trying to get together to find somebody to find the

23  right referral to somebody that would take it.

24        So that's what was going on, once again, during these

25  visits.  And keep in mind, on these follow-up visits, it

 1    doesn't have to be physical examinations, yet almost every time

 2    there still was some type, almost every time.  Not every single

 3    time, but almost every time, there was still physical

 4    examinations when they needed to do none.

 5           And the use of referrals, we just talked about that.

 6    There were lots of referrals.  The medical chart, we know it

 7    showed -- clearly showed provider/patient relationship, because

 8    they actually had developed a relationship to the point where

 9    obviously the patient felt comfortable enough to share that she

10    had taken a pill that she wasn't supposed to.  She was

11    counseled on that.  It was documented in the file, all those

12    things were done.

13           Because those things happen.  Every doctor that got

14    up and testified would tell you that those things happen.  You

15    know, you're going to have somebody that takes their friend's

16    pill, that takes their neighbor's pill, that takes their

17    spouse's pill on occasion.  It's going to happen.  And you have

18    to counsel them.  It's the best thing as a provider is what you

19    do, you counsel them on that.  And this was the first time that

20    they had ran into that, to that particular issue.

21           And so we had the one or more generally accepted

22    indications for the use of controlled substance, that is for

23    the shoulder problem, which was confirmed by November 21st,

24    2013, tear in the shoulder.

25           So once again, the practices that these providers

                    UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1  showed, the interaction between them was not a case of window

2  dressing.  Might there have been things better that they could

3  have done?  I'm sure they could.  I'm sure -- almost

4  everybody -- I'm going to sit here when I leave here today

5  wishing I had done that.  Everybody is going to do that.  You

6  wished you had done better.

7        But you have to look at the -- you have to look at

8  what they did.  And they certainly did in good faith to try to

9  help their patient, to try to make changes, to make medical

10 decisions for their patient.

11       Folks that are making medical decisions, that's not

12 drug dealers.  These -- those are two totally separate things.

13 They're healers, not dealers.  That's what they're doing.  And

14 that's clear from these files that's what they're doing.

15       The last one I want to talk to you about is Mr. Reus.

16 And I want to do that for a couple of reasons.  First of all,

17 when -- I didn't want you to just take my word for it when I

18 told you a minute ago that in the Reus file I was going to show

19 you about the 300 high doesn't necessarily mean that Dr. Larson

20 intended on lowering it.

21       Here is the -- this is the January -- this is a

22 January visit where Holli Carmichael -- where Holli Carmichael

23 had seen Mr. Reus.  You can see that, and you can see here

24 where "high 300," and it was circled.  Everybody see that?  So

25 that's January of '14.

Closing Argument - Mr. Whitt

1    I'm going to move you to the very following month,

2   February of '14.  And it's Dr. Larson.  And if you can --

3   almost got it straight to the 300, did not lower.  Did not

4   lower it.  If he was so frustrated by these folks doing this,

5   why this?  Why didn't he lower it?

6    The reason is, is because the clear indication of the

7   practice and communication between Dr. Larson and his providers

8   were, it's the arrow is what matters.  That's the way he did

9   it.  That's not -- that's the reason.  The 300 was his comfort

10   level, just like Dr. Browder said that it was.  Because you can

11   see from the files that that's where they are.

12    And with Mr. Reus, I'm -- we've heard a lot about

13   Mr. Reus' file, so I'm throwing that up there -- oh -- but I

14   want to get straight to a particular part of this, and I'm not

15   going to go through all of these, it's the same that we had

16   seen, but I do want to get to something.

17    Mr. Reus' last visit was September 8th,

18   September 8th.  I want to go to a June 30 visit.  We talked

19   about this.  We talked about this at one time.  And then I had

20   a witness up there that didn't know everything about it, and so

21   the Court said, well, we'll wait on a different witness.

22    And what we ended up doing is this, I want to go back

23   to the June 30 visit.  Because on June 30, he goes into the

24   clinic, and they -- and he gets a -- obviously gets his

25   prescription, and they do a drug screen, drug screen on

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

 1    June 30th.  They send it off to the lab.  So when he comes back

 2    in July, we're expecting to see a confirmation.  Right?

 3    Because they requested a confirmation.

 4         We know, however, we didn't always get these

 5    confirmations back.  But we also know from Shannon Hill, we

 6    understand that she wasn't always playing on the up-and-up.  So

 7    we come back in July -- here we go.  We come back in July

 8    expecting to see the confirmation from June 30th.  Right?

 9         Let's make this bigger.  And this is actually in the

10    file.  We knew this already.  I'm going to -- it may be

11    difficult for you to read, but I'm going to tell you this right

12    hear says "6/30/14."  Okay.  So this was the -- this was the

13    original of what was done there.

14         And then it was sent off, and then you see there

15    was -- when we come back in July, there's no confirmation, but

16    instead you see this, "Sample leaked in transit."  That means

17    sample leaked in transit, which means there was no

18    confirmation.  Right?  If you're a provider, leaked in

19    transit -- in transit, there is none.

20         And we know that Shannon Hill -- Shannon Hill was the

21    one who -- well, that's her initials right here, by the way,

22    "SH" for Shannon Hill.  She's the one that wrote that.  She's

23    the one in charge of that, so she's the one that wrote it.

24         So all we know is, by looking at the file, is that

25    comes back for July, and we've -- we've leaked in transit, so

                    UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

 1    we don't know what it would have been.  Except for -- except

 2    for the fact that -- remember those boxes?  Remember those

 3    boxes of missing screens and confirmations and stuff that

 4    weren't in the file?

 5            Well, lo and behold, I found one.  This is not till

 6    after the fact.  We found the June -- the June 30, what should

 7    have been in this file, what this provider should have seen,

 8    and here it is.  It's a two-page.  I'm going to -- just so we

 9    can -- kind of hard for me to do that, guys.  Let's do this.

10            We show right here a collection date of June 30.

11    Now, keep in mind, Shannon Hill said this thing was leaked in

12    transit.  That's what she said.  But here it is, never for

13    anybody to see, except was found in a storage room, I guess,

14    where Ms. Hill would keep these clandestine things.

15            And what's it positive for?  Well, lots of stuff,

16    folks.  We got Methadone right here.  Let me see if I can make

17    that bigger for you.  We've got Methadone, EDCP, we've got the

18    oxymorphone, obviously, the morphine, all kinds of stuff, all

19    kinds of stuff.  And that is kept from this provider.

20            That is not on the provider for someone to take it

21    upon themselves to criminally inject themselves to hide a

22    document like this that could be so important, and that's why

23    it was done.  That's why you didn't find it anywhere near this

24    file.  That information could have been used, could have been

25    acted upon, but it was hidden, and it was hidden by Shannon

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1  Hill and lied to by Shannon Hill so that the provider wouldn't

2  see it, so that Shannon Hill, I guess, could make her extra 50

3  bucks.

4         So then we come later on, and we -- to the September

5  visit, the last visit, and he actually sees, he actually sees

6  Donna Smith first.  Here it is.  So we get to his last visit.

7  All right.  You actually see this little "DS" right here.

8  That's Donna Smith.

9         And Donna Smith originally had given him a

10  prescription for his regular 300.  You see the 300 right here.

11  Had originally gave him a prescription, but you look in the

12  back of the -- and you realize it wasn't accepted or there was

13  a problem with it, so he comes back to the clinic, and that's

14  when we see -- and the government showed you the prescription

15  that was actually written was by Ms. Clemons.

16         But when Ms. Clemons came back, she knew from the

17  previous month she had already warned him.  She had already

18  warned him about the new MRI.  She had already warned him about

19  getting the other records.  So he comes back, and she reduces

20  him down to 180.  She doesn't give him the 300 like Donna Smith

21  had done when she met with him.

22         She actually came in and said, "No.  He doesn't have

23  the new MRI.  He doesn't have this stuff.  180."

24         And so he walked out of there with a reduced, almost

25  in half, prescription.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    I ask you to consider the things in the totality, as

2  the instruction tells you, to consider what that

3  patient/provider relationship was.  It was clearly one where

4  she's trying to make the right decision for her patient to do

5  no harm, to do no harm.  She has made a medical decision and a

6  good one.  Sometimes we make good decisions, bad decisions.

7  Legally, we make good decisions, bad decisions.  But made a

8  good one and was doing the right thing for her patient, even

9  though there were bad actors actually at this clinic.  Lot of

10  them pled guilty.

11    But the bad actors aren't these providers over there.

12  The bad actors are the ones that were trying to manipulate.

13  And what ends up happening to Mr. Reus?  He gets half his

14  medication.  He and his daughter go out the following day and

15  go around, and he trades them for -- and trades his medication

16  for benzos, trades them for other medications, sells them, does

17  all these things.  She doesn't even know all the stuff that

18  they're doing.

19    That night, actually the night of, she has -- you

20  know, she's having to step over him and laughing as she's

21  stepping over him.  Could have injected herself into that and

22  done something, but I'm not going to -- I'm sure that was

23  hurtful enough.  I'm certainly not going to judge her for her

24  actions that day or how she handled her relationship with her

25  father.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1        But she sees him after she's taken him and driven him

2   around all through Newport to sell and trade these drugs.  And

3   now we get to the issue.  Well, now this is a count.  Now, this

4   is a death enhancement count now.

5        So you look at the test.  First of all, were these

6   medications -- were these medications the medications that

7   caused his death?  Well, how in the world would you know that?

8   How in the world would you know where this medication came

9   from?  Admittedly, according to the daughter, traded, traded

10  for benzos, traded for other medication, obviously morphine.

11  You know, there was multiple drugs he certainly wasn't

12  prescribed by this clinic.

13       So how can you say that his -- that those

14  medications, those prescriptions calls for the but-for test for

15  the death of Mr. Reus?  You can't.  Not only is it not logical

16  or rational, it's certainly not proof beyond a reasonable

17  doubt.  There's every doubt in the world to question where in

18  the world those drugs came from.

19       Once again, I've showed you some of these charts.  I

20  showed you the different way, because I think it's important.

21  I think it's important that you understand that what it is that

22  we are here for, and it's not to determine whether or not --

23  and Dr. Browder and -- said it best.  "I have some problems

24  with these charts.  I would like to see this.  I would like to

25  see that."

UNITED STATES DISTRICT COURT

1    So when the government is talking about the struggle,

2 there was a struggle that he had with some of the charts.  But

3 the -- this is not malpractice.  This is not an issue with

4 malpractice.  This is an issue where you look at the

5 activities.  And when you look at the clock, and you go around

6 that clock, and you look at the things that the providers did,

7 and you look at the -- they followed all the rules and

8 guidelines as far as that were required.  Says you have to have

9 physical examination.  Did all those sorts of things.  Risk

10 assessment, did all those sorts of things.

11    As a matter of fact, I wrote the four that the

12 government had put up, appropriate history, physical exam,

13 diagnosis, and a treatment plan and follow-up.

14    Those things exist.  They may not exist to the level

15 of what Dr. Blake wanted them to be.  But that's quality of

16 care.  That's the quality of care, a standard, a best practice,

17 any of those things.

18    That's not why we're in this courtroom today.  That's

19 not why.  We're here on a criminal case, seriously.  And these

20 providers are on the line on a criminal case, not a

21 malpractice.  This is the manner in which you have to judge

22 this.

23    You listen to these instructions, which will tell you

24 this is not a standard-of-care case.  And there's no way to get

25 around that Dr. Blake and Michael Carter clearly judged and

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    assessed these cases on the issue of standard of care, because

2    they say they did.  That's not my opinion.  They said they did.

3    I got to cross him on it.  I just let him keep going.  He said

4    standard of care.  Keep going.

5            That's not it.  That's not why we're here.  That's

6    not the standard that we use in these courtrooms, in these

7    criminal courtrooms on this type of case.  That's not it.

8            I do want to talk just a few things in closing, just

9    to kind of counter a few things that the government talked

10   about on theirs.

11           They called Lovell Road the worst of the worst.

12   That's where Shannon Hill and Stephanie Puckett worked.  That's

13   the file I just showed you a minute ago, where Shannon Hill is

14   the -- is the -- had kept that particular -- kept that

15   particular confirmation screen out.  That is the worst of the

16   worst.  What she did in compromising these providers in this

17   clinic and everybody else in here, what that -- that is the

18   worst of the worst.

19           And what strikes me as more surprising is that they

20   will in here, get up here to testify against the very people

21   that they were lying to and keeping stuff from, to hope you to

22   get -- to hope you will get to prosecute them so that they

23   might be able to get a little bit less time.  That, too, is the

24   worst of the worst.

25           Talk about all the Blumenthal e-mails.  That was

                    UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    years before these girls ever even went to work -- or these

2    ladies went to work there.  I'm getting old now.  Everybody is

3    girls.  My daughter turned 21 last week, so I'm getting a

4    little scared.

5            We talked about Marc Valley.  He was -- that was also

6    there before Ms. Clemons ever worked there.  Talked about the

7    government referred to the tons of other modalities.  We talked

8    about the modalities.  I had nine of them sitting up there, and

9    six of them we offered, three of them we didn't.  We told you

10   why we didn't.  They clearly offered other modalities.  They're

11   required to and they did.  Might not have been injections,

12   might not have been surgeries.

13           Another surprising thing that I saw up there, talked

14   about Cam Patterson was under the addiction or dealer group

15   category.  He may have said he bought one pill or sold one

16   pill.  Maybe that's what made him a dealer or something.

17           But his case was clearly different.  Cam Patterson

18   came to this clinic as an option, having been to another

19   clinic, as being given an option that you either need to take

20   medication or you need to have surgery.

21           And we know from the Intractable Pain Treatment Act

22   that you don't have to take a surgical option.  Okay.  Don't

23   have to do that.  But he goes to take the opioids, and he does

24   that for a while, and they bump him up because he's in pain.

25   Well, heck, yeah, he's in pain.  I had the same surgery.

UNITED STATES DISTRICT COURT

1    That's painful.  We talked about that.

2            He ends up having to have the surgery in June.  But

3    then what happens, he doesn't get full relief, so he comes back

4    to the clinic, and he starts up having to take medication.  And

5    the reason why is because he ended up having to have a

6    follow-up surgery, and these things happen.

7            He was a person who clearly had -- clearly had an

8    injury.  He clearly had pain.  He properly described his pain.

9    He was properly treated, and yet they're going to look at this

10   file and say that it's without legitimate medical purpose and

11   not the usual course of professional practice.  Makes no sense.

12   He is a legitimate pain, has legitimate pain that required

13   surgery not once, but twice.

14           How can that be window dressing?  Wasn't window

15   dressing to him, I'm sure.  But he said his pain was

16   legitimate.  Not sure why he was up there in that.

17           And, finally, they talked about -- and we kind of

18   briefly discussed that, that they ceased being nurses at all,

19   that they ceased being providers at all.

20           I guess the last thing that I would tell you is,

21   along those lines is, and I've said this twice already, and

22   Mr. Reagan may even say it again, dealer and healer, dealer and

23   healer.  Big difference between the dealer and a healer, a big

24   difference.

25           They've suggested to you that these are nothing --

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Whitt

1    they're not healers.  They're window dressing to try to make

2    the money, make an above-average wage, which they weren't

3    making.  When you look at all of the totality of their -- of

4    their work.

5            And you can count the pills.  They gave you that to

6    count them.  It sounds like a lot.  Over the course of a lot of

7    patients, it does add up.  Notice, we didn't see other people's

8    numbers.  We didn't see Dr. Blake's to see how many -- how much

9    medication they had dispensed either, down here in his clinic

10   with 22,000 patients.  Didn't offer that number in comparison.

11           It is a lot of medication.  But for -- but for it to

12   have -- they had 6,600 patients, I think, at this clinic in

13   totality over the course of years, I believe.  I may be wrong

14   about that figure, but I think I'm pretty close.  But it didn't

15   take long to add up to big numbers when you do that.  That's

16   clear.

17           But I'm going to let Mr. Reagan take over after

18   lunch.  I probably went a little bit over my time than what I

19   intended.  But I would just suggest to you to look at the

20   manner in which these cases were addressed by the experts as

21   well, and to what they were doing, what the practices were,

22   what was the interaction, what were the general practices that

23   these -- that Ms. Clemons was doing.

24           Because this road map that I've tried to show you to

25   get you to get you to, it leads to one place, and it leads to

UNITED STATES DISTRICT COURT

1  not guilty.  That's where the road map goes.  I believe we're

2  good for --

3        THE COURT:  All right.  Thank you, Mr. Whitt.

4        We'll go ahead and take our lunch break, a little

5  later lunch break.  Let's stick to an hour and 15 minutes and

6  come back at 2:30.  Give you plenty of time for lunch and to

7  stretch.

8     (Jury out at 1:12 p.m.)

9        THE COURTROOM DEPUTY:  This honorable court stands in

10  recess.

11    (Recess from 1:13 p.m. to 2:34 p.m.)

12        THE COURTROOM DEPUTY:  All rise.

13        THE COURT:  Ready to keep going?

14    (Jury in at 2:35 p.m.)

15        THE COURT:  Thank you.  Everyone please be seated.

16  You heard from Mr. Whitt right before lunch, and now Mr. Reagan

17  is going to continue with closing argument on behalf of the

18  defendant, Ms. Clemons.

19        Go ahead, Mr. Reagan.

20        MR. REAGAN:  It's been a little while since y'all

21  have heard from me.  I let Jeff do all the heavy lifting with

22  the doctors.

23        But you know one of the first things I told you was

24  that Cynthia Clemons is not guilty, and that has not changed

25  one bit.  I want to talk to you about some things that the

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    government didn't talk to you about.  One of the things that

2    they did not talk to you about, they talked about several of

3    the jury instructions, but I want to talk to you about the most

4    important instruction in this case, the one that is most vital

5    to us as citizens when the government comes and accuses us of

6    committing a criminal act.

7           We're not guilty simply because they say so, because

8    our constitution, that great document that governs us all, says

9    that unless and until the government can prove us guilty beyond

10   a reasonable doubt, we are not guilty.  All you heard from this

11   case was the government's argument this morning, they obviously

12   think that Cynthia Clemons is guilty.

13          But that opinion of theirs doesn't mean anything.

14   What is important is what comes from the witness stand and what

15   comes from the judge's instructions and what you-all decide,

16   because it's your power.

17          It's what we have used in our society to protect

18   against government overreach, to protect against innocent

19   people being convicted for something they didn't do, for

20   something the government can't prove they did beyond a

21   reasonable doubt.

22          And that reasonable doubt instruction tells us that

23   the government must prove every element of the offense charged

24   beyond a reasonable doubt.  A doubt -- a reasonable doubt is

25   one, as we talked about in voir dire, a reasonable doubt is one

UNITED STATES DISTRICT COURT

1    based on reason and logic.  It is a doubt based on reason and

2    common sense.  Reasonable doubt may arise from the evidence.

3    It may arise from the lack of evidence or the nature of the

4    evidence.

5         Proof beyond a reasonable doubt means proof which is

6    so convincing that you would not hesitate to rely upon it in

7    making the most important decisions of your lives.  And I can

8    assure you today, this is one of the most important decisions,

9    if not one of the most important decisions that you'll ever

10   make in your lifetime, at least it is to Cynthia Clemons.

11        And what proof is the government asking you to rely

12   on in convicting these providers?  They're asking you to rely

13   on in large part the testimony of professional liars, people

14   who lied to make a living.  People who were sponsored by Jason

15   Butler, who made a living off of lying, who made a living off

16   coaching other people and telling them thousand lie.

17   Professional liars who came into the clinic and told these lies

18   to get the medications they needed, that they said they needed

19   for pain, but that they really wanted to take and sell out on

20   the street.

21        That wasn't all lies that they told, as we heard from

22   some of them.  Because some of them said, yes, I had legitimate

23   pain.  Lisa Elliott, remember Lisa Elliott?  She said, "Yeah, I

24   had legitimate pain."  She had been injured in a car wreck, I

25   believe.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    Cameron Patterson definitely had legitimate pain.

2  This is a man, I think it was Cameron Patterson, forgive me if

3  I'm wrong, but he had two back surgeries that didn't work.  I

4  mean -- were those back surgeries not done within legitimate --

5  for a legitimate medical purpose?

6    Those back surgeries were done for a legitimate

7  medical purpose to help him with his back pain.  How could

8  providing medication to him to assist him with that back pain

9  be not within the legitimate medical purpose and usual scope of

10  professional practice?

11    Has the government proven that that was not so?  I

12  submit to you they haven't.  What he did prove was he had

13  legitimate pain.

14    And another thing is, we talked about the activities

15  of daily living, how these are clinic -- these clinics are

16  not -- they're not pill mills.  They're not pain clinics.

17  They're pain management clinics.  And the purpose of the

18  medication that these clinics prescribed is to help people who

19  have pain that would interfere with their daily living

20  activities to enable them to function, to go to work, to go to

21  school, to take care of their children or their grandchildren.

22    And Cameron Patterson is a great example of that.

23  Because we know he had legitimate pain.  He had back pain.  He

24  had back surgery.  He didn't want any more back surgery.  He

25  wanted to take pain medication.  And taking the pain

UNITED STATES DISTRICT COURT

1    medication, he went to school, he held down a full-time job.

2    That's the purpose of these pain medications, is to help people

3    like that, and that was the purpose they were prescribed for,

4    particularly with Cameron Patterson and all the other patients

5    that we've talked about.

6         I want to talk about one thing about legitimate

7    medical purpose. This is something that Jeff Whitt touched on.

8    This is from Carolyn Hayes' record. I can't tell you what --

9    y'all don't mind if I step over here a minute, do you?

10        This is her discharge summary from when she was

11   discharged at the emergency room when she was taken after she

12   passed out at the courthouse. She's taken to the emergency

13   room, they give her Narcan. They know that she's prescribed

14   medication from the clinic, from Lovell Road clinic, I think,

15   maybe Lenoir City. But anyway, they knew she was prescribed

16   medications from these clinics. And did they say, "Oh, no, my

17   gosh, don't -- that's a pill mill, don't take that medication?"

18        No. They said, "Take meds as prescribed."

19        Do you think they felt there was a legitimate medical

20   purpose for those drugs, for those medications? They wouldn't

21   have told her to keep on taking them, if they weren't, would

22   they?

23        Cynthia Clemons is a mother of five. You've seen her

24   mother and father here during the trial. You see her family

25   there today. She worked hard. She had to work hard to get

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    through nursing school while supporting her family.  She had to

2    work hard to get into nurse practitioner school to support her

3    family.  When she got out of school, she worked as a -- in an

4    anesthesiology practice for a number of years.  She worked at

5    Blount Memorial Hospital for several years.  And she worked at

6    a couple of different pain clinics, two or three different pain

7    clinics.

8          She's making $65 an hour as a 1099 employee.  And

9    those of you who are self-employed, as I am, you know that when

10   you're a 1099 employee, when you don't have -- when you don't

11   have your employer paying your taxes, you got to pay them

12   yourself out of what you make.

13         She had no health insurance.  Had to pay her own

14   health insurance and that of her family, too, I would imagine.

15   Didn't get any annual leave or sick leave.  She didn't work,

16   she didn't get paid.  She wasn't making millions of dollars.

17         Why would someone do this, commit a criminal act

18   intentionally and knowingly and risk all that, risk being with

19   her family?  No one would do that.

20         And, you know, not only did she work at the -- in the

21   pain management side of the clinic, but she also worked on the

22   primary care side.  And you heard her on the tape, Matt Sterns,

23   and we'll get to that in a minute, but you heard her on that

24   tape how she loved primary care a lot more, because it was a

25   lot different and a lot more varied.  But she preferred working

UNITED STATES DISTRICT COURT

1    at the pain clinics, because the pain clinics, the primary care

2    clinic, because when she worked at the hospital, she had to

3    work weekends, and she wanted to have weekends with her family.

4    Where's the nefarious motive in all that?

5           The government wants to talk about how she ignored

6    all these things.  How can you ignore something that people are

7    actively -- taking active measures to prevent you from finding

8    out about it?

9           Take one example, one huge example, and this is one

10   that Stephanie Puckett told you about from the stand.  Eldin

11   Hardy comes to the clinic to see Cynthia.  He sees Cynthia

12   there.  He has his arms covered up in bandages.  He says he's

13   been in an automobile accident.  Cynthia writes in the chart,

14   "Get me these UT medical records from the hospital before I

15   write this prescription."

16          Stephanie Puckett got them.  And don't forget Eldin

17   Hardy is a sponsored patient by the people that are paying

18   Stephanie Puckett.  Stephanie Puckett got those records.  She

19   looks at the records.  They talk about IV drug use.

20          So I'm sure she took those right in to Cynthia

21   Clemons and said, "Hey, you need to look at these.  These may

22   help you make your decision."  No, I'm sure she didn't.

23          What she said she did is, she shredded them to keep

24   Cynthia Clemons from seeing those, to keep Cynthia Clemons from

25   knowing that these bandages are covering up IV drug use.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    Cynthia Clemons didn't ignore that.  She tried to find out what

2    was going on.  And she did, she wrote him a prescription.

3           But we know from the other medical proof that we've

4    had, you can't just cut somebody off from an opioid

5    prescription.  Hippocratic Oath says, first, do no harm.  If

6    you cut somebody off, you're doing harm.  She didn't do that.

7    She had to take him at his word.  If she had seen those records

8    from UT Hospital, that would have made a big difference.

9    Stephanie Puckett knew that.  That's why she didn't show those

10   to Cynthia Clemons.

11          You know, and there are other things that Stephanie

12   Puckett talked about that show to you what kind of provider,

13   what kind of nurse practitioner Cynthia Clemons was.  She

14   talked about -- talked about a lady named Jeanine who called

15   her.  Remember?  Jeanine called Stephanie Puckett.  I guess

16   this was after Stephanie had gone to KPC.

17          But she said that she refused to see Clemons, Jeanine

18   did.  She refused to see Cynthia Clemons, because Cynthia

19   Clemons was going to discharge her for having marijuana in her

20   system, and she was also going to make her do pill counts.  And

21   Jeanine is the one that called Cynthia Clemons the bitch

22   doctor, because Cynthia didn't just give her what she wanted.

23          You know, the government talks about -- you know,

24   they talked about, oh, they were just discharging people

25   because they were becoming liabilities.  They were becoming --

UNITED STATES DISTRICT COURT

1    they were pill seekers.  Well, if you imagine what they would

2    be saying if these people who came in with track marks, with

3    bad drug screens, what they would be saying if they hadn't

4    discharged them?

5         On the one hand, you're a bad provider because you

6    discharged these people when they're not following the rules,

7    when they're not doing what they're supposed to do.  And on the

8    other hand, you're a bad doctor if you -- if you don't

9    discharge them.  I mean, it doesn't make any sense.

10        The other phone call that we talked about with

11   Stephanie Puckett was a fellow named Don, and he was -- he

12   called Stephanie Puckett after she had gone to KPC and said,

13   "Hey, you know, this -- you know, Cynthia Clemons is making me

14   do pill counts every two weeks.  Can she do that?"

15        And Stephanie Puckett tells him, "Well, you know,

16   that's not a requirement.  They don't have to do that."

17        But they were doing it.  They were doing it to

18   monitor these patients, to monitor them to make sure that --

19   you know, to try to make sure that they were not simply getting

20   medicine for the sake of their addiction or whatever, that they

21   were getting medication, they were using it in the proper way,

22   and that they were not selling it on the streets.

23        We talked about another phone call with Stephanie

24   Puckett.  This one was from Jason Butler.  Jason Butler called

25   and told Stephanie, "Hey, I got one of my patients, I want to

1   get her in there Wednesday."

2          And what did Stephanie Puckett tell him?  Stephanie

3   Puckett told him, "No, no, don't come in that day.  That's

4   Cynthia and Holly Harrell.  Don't come in that day.  She's a

5   bitch."  And so she set them up the next day with Alicia Payne.

6   Didn't want him to see Clemons.

7          Other things Stephanie Puckett said that providers

8   would -- they did pill counts, and patients would be called in

9   for random pill counts.  I would imagine with Stephanie Puckett

10  running the front, that patients who were told to be called in

11  for pill counts may not have got called in every time.  Depends

12  on who they were, who sponsored them, who was paying Stephanie.

13         But another thing that Stephanie Puckett said, and

14  you remember this testimony about this telephone call on the

15  wiretap between Stephanie Puckett and Shannon Hill, and they've

16  gotten wind that there's something going on, that they think

17  that one of the patients may have been wired up to come in and

18  talk to them or something.  And they were talking amongst

19  themselves.  They're not talking to the police or anybody else.

20  They're talking amongst themselves.

21         And they say, "Well, we're trying to figure out

22  what's going on, but, you know, the providers didn't do

23  anything wrong.  They must be after us."  Because, you know,

24  Puckett said the providers weren't in on her scheme.  They

25  didn't know what she was doing.  They took active measures to

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1   prevent anybody from finding out about that.

2          So how can you ignore something that people are

3   actively hiding from you?  And when we talk about deliberate

4   ignorance is -- you know, deliberate means on purpose.  When

5   you do something deliberately, you mean to do it.  And so

6   deliberate ignorance doesn't mean they should have known.

7   That's not what it means.  What it means is, they knew and they

8   ignored it.  There's been absolutely no proof of that.

9          One of the -- you know, the government wants to talk

10  about this Matt Sterns video.  Let's talk about Matt Sterns for

11  a little bit.  We talked about Matt Sterns' file where they had

12  the records from the previous clinic that he had brought in.

13  They had an MRI that he said was a real MRI.

14         They brought in the records from the previous clinic

15  that showed he had -- he told him that he had -- at that

16  clinic, that he had real pain.  I don't recall now whether it

17  was back pain, neck pain, whatever.  I think it was neck pain.

18         But anyway, he told them, and it was in his file that

19  was brought to those providers, he told them that he had such a

20  pain problem, he could not pick out a gallon jug of milk

21  without excruciating pain.  That's what he told them.  That's

22  what he told them.

23         I'm sure y'all remember Matt Sterns is the undercover

24  officer.  That's the one that had the wire.  He goes into the

25  clinic, does this undercover visit.  He comes in, does his

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    undercover visit, he does everything possible, everything

2    possible to make himself look like a legitimate pain patient.

3         He has the MRI. He brings in the records from the

4    previous clinic that talks about excruciating pain. When he

5    comes in to take his urine test, he spikes the urine, spikes

6    the urine so that it would look like on his UDS that he was

7    taking the medication he was prescribed.

8         If you want to come in and find out if this place

9    isn't on the level, why do you do all that? Because he knew,

10   like these other patients knew. These other scamming patients

11   knew that if he didn't do that, he would not have gotten

12   written a prescription. And if he had not gotten written a

13   prescription, that would have kind of messed up his

14   investigation.

15        And the other thing that the government wants to talk

16   about on Matt Sterns and his visit is the time he came in and

17   he said, "Oh, yeah, I'm -- I'm kind of a couple weeks late for

18   my appointment because I was out of town on vacation. And

19   while I was gone, I had to -- I ran out of medicine and I had

20   to take a pill from a friend."

21        And, you know, Cynthia Clemons, she -- at first, it

22   looks like on the video she thought he was talking about

23   marijuana. And she said, "Well, marijuana is not legal down

24   there."

25        He said, "No, I'm talking about a pill."

UNITED STATES DISTRICT COURT

1    She says, "Oh, okay.  I'll just write down you were

2    on vacation for two weeks," which is not the perfect thing to

3    do.

4          THE COURT:  Mr. Reagan, I don't want to interrupt.

5    Just try to stay close to the microphone.

6          MR. REAGAN:  I'm sorry, Your Honor.  I need a leash.

7          THE COURT:  Okay.

8          MR. REAGAN:  I've got the microphone right here.

9          THE COURT:  Okay.  Stay near the podium then.

10         MR. REAGAN:  Yes, sir.  When the government showed us

11   that video, okay, they showed it to that point, and they

12   stopped where they wanted to stop.

13         We objected.  We said, "No, no, no.  Let's play the

14   rest of it.  The jury needs to see all this."

15         And what you saw, when the rest of it is played, is

16   she's still asking him to get his blood lab reports to make

17   sure that this medicine is not messing with his internal

18   organs, to make sure she's not doing any harm to him by

19   prescribing this.

20         And he says -- and just to step aside here, you

21   remember all the patients saying, "Well, all we had to do was

22   ask for more medicine and they give it to us"?

23         What he says is, "Can we up my medication?  Can you

24   give me more medication?"

25         And she says, "No.  No.  Not until we get your drug

UNITED STATES DISTRICT COURT

1    screen back and see what's in your system."

2            She didn't ask him what he had taken.  He may have

3    told her something that was wrong.  First of all, he may not

4    have known what he had taken.

5            But she said "No, you're -- we're going to leave

6    everything like it is right now until we find out what was --

7    what's in your system, and you bring us these blood reports so

8    we can make sure you're okay."

9            And, again, you know, the government didn't want to

10   play that whole thing.  They wanted to cut it right off in the

11   middle, but you needed to see that.  She did not ignore that

12   problem.  She did what she needed to do to check it out.

13           And, you know, the government says they were joking

14   about addiction.  He was talking about being addicted to

15   Mountain Dew.  They weren't joking about addiction to opioids

16   or anything like that.  He was talking about Mountain Dew.

17   They were joking about Mountain Dew.

18           Lisa Elliott, you know, one of the other things --

19   excuse me.  One of the other things that Lisa Elliott told us

20   was that the providers were not involved in what was going on

21   with Stephanie Puckett and Shannon Hill and Patty Newman.  And

22   she told that not only in here to you-all, but she told that to

23   the FBI when she was arrested.

24           She told the providers that she was a legitimate pain

25   patient.  She told the providers she had neck pain.  She had an

                    UNITED STATES DISTRICT COURT

1    MRI.  She told them it was a real MRI.  You know, this pattern

2    is repeated over and over again with just about every one of

3    these patients they put up here.

4            Lee Jenkins, remember Leo.  Leo told us that, yeah, I

5    had a slipped disc, and it caused me a lot of pain, and he was

6    still in a lot of pain.  And that's what he told the providers.

7    He did say that he overexaggerated, overexaggerated the pain to

8    get the medicine, because if he told them he wasn't in that

9    much pain, he wouldn't have gotten the medicine, and he knew

10   it.

11           Scott Willis, do you remember Scott Willis?  He's the

12   chicken-fighting man, rooster guy.  He said that, you know,

13   yeah, I had -- I told them, hey -- I think he actually said he

14   went in to Stephanie Puckett and said, "Hey, I've got a couple

15   of track marks on here.  What can I do about that?"  And they

16   came up with the idea, oh, yeah, just tell them it's rooster

17   marks.

18           When I asked Scott Willis about that on cross, I

19   said, "Well, you know, what -- what were these like?"

20           And he said, "Well, it was just one or two marks,"

21   and it was right there where a rooster would have hit him.

22           He comes into the clinic, and he's alert, he's

23   oriented.  He doesn't look like he's under the influence of

24   anything.  And he does fight roosters.  You know, everybody

25   over there knew it.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1     Andrea Osborne, Andrea Osborne comes into the clinic.

2  She tells us that Stephanie Puckett coached her on what to say

3  to the providers to get her medication.  She also said that

4  Cynthia Clemons was the only provider to ever ask her about

5  track marks.

6     And she also told Sylvia [sic] Puckett, and this is

7  what Andrea Osborne testified to from the stand, told Stephanie

8  Puckett she didn't want to see Clemons again because she was

9  concerned she wouldn't get her meds if she saw Clemons.

10     If Cynthia Clemons is ignoring this stuff, why is

11  Andrea Osborne worried that if she sees Clemons, she's not

12  going to get her medication?  Why is Jeanine calling Sylvia

13  Puckett and complaining about being discharged for marijuana

14  and having to do pill counts?  Why is Don calling and saying

15  Cynthia Clemons is going to make me do pill counts every two

16  weeks?

17     And the government talks about these providers

18  ignoring routine monitoring.  That's routine monitoring.

19  Monthly visits are routine monitoring.  They want to talk about

20  these being high-risk patients, yet they complain about them

21  coming in every month, the government does.  That's why they

22  come in every month, so you can monitor, so you can see what's

23  happening, so you can see what's going on.

24     You know, one of the -- one of the red flags that

25  they talked about, what the government wanted to talk about at

UNITED STATES DISTRICT COURT

1    the start of this case was how trashy these people look coming

2    into the clinic.  Look like they shop at Walmart.  They drive

3    bad cars.  I think one of the security guards described them as

4    street urban cars.  You know, what does he mean by that?

5         But then Shannon Hill gets on the stand, and we

6    talked to her, and Shannon Hill says, "Well, yeah, I used to

7    work in a dialysis clinic, and we had the same type of patients

8    there."  And it's the government trying to use what's there to

9    try to make you-all think that that's bad.  And it's not.

10        What else did Shannon Hill tell us about Jason

11   Butler?  That Jason Butler would come in with patient --

12   Butler's sponsored patients would come in, a couple of them

13   would come in at the same time, and they would have the same

14   MRI, except, you know, the names were changed.  And Stephanie

15   Puckett didn't go tell the providers, "Hey, these are fake

16   MRIs."

17        What Stephanie Puckett and Shannon Hill did was, "No.

18   Just don't put both those patients in with the same provider.

19   Split them apart, so the providers won't know."  Another one of

20   those active measures that they took.

21        Again, Shannon Hill confirmed what Stephanie Puckett

22   said, the providers didn't know what was going on, because they

23   kept it from them.  They kept it from them.  Active measures to

24   conceal what was going on, to keep these providers from knowing

25   what they needed to know to make the medical decisions that

Closing Argument - Mr. Reagan

1    they wanted to make.

2            They wanted to talk about -- about how -- one of the

3    red flags is a dirty clinic.  It's a not clean.  It's just --

4    they're ratty looking.  Crystal Parks -- or Crystal Morgan, I

5    think her name is now, came up and testified.  She said, yes,

6    when she went in there, the office was cleaned, it was well

7    organized.  Government's own witness comes in and says it's

8    clean.

9            And one of the other things a lot of the patients

10   talked about was how packed these waiting rooms always were.

11   They talked about that until we got the still photos from Matt

12   Sterns' visits, and showed them to you, and there's maybe two,

13   three, maybe four people in there.  They're certainly not

14   packed.  And that's photographic proof of that fact.

15           Another thing is, the government talks about -- well,

16   they didn't -- you know, they didn't make referrals to

17   neurosurgeons or to orthopedists.  Okay?  On the one hand, the

18   government wonders how somebody can pay $300 a visit here, and

19   they wonder why they don't get referred to -- people without

20   insurance, why they don't get referred to neurosurgeons who's

21   neurosurgery probably starts at $12,000.

22           And who's got $12,000 laying around to pay a

23   neurosurgeon?  You know, you may get surgery there, and you may

24   end up like Cam Patterson and it doesn't work, first of all.

25   But they were making those referrals.  And the person that told

UNITED STATES DISTRICT COURT

1   us that was Brandon Ledford.

2          Brandon Ledford said, going to a neurosurgeon would

3   be impossible for me because of the expense.  There were a lot

4   of other patients in his same boat.  You know, Brandon Ledford

5   lets us know that referrals were made.  It's just the patients

6   couldn't afford them.  There may have been patients like Cam

7   Patterson who chose not to have another surgery and chose to

8   control his pain with pain medication.

9          Another thing they talk about, one of the red flags

10  is, no medical supplies, and there's no medical supplies in

11  these clinics.  And yet when Jessica Watson gets up on the

12  stand, she talks about Cynthia Clemons swabs her arm with an

13  alcohol swab.  I guess that alcohol swab came from the medical

14  supplies that weren't there.

15         Now, I want to talk about Heather Alred.  From the

16  perspective of Cynthia Clemons, Cynthia is in the clinic one

17  day.  Heather Alred comes in, and Heather Alred has track

18  marks, track marks that Cynthia Clemons discharges people for.

19  But she didn't discharge -- didn't discharge Heather Alred

20  because Heather Alred tells her, "Look, here's what happened.

21  I got assaulted.  I got raped.  This guy jabbed me with

22  needles."

23         And the government wants to talk about Cynthia

24  Clemons not caring for Heather Alred or what -- you know, what

25  this story she told.  And I don't know whether Heather Alred

1    was raped or not.  Nobody was ever charged for it.

2           We'll talk about Leslie Steelman.  He was never

3    charged for it, never even been convicted for it, never even

4    been charged.  The government wants to call him a rapist.  I

5    guess they've already convicted him without a trial.

6           But going back to Heather Alred.  She's going to the

7    clinic.  She knows she's got these track marks.  She knows

8    she's got to come up with something to keep from being

9    discharged.  And she tells them this story about her being

10   raped by Leslie Steelman.

11          Cynthia Clemons could have discharged her right then

12   and there, written her a taper dose, said, "No.  Track marks,

13   go."

14          She didn't do that.  She said, "Well, let's -- you

15   know, let me look at this."

16          She brings in -- she gives the note to the medical

17   director, Dr. Larson, she calls him in, says, "Hey, this is

18   what this lady is saying."  You saw the note that she gave to

19   him.  "What should I do?"

20          And Dr. Larson says, "Let's get the police reports.

21   Let's get the report from the sexual assault nurse."

22          The government says, "Oh, why didn't she refer her to

23   a sexual assault nurse?"  She had already been to a sexual

24   assault nurse.  Why would you refer her to see another one?

25          And they get the police records, and, they're -- you

Closing Argument - Mr. Reagan

1    know, they're not even going out a month with her.  They're

2    saying, "Let's bring you back in a, week and let's see what

3    these records say."  And they have to do it another week.

4    They're doing it a week at a time.  And they're giving her the

5    benefit of the doubt.  Cynthia Clemons is caring about what

6    happens to her, because Cynthia is not sure what's going on

7    with her.

8            And then we get the records and we go over the

9    records, and the story in those police records isn't quite what

10   she told Cynthia.  But she still doesn't get discharged.  She

11   comes back another week later and has a dirty drug screen,

12   which, you know, could have been enough again to discharge her

13   right there on the spot.

14           But because of what's going on with her, they don't

15   do that.  They ask her to come back another week, let's do

16   another drug screen and see if maybe that was a -- you know, a

17   mistake in the lab or whatever.  Goes back the next week, got

18   drugs again that shouldn't be there, and even at a higher

19   level.  Then and only then does she get discharged.

20           If these were uncaring, not compassionate people, she

21   would have been discharged the minute she came in there with

22   those track marks.  We know that from the proof that's come in

23   about the discharges and the discharge summaries and all that.

24   People were discharged for track marks all the time.

25           And then the government talks about -- one thing I

UNITED STATES DISTRICT COURT

1   want to talk about, Heather Alred, is this, she goes to the ER.

2   Right?  She tells them what's happened to her.  That hospital

3   knows that she was being prescribed oxycodone and oxymorphone

4   from the clinic.  They knew that, and they discharged her.

5   They gave her additional oxycodone.

6         And they also told her to -- here's the oxycodone

7   they prescribed her, the additional oxycodone, and then, you

8   know, here that they've said, "Yeah, you're taking oxycodone

9   and oxymorphone.  Continue these medications as you were prior

10  to today's visit."

11         They knew these pill -- this medicine was being

12  prescribed to her.  They knew the clinic it was coming from,

13  because they had the pharmacy printout, and that's in the file.

14  You can look at it.

15         And did they say, "Oh, my God, no, that's a pill

16  mill.  You can't take those pills"?

17         No.  They said, "Keep taking those."

18         Do you think they thought those were for a legitimate

19  medical purpose?  They didn't say, "Stop taking those."  They

20  said, "Keep taking them.  Here, we'll give you a little more

21  oxycodone to help you with this thing you're going through

22  right now."

23         THE COURTROOM DEPUTY:  Five minutes.

24         MR. REAGAN:  I'm sorry.  I've got five minutes.  Hope

25  it's five minutes, not five seconds.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    And I'll just close -- one thing I want to close is

2   with this, and this is from -- I apologize to you for reading

3   to you, but I don't have it memorized.  This article is talking

4   about the -- this is a 2018 article when they're talking about

5   lowering the MED levels and all that, CDC guidelines.

6    "These requirements have caused some physicians to

7   stop treating pain with opioids completely.  There may also be

8   an adverse effect on chronic pain patients who will have to

9   deal with debilitating pain without the one measure that has

10   proven effective for them, pain medication.

11    "One study of 3,108 pain patients indicates that

12   84 percent report more pain and a decreased quality of life as

13   result of the CDC guidelines and 42 percent have considered

14   suicide.

15    "We also have to take into account the unintended

16   consequences of increased mortality from illicit opioids, such

17   as heroin and illicit fentanyl analogs.

18    "While we have seen dramatic decreases in opioid

19   prescribing patterns, we have seen an increase in overdose

20   deaths as people turn to street drugs.

21    "As we navigate these difficult times, it is

22   important that we always keep our patients' best interest in

23   the forefront of our decisions.  While it is imperative that we

24   change our mindset on when and how we prescribe opioids, we

25   must also remember that there are patients out there that do

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Reagan

1    suffer from chronic pain and deserve to be treated with the

2    same compassion as anyone else."

3            The author of that article Dr. Rett Blake, the

4    government's expert.

5            And what did Cindy Clemons say in her meeting with

6    her appointment with Sterns when they talk -- when she talks

7    about the -- you know, there are new guidelines coming out

8    where they have to reduce them down, she said, "This is going

9    to hurt a lot of people."  Rett Blake says the same thing.

10           All these things I've been talking to you about, you

11   know, discrepancies in the proof, you know, the things that

12   these people -- patients are saying that Cynthia Clemons did,

13   that they didn't like because she wasn't giving them the

14   medicine they wanted, all those fall within the realm of

15   reasonable doubt.

16           If you think that Cynthia Clemons might have not --

17   if you think the government has proven that Cynthia Clemons

18   might have prescribed these drugs without a legitimate medical

19   purpose, they're outside the scope of professional practice,

20   you think that might be true, that's reasonable doubt.  If you

21   think it's even likely that it's true, that's reasonable doubt.

22   And reasonable doubt is a very high standard, ladies and

23   gentlemen, all the way from he was proven not guilty and

24   defendant's don't have a burden of proof.

25           We don't have to prove ourselves not guilty.  It's

UNITED STATES DISTRICT COURT

1    the government's burden, because as we talked about, that's

2    what the constitution provides.  That's the law of the land.

3    That's what the instructions the judge will give you.  It goes

4    all the way up to guilt is highly likely.  Even that doesn't

5    satisfy reasonable doubt.

6           So, again, we don't guess people into the

7    penitentiary.  We don't assume people into the penitentiary.

8    We don't send people to the penitentiary because they might be

9    guilty.  It's the government's burden, ladies and gentlemen.

10           What you have seen from the proof is that Cynthia

11    Clemons was a caring and compassionate provider who did what

12    she thought she should do in these cases.

13           And, you know, the deliberate ignorance the

14    government was talking about, you know, the judge will tell you

15    she may have been careless sometimes.  She may have been

16    negligent sometimes.  But that is not, not deliberate

17    ignorance, and that does not make her guilty beyond a

18    reasonable doubt.  The government has to prove it beyond a

19    reasonable doubt.  They haven't done so.

20           Jeff Whitt and I have been here fighting for Cynthia

21    Clemons for three months now.  But now my part -- our part is

22    now over.  It's up to you-all now.  You are the ones who must

23    decide.  You are the ones who must say no, this case has not

24    been proved beyond a reasonable doubt.

25           If you feel that, if you don't feel it's been proven

Closing Argument - Ms. Cravens

1    beyond a reasonable doubt, the judge will tell you under your
2    oath, you must find -- return a verdict of not guilty.

3          Let Cynthia Clemons go home with her family, because
4    Cynthia Clemons is not guilty.

5          THE COURT:  All right.  Thank you, Mr. Reagan and
6    Mr. Whitt, for closing argument on behalf of Defendant Clemons.

7          Who's going next?  Are you ready to go?  All right.
8    We'll go ahead.  Next is going to be closing arguments on
9    behalf of the Defendant Ms. Hofstetter.  And Ms. Cravens will
10   go first on Ms. Hofstetter's behalf.

11         MS. CRAVENS:  Ladies and gentlemen, a few years ago,
12   I read a book called "The Signal and the Noise."  A friend gave
13   it to me because I was trying to make a big decision.  And the
14   idea behind the book -- and it had lots of math, which you know
15   I skimmed over.

16         Yeah, the big picture behind the book was that when
17   you're trying to make a big decision, you have to separate what
18   is signal from what is noise.  And signal is fact, the reliable
19   things, the things that make sense.  And noise are the -- is
20   the stuff that distracts you, the flashing lights, the extras,
21   the things you get caught up in but don't really impact what is
22   the fact, the basis on which you should make your decision.

23         So I was thinking about that, and speaking with
24   Mr. Burks, we're going to split our time here today, about
25   talking to you.  And thinking about this case that we've all

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    lived for so long now.

2           And in applying that concept to my thoughts this

3    week, ladies and gentlemen, the government wants you to convict

4    Sylvia Hofstetter on the noise. They want you to convict her

5    because of her personality. She's not always likable. Little

6    bit strong-willed. They want you to convict her because she

7    made a lot of money and she liked to gamble. They want you to

8    convict her maybe because opiates, we know in 2020, are bad.

9           That's all noise, all noise. The signal in this case

10   are going to be what Judge Varlan tells you, probably tomorrow

11   when he gives you those jury instructions. Those are the

12   signals you have to seek out. Does it -- has what the

13   government's shown you in each and every element answer those

14   instructions?

15          It's why Mr. Reagan is pointing out the most

16   important, reasonable doubt. It's not only the most important

17   instruction, it's the most important part of your job. You are

18   here to seek reasonable doubt. Because if you find it in the

19   government's proof, you don't have an option under the law but

20   to return a not-guilty verdict. It's as simple as that.

21          So I want to talk to you a little bit about what I

22   call noise that we've seen in this case. So you know after

23   three months of trial that it's been almost five years here, in

24   about six weeks, since the federal government descended on

25   these clinics and arrested Ms. Hofstetter and some others, five

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    years.

2         You know that there was at least one year, maybe two

3    before that, that the government was investigating these

4    clinics.  You know that, because you've met Matt Sterns.  You

5    know that because you met the gentleman from Florida, the agent

6    whose name escapes me.  He was going to the zoo.

7         You know that investigation happened.  You know there

8    were undercover agents going in because you saw people like

9    Matt Sterns with their key chain camera or cell phone camera or

10   whatever was -- contained the camera in the exam room with

11   Ms. Clemons.  You saw the still photographs that Mr. Reagan

12   referenced of the packed waiting rooms for Mr. Sterns.

13        This idea, their red flags, the crowded waiting

14   rooms, noise.  If they could have proved it, they would have.

15   You would have seen it on those videos.  That's not what you

16   saw.  They didn't bring you the key chain cam of the packed,

17   crowded waiting rooms.  They brought you a parade of admitted

18   liars, of admitted scammers, professional cons.

19        Not the signal, they brought you the noise.

20        Another red flag.  We talked about -- the government

21   has made a big deal out of parking lots, out-of-state tags and

22   parking lots.  Such a big deal that I asked Dr. Blake, "Do you

23   spend a lot of time in your parking lot?"  I was really shocked

24   he said yes.  But they made a big deal out of that, a red flag

25   for an illegal pill operation.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    They've shown you one picture from all their

2    undercover surveillance of one tag from Jefferson County.  In

3    seven years of investigation, one Jeff County tag, right up the

4    road, and a parade of admitted liars and cons.

5    Security, armed security, we've heard a lot about

6    security guards too.  More noise.  The government talks about

7    how there was security at this facility.  It was necessary to

8    protect the patients.  Ms. Hofstetter did that.  The

9    government's witness told you they did that.

10    Dianna Berdal, the landlord, came right in here, sat

11    on that stand, and told you they asked for a security guard to

12    be hired because the parking lot was messy.  Cigarettes were

13    burning in mulch.  The ashtray was on fire.  Somebody needed to

14    keep it clean, keep people from littering, whether it was

15    Bradford behind, the hair salon below, or these clinics that

16    were a result, causing the litter.

17    It wasn't the clinics that hired the armed security

18    guard.  That's not indicative of some sort of need to control

19    their patient population or to protect themselves.  It's

20    because the landlord wanted them to keep the parking lot clean.

21    They did what they were asked, compliant.

22    This morning, Ms. Pearson, she mentioned paper

23    signage.  And we've talked a lot about the names of these

24    clinics, as if they're trying to hide what they do there, as if

25    they chose those names to deceive.  That's how they talk about

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    it.  That's noise.

2              And we know that again because the landlord took the

3    stand.  You remember seeing the lease?  The lease that

4    prohibited the use of the word "pain" and allowed all signs had

5    to be approved by the landlord?

6              Ms. Pearson referenced paper signage.  But you've

7    seen the picture from Gallaher View.  You've seen the picture

8    from Lovell Road with a sign right there on the door.  It's not

9    illegal to have an inefficient sign.  It's just noise.

10             And then perhaps one of my favorite examples, Lori

11   Crabtree.  We met Lori Crabtree, and you -- you can go back and

12   look at it, Exhibit 654.  You'll be able to look at anything

13   you want to back there.

14             They were talking to Lori Crabtree about how

15   Ms. Hofstetter dressed and her love for fine jewelry.  And they

16   put up a picture of Sylvia Hofstetter, and it has that big,

17   thick, gold chain hanging down to almost her waist and a big

18   thick gold ring across her entire fist.  They made a big deal

19   out of her jewelry.

20             "Does she wear jewelry like that?"

21             "Yeah."

22             Nobody believed that.  That was a Halloween costume.

23   How do we know that?  Because the date was on the photo.

24   They're trying to make something exist where it does not, and

25   trying to convince you that that's true, that it's signal when

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1   it's just noise.

2          Another signal, and this -- I'm not going to repeat

3   everything.  Mr. Whitt particularly, throughout the course of

4   this trial, has talked to you about legitimate medical purpose

5   and the usual course of professional practice.  That's a

6   signal.  The judge is going to define it for you.  He is going

7   to tell you what that means.

8          And then you have to decide if they have proven

9   beyond a reasonable doubt, the government has proven beyond a

10  reasonable doubt that those prescriptions were not for a

11  legitimate medical purpose and in the usual course of

12  professional practice.

13         Ms. Hofstetter, she has no medical background, which

14  you know.  She wasn't a site manager, though they insist on

15  calling her that.  She was a corporate manager, a corporate

16  administrator, which you've heard.

17         She had regional and site managers beneath her,

18  people like Maria Vera, Stephanie Puckett, Lori Crabtree, those

19  were site managers.  Those were people in the clinics every

20  day, and she relied on them.  She relied on her medical

21  directors.  She wasn't there every day.  The witnesses told you

22  that.

23         Staff, like Crystal Parks Morgan, told you that.  And

24  more importantly, perhaps, I'll say signal, a little less

25  noise, Crystal Parks Morgan told you that she never saw

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    anything illegal when she worked at these clinics.  When she

2    was asked if she had, what would she have done?  Her response

3    was, "I would have gone and told Sylvia, and I'd have quit."

4          So it defies logic, that if Sylvia was someone that

5    Crystal Parks Morgan believed wouldn't do anything about an

6    illegal act occurring in this clinic, why would she have said

7    she would have told her?

8          If Dr. Blumenthal, Dr. Valley, Dr. Larson knew they

9    were working with Sylvia to run an illegal pill clinic, a pain

10   mill, there's some more noise, why would they send e-mails

11   suggesting improvements?  Why would they make them?  Why would

12   Debra Kimber be brought in to do compliance?  Now, truthfully,

13   Debra Kimber did say the compliance wasn't important to Sylvia.

14   Fair statement.  She made that.

15         I don't know if compliance was important, but it

16   seems to me that if you were trying to make sure you had all of

17   your window dressing in order, you would have wanted --

18   compliance would have been important, because those notebooks

19   make it look more legitimate.  Less -- it's window dressing.

20         So we've made a big deal out of that.  And Mr. Reagan

21   has covered a lot of those issues regarding that window

22   dressing.  But I want to suggest that there's a simpler

23   solution to this question.  Was it window dressing or

24   legitimacy?

25         Well, the simplest answer is often the truest one.

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    It wasn't appearance.  It wasn't window dressing.  It was just

2    legitimate.  It was just the business operating.  Boxes of

3    files you saw through pictures of through Ms. Sherrod, through

4    the agents, all of these documents that you've seen during the

5    course of this trial, regular business records.  Chart after

6    chart was kept in the same order.

7           Now, we know there was something illegal happening at

8    those clinics.  Can't deny Stephanie Puckett and Shannon Hill

9    definitely were running an illegal operation, and they've

10   admitted it.  You've heard the recordings of how hard they

11   worked to hide it for Sylvia and how mad they knew she would be

12   if she found out something illegal was happening in that

13   clinic.

14          And they told you she didn't know anything about it.

15   Patients told you she didn't know anything about it.  So it's

16   the simplest common sense answer is, if Sylvia Hofstetter were

17   running the operation the government wants you to convict her

18   of running, patients wouldn't have had to do that.

19          Shannon and Stephanie wouldn't have had to do that.

20   In fact, they would have been employee of the month.  Sylvia --

21   there's another signal about how Sylvia would have reacted to

22   that.  She did.  When she found out something was wrong, you

23   heard Lori talking about there were papers in the floor.  She

24   went in and there were papers in the floor.  We started these

25   audits.  And you've seen a lot of those audit sheets as we've

UNITED STATES DISTRICT COURT

 1    gone through some of these charts.

 2         And Sylvia was mad.  Sylvia wasn't mad because she

 3    was losing patients.  Sylvia was mad because she had just

 4    figured out something wasn't right.  She didn't know what, but

 5    she was bound and determined, that's true, she's bound and

 6    determined to find out.  Consistent with her personality.

 7         And so she brought in Lori Crabtree and some others

 8    that Lori talked about to figure out what had been going on,

 9    why these papers weren't where they were supposed to be.  How

10    bad was it?  How deep did it go?  What had been happening?

11         And so they started this audit.  The audit was

12    ongoing at the time of the raids.  The audit that produced

13    sheets, little checklists that you've seen.  They look kind of

14    like this.

15         See if I can maneuver this without causing some kind

16    of -- Jessica Watson.  You know Jessica.  You met her, been

17    through her file a lot.  This is just an example of one of the

18    many kinds of audit sheets that you will have seen.

19         And that was in an effort to figure out what had been

20    happening.  You can't fix a problem you don't know about.

21    Dr. Blumenthal was giving her information throughout the course

22    of the clinics, Dr. Larson, Dr. Valley, they're making changes,

23    updating protocols.  Same thing with this.  Just figured out

24    there's a problem.  Is it a paperwork problem?  Is it just file

25    clerk not doing her job?

                    UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    That's when they start looking.  And then they start

2  finding these sorts of things.  She never really gets to the

3  bottom of it before the federal government slaps handcuffs on

4  her.  But she sure tried.  She's doing audits like this, trying

5  to uncover information.  Trying to find the signal in all the

6  noise.

7    Jessica Watson, I'm not going to talk anymore --

8  well, I'm not going to make that promise.  I'm going to try not

9  to talk anymore about Ms. Puckett and Ms. Hill, because I think

10  Mr. Burks has some things to add.

11    But I do want to mention one sort of example of that

12  scam they sat in here and told you they were running with

13  patients from Mr. Butler and Mr. Jenkins.  This was

14  particularly telling to me, because it really jumped out at me

15  just a few weeks ago of how good at it they were, how

16  convincing these patients and those scammers were in this

17  clinic.

18    And it had to do with Jessica Watson.  You'll

19  remember, I'm sure, that file being reviewed with Dr. Blake,

20  sort of visit by visit, and going through all -- every one of

21  those drug screens, checking to see what was there, what the

22  providers should have seen.  Spent a long time on it.

23    And there was one that the government spent a long

24  time on that caught my eye.  And this is from Ms. Watson's

25  chart, which you know is an exhibit.  This one caught my eye,

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    because it proved how good they were.  The United States

2    government stood in this courtroom, pointed to this document,

3    had their expert testify that this was Jessica Watson's drug

4    screen.

5         That's not the name on that document.  That's Rachel

6    Watson, May 30th.  That's her May 30th visit.  Their scam was

7    so good at fooling people, that it fooled them right here into

8    this trial, all these years later.  Can't rely on that kind of

9    noise.

10        And we know that that was Stephanie and Shannon's

11   little scam, because there's also a second copy of that same

12   drug screen over in Rachel Watson's file where it belonged to

13   be seen by a different provider.  And we know that as part of

14   their scam, because that drug screen which you can find

15   elsewhere, would have been positive for cocaine and they

16   wouldn't have gotten their pills.  That would have upset the

17   apple cart.  That wasn't going to happen.  So that's -- you

18   know, maybe that's signal and noise.

19        Here's another signal about Sylvia Hofstetter and

20   what she knew.  Brandon Ledford, who Mr. Reagan mentioned, he

21   stood there and we were talking to him about what happened

22   after things changed in late '14 after Hill and Puckett left.

23   He said there's a big change, big change.  Well, I reckon so.

24        Sylvia is now trying to figure out what's wrong.

25   She's on-site a little more often.  She's got the audit going,

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

 1    trying to figure it out.  Gerritt Orrick.  I loved Gerritt.

 2    Described all his cars by his rims.  Do you remember that guy?

 3    Interesting fellow.

 4         But he told us, he gave us some signal.  When that

 5    black Lexus pulled up, everybody got right.  Why?  Why did

 6    everybody get right?  Boss lady, boss lady was coming.  And

 7    they had to get right, because they knew if they weren't and

 8    she saw it, the jig was up.  Because Sylvia Hofstetter was

 9    running a pain management clinic.

10         If she were running an illegal pill mill, she

11    wouldn't have cared what Gerritt Orrick or anybody else was

12    doing.  They wouldn't have been afraid to be seen by her.

13    Puckett and Hill wouldn't have been afraid to be caught by her.

14         That's the signal, ladies and gentlemen.  That's the

15    signal.  You've heard it from the witnesses.  So think about

16    what they said.  No one of these patients or these providers

17    can say otherwise.

18         They can complain about Sylvia's personality.  Big

19    personality, we know.  But that's the extent of it.

20         And so I want you to think, and this is the same

21    instruction Mr. Reagan referenced, because your job here is not

22    to do anything except put the government to its burden and to

23    take a look at reasonable doubt.

24         With each -- with regard to each of these elements,

25    will you rest easy trusting that kind of information?  Five

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    years of investigation, five years since these clinics were

2    closed down, and all these documents were in the exclusive

3    possession of the United States, five years in which Agent

4    Nocera told you they didn't bother to look at all the

5    documents.  They didn't read them all.

6         They gave you few e-mails, not a lot.  Some charts,

7    not the boxes of PMPs, audit sheets, and UDS that were

8    otherwise filed.  Is that the kind of information that you can

9    rest easy, rest your decision easily that there's no reasonable

10   doubt in this case?

11        All the opinion witnesses, Dr. Blake, Dr. McCoy,

12   Dr. Browder, can't remember specifically Mr. Carter -- or

13   Dr. Carter.  Said, you know, Dr. Blake, he said -- he sat there

14   and he said Dr. Browder, he's a real doctor, real doctor.  He

15   said reasonable providers can disagree.  Mr. McCoy said that.

16   Dr. Browder said that, something to the effect of reasonable

17   providers can disagree, period, end of story.  If reasonable

18   providers can disagree, that's a truckload of reasonable doubt.

19        So I'm going to give Mr. Burks his time.  But before

20   I do, I want to tell you just a little bit -- take a little

21   opportunity to tell you about what I know about Sylvia.

22   Because you've heard, you know, she's a bitch, didn't like her.

23   And maybe that's true.  Maybe it's not.

24        She's a hard personality, for sure.  She reminds me a

25   lot of me.  Some people think I come across one way, and some

UNITED STATES DISTRICT COURT

1    people think I come across another one.  Sometimes I think it's

2    a compliment, and sometimes I'm a little offended.

3            Sylvia is a lot like that.  She's strong-willed.  You

4    know that she came up here from her -- from Miami.  Her family

5    emigrated from Cuba.  You got to sit here for months, and in

6    and out, you've seen her mother, flying in and out, as she was

7    able to do, to be here with her daughter.  You've seen sisters.

8    You've seen -- they look very much alike, but there are two.

9    And they have flown in and out to be here with Sylvia as they

10   can.  You've seen her aunt on occasions, her brother.  The

11   people who can be here for her have been here.

12           And at heart of hearts, that's really who Sylvia

13   Hofstetter is.  She's really this person.  They're going to

14   point out the pool table, her fancy house.  I'm going to point

15   out a photo wall.  It's blown up from that last picture you saw

16   of her house.  This is her family, her mom, aunt, cousins,

17   friends, daughter, and her grandson.

18           Grandson is the light of her life.  She hasn't spent

19   a lot of time with him, as you might imagine, over the last

20   five years, but that's her soft spot.  It's her grandson.

21           So she's not this monster.  She's not this serial

22   gambler who's gambled away, according to the government, way

23   more money than these clinics ever made.  Not her at all.

24           She came to Knoxville on a temp job for her neighbor

25   to be closer to her boyfriend, Mr. Davis, who had moved to

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

 1   Atlanta, thinking she'd be here a little while, get these

 2   businesses they wanted to start up and running and go back to

 3   her family.

 4        And, granted, it gave her an opportunity, a business

 5   opportunity she never thought she'd have.  They pulled her

 6   right in.  Kept her busy, kept her running, kept her unable to

 7   see anything but a legitimate clinic, a legitimate business.

 8   That's why she came here.  Not the I-75 pipeline.  She came

 9   here to build a life.

10        For all that's been said about her personality, I'm

11   going to say this, thank goodness she has a strong personality.

12   Someone made of weaker stuff couldn't have survived five years

13   of waiting for you, of waiting for the day that a jury would

14   finally hear the actual evidence, not the perception of it, not

15   the characterization of it, not the stylized, mediaized version

16   of it, but the actual evidence, and be given the actual

17   instructions from a judge on which they decide her fate.  A

18   weaker person couldn't have endured.  Strong-willed one, she

19   is.

20        And that's why you're here.  Because she trusts you.

21   She trusts you to make the decision the way you would make it

22   for yourself, the most important decisions of your life.  Have

23   they done enough?  Have they been careful enough to prove a

24   criminal case on any of the counts against Sylvia Hofstetter?

25        Frankly, I submit, they haven't.  They've given you

UNITED STATES DISTRICT COURT

Closing Argument - Ms. Cravens

1    the noise, but not the signal.

2            I thank you very much for your dedication.  I know

3    how hard it is to have listened to all of us for three months.

4            So on behalf of Ms. Hofstetter, I'm going to turn it

5    over to Mr. Burks, but I do thank you.

6            THE COURT:  Thank you, Ms. Cravens.

7            Before we hear from Mr. Burks, why don't we take a

8    break, take our afternoon break at this time.

9        (Jury out at 3:56 p.m.)

10            THE COURT:  We'll take a break, let's say till about

11   ten after four.  Mr. Burks, Ms. Cravens left you plenty of

12   time.  One of our jurors has a dentist appointment.  We need to

13   be out the door no later than 5:30.  So why don't we go to

14   about -- depending on how long -- I think if we went to five or

15   5:15, you'd still have plenty of time, so unless you have some

16   reservations, I think we'll go ahead and get started with you.

17   If you don't finish by around them, you can finish up in the

18   morning.  All right.

19            THE COURTROOM DEPUTY:  This honorable court stands in

20   recess.

21        (Recess from 3:57 p.m. to 4:16 p.m.)

22            THE COURTROOM DEPUTY:  This honorable court is again

23   in session.

24            THE COURT:  Everybody ready?

25        (Jury in at 4:16 p.m.)

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1          THE COURT:  All right.  Thank you.  Everyone please

2   be seated.  Mr. Burks will continue with closing argument on

3   behalf of the defendant, Ms. Hofstetter.

4          MR. BURKS:  Thank you, Your Honor.

5          Ladies and gentlemen, I have to confess that this

6   makes me awfully nervous to stand before you knowing that

7   you-all will be sitting in judgment of my client, Sylvia

8   Hofstetter.  And that I do want to thank each and everyone of

9   you.

10         I don't know that I've ever been part of a trial that

11  has demanded so much from citizens doing their duty.  And the

12  fact that you-all have been willing to take on this duty is

13  just -- it's awed me.  I mean, I'm blown away, because I've

14  watched you, and you-all have paid great attention to this

15  case.  And I can't thank you enough, and that's regardless of

16  the outcome of this case.  I can't thank you enough for what

17  you-all have done.

18         You, as the jury, make up the bedrock of our judicial

19  system.  I say that because while we put on proof and

20  cross-examine, the judge gives you the charge, you-all

21  determine what justice is.

22         Every time that a jury sits before a citizen or

23  citizens accused, they set a standard of justice, and you-all

24  will set a standard of justice in this case.  And I can't be

25  more proud of watching you listen and take note to try to

UNITED STATES DISTRICT COURT

1  figure out what the truth is.  I really believe that you-all

2  have sought truth in this case, and that's all we could ever

3  ask.

4          So on behalf of Sylvia, Loretta Cravens and myself, I

5  personally want to thank you for that.

6          And this case is, you know, so voluminous, and we had

7  over a terabyte worth of discovery and information on the front

8  end, and it's gone beyond that.  So I know that y'all have

9  heard a lot.  I don't expect to be able to tell you anything

10  that you hadn't already heard.  So I'm going to try to be

11  concise, but there's some things that I think are important to

12  tell you from our viewpoint.  First thing I'm going to do is

13  get my reading glasses.

14          The judge is going to tell you what the law is, and

15  certainly we've all touched on it.  And I'm not going to go

16  through a list of all the law and what the Court will charge

17  you with, but I simply would say that the bedrock of this case

18  has to do with the issue of these conspiracy cases.

19          And a conspiracy case basically says that the

20  government must prove beyond a reasonable doubt that Sylvia

21  Hofstetter, Courtney Newman, Ms. Womack, Holli Womack, and

22  Cynthia Clemons all agreed to enter into these crimes that

23  they're alleged to have committed.  That's really the beginning

24  of what a conspiracy is, and the Court will tell you how you

25  determine that.

1          But I think the question you have is, did they really

2  do that?  Did they ever actually say, "I want to be a part of a

3  criminal enterprise or a pill mill or money laundering"?  Was

4  that my intent to be a part of that?  That's really the

5  question.

6          Did they prove that to your satisfaction beyond a

7  reasonable doubt?  And that's -- that's where you will begin, I

8  suspect, to look at these facts and these cases to make that

9  determination and to determine whether or not these individuals

10  did enter into these conspiracies with the intent to be a part

11  of some criminal act.  And it really sort of boils down to

12  that.

13          As jurors, when you raised your hands 36 trial days

14  ago and months ago, y'all took an oath, and part of that oath

15  was that you would try these cases to the best of your ability,

16  and you would not do it with any prejudice or bias or sympathy

17  that you may feel towards one side or the other.

18          That seems to be just sort of a saying.  But in this

19  case, it's really important, because as we all know, the

20  elephant in the room is the opiate crisis that you hear about,

21  you read about, you talk about.  And what's important in this

22  case is that under your oath, you shall not have -- you should

23  not have any bias towards a crime that's been committed because

24  you're to determine whether or not the defendants are guilty of

25  a crime, not this opiate crisis.

UNITED STATES DISTRICT COURT

1    That would -- if that sways you, if that influences

2    you in any form or fashion, then that is the bias that the

3    Court, I think, will charge you that you should not have.

4        So the question is not about what your personal

5    feelings are about the opiate crisis, about all of the problems

6    that that causes.  Your duty under your oath is to determine

7    whether or not Sylvia Hofstetter is guilty of these charges.

8    Has the government proved beyond a reasonable doubt?  That's

9    really what it's about.

10       So as we delve into that, you've heard other charges.

11   I just want to touch on -- on two more, that I think are

12   critically important in this case.  You're going to hear the

13   Court charge you on the credibility of witnesses.  And the

14   Court, I believe, will tell you that as jurors, you're to

15   decide the credibility and the believability of each witness.

16   This is your job.  It's not our job.  It's not His Honor's job.

17   It's your job to determine the credibility of these witnesses.

18   And you are to give the weight as you see fit.

19       And then you'll hear him tell you some things for you

20   to consider.  And a couple of those that I think, if he tells

21   you this, I anticipate he will, that you should ask yourself if

22   the witness had any relationship to the government or the

23   defendant or anything to gain or lose from the case that might

24   influence the witness' testimony.  That's going to be a charge

25   that you'll have in this case.

Closing Argument - Mr. Burks

1    You are also to consider whether the witness had any

2 bias or prejudice or any reason for testifying that might cause

3 the witness to lie or to slant the testimony in favor of one

4 side or the other.

5    Something that -- well, ask yourselves if the witness

6 testified inconsistently while on the witness stand or if the

7 witness said or did something or failed to say or do something

8 at any of the other times that is inconsistent with what the

9 witness said while testifying.  It can make the witness

10 unbelievable.  But that's up to you to determine.  Also

11 consider other things that you think shed some light on the

12 witness' believability.

13    Now, those aren't all of the instructions, but those

14 are some I point out to you, because we're going to talk about

15 some witnesses and talk about how you should consider -- I'm

16 going to suggest you should consider their testimony.

17    Also, again, the issues of -- let's say the money

18 laundering, the money laundering is if Mrs. Hofstetter was --

19 knew that these moneys were part of some ill-gotten gain, then

20 if she uses them and sends them through a corporation or, as

21 they say, conceals, if you find that, that they've proven that

22 beyond a reasonable doubt, that would be a money-laundering

23 situation.

24    You heard Mr. Still up there several months -- weeks

25 ago or a month ago saying, "Well, if you pass it through a

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1    business, then that's concealing it."  But we know that lots of

2    people that have companies that will put money in one company

3    to pay expenses and to send others.  You have to determine

4    whether they've proven to you beyond a reasonable doubt if

5    Mrs. Hofstetter has concealed any moneys in that light.

6          Also, you heard discussions about whether or not

7    Mrs. Hofstetter, Ms. Newman, Ms. Clemons aided and abetted one

8    another and did knowingly and intentionally open and use and

9    maintain a business for this illegal drug trafficking, as the

10   government has labeled it.

11         Again, did they know that these businesses were being

12   used in that fashion?  We know that they didn't know what

13   Mrs. Puckett and Mrs. Hill were doing.

14         The question to you is, were they doing it because

15   they thought they were operating a pill mill or a pain clinic?

16         If you find that there is reasonable doubt as to

17   whether they knew that this was, as the government calls it, a

18   pill mill, we know the definition is different, but an illegal

19   pain clinic, if they haven't proven that beyond a reasonable

20   doubt, then they have not met their burden.  So that's another

21   charge.

22         And the last one I want to talk about is the

23   deliberate ignorance.  I didn't have it, but I think I can talk

24   about it without it.

25         The Court will charge you on deliberate ignorance.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

 1  That is that you have to purposely, deliberately turn away from
 2  something you know that's going on.  You close your eyes.
 3  Sometimes we call it blind -- the blind eye or you turn away
 4  from it.  But it's not that you just know about it, but you
 5  actually take an affirmative action by deliberately turning
 6  away from it.

 7          Now, in the proof of this case, I think just the
 8  opposite is what's been proven.  Any time that Mrs. Hofstetter
 9  was alerted to some problem, she addressed it.  Dr. Blumenthal,
10  he has some concerns about the -- the clinic, as it was getting
11  started, he was the doctor in charge.  And they showed you some
12  e-mails where he was concerned about those issues and wanted
13  Mrs. Hofstetter to take some action.  There were other e-mails
14  that when we asked about them, they said, "Well, we haven't
15  read those.  We don't know about those."

16          But the one e-mail that we did look at, if I can find
17  it.  I apologize.  I may have to come back to that.  It's the
18  e-mail from Blumenthal.  I've got it.  I'm sorry.  Here it is.

19          This is Exhibit 580.  It's been introduced.  And you
20  remember all the e-mails they had where he was panicky and he
21  was -- he was really concerned about things that were going on
22  and nervous and all that?  They showed you those e-mails, but
23  they didn't show you this e-mail, and we brought it up.

24          This is Exhibit 580 from Dr. Blumenthal.  I'm going
25  to step over here so I can read it too.  This is in May the

UNITED STATES DISTRICT COURT

1   15th, 2011.

2           "Dear Sylvia, permit me to thank you for running an

3   outstanding skillful group meeting on Thursday.

4           "The team needed it, and I needed it personally.

5           "Learning appropriate aspects of the business and

6   business management helps me 'stay out of the middle' of areas

7   where I truly do not want to go.

8           "You are the best person to teach me those aspects.

9           "I think we should both benefit from having some

10  private discussions to discuss what's working well, what isn't

11  working well, and how to achieve the best outcomes.

12          "Also, I have had a lot on my plate just now,

13  especially some very unfortunate divorce issues, challenging

14  parenting issues, and the fact that I absolutely must prepare

15  for and pass my Family Practice Boards again in November (a

16  major studying and time-management task!)

17          "At times, I feel overwhelmed, and I apologize for

18  'blowing my cork.'

19          "I want to see this business thrive, and you and I

20  are the central figures in making it do so.

21          "Let's do it!

22          "Thanks, Mark."

23          I show you that as an exhibit that we've looked at.

24  It's different than what we saw that the government would

25  present to you.  I submit, just like Ms. Cravens said, those

                    UNITED STATES DISTRICT COURT

1 are noises. What that e-mail says is different. And he

2 apologized for how he had been feeling. He had been going

3 through some personal things, and he was scared.

4       So did she turn her blind eye when she got his

5 complaints, his information both before and after, or did she

6 address those issues? She did.

7       Again, and we'll go through this some more, but I'm

8 going to stay on this just for a little bit. Fast-forward now

9 to 2014 when it hits the fan. And what hit the fan was when

10 Mrs. Hofstetter comes back and finds the files in disarray,

11 everything is in disarray. She confronts. She doesn't hide.

12 She doesn't just ignore it. She confronts the problem. And

13 what she confronts is enough to where Puckett decides it's time

14 for her to leave because it's about to hit the fan again.

15 They're going to find something out. That's Puckett's reason

16 for leaving.

17       And what do we find later is that when

18 Mrs. Hofstetter has some idea that there was some problems, did

19 she turn away deliberately and ignore the problems? Or did she

20 go out and say, "Lori Crabtree Gaston and the rest of you,

21 let's pull these files. Let's look and see if there are things

22 that are not in there. Let's look and see if these files are

23 where they should be."

24       And what did we find out? Lo and behold, there were

25 audits that were done, and those audits showed that something

UNITED STATES DISTRICT COURT

1  was amiss with that lab, the UDS's. Was that turning a blind

2  eye? Was that deliberately ignoring a potential problem when

3  it was brought to her attention that there was something that

4  she didn't know.

5          I know the government made some comment with Agent

6  Nocera, did anybody go over the law? Well, they didn't know

7  what they had. They didn't know what they had really until

8  they got the wiretaps after this -- this clinic was closed and

9  they got that evidence. Then they saw what in the world

10 Puckett and Hill were up at -- up to.

11         One other example, pain cream. Ms. Hofstetter found

12 out that Maria Vera was going behind her back and trying to do

13 a pain cream scam. And the scam is that they would send the

14 cream to customers who didn't ask for it, and then they

15 would -- they would send it to customers that had insurance,

16 and then they would bill the insurance companies, and then they

17 were -- then Maria was getting the money and getting kickbacks

18 from the pain cream company.

19         And, in fact, you heard that what they did is, they

20 took Holli Womack, she didn't know at the time, I think she

21 signed maybe one prescription not knowing it was a scam, and

22 then they sat there and forged her prescriptions, 40 or 50

23 forgeries.

24         Again, Maria Vera -- Marie -- I'm going to do it

25 again. I'm going to do a Burksism here. Maria Vera,

UNITED STATES DISTRICT COURT

1   Ms. Puckett, and Ms. Hill were behind that.

2           Did she turn a blind eye?  Absolutely not.  She

3   confronted Ms. Womack.  She said, "Have you been doing

4   something against this clinic?"  Of course Ms. Womack didn't

5   know what she was talking about and then realized and decided

6   at that point she hadn't done anything wrong, and she didn't

7   want to be accused of anything.

8           But Mrs. Hofstetter took an affirmative action every

9   time something came up that appeared to be a problem.  So if

10  you look at that charge, she didn't deliberately ignore

11  anything.  In fact, she did the opposite.  So that's the other

12  charge that I would ask you to look at.

13          Now, the core of the government's case is built

14  around two things.  One are lenses.  You've heard people talk

15  about the lens that's -- the lens today as opposed to the lens

16  back then.  It's the lens that you see things through.  You

17  know, you hear people talk about rose-colored glasses.  You

18  know, they see something through rose-colored glasses because

19  then it looks different.

20          Let me talk to you, if I may, if I have your

21  permission to talk to you about what I think this case is

22  through the lenses of different people.

23          This case started -- this case, I'm talking about the

24  government's case, started when the FBI found people selling

25  prescription medications on the street.  They did stings.  They

                    UNITED STATES DISTRICT COURT

1    arrested them.  And they learned from that that there was

2    somebody by the name of Jess Butler, who was orchestrating some

3    kind of a scam to get these pills.

4           So the government through the FBI, they put on their

5    lens of a crime.  I see this as a crime.  This is a violation

6    of the law.  So what I'm going to do is I'm going to follow it

7    to its furtherest point.  And so they get wiretaps.  They get

8    wiretaps.  And according to Andy Chapman, they find out that,

9    lo and behold, Jess Butler is up to it -- up to his neck in

10   this business.

11          But more than that, they find out that Jess Butler is

12   working with three people on the inside of our clinic,

13   Mrs. Puckett, Mrs. Hill, and Mrs. Newman.  Not this Newman, but

14   Patty Newman.

15          So what do they do?  They get more wiretaps.  And

16   when they get more wiretaps, they get taps on Mrs. Puckett and

17   Mrs. Hill's phones and Mrs. Newman's.

18          That's when they learn about what those ladies were

19   up to in this clinic.

20          I asked Andy Chapman, I said, "Well, Agent Chapman,

21   did you try to get information about Mrs. Hofstetter?"

22          And he said, "No."

23          And I said, "Well, why not?"

24          He said, "Because we couldn't find anything that she

25   had done, according to these wiretaps."

                    UNITED STATES DISTRICT COURT

1  That's where the wiretaps stopped.  Now, I know that

2  Mr. Stone will get up and say, well, they -- the girls left and

3  they didn't have time to work it.  Well, they worked it -- they

4  worked this thing for a long time.

5  And even after -- and even after they left in the

6  summer of 2014, these clinics were still operating up until

7  March of 2015, which didn't stop them from attempting to see if

8  there was anything that Mrs. Hofstetter had said or done by

9  wiretap, illegal.

10  They did have phone conversations, according to

11  Mrs. Puckett, where Mrs. Hofstetter called her a couple of

12  times, one of which she was asking her, "What's this deal about

13  the pain cream," and they talked about Maria Vera.

14  So that's the lens that this started with.  That's

15  the FBI's lens.  They see this case as a crime, so everything

16  that touches it has to be a crime.

17  Well, what about other views of this case?  Well --

18  and I'll go into this a little bit later, but you've got people

19  like Ben Rodriguez, and I certainly want to talk about

20  Mr. Rodriguez, and Mr. Tipton.  They see this case through

21  their lenses of if I can throw Sylvia Hofstetter under the bus,

22  then I can win favor with the government and get a 5K motion,

23  even though Mr. Rodriguez says he doesn't know anything about a

24  5K motion.

25  You-all do, because you heard all these witnesses

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1  come in here.  We had almost 50 witnesses march up there, and a

2  lot of them talked to you about, "Yeah, I want that 5K motion.

3  I'm here.  I need that 5K motion.  I want liberty.  I want out.

4  Or I want a benefit.  I want a break."  Ms. Puckett, Ms. Hill,

5  Mr. Tipton, he hadn't even been sentenced yet.  The only one

6  that acted like he didn't know anything about was the

7  ringleader, Mr. Rodriguez, as far as throwing people under the

8  bus.

9        So the lenses of that, let's talk about some other

10 lenses.  Let's talk about the providers that came in and

11 testified.  They were scared to death.  And I remember asking

12 one of them that they were concerned about what was going on,

13 and I said, "Are you concerned because you see these four

14 fellow employees and workers that you worked with sitting over

15 here in a criminal courtroom, and you see this entourage of the

16 FBI and the U.S. attorney and the Washington RICO chief deputy

17 sitting here prosecuting?"

18       Well, quite frankly, if I had even worked in that

19 clinic, I'd be scared to death if I saw all of this.  And they

20 were scared.  They admitted they were scared.  And they were.

21       So they looked through this lens like, I'm not

22 getting in the middle of this.  Now, I look back, I look back

23 20/20 hindsight, and yes, I can now see now that things have

24 come to light about what was going on with Puckett and Hill and

25 all that.  Yes, I can see that that was a problem area.  I can

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1    see that now.

2          The government's case, I would say to you, is built

3    upon 2020 hindsight and a 30,000 view from the sky looking

4    down, not looking at the evidence as it took place on a daily

5    basis.

6          So the last lens or the second to last lens they want

7    to talk to you about is the lens that Andy Chapman talked about

8    in his testimony.

9          You remember Mr. Chapman being asked about Melanie

10   Rucker.  She was, you remember, the lady that worked for the

11   Department of Health that would come in and do investigations

12   on the clinics and audit the charts and those types of things.

13   And Mr. Rucker -- I mean, Ms. Rucker and Mr. Chapman had a

14   conversation.  And Mr. Chapman had said that he disagreed with

15   what she had said.

16         And then there was sort of back and forth.  Well,

17   what did she say?  Finally, we got the answer.  And what he

18   first said is she would say something to the effect that she

19   would be surprised if they were doing anything wrong.

20         I said, "Now, Agent Chapman, let's look at your

21   affidavit.  Please look at that.  Refresh your recollection."

22         And he did.  And then he said, after refreshing his

23   recollection, "She said that in her investigations, these

24   clinics were legitimate."  And he said, "Yeah, that's what she

25   said."

UNITED STATES DISTRICT COURT

1    Now, if you'll look through the lens of the

2 Department of Health and Melanie Rucker's comments to the FBI

3 agent, the lenses of the health department is, these were

4 legitimate clinics.  No evidence to the contrary, as far as the

5 Department of Health.

6    And who is the Department of Health?  They are one of

7 the regulatory bodies that regulate pain clinics in the state

8 of Tennessee.  That's how they're regulated.

9    Now, Mr. Stone came back with Mr. Chapman and said to

10 Mr. Chapman, "Now, Mr. Chapman, you spent hours and thousands

11 of hours and thousands of man hours and thousands of phone

12 calls and thousands of wiretaps, you can't sit there and say

13 that Mrs. Rucker's investigation could even come close to your

14 investigation."

15    He said, "That's right."

16    In fact, he said, "It's like in a different ZIP

17 Code."

18    And Mr. Chapman says, "Right."

19    And you know what?  I don't necessarily disagree with

20 showing a difference.  But what I do show to you or suggest to

21 you, again, Andy Chapman, Agent Chapman is seeing it through

22 what?  The crime, the glasses through the crime.

23    What is Melanie Rucker looking at it through?  The

24 clinic and the clinic records and the clinic files.  She finds

25 it legitimate.  She is an investigator.  She's a nurse by

UNITED STATES DISTRICT COURT

 1  profession.  That's what -- and she works for the Department of

 2  Health.  That's exactly what she does.  If there's been a

 3  complaint, she goes and checks the complaint out.  She goes

 4  in --

 5          MR. STONE:  Your Honor, I'm going to object.  This

 6  goes too far.  There are no facts in evidence.  They have

 7  subpoena power.  They did not subpoena Ms. Rucker.  This is --

 8  there are no facts in evidence.  He's just talking about things

 9  that he thinks might be true or something, I guess.

10          THE COURT:  What about that, Mr. Burks?

11          MR. BURKS:  I think I can argue I think it's clear

12  that she says her investigations into these clinics as the

13  representative of the Department of Health said it was

14  legitimate.  And all I'm expanding on is that in doing that,

15  she looked at files, she looked at --

16          MR. STONE:  Your Honor, none of this is in evidence.

17  None of it.

18          MR. BURKS:  I think it's fair argument.

19          THE COURT:  Well, the question is, are you arguing

20  from the evidence in the record?

21          MR. BURKS:  I think I am.  I really do.  I think the

22  investigation --

23          THE COURT:  That's the standard.  So go ahead with

24  keeping that in mind.

25          MR. BURKS:  All right.  Thank you, Your Honor.

                    UNITED STATES DISTRICT COURT

1    They're different investigations.  It's different

2  lenses that these clinics were looked at.  That's the point I'm

3  trying to make.  And if you look at it through the Department

4  of Health, according to Melanie Rucker, these clinics were

5  legitimate.  It's what she said to Andy Chapman.  And that's

6  what he testified that she said.  Those are different lenses.

7  Those are important lenses.

8    Why are they important is because assuming one that

9  investigates the clinics and looks at files will determine

10  whether or not these are, as the government likes to talk

11  about, window dressing files or if they're legitimate pain

12  management heal -- where they're treating these patient files.

13  That's the lens that the Department of Health would look at at

14  these files and look at these clinics.  So those are different

15  lenses.

16    The last lens is your lens.  You-all have heard all

17  this proof.  You can weigh what you've heard and how you look

18  at that.  But you're going to have the lens of this jury to

19  determine what the truth is, what was proven beyond a

20  reasonable doubt or not.  And it's your lenses that makes the

21  most important issues of this case.  It's how you see it, each

22  one of you see it.

23    So it's your lenses that are going to investigate and

24  have investigated what came from this witness stand and what

25  this Honor will tell you about the law, not what we talk about.

Closing Argument - Mr. Burks

1   You know we're trying to underline things we think are

2   important.  But it's what you hear from that witness stand and

3   what the Court tells you about it, what evidence that you see.

4   And there's a lot of that evidence there.

5           But you're the ones that will make the ultimate

6   determination through your lenses, not the FBI, not the

7   providers, not anybody else.  You can take into consideration

8   what they've said, and certainly I think those are important.

9   But it goes to the crux of the case.  Who looked at these files

10  during the course of the investigation?  FBI didn't.  They

11  didn't get their experts to even look at it until sometime

12  later.  They were looking at it as the crime.  Department of

13  Health was looking at it.

14          So you've heard from the experts and Mr. Whitt,

15  Ms. Pearson talk about the experts, and they're talking about

16  legitimacy of the patient files.  And I'm not going to repeat

17  all that.  Everybody has done a good job of wringing their side

18  out.  Ms. Pearson brought her position out.  Mr. Whitt has done

19  a good job telling you what Dr. Browder and Nurse Practitioner

20  McCoy have had to say about it.

21          But you add that one other element in there I think

22  is important, and that is there's another lens that looked at

23  that in addition to these experts.  It's the Department of

24  Health.  It's Melanie Rucker.  That's important.

25          Okay.  I am watching my time, and I know we've got to

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1    move, and I'm going to try my best to see what I can do.  Let's

2    talk about -- let's talk about some important witnesses in this

3    case.

4              Oh, oh, I forgot.  I apologize.  Can I back up just

5    for a second?  Okay?  Another deliberate ignorance argument.

6    You remember not only -- not only did Mrs. Hofstetter challenge

7    and get her clinic to look at these files, but she did

8    something else.

9              Exhibit 582, you remember, she contacted Sterling

10   Labs, and said, "Hey, we're missing this stuff.  We need them."

11   And what we know is that Deana Haney -- Haney -- Haney -- I

12   guess it's Haney.  I can't hardly read it.  I apologize.

13             She says, I wanted to inform you of the missing drug

14   screens reports matters.  I was informed and shown that some of

15   the patient files have missing drug screen reports.  I reviewed

16   the files and began to take action on replenishing the

17   patient's records.

18             Now, is that a deliberate ignorance of turning away

19   from a problem on behalf of Mrs. Hofstetter?  And then she

20   tells us about some of the files.

21             And we got Jessica Lively, her files apparently had

22   things missing.  She's one of the sponsored patients.

23             Jessica Watson, we know about her.  She's another

24   sponsored patient that were going through Puckett and Hill, and

25   her stuff is missing.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1      We've got Lisa Elliott. Hey, we know about Lisa.

2  She was going through, wasn't she. She was with Butler and

3  that crew. And guess what? She got stuff missing.

4      Now, how did she get -- how did these people get all

5  this stuff missing? It was Hill and Puckett, and that's why

6  they're looking through this. I could go down through there.

7  And you-all can look at this when you go back there, but some

8  of those are the same names that they're looking at, Mario

9  Boyd, you haven't heard that he was one of them too.

10     Hey, look here, number three. Guess what? Who's

11  missing stuff in his file? We recognize that name. That's

12  Mr. Butler. Mr. Butler is the one that was working with

13  Puckett and Hill, and lo and behold, he's got stuff missing out

14  of his file.

15     Now, how did those get missing? Well, we know. We

16  know Puckett and Hill did it. We know that. That's the scam.

17  And to sit here and say, well, you know, just a little side

18  venture thing, no, it wasn't. It was a scam that did a couple

19  of things. It puts patients at risk. It's not about the money

20  issue, even though there was money. And even though we know

21  Stephanie Puckett said she later became sponsors of people so

22  she would get the drugs. She sent her husband in, Michael, get

23  the drugs. Ms. Hill's husband came in, got drugs.

24     They were drug dealers. They weren't just working in

25  the clinics. They were drug dealers. They were getting pills

UNITED STATES DISTRICT COURT

1    and selling pills.  That's a drug dealer.  That's what they

2    were doing.

3          And they were putting these nurse practitioners and

4    doctors in harm's way, because they didn't have the material

5    that they should have had in order to look at something to

6    determine what was in the best interest of these patients.

7    They want to say that these nurse practitioners didn't care

8    about these patients.  Well, they did care about them.  They

9    just didn't have the information because Puckett and Hill

10   didn't give a flip about them.  They wanted the money.

11         That's the scam.  That's the crux of this case.

12   That's the crux of their case.  To come in here and say, well,

13   this was just a pill mill, we'll talk about that for a few more

14   minutes, is not right.

15         What sets this case apart from any other illegal pain

16   clinic case is we've got the fox guarding the henhouse.  We've

17   got the people that we've trusted to do it right doing it

18   wrong, and we didn't know about it.  And Puckett says we didn't

19   know about it.  Everybody says we didn't know about it.

20         But that was what was going on.  That's what

21   distinguishes this case from any other case you will run across

22   involving an alleged pill mill or pain clinic.  It's what

23   Puckett and Hill and Newman were doing and getting away with it

24   under the cloak of secrecy, under the cloak of deceitfulness.

25   And that's what this case is really about.

Closing Argument - Mr. Burks

1    Now, there were a lot of people arrested, a lot of

2  people charged.  We also have -- we talked about, and I think

3  it's important to remember a couple of things that we learned

4  from those wiretaps that finally were admitted to by

5  Mrs. Puckett.

6    Y'all know I'm not that organized.  I hope you know

7  that, don't you.  I'm sorry.  Kind of like the scorpion and the

8  fox, and the fox gives the scorpion a ride across the river,

9  and he says, "Don't sting me scorpion."  Scorpion says, "I

10 won't do it."  Gets across the river and the scorpion stings

11 and kills the fox.  The fox said, "Why did you do that?"  The

12 scorpion says, "Well, it's just my nature."

13    I guess it's sort of my nature to sort of look for

14 some of this stuff, and I do apologize for that.  What I'm

15 looking for -- oh, thank you.  She's pretty good, isn't she?

16    Stephanie Puckett, I want to touch base on a couple

17 of wiretaps, and I think these are really important.

18 Mrs. Puckett finally admitted this.  And you heard Mr. Reagan

19 touch base on this, but, again, I think it's important to bring

20 it up.

21    When Mr. Butler was arrested, you remember that, and

22 they got on that phone conversation and they told us all about

23 it.  And what was said was, Mrs. Hill was scared because

24 Mr. Puckett -- Mr. Butler is now charged with some offense.

25    And she says, "Well," to Ms. Puckett, "Ms. Puckett,"

UNITED STATES DISTRICT COURT

1   she probably called her Stephanie, "Stephanie, is he going to

2   turn on us?  What if they wire him up and send him into the

3   clinic?"

4           And what does Ms. Puckett say?  She says, "Why would

5   they -- why would he wear a wire for the providers?  The

6   providers don't do anything wrong.  So it had to be to get me

7   and you."

8           That's taletelling for two reasons.  Number one, they

9   know their time is short on this scheme.  Number two, more

10  importantly, these two ladies that don't think anybody is

11  listening to them are talking in secret, saying these providers

12  don't do anything wrong.  These ladies were in those clinics

13  day in and day out.

14          She's testified, Ms. Puckett did, that that's what

15  they said in this conversation.  That's important.  They should

16  know if this was a pill mill and these providers were just

17  writing scripts.  But that's not what she said.  They were

18  doing nothing wrong.

19          The other thing that sort of brings me into the other

20  arguments I want to talk about is another phone conversation

21  between these two ladies.

22          You remember Mrs. Puckett, once they get into this

23  conversation -- these conversations are very close to each

24  other.  Mrs. Puckett has to say or admit, Ms. Hill, I've been

25  in trouble.  You know, I had robbery, prostitution, I mean, a

UNITED STATES DISTRICT COURT

1  myriad of things.  And the one thing I learned is when in

2  trouble, you're trying to find a way out.

3         Now, that's not just Mrs. Puckett, that's any of

4  these people that came in and took that stand.  What are they

5  doing?  They're trying to find a way out.  And a way out is

6  throwing somebody else under the bus.

7         Those aren't my words.  Those are Stephanie Puckett's

8  words.  But those could have just easily have been the words of

9  Chris Tipton and Ben Rodriguez, because each of them came in

10  here to try to avoid further trouble or avoid a stiffer

11  sentence of finding someone to throw under the bus.

12        And who did they try to throw under?  Sylvia

13  Hofstetter.  Because that's the way the criminals work.  You

14  get in trouble, and you say what you got to say to appease you

15  who you've got to appease.

16        And in these cases, to get that 5K motion -- because

17  with the 5K motion, Mr. Stone will stand up and ask this Court

18  to reduce that sentence.  But to do it, you got to throw

19  somebody under the bus.  And the person that you throw under is

20  the person that's here asking the jury to try to determine what

21  the truth is in this case.  That's Mrs. Hofstetter.  So the

22  code of the criminal and the pawn is to find somebody to throw

23  under the bus.

24        And I'm going to come back to finish with those two

25  witnesses.  But I do want to talk about a couple more quick

UNITED STATES DISTRICT COURT

1    things.  Again, this sort of goes to the medical -- this is

2    sort of jumping a little bit around.

3           I want to talk about Dr. Valley, because that's, I

4    think, an important part of this.  They put on Mr. Blumenthal's

5    e-mails about all the trouble in Dodge City, so to speak, of

6    the clinics, trouble, trouble, trouble everywhere.

7           Well, you did see where Dr. Blumenthal was kind of

8    saying, "Wait a minute, you know, we had these meetings.  It's

9    really been helpful."

10          But Dr. Valley, as you remember, actually came into

11   this by saying, "You need to get rid of the medical director,"

12   which was Dr. Blumenthal, because Dr. Valley wanted to become

13   the sole doctor there.

14          And Dr. Valley then presented, as you-all will

15   remember, that contract.  Do you remember the contract that he

16   sent to Chris Tipton?  Remember that, where he said, I want you

17   to pay me all this money, pay me $11,000 a month consulting

18   fee, pay me a quarter of a million dollars a year to manage all

19   these clinics?

20          And oh, by the way, I want you to build me a clinic

21   up in upper East Tennessee that will be my clinic.  If I ever

22   decide to leave, that will be mine.  And the partners said no.

23   And that's sort of started flushing Dr. Valley a little bit out

24   of the realm of what he thought he was going to end up with.

25          He ultimately hooked up with Chris Tipton, because he

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1    saw the money train.  Mr. Tipton was -- he was rolling with all

2    these deals going on, you know, and Dr. Valley, hey, this looks

3    pretty good.  So he hooked his wagon to Chris Tipton, and he

4    and Chris went down to Chattanooga.  And guess what?  The

5    scorpion stung again.  He caught Dr. Valley and cheated him.

6           But Dr. Valley, the important thing that I want to

7    talk about, two things.  One is, what he did tell us that's

8    important, one of which was -- and you-all saw this, and I

9    pulled these up.

10          This is Exhibit 543.  This is just an example that we

11   use to show Dr. Valley and a notation.  Do you remember seeing

12   this?  And we talked a lot about that, where Dr. Valley would

13   look at the file.

14          Now, remember these medical doctors had a duty to

15   look at how many of the -- how many of the files, 20 percent,

16   50 percent, it was a hundred percent, wasn't it?  It was an

17   opiate file, they had to look at every file and chart it.

18          So Dr. Valley did that, and on this Ricky Nelson

19   file, on May the 9th, 2012, and I just -- I pulled this up, and

20   it says, "Chart review 5/15/12.  I concur in treatment plan,"

21   with the signature "Valley."

22          Now, when Dr. Valley was on the stand, I showed him

23   these, and I asked him what did that mean?  What did he

24   actually do in order to write that concurring thing about the

25   treatment plan?

UNITED STATES DISTRICT COURT

1    In his testimony, he told us this is what he did.  He

2  told us he looked at the chief complaints.  He told us that he

3  looked for any history or present illness that the nurse

4  practitioner listed.  He looked at previous visits and any

5  reference to previous visits.  He looked for comments regarding

6  previous urine drug screens.

7    He said, "I flipped back to the previous visits to

8  see if there were any outstanding -- anything outstanding that

9  wasn't addressed in the notes."  He checked the urine screens

10  to determine if there was any aberrant drug screens, anything

11  in there that shouldn't be in there.  And then he said, "I

12  determined whether or not there was an appropriate diagnosis

13  that met the criteria supported by the physical findings."

14    What does that sound like?  Legitimate medical

15  purpose?  And then he said, "I then determined if the treatment

16  plan was appropriate.  And if I determined the treatment plan

17  was appropriate, I concurred in the treatment plan."

18    While Dr. Valley was at this clinic, that's how he

19  handled these files.  That's what he told us from the witness

20  stand.  And that is consistent with what Dr. Browder and nurse

21  McCoy told us.  These are some of the same things on that wheel

22  you remember that Mr. Whitt showed you.  These are the same

23  type of things.  These are activities that Dr. Valley looked at

24  and did, and then he concurred or he didn't.  You know, he

25  said, "There are times I put a note.  I don't concur.  I put a

1   note."

2            Just for your reference, and I'm not going to go

3   through it.  You can go back and look at it.  That's that

4   contract, 541, Exhibit 541, I'd ask y'all to look at that he

5   wanted to -- this clinic to do.

6            The final thing about Dr. Valley that we learned that

7   I think was important, one of the things that the government

8   has tried to suggest to you, that a clinic that gets paid in

9   cash, that's a red flag.  You heard them talk about this cash

10  being a red flag.

11           Dr. Valley when asked about his clinic, he left

12  Chattanooga, now he has a clinic up in East Tennessee.  And he

13  was asked, "Dr. Valley, do you take insurance?"

14           He said, "Nope."

15           "Well, how do you get paid?"

16           He said, "I take cash."

17           Does that mean that he's running an illegal pain

18  clinic?  No.  That's a legitimate way.  If someone chooses to

19  do it in cash, they do it in cash.

20           So Dr. Valley gives us some important information

21  about the snapshot of this clinic during a time leading up to

22  and right before Puckett and Hill get their claws into these

23  clinics.

24           And at the time that Dr. Valley was there, he was

25  approving these files.  And not only approving them and

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1    concurring with them, he determined that these were legitimate,

2    reasonable treatment plans for these patients.

3            Now, to sit there and say that these patients were

4    not receiving medical care, it's just not correct.  It's just

5    not accurate.  Dr. Valley was the government's witness.  He

6    wasn't our witness.  We didn't call him as an expert.  But

7    that's what he shared with us on the witness stand.  I concur

8    with the treatment plan.

9            Do you remember Mr. Still, the money man, the one

10   that had that Mississippi drawl?  Y'all remember him, don't

11   you?  He got -- he's kind of cute, wasn't he?  Yeah.

12           He said that he is attributing $33,000 of some money

13   that Mrs. Hofstetter -- you remember that?  So that's kind of

14   like -- that's part of this theory of looking at money

15   laundering.

16           And lo and behold, we presented to him a check of

17   $33,000 at that same time frame that was actually a check that

18   went through Mrs. Puckett's account to pay to Prodigal, because

19   these were moneys that were given to Mrs. Hofstetter on behalf

20   of the partners that were buying Prodigal.

21           So this wasn't any money-laundering issue.  This was

22   a check that Mr. Still just apparently didn't look for.  That's

23   Exhibit No. 572, if you want to review that as well.

24           I want to talk about discharges.  I'm trying to watch

25   my time, Your Honor.

UNITED STATES DISTRICT COURT

1    THE COURT:  You've got additional time.  We'll go

2  about five or ten more minutes, and if you're not done, you can

3  finish up in the morning.

4    MR. BURKS:  Maybe this will be a good place to stop

5  on discharges.  I can do that.

6    THE COURT:  All right.  Go ahead with that.

7    MR. BURKS:  Thank you.  Again, thank you-all for your

8  patience.  One of these days, I'm going to get like Ms. Pearson

9  where you can flip that thing and flip it up there.  She did a

10  good job.  I liked that.

11    You remember we had the discharge -- battle of

12  government's discharges, Mrs. Sherrod's discharges, and they

13  were not exact, because as you heard, there were different

14  opportunities to look at the files, and maybe not look at all

15  the files.

16    But the bottom line is, and what -- what we know from

17  Agent Vehec is that they're really about -- they say the same

18  stuff.  And what they say is -- I've got my second page.  Let's

19  find the first page for you here.  Might just lean over there

20  and ask her what her number was, but I can't do that.  All

21  right.  Let's see if I can't find that.  I got it.  I found it.

22  I got it.  Thank you.  Okay.  Here we go.

23    Now, you got to ask yourself a question.  If we're

24  operating a pill mill, the last thing you want to do is get rid

25  of patients.

Closing Argument - Mr. Burks

1    Now, I know the government will want to say, well,

2    that's just window dressing.  We keep hearing that term, window

3    dressing, window dressing, window dressing.  I consider it a

4    code saying we really can't explain it illegally, so I can't

5    tell you that it makes it legitimate looking, because it is

6    legitimate to discharge patients.  So we just call it -- we

7    just call it window dressing.  So that way they get around with

8    not really confronting what the facts are.  But you-all

9    determine whether this makes sense to you as to whether this

10   was a pain clinic or not.

11   Now, Agent Vehec said that she found 2,000 -- sorry,

12   Jeff, it's 2,000, not 200 -- 2,083 discharges, and they had all

13   those charts and what years, and we've got the same stuff.  But

14   I think this is the key.

15   Now, they would have you to believe, by listening to

16   the testimony, that they would discharge a patient and then

17   they just run them back to another place.  That's kind of how

18   they made you feel anyway.  Made me feel that way until I saw

19   these numbers.  If I was going to discharge 2,083 people and I

20   was just doing it to make it look good, then I was going to run

21   them back to the other clinic, why did we only readmit 209?

22   That's a little over ten percent.  Which means another

23   80-something percent were discharged for good.

24   So that's not window dressing.  That that's the loss

25   of 1,793 patients, according to Agent Vehec.  Ms. Sherrod

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1    looked at files, and according to her records, and I admit that

2    we probably didn't see as many.  But she had 1,980 discharges.

3    And, again, her independent investigation showed there was 229

4    readmitted.  Those are about the same percentages.

5            Now, I ask you a simple question.  Why in the world

6    would a pain clinic discharge that many patients and not bring

7    and readmit, if that's the government's theory of what we were

8    really doing?  That's the difference of 1,793, and Agent

9    Vehec -- and I have no doubt that what she puts down -- and she

10   said it's approximate.  I think they're all approximate.  There

11   may be a file in there that somebody missed, but this gives you

12   the general idea of the amount that's dealing with.

13           And then you've got a difference of 1,751 patients.

14   Now, what is -- what is the real bottom line to that?  What

15   does that really tell us?  It tells us that this clinic was

16   getting rid of and discharging patients for legitimate

17   discharge reasons, and only a certain amount were allowed to

18   come back.  And by virtue of that, they're either the dumbest

19   pill mill that I've ever seen or they're a legitimate pain

20   clinic.

21           Because what that means is, that if you just took one

22   visit of that 1,793 patients, come back one time, one time

23   only, $300, not even 350, or the 1,751, come one time, I'm not

24   talking about month and month after month, what financially

25   does that do to this clinic?

UNITED STATES DISTRICT COURT

1    What that says is, that if those patients that they

2   discharged did not get to come back, only just one more time

3   under Ms. -- Agent Vehec's rule, this clinic basically lost

4   over a half million dollars on one visit for 1,700 patients

5   over that period of time.

6    And under Mrs. Sherrod's file, it's 525,000, again,

7   over a half million dollars, if this clinic had patients taken

8   out of this clinic. And these numbers, the 1,793 is the

9   difference between those that came back. So these are the ones

10   that never came back on both of these.

11    Those discharges, and I'm going -- I'll stop at this

12   point. Those discharges tell a real important story. Pain

13   clinics don't do that. People that are in it, as Ben Rodriguez

14   says, we were just letting the train run, and when they stopped

15   us, they stopped us. We're going fast and furious.

16    That isn't fast and furious, folks. That's not fast

17   and furious. That's trying to run a legitimate pain management

18   clinic. That's not window dressing. And that's not

19   explainable in any other terms than the fact that it is.

20    And I'll stop on this for tonight.

21    THE COURT: All right.

22    MR. BURKS: Let me make one comment to get --

23   discharges. You heard a lot of the experts talk about, do they

24   discharge, don't they discharge. Dr. Blake says we don't

25   discharge, we just change modalities. Dr. Browder said, we

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Burks

1  take a lot of patients that had been discharged from other

2  clinics to our clinics to see if they have gotten the stuff out

3  of their system, to recheck them.

4       But why?  Why do you do that?  Because they're

5  chronic pain patients that have a legitimate medical purpose.

6  They got discharged for various reasons.  They still have a

7  chronic pain problem.

8       So these pain management clinics, like Dr. Browder's

9  clinic, will take these people in.  They'll monitor them.

10  They'll try to make sure they'll protect them.  And that's what

11  we tried to do, except for the fact Puckett and Hill were

12  interfering with a lot of that.

13       With that, Your Honor, I will --

14       THE COURT:  All right.  Thank you.  We'll let you

15  finish up in the morning.

16       We'll excuse the jury for the day.  Again, we're in

17  the midst of closing argument.  But keep in mind, closing

18  arguments are not done.  You haven't had the charge from the

19  Court, all of which I anticipate you will -- will be delivered

20  to you tomorrow.  So you won't begin your deliberations until

21  after that.

22       So keep in mind that you must, even though we're

23  nearing the point where you will begin your deliberations, you

24  still -- until that time, let's continue not to talk about the

25  case among yourselves or engage in any type of deliberations

UNITED STATES DISTRICT COURT

1    until probably sometime tomorrow afternoon.

2              Also, keep in mind that to the extent there is

3    anything written about this case in the media or otherwise, you

4    should put that aside and not read it at all until the case is

5    over, either as it relates to this case or any other issues

6    pertaining to this case, as we discussed in the past.  Just put

7    all that aside until the case is over.

8              But otherwise, have a pleasant evening and we will

9    see you tomorrow, Tuesday, January 28, at 9:00 a.m.

10             Jury is excused.

11        (Jury out at 5:24 p.m.)

12             THE COURT:  All right.  Everyone please be seated

13   just for a moment.

14             Mr. Burks, we'll give you nine to 9:30 time slot

15   roughly.  You got time to think about that.

16             MR. BURKS:  That's fine.  Thank you, Your Honor.

17             THE COURT:  Mr. Oldham is going next, followed by

18   Mr. Rodgers, and then we'll allow for rebuttal closing

19   argument.  And then we'll see where we are.

20             That may -- that will probably take all of the

21   morning or possibly lunch break and rebuttal.  We'll just see

22   where we are in terms of how long Mr. Oldham and Mr. Rodgers

23   take.

24             And then the Court, as you can tell by the jury

25   charge pages, that will take some time for the Court to deliver

                    UNITED STATES DISTRICT COURT

1    its charge.  And then the jury will get the case.

2          Let me go ahead since -- well, we didn't finish

3    early.  But let me just go ahead and address, which I have not

4    done yet, the defendants' motions, pursuant to Rule 29, that

5    were brought at the close of the government's case in chief and

6    renewed at the close of all the evidence in this case.

7          The defendants' primary arguments are that the

8    government has offered insufficient evidence of the crimes

9    charged in the fourth superseding indictment with particular

10   emphasis on conspiratorial agreement, the enhanced penalties

11   for overdose deaths, and whether the prescriptions were written

12   outside the usual course of professional practice and not for a

13   legitimate medical purpose.

14         Rule 29 provides that after the government closes its

15   evidence, the Court on the defendant's motion must enter a

16   judgment of acquittal of any offense for which the evidence is

17   insufficient to sustain a conviction.  Rule 29 permits both the

18   motion to be renewed as well as for the Court to reserve

19   decision on such motion until before or after the jury returns

20   a verdict.  As noted, the Court has previously reserved

21   decision on the defendants' motions.

22         It's important to note that this is a different

23   standard that the jury has, a significantly different standard.

24         For purposes of Rule 29, evidence is sufficient to

25   sustain a conviction if after viewing the evidence in the light

UNITED STATES DISTRICT COURT

1    most favorable to the prosecution and after giving the

2    government the benefit of all inferences that could reasonably

3    be drawn from the testimony, a rational trier of fact could

4    find that the government has proved the legitimate medical

5    purposes of the crime beyond a reasonable doubt.

6            First, defendants argued as to the conspiracy counts,

7    particularly Counts 1, 2, and 4, that the government has not

8    presented sufficient evidence of an agreement or defendant's

9    state of mind with respect to the joining the alleged

10   conspiracy.  The government countered that its, quote, pill

11   mill proof, closed quote, established that any reasonable

12   person would know that the clinics in this case were pill

13   mills, and by choosing to associate themselves with the

14   clinics, the government's argument goes, defendants agreed to

15   assist in the diversion of opioids to drug addicts and drug

16   dealers.

17           The government argues that this evidence creates a

18   classic jury question as to whether defendants had the

19   requisite mindset with respect to the agreement element of the

20   alleged conspiracies.

21           The Court finds that the government has presented

22   sufficient evidence of an agreement for a rational jury to find

23   that element of the conspiracy counts prove beyond a reasonable

24   doubt.

25           The Sixth Circuit's jury pattern instruction or jury

                    UNITED STATES DISTRICT COURT

 1    instruction with respect to conspiratorial agreement, which the
 2    Court will give to the jury states that, quote, the government
 3    must prove there was a mutual understanding, either spoken or
 4    unspoken, to cooperate with each other to quote -- to, closed
 5    quote, carry out the objectives of the conspiracy here to
 6    distribute controlled substances outside the usual course of
 7    professional practice and not for a legitimate medical purpose.
 8            The government's evidence is sufficient under Rule 29
 9    standards for a rational jury to find that defendants knew that
10    they were working at illegitimate pain clinics.  Specifically,
11    the government has introduced evidence, and it's been argued to
12    date, or it was argued in the government's openings or --
13    opening closing argument, as well, that the clinic did not
14    accept insurance and charged $300 per visit, the waiting rooms
15    were full, patients were nodding off in the waiting rooms,
16    neighboring businesses complained about the clinic's patients
17    behavior, and other evidence the government contends that
18    indicates the clinics were so-called, quote, pill mills, closed
19    quote.
20            Viewing this evidence in the light most favorable to
21    the government, a rational jury could find the defendants had
22    at least a silent mutual understanding that by working at the
23    clinics, they were agreeing to participate in the unlawful
24    distribution of controlled substances.
25            The Court also finds that this and other evidence

                        UNITED STATES DISTRICT COURT

1    prevented -- presented by the government is also sufficient for

2    a rational jury to find that the government proved the other

3    elements of the charged conspiracies beyond a reasonable doubt.

4         Specifically with respect to Count 1, the RICO

5    conspiracy, Defendant Hofstetter also argued through

6    Document 828 that the government failed to identify the

7    subsection of 18 United States Code Section 1962 under which

8    the government brings the RICO charge, entitling her to a

9    judgment of acquittal as to Count 1.

10        The Court, for purposes of Rule 29, would reject this

11   argument finding, as the government noted at the charge

12   conference, that the subjection under which Defendant

13   Hofstetter is charged is identified in the indictment in

14   Paragraph 53 on Page 19.

15        Second, the defendants argued that the government has

16   not presented evidence sufficient to find that the enhanced

17   penalties for overdose deaths were caused by defendant's

18   alleged criminal conduct, particularly defendants rely on

19   evidence showing that some of the subjects of those enhanced

20   penalties may have been selling or trading the drugs prescribed

21   at the clinics, taking drugs other than those prescribed at the

22   clinics, or failing to take the prescribed drugs as directed.

23        The government disagrees and argued that the facts

24   upon which the defendants arguments rely were present in the

25   Volkman II case, the Sixth Circuit 2015 case, including that

UNITED STATES DISTRICT COURT

1    the deaths were caused by multidrug intoxication, which with

2    respect to some of the charged deaths involved drugs other than

3    those prescribed by the defendant, and at least two of the

4    subjects were not taking the medications prescribed, that is

5    crushing and snorting the pills or ingesting the pills more

6    frequently than directed.

7         The Court finds that a rational jury could find

8    beyond a reasonable doubt that the charged deaths were caused

9    by the criminal conduct alleged in the counts associated with

10   those deaths.

11        First, the Court notes that a failure to take a

12   prescribed medication as directed does not sever the causal

13   chain, again, under the Volkman II decision.  And next with

14   respect to the issue of a multidrug overdose, the Supreme Court

15   in the Burrage v. United States, 2014 case, held that the use

16   of a drug must be a but-for cause of the victim's death or

17   injury.

18        This means the Sixth Circuit held in Volkman II that

19   to establish causation with respect to an overdose -- an

20   overdose death, a controlled substance distributed by a

21   defendant must be an independently sufficient cause of death,

22   even if the controlled substance combines with other factors to

23   produce death.

24        Here, in this case, the testimony of, among others,

25   Debbie Shockley, Tony Keathley, Randy Haynes, and Sara and

UNITED STATES DISTRICT COURT

1  Christopher Kinsey provided sufficient evidence -- or provides

2  sufficient evidence upon which a rational jury could find,

3  given, among other factors, the close temporal connection

4  between the patients' clinic visits and their deaths, that the

5  opioids prescribed by defendants were the drugs or among the

6  drugs ingested by the patients immediately prior to their

7  deaths.

8       Testimony of Don Sherwood, Dr. Jerry Bradley, and

9  Dr. Christopher Lochmuller completed the causal chain.  It

10 constitutes sufficient evidence upon which a rational jury

11 could find that although other drugs may have been ingested by

12 some of the patients immediately prior to their deaths, it may

13 have been a contributing factor in some of those deaths, opioid

14 intoxication was a but-for cause for each of the patient's

15 deaths that are subjects -- that are the subjects of enhanced

16 penalties in this case.

17      Accordingly, and again, viewing the evidence in the

18 light most favorable to the government, the Court finds the

19 government's evidence with respect to the overdose deaths is

20 sufficient for a rational jury to find the Burrage causation

21 standard satisfied.

22      Third, the defendants argued that the evidence is

23 insufficient to establish that the prescription -- that the

24 prescriptions at issue were outside the usual course of

25 professional practice and not for a legitimate medical purpose.

UNITED STATES DISTRICT COURT

1    They point or pointed at that time or in their arguments to the

2    fact that in some instances, patient files were manipulated to

3    support patient's claims of pain.

4         The government countered that it has presented

5    evidence sufficient to find that this element is satisfied

6    despite the manipulation of certain patient files.

7    Specifically, the government pointed to the testimony of

8    Drs. Blake and Carter, and, again it's, quote, pill mill proof,

9    closed quote.

10        Again, for purposes of Rule 29 analysis, the Court

11   would agree with the government's argument in this regard.

12        Although there has been evidence that patient files

13   were manipulated by some clinic staff, the Court finds after

14   reviewing the testimony presented by the government, both at

15   its case in chief, as well as the testimony presented in the

16   entirety of the trial, that a rational jury could conclude

17   beyond a reasonable doubt that defendants were prescribing

18   controlled substances outside the usual course of professional

19   practice and not for legitimate medical purpose.

20        Among other things, defendants opinion witnesses

21   opined that -- excuse me, the government's witnesses opined

22   that charting assessment of patient's risk of abuse, physical

23   examination, and other practices at the clinics were

24   inadequate, and that the treatment plans that the clinics were

25   generally limited to the prescription of high-dose opioids

UNITED STATES DISTRICT COURT

1  written for patients despite among other factors introduced by

2  the government, including minimal findings on their MRIs, their

3  relative young age, and potential for drug abuse.

4      Moreover, among other things, defendant -- excuse me,

5  the government's opinion witnesses based these opinions on

6  review of the patient files, some of which may have been

7  manipulated by clinic staff, so the potential manipulation of

8  those files does not preclude a rational jury from concluding,

9  as those witnesses opined, that the prescriptions at issue were

10  unlawful.

11      Accordingly, the Court finds the government has

12  presented sufficient evidence with respect to this element.

13  The Court also finds that this and other evidence presented by

14  the government is sufficient for a rational jury to find the

15  government proved the other elements of the distribution

16  counts, those being Count 14, 16, and 18 beyond a reasonable

17  doubt.

18      In sum, with respect to all counts, when viewing the

19  evidence in the light most favorable to the government and

20  after giving the government the benefit of all inferences that

21  reasonably could be drawn, the Court finds the government has

22  presented sufficient evidence for a rational jury to return a

23  verdict of guilty to all counts.

24      The Court notes that it reaches this determination

25  both on the basis of the evidence at the time the motions were

UNITED STATES DISTRICT COURT

 1    initially brought and at the time of renewal, and accordingly,

 2    the Court will deny the defendants' respective motions.

 3            Unless there's anything else we need to take up,

 4    we'll --

 5            MR. REAGAN:  One thing.

 6            THE COURT:  There is something.  Mr. Reagan?

 7            MR. REAGAN:  Our motion for mistrial, you're taking

 8    that under advisement?

 9            THE COURT:  I've taken it under advisement.  Haven't

10    had a chance to go back and review the transcript and consider

11    it in light of the evidence and the law, but I will address

12    that probably tomorrow.

13            MR. WHITT:  And I will say I believe the government

14    and I have resolved the issue we had regarding the -- we're

15    just going to let them go in as they were -- in the A version

16    of those.

17            THE COURT:  All right.  Any -- is that --

18            MS. PEARSON:  Yes, Your Honor.  I believe what --

19    what counsel would like us to do, based on all the discussions

20    we've had, is remove the 290 and substitute the A versions.  Or

21    would you prefer both went back?

22            MR. WHITT:  No, I think just substitute.

23            THE COURT:  Just the A version.

24            MS. PEARSON:  Yes.  Okay.

25            THE COURT:  Just make sure Ms. Norwood has that, and

                        UNITED STATES DISTRICT COURT

1    that will be fine.

2            All right.  If nothing else, finish up with Mr. Burks

3    in the morning, we'll turn to Mr. Oldham, and then to

4    Mr. Rodgers, and then I believe Mr. Stone, and then the Court's

5    charge, and then the jury will get the case.

6            Everyone have a nice evening.

7            THE COURTROOM DEPUTY:  All rise.  This honorable

8    court stands in recess.

9        (Proceedings recessed at 5:37 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

1
**CERTIFICATE OF REPORTER**

2
STATE OF FLORIDA

3
COUNTY OF HILLSBOROUGH

4
   I, Rebekah M. Lockwood, RDR, CRR, do hereby certify

5
that I was authorized to and did stenographically report the

6
foregoing proceedings; and that the foregoing pages constitute

7
a true and complete computer-aided transcription of my original

8
stenographic notes to the best of my knowledge, skill, and

9
ability.

10
  I further certify that I am not a relative, employee,

11
attorney, or counsel of any of the parties, nor am I a relative

12
or employee of any of the parties' attorneys or counsel

13
connected with the action, nor am I financially interested in

14
the action.

15
  IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16
Hillsborough County, Florida this 9th day of April, 2020.

17

18

19

20
        _____
        REBEKAH M. LOCKWOOD, RDR, CRR

21
        Official Court Reporter
        United States District Court

22
        Middle District of Florida

23

24

25