IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

_____
                                )
UNITED STATES OF AMERICA,        )
                                )
          Plaintiff,             )
                                )
vs.                              )   Case No.:  3:15-CR-27
                                )
SYLVIA HOFSTETTER,               )
COURTNEY NEWMAN,                 )
CYNTHIA CLEMONS,                 )
HOLLI WOMACK,                    )
                                )
          Defendants.            )
_____ )


**EXCERPT OF JURY TRIAL PROCEEDINGS**
**CLOSING ARGUMENTS (CONTINUED)**
**BEFORE THE HONORABLE THOMAS A. VARLAN**

**January 28, 2020**
**9:10 a.m. to 2:21 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**            TRACY STONE, ESQUIRE
                                  Assistant United States Attorney
                                  United States Department of Justice
                                  Office of the United States Attorney
                                  800 Market Street
                                  Suite 211
                                  Knoxville, Tennessee 37902

                                  KELLY K. PEARSON, ESQUIRE
                                  DAMARE THERIOT, ESQUIRE
                                  United States Department of Justice
                                  Office of the United States Attorney
                                  1301 New York Avenue NW
                                  Washington, DC 20005


(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496

**APPEARANCES (CONTINUED):**

**FOR THE DEFENDANT:**          CHARLES C. BURKS, JR., ESQUIRE
**SYLVIA HOFSTETTER**           Justice, Noel & Burks
                                1816 West Clinch Avenue
                                Knoxville, Tennessee 37916

                                LORETTA G. CRAVENS, ESQUIRE
                                Cravens Legal
                                P.O. Box 396
                                Knoxville, Tennessee 37901

**FOR THE DEFENDANT:**          CHRISTOPHER J. OLDHAM, ESQUIRE
**COURTNEY NEWMAN**             Gulley Oldham, PLLC
                                706 Walnut Street
                                Suite 302
                                Knoxville, Tennessee 37902

                                MARK E. BROWN, ESQUIRE
                                Menefee & Brown, LLP
                                9724 Kingston Pike
                                Suite 505
                                Knoxville, Tennessee 37922

**FOR THE DEFENDANT:**          RANDALL E. REAGAN, ESQUIRE
**CYNTHIA CLEMONS**             Law Office of Randall Reagan
                                100 West Summit Hill Drive
                                Knoxville, Tennessee 37902

                                M. JEFFREY WHITT, ESQUIRE
                                Whitt, Cooper, Trant & Hedrick
                                607 Market Street
                                Suite 1100
                                Knoxville, Tennessee 37902

**FOR THE DEFENDANT:**          CHRISTOPHER RODGERS, ESQUIRE
**HOLLI WOMACK**                Law Office of Kit Rodgers
                                P.O. Box 70764
                                Knoxville, Tennessee 36938

**ALSO PRESENT:**               SYLVIA HOFSTETTER, DEFENDANT
                                COURTNEY NEWMAN, DEFENDANT
                                CYNTHIA CLEMONS, DEFENDANT
                                HOLLI WOMACK, DEFENDANT
                                MICK NOCERA, FBI AGENT
                                JOELLE VEHEC, FBI AGENT
                                JULIE PATTERSON, PARALEGAL
                                DAN SHERROD, INVESTIGATOR

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496

1                          **INDEX**

2                                                    **PAGE**

3    Continued Closing Argument by Mr. Burks              4

4    Closing Argument by Mr. Oldham                      37

5    Closing Argument by Mr. Rodgers                     77

6    Rebuttal Closing Argument by Mr. Stone              94

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496

1           (Excerpt of Proceedings)

2           (Call to Order of the Court)

3                THE COURT:  Morning, everyone.

4                Ready to continue, Mr. Burks?

5                MR. BURKS:  I am, Your Honor.

6                THE COURT:  Let's bring our jury in.

7           (Jury in at 9:10 a.m.)

8                THE COURT:  Thank you.  Everyone be seated.  Good

9      morning, members of the jury.

10               THE JURY PANEL:  Morning.

11               THE COURT:  We're ready to continue with closing

12     arguments this morning.  Mr. Burks may continue with closing

13     argument on behalf of the defendant, Ms. Hofstetter.

14               MR. BURKS:  Thank you, Your Honor.

15               Good morning, ladies and gentlemen.  You know it's

16     always dangerous to let a lawyer have an overnight to

17     reconsider whatever he didn't say or needed to say.  But I will

18     tell you that I didn't add anything to what I was going to say

19     yesterday.  So hopefully I'll be on track with what I want to

20     do.

21               Again, I know on behalf of the government, on behalf

22     of our clients and this Court, we're awed by the attention and

23     the commitment that y'all have made in this case to seek

24     justice and truth.  And so we -- bottom of our hearts, we thank

25     you.

Continued Closing Argument - Mr. Burks

1      I got a few things that I wanted to sort of wrap up

2  with, and I know that we had to stop.  We talked about a couple

3  of things, and we talked about the issue -- excuse me.  I

4  apologize.  I forget I had that mic on.  That makes it louder.

5      About the UDS issues we had at the clinic that were

6  later discovered through the audit investigation by

7  Mrs. Hofstetter and the people that helped that.  And as I was

8  looking at some of these, I noticed that these names were so

9  familiar that happened to be, and I'm just going to run these

10  quickly by you to underline again the -- the Elmo, Julie?

11      THE COURTROOM DEPUTY:  Elmo?

12      THE COURT:  There we go.

13      MR. BURKS:  Thank you.  These are some of the charts

14  that -- that were reviewed after Puckett and Hill left.  And

15  you can see in just this amount of time the people that have

16  come before you or you've heard about that were having their

17  UDS's manipulated or -- Scott Willis, Andrea Osborne, good, old

18  Lee Jenkins.  Remember Mr. Jenkins, of course.  They were doing

19  a number with his stuff.

20      These are all things that once these charts got

21  looked at, and we don't know -- a couple of things, Michael

22  Puckett, who is Stephanie's husband, he had several things in

23  his charts were -- after they left, there's no telling what all

24  was removed, because, remember, Patty Newman was still there.

25      And in the conversations that we talked about with

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1   Mrs. Puckett and Mrs. Hill, they said that Patty Newman was

2   shredding things.  And you can see here, for instance, Michael

3   Puckett, we don't know if these ever got in the file or if they

4   got in the file when the nurse practitioners or the doctors

5   looked at them, or were they taken out as they were getting out

6   of town, so to speak, out of the clinic.  But these were

7   troubled files that were confronted with after they left.

8   Chris Hill, that is -- that is Mrs. Hill's husband.

9            So you also heard that in the box, there were, gosh,

10  300 or so of these audits that were put off -- that were in a

11  file that still hadn't got into these files.

12           So it just underscores a lot of issues that came up

13  after these ladies left this clinic and left this mess.  And so

14  we also talked to -- briefly about the discharges of patients.

15  And you saw the discharge of patients by year that Mrs. Sherrod

16  did.

17           And I just -- and this is an Exhibit No. 587, I

18  think.  Is that 87 -- 89 -- 589.  Thank you.

19           And you can see that the discharged patients by year,

20  obviously, 2013, not 2012, was a major year that they were

21  discharging patients.  That was Dr. Larson that was in charge

22  at that point in time, along with some of the defendants here,

23  and then you've got 2014, which is pretty close to 2012, and

24  then you got a few in 2015.

25           Of course, the clinic wasn't open but -- till March

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    when they raided them, so you wouldn't expect a lot of

2    discharges during those few months.  But as you can see, the

3    basis of these discharges and in the years that they had.

4          So in looking at a couple of other quick issues, and

5    then I'll get to what I want to finish on.  The testimony that

6    you've heard throughout this trial is consistently through

7    these witnesses, except for one, that Mrs. Hofstetter was hard

8    and Chris Tipton said she was a tough cookie.  Others said that

9    she could be rude, she could be downright mean.

10         But you look at the environment that she would walk

11   into.  These were people that were chronic pain patients.

12   These were people that were not there with their children for

13   pediatric treatment.  So she did have to be tough.  And she was

14   tough.

15         And I don't -- I don't cross her at all on that.  I

16   admire her.  I admire her for having to work in a, quote, man's

17   world with the Italians and Ben and Chris and these people that

18   took no prisoners.  So she did have to stand her ground or

19   really get demolished.  So I appreciate that about

20   Mrs. Hofstetter.  I appreciate the fact that Sylvia can stand

21   up to that kind of pressure.

22         And as Ms. Cravens talked about the pressure of

23   coming in and asking you to determine her fate.  That takes a

24   lot.  That takes a lot of -- you think about that.  Weaker

25   minds and weaker hearts will wilt.

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1          But she didn't, and she hasn't.  She's trusting in

2    this jury.  That's all she's ever asked for is someone to

3    determine that, because she's pled not guilty.  And so it's up

4    to you to make those decisions.

5          But she -- I've enjoyed actually working with

6    Ms. Hofstetter because of that, that character of toughness and

7    determination.  And it gets you in trouble.  And probably in

8    this case, people that came in and testified in this trial, you

9    know, they didn't particularly appreciate and like her because

10   she was tough, and she was demanding, because that's what her

11   role was.

12         What was her role?  She was in Florida.  And she

13   wasn't even a part of this conversation about coming to

14   Tennessee.  We know that based upon the testimony by both

15   Mr. Rodriguez and Mr. Tipton.  Remember what they said when

16   they were planning to come up here for whatever that plan was,

17   and I'll talk about that in a little bit, Mrs. Hofstetter

18   wasn't on their radar to send her up here.

19         Who was it?  Do you remember?  Who was it that they

20   were going to send and actually sent up here?  It was a manager

21   of the clinic down there by the name of Claudia Mulberry.  And

22   I think even Agent Nocera had commented about that, even in --

23   that he knew and remembered that she was supposed to come here,

24   and she did come up here.

25         She was part of the plan.  She was part of the

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1  discussions about what it was that they were going to do here

2  in Tennessee.  It wasn't Mrs. Hofstetter.  Mrs. Hofstetter came

3  up here to basically open this thing up.  Well, came with a

4  suitcase and a -- not any living arrangements or anything, just

5  to get this started.  So she wasn't part of this plan.  She

6  never was part of the discussions and this plan, contrary to

7  what Mr. Rodriguez would have you believe.

8          So the other thing I wanted to touch on, too, is that

9  you heard testimony that Mrs. Rodriguez -- Ms. Hofstetter also

10  had her daughter up here, and her daughter worked at this

11  clinic, and her daughter brought her only grandchild.  Little

12  Syl was her only child, and Little Junie, they called it, is

13  the grandchild.

14          Now, do you think for a moment that if you were going

15  to be in here and you were running this illegal pill mill, that

16  would you bring your daughter up here to work in that kind of a

17  situation, put her at that kind of a risk?  Think about that.

18          Think about your own children.  Would you ever do

19  that?  I don't think so.  I've got a daughter and a son, and I

20  certainly can appreciate -- and I've got five grandchildren, so

21  I can appreciate the caring for that.  So if this was, as the

22  government portrays, this pill mill, as far as what these

23  ladies were working in and doing, then you wouldn't bring your

24  daughter in the middle of that, ever.

25          You heard Mr. Rodriguez talk about his feelings about

UNITED STATES DISTRICT COURT

1   his daughters, and I want to talk to you about that in just a

2   minute.  But I just ask you to think about that.  Think about

3   the reality and the consequence of that type situation.  If you

4   knew that this was, as the government portrays, an illegal pain

5   clinic, would you ever, ever expose your daughter to that kind

6   of environment?  I don't think so.

7           Couple other things I want to touch base on.  You

8   heard testimony from the charming Mr. Still, who testified that

9   he had looked at all these numbers and got numbers from the

10  casinos.  And I don't know about you-all, y'all are probably

11  sharper than I am, it didn't make a bit of sense to me.

12          I couldn't make any sense -- the only thing I got out

13  of that were two things.  One is, he didn't know either,

14  because he said he had to talk to a buddy of his.  Do you

15  remember?  It wasn't something in his wheelhouse where he had a

16  specialty in it.  He had to figure out what somebody else was

17  telling him, and we don't know what that buddy knew.

18          But what we do know is logically it's churning.

19  That's what he talked about is this churning.  And really

20  that's the only thing I know about any of that is that when you

21  put money in, you win money, you put more money in, and it just

22  churns.

23          Now, if you accept what he says, she spent, what was

24  it, $34 million, well, there's no $34 million around anywhere

25  on this.  So that doesn't make any sense to me.  Now, it may to

UNITED STATES DISTRICT COURT

1   you.

2          You know what that really is?  That's noise.  That's

3   noise.  That -- whether she goes to the casinos and does that

4   is activity.  It has no bearing, none whatsoever, as so whether

5   or not Ms. Hofstetter is guilty of these charges.  And I'd ask

6   you to consider that.  I consider this noise.

7          There's a lot of noise in this case, and I really

8   like -- I've never heard that expression and what Mrs. Craven

9   talked about yesterday.  But it made a lot of sense to me, is

10  that we got a lot of noise.

11         And that noise is to distract -- let me give you

12  another bit of the noise.  You know, when you can't go straight

13  on against somebody, you try to convict them by other things,

14  other noises and get them -- try to look -- make things look

15  bad on a person.  And one of those things is that there are

16  these allegations of theft.

17         They're not charged -- she's not charged with theft

18  in this case.  And if she was guilty of theft in this case,

19  she's charged with everything else under the sun, I'll

20  guarantee you that that would be part of these charges if the

21  government honestly believed that they had any kind of a case

22  on that.

23         But where do we have that information?  Where does

24  that noise come from?  It comes from Ben Rodriguez and Chris

25  Tipton.  That's what -- that's the only place you hear this

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1   noise.  And when you hear the noise, you got to say, well,

2   let's just compare and see what that noise sounds like.

3           What we were told by Mr. Tipton and Mr. Rodriguez,

4   let's talk about the clinics here that Mr. Tipton says in his

5   testimony that he had heard a rumor.

6           I said, "Well, did you check it out?"

7           "No, not really."

8           "Did you talk to the partners?"

9           "Yeah.  I said something to them."

10          "And what did they want to know?"

11          "Well, they wanted to know if it happened or not."

12          I said, "Well, what did you do?  Did you do an audit?

13  Did you get an accountant in?"

14          "No, we didn't even have an accountant at that time."

15          "Did you have any evidence, anything that indicated

16  that there was anything to that?  Was there anything that you

17  felt supported this noise?"

18          I didn't say noise at the trial.  I'm using

19  Ms. Cravens' word again.

20          "No.  We didn't."

21          Oh, but Ben Rodriguez.  You remember Ben.  Ben comes

22  in, and he's, "Oh, yeah, we heard about this theft."

23          "Did you do anything?"

24          "Oh, yes, yes.  I brought an accountant up here, and

25  we went through these QuickBooks.  And we were able to find

UNITED STATES DISTRICT COURT

1  this, and we were able to find that.  And we were able to --
2  we -- confront Mrs. Hofstetter."
3         She admitted all of it, just like he claims she
4  admitted down in Florida.  Now, you got two partners and they
5  can't even make a straight story out of it between the two of
6  them.  Why?  Because it's noise.  That's all it is.  And why do
7  we have it?
8         Why is that in this case?  So the government can
9  stand up here at the end and say, well, you know, when you have
10 somebody that's stealing, you know that they're crooked enough
11 to run this pill mill, and so we just sort of treat that as --
12 what did Ben say in his argument said, just like the store, you
13 know, you just sort of have little loss prevention there, but
14 if you've got somebody that's going it that's no big deal,
15 because they're making you-all this money.  That's why this
16 whole thing is in here about this, quote, theft.
17        Did they prove any theft to you?  Did they?  If they
18 didn't, why is it in here?  Other than to try to beat up on
19 Mrs. Hofstetter indirectly where they can't do it directly.
20 It's noise.
21        Just like Jeff Whitt said, all we heard about was
22 pancakes and porn.  What did that have to do with it?  It's
23 noise.  It's just chatter to try to get you off the target of
24 what we're looking at.
25        So I want to also talk to you briefly.  Maybe I won't

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1   talk to you briefly about that right now.  I'll have to come

2   back to briefly.

3           I'm going to talk to you a little bit, and I'm going

4   to be very conscious of my time here.  You're going to have a

5   hundred-something pages of charges from this Court.  But I

6   think it can boil down to just one or two, really, questions

7   that you have to answer to yourself.

8           One is this issue of whether Mrs. Hofstetter became a

9   part of this RICO statute.  This is not a charge that you see a

10  lot in East Tennessee.  Because it's about organized crime,

11  gang-related crimes.  That's why lawyers from Washington are

12  down here prosecuting this.  It's just not something we do.

13  And, quite frankly, it's a little unnerving for a defense

14  attorney, because it's really kind of confusing at times.

15          And is this something that really looks like and

16  feels like organized crime or gang-related crimes?  You know,

17  it was originally, I think -- and I can be corrected on that,

18  they had a lot of these organized crimes, the Mafia.  They were

19  trying to get to the Mafia, and so they created to where the

20  Mafia would be entering into different legitimate businesses,

21  but using that to filter money and filter things through, loan

22  sharking, things of that nature.

23          But it's expanded, and now it's down here in front of

24  us.  So I think the key thing that you -- I would ask you to

25  consider is that in the types of racketeering activities

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    alleged in the superseding indictment, the Court will instruct

2    you, and I think part of that instruction -- there are multiple

3    pages of just the RICO statute.  I mean, it takes up close to

4    half of the whole charge.

5           But in order to convict a Defendant Hofstetter of the

6    RICO conspiracy offense, the jury verdict must be unanimous as

7    to which type or types of predicated racketeering activity that

8    the Defendant Hofstetter agreed would be committed.  And I

9    think that's -- those few words are the keys.

10          They have to prove to you that she had agreed or

11   would be agreeable to or did agree to -- you have to connect

12   her.  You can't just say that if she worked with these men and

13   if you think these men were in violation of that, that doesn't

14   make her guilty.  She has to have an intent and an agreement.

15          Now, you can have agreement by your actions or

16   whatever, but you have to agree to the racketeering activity.

17   You can have a legitimate business, but if it does racketeering

18   activities, such as drug trafficking or money laundering, which

19   are the two in here, then that's what you try to connect back

20   as to whether or not she was part of this, quote, enterprise

21   for racketeering.  Not that she worked there.  There are a lot

22   of people that worked at all these clinics.  They're not all

23   charged with or guilty of or looked at as part of a

24   racketeering clause.

25          Chris Tipton is not even charged with racketeering,

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    and he was one of the partners.  So you have to look at that

2    and say what proof is there that Mrs. Hofstetter was in

3    agreement with either the drug trafficking or the money

4    laundering?

5         And money laundering, you'll hear, is simply -- it's

6    not spending money and not making money.  You can make all the

7    money that you -- your heart's desire if you're doing it

8    legitimate.  It's the illegitimate money.  They have to prove

9    to you that it's illegitimate money that Mrs. Hofstetter had

10   and that she knew that this was illegitimate money.  This was

11   proceeds from some illegitimate activity.  Those are the

12   bedrocks of both of those charges.

13        So when you look at these charges, I'd ask for you to

14   really consider that, and that -- well, that's enough said

15   for -- I'm not going to tell you what the law is.  His Honor

16   will do that.  I just ask that you read that and keep in mind

17   those admonishments.

18        We heard a lot from lot of these witnesses.  Lee

19   Jenkins came in here, said she was tough, she really didn't --

20   they'd stay away from her.  They wouldn't go around her,

21   because she was hard.  When she walked into that building,

22   everybody, what did Mr. Orrick say, got right, settled down,

23   and it went like what you would expect, a medical practice to

24   go and look.

25        What did Brandon Ledford say?  He said that when

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    Puckett and Hill left, they -- it was a big change.  And that's

2    what everyone got on that witness stand and said about

3    Mrs. Hofstetter.  She wasn't fooling around.  She wasn't

4    buddy-buddy, palling around, other than what Ben Rodriguez says

5    about Florida.

6         Florida, that's one of these, quote, enterprises,

7    illegal.  Never closed down.  Was raided in 2010.  Nobody was

8    charged.  Out of that, they were charged up here, which were

9    the three owners and Ms. Hofstetter.

10        Nobody down there was charged as a pill mill.

11   Dalgleish, you saw the tape on Dalgleish.  They brought that

12   in.  Why did they bring that in?  Noise.  Why is it noise?

13   Because Mrs. Hofstetter was given a prescription by her doctor.

14        Ms. Hofstetter has no legal authority to go against

15   what the doctors order and don't order.  And you've heard

16   throughout this trial, that when an opiate patient gets a

17   prescription, even when they're being discharged, there was

18   nothing criminally or medically wrong with a decision.  That is

19   a discretionary decision made by that healthcare provider, not

20   by Mrs. Hofstetter.  The only exercise she exercised in that

21   is, she didn't like that guy.

22        And he said, "I kept pushing.  I kept pushing.  I

23   wanted those pills, I wanted them."

24        And she said, "You're not getting any pills from

25   here.  You can go on.  You go on."

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1      And he said, "I pushed and I pushed and I pushed."

2      And I still don't understand the zoo stuff.  I'm not

3  going in there.  But that's -- that's noise.  That whole thing

4  was noise.

5      So let's talk in the end here about the crux of this

6  case.  The case of -- against Mrs. Hofstetter is built around

7  two individuals, Chris Tipton and Ben Rodriguez.  Why do I say

8  that?  Because they're the only ones that came in here and told

9  you, oh, yeah, she knew that this was a, quote, pill mill.  She

10 knew that.  She -- that's where they're going with that.  Those

11 two individuals.

12     So in order for you to accept that Mrs. Hofstetter

13 knew that this was something other than a pain clinic, that she

14 saw it as a pain clinic, and that these three other ladies saw

15 as a pain clinic, Ben Rodriguez and Chris Tipton.

16     Oh, you get the noise of the parking lots and the

17 rooms were full.  Did you see any pictures throughout this

18 whole trial of a crowded room from an undercover agent or the

19 many hours of investigation and surveillance they did, did you

20 see one picture of crowded parking lots with needles and

21 diapers and all that sort of stuff?  Did you see that?  If you

22 did, I may have slipped out to use the restroom or something.

23 I didn't see it.  And I don't think you did either, because it

24 wasn't there.

25     What you did see is one undercover video during the

UNITED STATES DISTRICT COURT

1  time the office was open, and there were very few people in

2  there.  That was a random shot.  And you may hear more about

3  that.

4  Okay.  Chris Tipton.  What do we know about Chris

5  Tipton other than he's not very believable.  He testifies and

6  says things that make Chris look good.  But what do we know?

7  We do know that Chris Tipton was charged with various offenses.

8  Tipton was charged with drug trafficking conspiracy, just like

9  Ms. Hofstetter, just like these other defendants.

10  He was charged with money laundering conspiracies.

11  He was also charged with those anti-kickback charges where he

12  defrauded and stole from the government.  He says in his

13  testimony that he cost Medicare nearly $3 million for the money

14  that he received from confirmation and Sterling.

15  He also told us, when asked, did Mrs. Hofstetter have

16  anything to do with that scheme, he said, no, she didn't know

17  about it.  Now, he did let the Italians in on the Sterling Lab,

18  because he was -- he was worried that they'd come after him if

19  they thought he had done something wrong.

20  One more noise, and I'll stay with Tipton.  Just

21  thought about it.  I just forgot to tell you about it.  Secret

22  clinic.  Secret clinic.  What does that mean?  It means that it

23  wasn't under the radar, it wasn't operating at nighttime and on

24  weekends and nobody knew about it.  What it means is they

25  didn't tell the Italians that they opened up another pain

UNITED STATES DISTRICT COURT

1    clinic.

2          And what's the problem with that?  What's the problem

3    with them opening up -- opening up another pain clinic?  Chris

4    Tipton testified that he opened up New Hope Clinic, which he

5    told on direct examination was a pill mill, which he wasn't

6    charged with.

7          We heard from Ben Rodriguez that he and Sartini or

8    Palma had a pill mill in Broward County that was open about

9    seven months, and he told us they had a Dr. Becker.  You

10   remember he mentioned Dr. Becker, Scott Becker, he was asked

11   that on direct examination by Mr. Stone.

12         Well, the authorities came and talked to Mr. Becker,

13   Dr. Becker, told him he was going to lose his license.  And

14   then they talked to the owners of the facility, the partners

15   that had the facility where the clinic was, and they closed

16   that sucker down.  We later found out on direct examination

17   by -- questions by Mr. Stone that Dr. Becker went to the

18   federal penitentiary for five years for prescribing opiates in

19   this -- in a pill mill.  And I can only imagine that that's the

20   pill mill.  Was Ben ever charged with that?  No.  No.

21         So we know that other people had clinics.  So this

22   clinic wasn't, quote, secret, other than the issue of the

23   question about not telling the Italians.

24         Chris Tipton told us that he made $366,000.  That's

25   rounded.  It's 366,877 from Confirmatrix in that short period

Continued Closing Argument - Mr. Burks

1    of time.  But to beat that, he made $1,109,875 from Sterling

2    Labs, the labs they were sending these patients to, because

3    Dr. Valley put down in the protocol all patients must be drug

4    tested.  And so Chris Tipton took advantage of that situation

5    and became rich off of that, among other things that he was up

6    to.

7              Now, that's the kind of person that the government

8    has been using to try to throw Mrs. Hofstetter under the bus.

9              What else do we know about Chris?  Chris testified

10   that, oh, yeah, when asked on direct examination, "Yes, this

11   was a pill mill.  This was a pill mill.  We all knew it was a

12   pill mill."

13             But when you look at what he actually said, early on

14   when he was -- do you remember when he said he saw some

15   undercover cars and got all nervous after the clinic opened, so

16   he got on the phone to his buddy Mark Weaver.  You remember

17   Mark was the guy that worked for the sheriff's department who

18   later he talked to, and you-all heard that conversation.  But

19   this is early on.  And Officer Weaver says, "Well, Chris, have

20   you done anything wrong?  If you're not doing anything wrong,

21   don't worry about it."

22             Chris says, "No, I wasn't doing anything, didn't do

23   anything wrong."

24             And I asked him about that on cross-examination.  I

25   asked him, "Is that true?"

UNITED STATES DISTRICT COURT

1    Said, "Yes.  I didn't think we were doing anything

2  wrong."

3    Now, that's the same guy that's saying this was set

4  up to be a pill mill.  Why is he saying it was set up to be a

5  pill mill, because that's how he throws --

6    I'm sorry.

7    THE COURT:  I'm going to interrupt.  We've had a

8  request for a break.

9    MR. BURKS:  Oh, absolutely.

10    THE COURT:  If that's okay.  We'll excuse the jury --

11    MR. BURKS:  Sure.

12    THE COURT:  -- for a break.

13    (Jury out at 9:46 a.m.)

14    THE COURT:  Just a moment.  I didn't mean to

15  interrupt your flow, Mr. Burks, but I got a message that one of

16  the jurors needed a break at that moment.  So we'll let you

17  finish up.

18    Sit down just a moment.  Let me go ahead and address

19  the defendant's motion to declare a mistrial.  Yesterday,

20  Defendant Clemons, joined by Defendants Hofstetter, Newman, and

21  Womack move the Court to declare a mistrial on the basis of

22  prosecutorial misconduct.

23    Defendants argued that a remark the government made

24  during closing argument violated their Fifth Amendment

25  privilege against self-incrimination by commenting on

UNITED STATES DISTRICT COURT

1   defendants' decision not to testify.

2           The statement at issue is, quote, guilt you never

3   heard about from these three defendants, closed quote.  And

4   that quote appeared in the following broader context, this

5   coming from the daily transcript, quote, I want you to think

6   about the raw emotions you saw, especially from Ms. Fristoe,

7   when she talked about working at these places years after the

8   fact.  You can tell with Ms. Fristoe, she felt the emotion of

9   being a small part in perpetuating these places.  Guilt you

10  never heard about from these defendants, closed quote.

11          The government opposes defendants' motion and argues

12  it did not intend to comment on defendants' choice not to

13  testify, and in fact, the government contends it did not do so

14  when the quote is viewed in context.

15          The Sixth Circuit has held that the prosecutor's

16  comments, quoting from the U.S. v. Robinson, Sixth Circuit,

17  1981 case, may not have the effect of shifting the burden of

18  proof from the government to the defendants or abrogating the

19  presumption of innocence to which defendants are entitled.

20          The Sixth Circuit, this coming from U.S. v. Wimbley,

21  2009 case, Sixth Circuit applies a two-step analysis in

22  determining whether prosecutorial misconduct has occurred.

23          Again, quoting or paraphrasing from the Wimbley case,

24  first, a court determines whether a statement by the prosecutor

25  was improper, and second, if the statement was improper, a

Continued Closing Argument - Mr. Burks

1    court must next decide whether the statement was so flagrant as

2    to warrant reversal.

3              Looking back at the Robinson case again, it was

4    helpful to the Court to review that case.  And the Sixth

5    Circuit states in more particularity, when a prosecutor is

6    alleged to have commented on a defendant's failure to testify,

7    again, I'm quoting from the Robinson case here, which quotes

8    from other cases, to reverse a conviction for improper comment

9    on the criminal defendant's Fifth Amendment right to remain

10   silent, we must find one of two things, that the prosecutor's

11   manifest intention was to comment upon the accused's failure to

12   testify or that the remark was of such a character that the

13   jury would naturally and necessarily take it to be a comment on

14   the failure of the accused to testify.

15             With that, with those legal contours in mind, and

16   having reviewed the statement and considered the arguments, the

17   Court would find that in this case, the context of the

18   government's statement makes clear that it was not improper,

19   because it did not represent an intent by the government to

20   shift the burden of proof or abrogate the presumption of

21   innocence, rather the comment at issue appeared in the context

22   of the government's discussion of two temporary practitioners

23   at the clinics who, per the government's argument, quote,

24   refused to be deliberately ignorant, closed quote, and

25   regretted working at the clinics for even a brief period.

UNITED STATES DISTRICT COURT

1          Thus, in context, it appears the government was

2    drawing a contrast between the fact that those individuals

3    acted on their knowledge of the allegedly illegal nature of the

4    clinic's activities and the alleged deliberate ignorance of the

5    nurse practitioner defendants.

6          The use of the word, quote, about, closed quote,

7    underlines that in context the government was referring to

8    general testimony about the nurse practitioner defendants'

9    apparent lack of guilt, that is deliberate ignorance, given

10   that they stayed at the clinics not to defendants' decision not

11   to testify about their guilt or lack thereof.

12         Similarly, the Court would find that the government

13   did not demonstrate the manifest intent of commenting on

14   defendant's failure to testify, nor was the remark of such a

15   character that the jury would naturally and necessarily take it

16   to be a comment on the failure of defendants to testify.

17         The statement at issue was brief, made in the context

18   of discussing deliberate ignorance, and did not use words

19   directly or indirectly alluding to testimony by any of the

20   defendants.

21         Thus, the Court finds the government's remark was not

22   improper.  And assuming arguendo, even that the statement was

23   improper in any aspect, the Court would further find that it

24   was not, quote, so flagrant as to warrant, closed quote,

25   declaration of a mistrial.

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    And further in that regard, the Court would also note

2  that both in its opening instruction to the jury and in the

3  upcoming charge to the jury, the Court has instructed and will

4  again instruct the jury that the fact that the defendants did

5  not testify cannot be considered in any way and is not to be

6  discussed in deliberations.

7    So for all these reasons, the Court will deny

8  defendants' motion to declare a mistrial.

9    Let's go ahead and take a ten-minute recess until

10 ten.

11    MR. REAGAN:  Judge, if I could ask, the U.S. v.

12 Robinson, did you say that was 1981?  From 1981?

13    THE COURT:  Yes.

14    MR. REAGAN:  Okay.  Thank you.

15    THE COURT:  The Wimbley case was 2009.

16    MR. REAGAN:  All right.  Thank you.

17    THE COURT:  All right.  We'll take a short recess

18 till about ten, and then we'll finish up Mr. Burks and go on

19 into Mr. Oldham.  Thank you.

20    THE COURTROOM DEPUTY:  This honorable court stands in

21 recess until ten o'clock.

22    (Recess from 9:52 a.m. to 10:03 a.m.)

23    THE COURTROOM DEPUTY:  This honorable court is again

24 in session.

25    THE COURT:  Ready.

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    (Jury in at 10:03 a.m.)

2         THE COURT:  Thank you.  Please be seated.

3         Go ahead, Mr. Burks.

4         MR. BURKS:  Thank you, Your Honor.

5         As you remember, after this clinic was raided,

6    Mr. Tipton called and talked with his buddy Mark Weaver, or

7    Webber, excuse me, or Weaver.  Maybe it's one of the other.

8         MR. STONE:  Webber.

9         MR. BURKS:  Yeah.  All right.  We've agreed, Mark

10   Webber.  And, of course, we know Mark Webber was recording

11   this, because he was working for the FBI, along with his wife,

12   that was planted in Chris Tipton's office.  They were onto

13   Chris Tipton.  They knew what he was up to with all of his

14   Leverage stuff and being investigated.

15        You know, Chris, when he told us about being

16   interviewed by the inspector general, they start talking about

17   this anti-kickback situation, and you remember what he said

18   was, "Well, I sort of thought it was the gray area."  Never

19   would really kind of own up on that, but it was the gray area.

20   He still wasn't owning up after the clinic had closed and after

21   he was, quote, cooperating, he still called it a gray area,

22   because our lawyers did the nominating agreement.  So that

23   really didn't mean that I owned it.  That's what he was telling

24   the inspector general.  He still wasn't buying into his deal.

25   But he eventually came around.

UNITED STATES DISTRICT COURT

1    But when he talked to Webber, he said a couple of

2  important things.  Like I just -- you once preached to me,

3  remember when he preached to him was when he called him the

4  first time when he told him he wasn't doing anything wrong.

5    He said, "I'll be as cooperative as you want me to

6  be.  The problem's going to be what am I going to tell them?

7  That's the part I don't get, because if I was -- I was doing

8  something wrong or if I felt my counterparts were doing

9  something wrong, guess what, I would tell you in a second.  But

10  that's the thing, I don't know anything that's wrong."

11    He doesn't know anything that's wrong with

12  Mrs. Hofstetter after it was raided because he had no proof

13  that she was involved in anything illegal regarding this

14  clinic.  He knew Stephanie Puckett by that time was doing

15  something, because he and his buddy, Kevin Faulkner, talked

16  about.

17    That's Chris Tipton.  Chris Tipton signed a plea

18  agreement and a supplemental agreement, and you saw that.  We

19  put it up on the screen.  And it simply says, it's a contract,

20  and it's a quid pro quo contract.  If you do something for us

21  and provide us with this substantial assistance that we need

22  for Mrs. Hofstetter to convict, then we're going to do

23  something for you.  And that is, we're going to give you your

24  5K motion and get your sentence way down, even though you

25  negotiated away from the drug trafficking and everything else.

Continued Closing Argument - Mr. Burks

1   That's the deal that -- that Mr. Rodriguez and Mr. Tipton had.

2   That's their contract.  You do something for us, and we'll do

3   something for you.

4           And something for Ben and Mr. Tipton had to do was

5   throw Sylvia Hofstetter under the bus.  And they had to do it

6   by saying, well, you know, Ben pled to RICO statute.  He pled

7   to no money laundering, no drug trafficking, no overdose

8   deaths, just something that carried zero to 20, which gives him

9   great leverage if he performs.  And performing is throwing

10  Mrs. Hofstetter under the bus.  That's what he was doing.

11  That's what he did do or he tried to do.

12          But one of the things about Ben, there are many

13  things about Ben, two things I'm going to mention, and I'm

14  going to quit with Ben, because you-all heard enough from Ben

15  Rodriguez, surely.  You know, the girl-on-girl thing, that's

16  that feminine thing, I don't do that, I don't praise?  But in

17  fact, when he sent the e-mail to -- to Mrs. Hofstetter back

18  when she was responding to him, in that e-mail, do you remember

19  what he said?  "I don't do that stuff.  I got a great wife.

20  She sends all of my messages back to make it sound much better,

21  because I don't praise."

22          So when you look at that e-mail, Exhibit 546, and it

23  will go back with you, y'all can look at that, his explanation

24  to the e-mail was, "Girl-on-girl, that's more of a feminine way

25  of telling somebody good job or praising.  I don't do that.

UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1    I'm -- it's not my character to do that.  I'm more of an

2    obnoxious person.  I talk on the phone when I'm driving.

3    Nicole writes my e-mails."

4            Well, this e-mail was in 2011, July the 15th, 2011.

5    We know, according to what he says, where was Nicole at that

6    time?  Was she still working at the clinic?  No.  Remember, she

7    was fired.  She was fired.

8            This e-mail got -- went out from Mrs. Hofstetter at

9    3:39.  Ben responds three minutes later.  By the time he got

10   it, by the time he looked at it, he responded to it.

11           That's not Nicole.  He's during the day.  It's a

12   Friday.  It's a workday.  And what does he say?  That's the

13   important thing.  He says about her work at these clinics,

14   "Great to have you managing these things."  Now, he could have

15   stopped right there.  But he said, "The right way."

16           Doing it right, Mrs. Hofstetter.  You're doing it

17   right.  That's what Ben Rodriguez wrote when he didn't think

18   about having to come into court and tell a jury that all this

19   was was pill mill stuff and pill mill this.  That's what he

20   wrote.

21           And not only that, on cross-examination, every time

22   Mr. Stone asked him questions, Mr. Rodriguez knew where he

23   needed to go with that answer, "Oh, yeah, that was pill mill."

24           "What was Sylvia's role?"

25           "Well, she was here to open the clinic and do the

UNITED STATES DISTRICT COURT

1    paper and do that."

2         "What about the pill mill?"

3         "Yeah.  She knew all about the pill mill.  She was in

4    agreement with the pill mill when we had our meetings back in

5    Florida."

6         Well, that couldn't have been, because she wasn't on

7    the radar.  Claudia Mulberry was on the radar when they were

8    having their meetings setting up to talk about coming and

9    opening up pain clinics in Tennessee.  She wasn't even there.

10   She wasn't a part of it.  That's just him performing to try to

11   put her under the bus.

12        But on cross-examination, I asked Mr. Rodriguez, I

13   said, "Mr. Rodriguez, was there -- were these clinics to be

14   legal or illegal in Tennessee?"

15        And his response shouts volumes.  He said there was

16   nothing illegal to be done in Tennessee.  We were opening up a

17   pain clinic and adding personal injury.

18        Remember what he said about the pain clinic in

19   Florida?  They wanted to have the pain clinic and then have

20   personal injury, you know, that $10,000 where they were getting

21   the money coming off?  That wasn't the goal.  It wasn't to open

22   up pill mills here.  It wasn't -- that wasn't the goal.

23        That whole thing comes in when they get caught with

24   all this other stuff.  What other stuff?  He had the other pill

25   mill that the doctor went to the -- to the federal

                    UNITED STATES DISTRICT COURT

Continued Closing Argument - Mr. Burks

1  penitentiary.  He had that as a pill mill.

2       This Hollywood clinic, he says, "Oh, yeah, now, I'm

3  saying it's a pill mill."

4       What did he tell us?  "Why did you stay on after the

5  raid?"

6       "I wanted to be able to give my daughters this

7  business."

8       You're going to give you daughters a pill mill?

9  Well, no.  You're going to give them a pain clinic.  That's

10  what he was saying, I was doing all this for my daughters.  Was

11  his goal a pain clinic to give to his daughters or after the

12  fact when he gets called into all this other stuff?

13       And, remember, he talked about the kickbacks, told

14  the FBI in the 302, yeah, there were kickback issues.  He had

15  all kinds of issues.  He was with the Italians.  They had all

16  kinds of issues.  But it wasn't with Mrs. Hofstetter, and it

17  wasn't with what she had been doing.

18       Ladies and gentlemen of the jury, in order for you to

19  find my client guilty beyond a reasonable doubt, you're going

20  to have to buy what Chris Tipton and Ben Rodriguez say, you got

21  to take it hook, line, and sinker.  That's their contract.

22       And, quite frankly, it's their con.  These are con

23  men.  They've always been con men.  Not just this clinic.  Look

24  at Tipton.  He was conning -- you remember that chart I had

25  with all of those clinics that he was getting off the top?  And

UNITED STATES DISTRICT COURT

1    you'll take that back.  That's an exhibit.  I'm not going to

2    spend time on that.

3            Well, I take my word back.  I'll lay it down as I

4    talk.  That's Chris Tipton.  Now, if that's not a con, I don't

5    know what a con is.  That's the man right here that the

6    government says you must believe in order to convict

7    Mrs. Hofstetter.

8            I wouldn't buy a used car from this guy.  Dr. Valley,

9    do you remember we talked about him?  He sucked him in.  He

10   thought Chris Tipton had the money.  He was going to make me go

11   for good.  Hook my wagon to the star, Chris Tipton.  And what

12   happened?  The scorpion stung him.  Tipton was the scorpion.

13           He's the one that the government tells you you'll

14   have to consider in their proof.  Now, they may not argue that

15   now after these guys got off the stand.  But in their proof of

16   this case, that's their proof.  That's their contract.

17           I'm going to tell you that I don't think that these

18   lawyers have done anything wrong or would do anything wrong in

19   this case.  They had to take the hand they were dealt, which

20   was Ben Rodriguez, Chris Tipton, and all of these other people

21   that you saw come in here.

22           As we told you in the beginning of this trial,

23   they'll march all these people in here, but you're going to

24   hear the same thing.

25           Those are the last lenses, is the cons.  They saw it

Continued Closing Argument - Mr. Burks

1   through how they can get out from under their penalty.  They'll

2   do anything and everything.  We know they'll do anything and

3   everything, because they'd already done it.  And they've

4   admitted they're guilty.

5        But they come in here to try to be sheep, but they're

6   really a wolf in sheep's clothing.  They're cons.  And in order

7   for them to be able to complete the con, there's one last con

8   they've got to do, and that's you.  They've got to con you.

9   You've got to buy their con.  If you buy their con, then

10  they're complete.  They're going to get their 5K.  They're

11  going home.

12       The question I have for you is, are you going to buy

13  their con?  Are you going to lower the level of justice to

14  accept that kind of testimony?  Reasonable doubt is the key in

15  this whole case.  Reasonable doubt, I would venture to say and

16  tell you that it is the most difficult decision one has to

17  make.

18       The Court will charge you with that.  But I would

19  further say that reasonable doubt should be a standard to where

20  you have to be convinced in your mind that these defendants and

21  Mrs. Hofstetter are guilty.  You have to be able to let your

22  mind rest easy on the certainty of guilt.  That's what should

23  be your level of justice, letting your mind rest easy on

24  certainty of guilt.

25       What does that mean?  That means if y'all finish this

UNITED STATES DISTRICT COURT

1    trial, and if you find one or more of the defendants guilty --

2    and I'll use Mrs. Hofstetter. You go home, you're tired,

3    you've had this thing for months, and you sit down and you

4    start talking. Now, you can talk to somebody about the case,

5    where you couldn't during this time.

6              "Well, tell me about the case."

7              Well, you start telling them. You tell them about

8    all the noise that you heard that had to be, all this money,

9    all these pills.

10             Well, we know that the -- the money, you can make

11   money in medical practices. There's nothing illegal about

12   that. All right. We'll not make that an issue. But it's this

13   opiate crisis. It's this horrible thing.

14             And your partner says, "Well, you know, it sounds

15   like you did a pretty good job. You ought to be proud of

16   yourself."

17             You're tired. You go and get ready for bed. You lay

18   your head down on your pillow, and you shut your eyes, but you

19   can't go to sleep. You can't go to sleep because you start

20   thinking, but what about -- what about the fact that these

21   ladies, Puckett, Hill, and Newman, were really the ones that

22   were doing all of the dastardly deeds in this clinic? It

23   wasn't Mrs. Hofstetter, and it wasn't these nurse

24   practitioners.

25             They -- they did with what they could, and you heard

UNITED STATES DISTRICT COURT

1   the experts.  They practiced medicine.  I convicted them as

2   drug dealers.  I'm not so sure they were drug dealers.  They

3   made mistakes.  They weren't doing the best job.  They weren't

4   standard of care.  But were they drug dealers?  Because that's

5   what the government told me that they were.

6           And you start thinking about Tipton and Rodriguez,

7   the e-mails, the inconsistencies of what they say.  And before

8   long, you can't go to sleep.  Why?  Because your mind cannot

9   rest easy on the certainty of the guilt.

10          Ladies and gentlemen of the jury, that's a reasonable

11  doubt.  That's what reasonable doubt is about.  And I'd ask

12  you, after hearing all this proof, to come back and find these

13  defendants not guilty.  There are reasonable doubts, not just

14  one, but many.

15          Mrs. Hofstetter was doing all this investigation.

16  She wasn't turning a blind eye or being deliberately ignorant

17  about that.  She was trying to figure out what was going on.

18  She didn't know.  She didn't know about Tipton.  Didn't know.

19  Nobody told her.  They hid it from her.  Why did they hide it

20  from her if it was a pill mill?  Who cared?  Why would they

21  have all those discharges if it was a pill mill?  Who cares?

22          THE COURTROOM DEPUTY:  Three minutes.

23          MR. BURKS:  She did.  I'll take it.  Thank you.  I

24  won't use all three minutes.

25          Because I submit that when you ultimately listen to

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1  the charge of this jury, and you think about all this evidence,

2  and you think about Mr. Tipton, Mr. Rodriguez, all these other

3  people who really do not point a finger at Mrs. Hofstetter

4  about doing anything illegal, or even point the finger that she

5  even knew things were going on in this clinic that were

6  illegal, but not under her tutelage, not under her management

7  and not under her authority, that does not make you guilty.

8        So thank you for your time.  I just simply ask you to

9  consider all that you've heard, and if your mind doesn't rest

10  easy on this most difficult decision, that's reasonable doubt.

11        Thank you.

12        THE COURT:  Thank you, Mr. Burks and Ms. Cravens, for

13  your closing argument on behalf of the defendant,

14  Ms. Hofstetter.

15        Now, we turn to Mr. Oldham for closing argument on

16  behalf of the defendant, Mr. Courtney Newman.

17        MR. OLDHAM:  Good morning.  I'm glad I got you in the

18  morning.  I was afraid I was going to get you in the afternoon.

19  Late yesterday afternoon, we were all nodding off.  I was about

20  to fall asleep.  This trial has sort of been like that.  We've

21  had exciting mornings and dull afternoons sometimes.

22        So like Mr. Burks, like Mr. Reagan, like Mr. Whitt, I

23  appreciate the fact that y'all have paid attention.  I've

24  watched you from over there, and you have been attentive.  I've

25  seen you take notes.  I've seen you follow the questions.  I've

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    seen you look from here into the witness, as trying to find out

2    what's going on.  And I appreciate that you're doing this.

3            I always tell people that serving on a jury is one of

4    the most magnificent things that you can ever do.  I'm a

5    lawyer.  People will not put me on a jury.  They will not.

6    I've been called for jury duty a couple of times.  And

7    everybody looks at me, like, well, you know, he's friends with

8    so-and-so or he's going to do this.

9            And I think I would be the best juror whatsoever,

10   because I think I could really put everything aside and

11   actually listen to the story.  Because that's what I've done

12   all my life.  For the past 30 years, that's what I've done, is

13   I've put everything aside and listened to the story of my

14   client.  And, see, you know, is this a case I can take to a

15   jury and put it in front of a jury and make the jury believe

16   the facts that my client has asserted to me.

17           So that's what I've done for these past 30 years is

18   listen and then tried to apply the law and then tried to tell

19   it to people like you.

20           I just wish I had the chance one time.  I wish I had

21   the chance go back in that room and hear what y'all have to say

22   and hear what y'all have to talk about.  I think it would be

23   fascinating.  So that said, I appreciate what you've done.

24           And I think I want to go back to when I first started

25   this case with you.  I think the very first thing out of my

UNITED STATES DISTRICT COURT

 1    mouth was I told you that I can become passionate, and I can

 2    start talking fast.  And what I would like for you to do --

 3    I've already asked Ms. Lockwood to do this, if I get going

 4    fast, say something, because it's important that you hear these

 5    things.

 6         It's just as important that you heard my first words

 7    three months ago, as you've heard my last words today.  Because

 8    people's lives are on the line, and they're in your hand.  It's

 9    a sacred duty you have.  And I want you to make sure that you

10    have every bit of information available to carry out that duty.

11         Now, another thing, I'm going to ask your permission,

12    I really would like to move over to this podium over here.

13    It's got a little more room to spread out, and I ask you, is

14    that okay with y'all?

15         THE JURY PANEL:  Sure.

16         MR. OLDHAM:  Okay.  I appreciate that.  And just to

17    stay on track, I've written mine down.  My mother always told

18    me I should do that, and finally, after all this time, I took

19    her advice.

20         THE COURT:  Mr. Oldham, why don't you pull those

21    microphones in?

22         MR. OLDHAM:  Okay.

23         THE COURT:  Great.

24         MR. OLDHAM:  I can do that.  Can everybody hear me?

25    Can you hear me?

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    As you know, I represent Courtney Newman.  We're

2  stuck back over in that corner back there, so we've sort of

3  been out of sight throughout this whole trial.

4    You haven't had much reason to seek her out.  Like I

5  say, we're sort of in that corner.  And I really haven't felt

6  much need to get up a lot.  And if I don't have anything

7  important to say, then I've tried not to waste your time by

8  saying these things.

9    So you've seen me when I thought it was important.

10  And it's important now to talk about why Ms. Newman is not

11  guilty of these charges and why you must vote to find her not

12  guilty at the conclusion of these deliberations.

13    Courtney Newman is a mother of three children, two

14  teenagers living with her and another married and away from

15  home.  She's a nurse who loved her profession.  She got her

16  master's degree from the University of Tennessee in 1999 and

17  was soon licensed as a nurse practitioner.

18    After she was licensed, Ms. Newman started working in

19  underserved, rural communities in women's health and prenatal

20  care.  At the same time, Ms. Newman worked part-time at the UT

21  Hospital in the oncology unit treating cancer patients.  In her

22  spare time, she taught nursing courses at South College, LMU

23  School of Nursing, and Walter State Community College.

24    After working in these fields for about 12 years,

25  Ms. Newman transitioned into pain management.  The reason she

UNITED STATES DISTRICT COURT

1    did was because it had more predictable daytime hours, no night
2    shifts, no weekend shifts.  And it allowed her to spend time
3    with her children.
4          Ms. Newman started working the Lovell Road clinic in
5    October 2013.  And it was close to home, and she had Fridays
6    off.  The job paid well enough.  I think you've heard testimony
7    that $65 an hour is about an average for nurse practitioners in
8    this community.  And she could make that with any other
9    employer that she went to.  But once again, the -- the hours
10   were good, the hours were what she wanted.
11         But as other people have mentioned, the job didn't
12   have benefits.  It didn't have paid time off, medical
13   insurance, or anything like that.  Now, she worked at Lovell
14   Road until March 2014.  She was there for a total of 86 working
15   days, a little under five months, until she left the clinic for
16   a job with benefits.  That's why she left is that -- if you
17   recall in her personnel file, there was an e-mail from her
18   saying, "I'm leaving, and I'm leaving to take a job with
19   benefits."
20         Now, as you heard from Darren McCoy, treating people
21   in pain management can be extremely rewarding, as you get to
22   help people in pain get back to living their lives.  You've
23   heard testimony that pain management doesn't cure the issues
24   causing the pain, but it allows the patients to deal with their
25   issues and live better on a daily basis and hopefully have more

Closing Argument - Mr. Oldham

1    productive lives.

2          It can be a very emotionally satisfying line of work.

3    Courtney Newman worked at Lovell Road because she wanted to

4    help those people coming in seeking relief from their pain.

5          Now, instinctively, you know that Courtney Newman did

6    not commit the crimes she's charged with. You know that

7    instinctively.

8          Later on, the judge is going to give you some

9    guidance on your deliberations. But to be found guilty of

10   these crimes there must be an intent to have committed them.

11         In other words, Courtney Newman can't be convicted if

12   she simply mistakenly, negligently, or even foolishly did some

13   of the acts that she's been charged with. To be convicted of

14   these crimes, Ms. Newman must have known what she was doing was

15   illegal, and proceeded to do those acts with the intent to

16   break the law. That's the standard.

17         So let's talk about that. When this trial started,

18   remember that I told you the story about the car mechanic

19   working in a dealership, and that there were a couple of people

20   in the parts department who were -- had a little scam going to

21   make some money on the side. I'm sure it didn't take you long

22   in this trial to figure out that I was talking about Stephanie

23   Puckett and Shannon Hill.

24         Now, instinctively, we know the mechanic in the story

25   didn't do anything wrong. And, equally, we know that Courtney

UNITED STATES DISTRICT COURT

1   Newman didn't do anything wrong.

2           But the government is attempting to punish Ms. Newman

3   for the bad acts of Stephanie Puckett and Shannon Hill, and we

4   cannot let that happen.

5           In my opening statement, I asked you to keep in mind

6   four things as we went through the trial.  I hope you'll

7   remember those.  I made a point about that.  I want to revisit

8   those things that I think you now have the information

9   necessary to answer those questions.

10          The first thing I asked you to think about, who are

11  the bad guys in the story we've heard throughout the trial?

12  Well, obviously, Stephanie Puckett and Shannon Hill were the

13  major bad guys in this.  They were running a scam, and it was

14  all about enriching themselves.

15          But it was more than that.  Below them were sponsors

16  who were not only paying Stephanie and Shannon bribes, but they

17  were paying for the office visits of patients in exchange for

18  some of the patients' medications.  Some of the bad patients

19  themselves paid Stephanie and Shannon directly to help cover up

20  bad drug screens and jump to the head of the line so that they

21  wouldn't have to wait to see providers like other patients.

22          All of these people abused the trust that the

23  providers placed in them.  Remember we've had lots of testimony

24  about the trust, the bond between patient and provider.  What I

25  tell you is what the provider relies on to give the treatment.

1      By Stephanie and Shannon's deceit, the providers were

2 prevented from seeing information that would allow them to

3 offer the proper treatments to the patients which likely would

4 have involved discharging some of them had they been able to

5 see the accurate drug screens and other information.  They even

6 admitted that they knew that their actions would put patients

7 in jeopardy by withholding the information.

8      We can look at the testimony here from Stephanie

9 Puckett.

10      "So, okay, if it had gotten back to a provider and

11 they had relied on that fake radiology report for their

12 treatment, they relied on you for that?"

13      "Yes, they did."

14      So if a provider was looking at a fake MRI that

15 Stephanie Puckett had provided that said that she had checked

16 it out, that might put the patient in jeopardy, because they

17 might be getting some treatment that might be inaccurate for

18 them, because Stephanie Puckett put fake information in the

19 files.

20      To a person, they all testified that they knew this,

21 each of these bad patients knew that absent the bribes they

22 paid to Stephanie and Shannon and the lies they told the

23 providers, they would have discharged -- been discharged from

24 the clinics.

25      I think every single one of them told you, every

UNITED STATES DISTRICT COURT

1    single patient that got up there told you, if I had not lied,

2    if I had not misled the provider, I knew, one, I wouldn't get

3    the medication I was getting, and I might be kicked out of the

4    clinic, because my drug screen, if it wasn't covered up, would

5    show that I might -- either might not be taking the drugs, or I

6    might have other drugs in my system.  That's what every single

7    one of them talked about.

8         Shannon Hill came in and she said, you knew that the

9    providers relied on that to a large degree in order to provide

10   proper care?  Yes, she said, I did.

11        And if they took their prescribed drugs with

12   something else that providers didn't know about, that can cause

13   problems, couldn't it?  Yes, it could.

14        So that was Stephanie and Shannon's con.  But there's

15   one thing I'd ask you to consider about these patients.  They

16   all came into the clinic and they lied.  There's no question

17   that they lied.  They sat up on the stand and told you that

18   they lied.

19        These people that the government put on the stand

20   were professional con men, and Mr. Burks talked a little bit

21   about con men.  They're called con men.  Con men is short for

22   confidence men.  They gain your confidence.  They gain your

23   trust.  That's what they do.

24        And these are people that were good at it.  They were

25   good on the stand.  Several of them, the people that you wanted

UNITED STATES DISTRICT COURT

1   to believe, but you knew the character of the people they are.

2   But all these people, every single one of these people came

3   into the clinics with legitimate pain complaints. I don't

4   think that we heard from a single patient that sat up on that

5   stand that said, "I didn't have any pain whatsoever." They all

6   had pain.

7          And they all had, for the most part, except for the

8   ones that Stephanie provided fake MRIs for, they all had

9   radiology reports to back it up. So not only did they have

10  legitimate complaints of pain, they had radiology reports from

11  somebody, some professional that had taken an MRI of their

12  affected body part, written down the information and said,

13  here's what is the pain generator in this case.

14         Now, the only thing they really had to lie about in

15  most of these cases was the level of the pain that they were

16  experiencing and whether the medications were helping them or

17  not.

18         You saw one of them -- you saw them up on the stand

19  and all of them were believable. The one that really jumped

20  out at me, and I thought about it throughout this entire trial,

21  Lisa Elliott. And we all remember Lisa Elliott. She was a

22  very affable, young woman, very believable. You can see why

23  when she went into see a provider and she talked to that

24  provider why they would believe her. She was very believable.

25  But it was a con game for her.

Closing Argument - Mr. Oldham

1          But that's what con men do.  They're believable.

2     They bring you into their trust, and then they take advantage

3     of that trust.  And that's what happened here.  But they're all

4     con men.  And for you to put someone in jail based upon the

5     testimony of con men, that's just not how we do it.

6          Let's be clear about something else.  Not everyone

7     who came into the clinic came in for bad purposes.  Let's think

8     about the whole universe here.  There were only about a hundred

9     patients or so that were involved in Stephanie and Shannon's

10    scam, about a hundred.

11         Stephanie, I think, testified that there would be one

12    or two a day that would come in there.  So it wasn't a lot, and

13    they could fly under the radar, and they could still make the

14    money that they wanted.

15         But even when you consider that there were about

16    2,000 people or so that were kicked out for breaking clinic

17    rules, that still leaves about 4,000 people that came to this

18    clinic and got treatment for some legitimate medical purpose

19    and it obviously helped them at some point.

20         Some of them came in for one or two visits, and they

21    either discovered that the opioid treatment wasn't for them or

22    they came in for a few visits, opioid treatment helped, and

23    they just eventually got better.

24         And we know that at the end of the clinic's life --

25    life span, there were about 500 patients that were coming to

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    the clinics on a monthly basis.  So we know that of 4,000

2    people, they all came in and left for different reasons.  But

3    we know that they came in there and they got help.  They

4    weren't taking advantage of the system.  They were being

5    treated for their conditions.

6          So another question that I asked you to consider, and

7    I think it's a big one, and you've heard the names now, where

8    are the other providers in this story?

9          Throughout the trial, you've heard testimony about

10   the other providers who worked at these clinics, despite

11   sometimes the best efforts of the government to keep you from

12   hearing about them.  You've heard the names of Lindsay

13   Stubblefield, Stephanie Carmichael, Stephanie Snowden, Holly

14   Harrell, Alicia Payne, Amber Burns, and others.  These

15   providers were not charged like the providers here.  And the

16   Court will tell you that you shouldn't consider the guilt or

17   innocence of other people or even if the other people should

18   have been charged.  And that's correct.

19         But what you can consider is that these providers

20   were the peers and coworkers of Courtney Newman and the other

21   providers.  Now, anybody who's ever worked a job where there

22   are multiple employees, and I suspect that's most of us, has

23   looked to their coworkers to ensure they were working in

24   accordance with company procedures.  You either looked at what

25   your coworkers have done before or you've gone to them seeking

UNITED STATES DISTRICT COURT

1    guidance about how a task has been done in the past.  That's

2    just common sense.

3         And anyone who's ever had a job has done exactly the

4    same thing.  That's what happened here.  In almost every

5    instance in this case, in the patient's charts, you saw

6    throughout this trial one or more of these providers had seen

7    the patient prior to Ms. Newman seeing that patient, and she

8    followed the same treatment plan that the prior providers had

9    done.

10        In almost every instance, one of these providers saw

11   the patient after Ms. Newman had seen them, and they followed

12   Ms. Newman's treatment plan.

13        That's the very essence of good faith, is the trust

14   that you have in the people that preceded you, seeing that

15   they've done something that Dr. Larson has signed off on it.

16   The providers that came after you saw what you did and saw that

17   Dr. Larson signed off on it, and they did the same thing.

18   That's good faith.

19        Ms. Newman didn't come up with some wild treatment

20   regimen for these patients.  She followed the guidance of her

21   peers, people with the same education and experience as her,

22   nurse practitioners like Holly Harrell who had been there for

23   almost two years by the time Ms. Newman started working at

24   Lovell Road.

25        When Ms. Newman looked at the patient chart where

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    Holly Harrell had been provider, she could see the practices of

2    the clinic and that Dr. Larson had signed off on the treatment

3    plans.

4         Ms. Newman could see the information that Holly

5    Harrell had sought from a patient, and that by following the

6    lead of Ms. Harrell, she would be operating within the accepted

7    practices of this clinic.  There was no reason for Ms. Newman

8    to believe that Holly Harrell, an experienced nurse

9    practitioner, who also worked at Knoxville Orthopaedic Clinic,

10   was doing anything wrong, and apparently the government agreed

11   in that assessment.

12        Implicitly, you can conclude that the government

13   approved of the medical decisions of the other providers, and

14   you can consider that when determining whether the medical

15   decisions made by Courtney Newman were for legitimate medical

16   purposes and within the usual scope of professional practice.

17        If these other providers were acting in good faith in

18   their medical practice, you can reasonably conclude that

19   Ms. Newman was as well.

20        What about the rules that Ms. Newman was required to

21   follow when she was working at the clinic?  Early on, I told

22   you to be aware of the government trying to apply rules, laws,

23   regulations that are in place now, but weren't in place at the

24   time this clinic was open.

25        I knew they would try to do it.  I heard some of

UNITED STATES DISTRICT COURT

 1    their pretrial motions, and I knew they would do it.  With

 2    their very first witness, Stanley Jones, they were caught doing

 3    that very same thing.

 4            You'll recall that Stanley Jones, who used to be a

 5    DEA agent, but then he moved onto working for Walmart, tried to

 6    testify about some Center for Disease Control Guidelines and

 7    implied that they were in effect while Lovell Road was treating

 8    patients.

 9            Since that was more than three months ago, I doubt

10    you would remember his testimony.  But he was forced to concede

11    that the guidelines he was talking about didn't come about

12    until 2016, well over a year after the clinics had closed.

13            Similarly, Dr. Rett Blake tried to testify that the

14    Tennessee Chronic Pain Guidelines were in place when Ms. Newman

15    worked at the clinic, but had to back down when he was shown

16    that they weren't issued until September 29, 2014, almost six

17    months after Ms. Newman had left the clinic.

18            Dr. Blake also tried to testify that those same

19    guidelines contained language about dosage dealings, but he was

20    forced to back down when he had a chance to review the document

21    and found no such language.

22            Finally, the government tried to mislead you about

23    the Tennessee Intractable Pain Act, which was in place the

24    entire time the clinics were operating.

25            The government asked Dr. Blake if there was language

                    UNITED STATES DISTRICT COURT

1  that made a physician prescribed opioids to a patient.  That

2  was misleading.

3         The law did not require a physician to prescribe

4  opioids, but it did require a physician to inform a patient

5  that there were physicians who did prescribe opioids.  These

6  were the type of clinics, Lovell Road, Lenoir City, these were

7  the type of clinics that these doctors referred people to that

8  they sent them to, because they did offer that treatment.  And

9  since they did prescribe, they were obligated to follow the

10 law.  And they did follow the law.

11        We probably at times glossed over it, but the entire

12 law was placed into evidence as an exhibit.  What I'm going to

13 invite you to do is, if you don't think that that law has been

14 described clearly to you, pull it out of the exhibits and look

15 at it.  I think it will be helpful to review that in

16 determining certain facts in this case.

17        Now, the last thing I ask you to consider, and this

18 is sort of the big question, and everybody sort of talked about

19 this, what's the incentive for Ms. Newman to have committed the

20 crimes she's charged with?

21        Courtney Newman is a nurse practitioner.  A nurse

22 practitioner is like a registered nurse but has a master's

23 degree in nursing.  You heard testimony that Ms. Newman

24 received both her undergraduate and master's degree from

25 University of Tennessee.  A lot of work goes into getting a

1   nurse practitioner's license.  And it's not something you just

2   throw away on a whim.

3          You saw Ms. Newman's resume which showed that prior

4   to working in these clinics, she worked mostly in rural

5   communities, obstetrics, and prenatal care.  She worked at UT

6   Hospital in the oncology unit, and at times she worked as a

7   nursing instructor.

8          You heard testimony that Ms. Newman was hired as an

9   independent contractor at East Knoxville Healthcare.  You saw

10  her at times she -- showed she worked eight or nine hours a day

11  for $65 an hour.  She received no benefits, no paid vacation,

12  health insurance, and she had to pay withholding taxes and

13  Social Security taxes out of her earnings.  That was it.  There

14  were no bonuses, no incentives, nothing, it was $65 an hour,

15  less the taxes she had to pay herself.

16         Ms. Newman saw about -- on average about 24 patients

17  a day.  And why is that number important?  Because that's the

18  amount of patients that each and every one of the experts that

19  we had come in and testify said was an optimal patient volume.

20  I think every single one.  Nurse Carter said between 25 and 30.

21  Dr. Blake said he expected his nurse practitioners to see

22  somewhere between the mid 20s and 30 patients a day.

23         That was an optimal number.  It wasn't hundreds of

24  patients a day.  It was an average of 24 patients a day.  If

25  you take an eight-hour workday or a nine-hour workday, that's

Closing Argument - Mr. Oldham

1    around three patients an hour.  Sometimes a little less.

2           She wasn't being inundated -- inundated, covered up

3    in-patients.  Sometimes my Smith County High School learning is

4    not good enough for the words I want to spit out.

5           But she didn't get bonus for seeing more patients.

6    She didn't get money taken away from her if she saw fewer

7    patients.  She wasn't paid based on the amount of prescriptions

8    she wrote, and she wasn't punished when she discharged a

9    patient.  She was like most of us, she went in, she did her

10   job, and went home at night.

11          Stephanie Puckett and Shannon Hill both testified

12   that none of the providers was aware of the scam they were

13   running.  And Ms. Newman nor any other of the providers didn't

14   benefit from it in any way.

15          You remember Stephanie Puckett famously said, the

16   providers don't do anything wrong, and she was absolutely

17   correct about that.  And Ms. Newman worked at the clinic until

18   she left for a job with benefits.

19          There's absolutely no testimony that there was any

20   incentive, financial or otherwise, for Courtney Newman to have

21   committed any crime.  She came into work in the morning, did

22   her job, left work at the end of the day, period.

23          Now, the government tried to bring in some testimony

24   to paint Ms. Newman in a bad light, but that just blew up in

25   their face.  And I'm going to talk about that in a minute.

UNITED STATES DISTRICT COURT

1    But what I want you to ask yourself as you head into

2    your deliberations is, what did Ms. Newman have to gain by

3    committing any criminal act?  What did she have to gain?

4    We know that when people rob banks, they're hoping to

5    get money from the banks to enrich themselves.  We know that

6    when people kidnap people and ask for ransom, it's for money to

7    enrich themselves.  Ms. Newman was getting $65 an hour for the

8    eight hours, nine hours a day that she worked.  And there was

9    nothing that she could do to change that, seeing more patients,

10   seeing less patients, writing more prescriptions, writing less

11   prescriptions.  There was absolutely no incentive for her to do

12   anything other than her job.

13   What you have heard in these 35-odd days of testimony

14   is that there was no incentive for Ms. Newman or any of these

15   providers to put their livelihoods or freedom in jeopardy.

16   None.  There's been no testimony.

17   I've racked my brain to think about anything any

18   person on that stand got up and said which led me to believe

19   that there was some gain to be had by these providers for doing

20   anything illegal.  And there was nothing.  I didn't hear it.

21   You didn't hear it.  It's just not there.  And there was just

22   nothing, nothing that suggested she would do any act that would

23   put her freedom at risk.

24   Now, the judge will instruct you that the government

25   must prove -- the elements the government must prove to convict

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    the conspiracy or for the other charges in this case.

2          One of those elements is there had to have been an

3    agreement to join a conspiracy.  You have to agree to do it.

4    There's no testimony whatsoever that Ms. Newman agreed to join

5    a conspiracy or that she had any intent or incentive to commit

6    any crimes.  And it -- it simply doesn't make sense that

7    Ms. Newman would so.

8          What I think you've seen is the government's case

9    sort of amounts to throwing things up against the wall to see

10   what sticks.  Bad stories.  And nowhere was this more evident

11   than with Courtney Newman.

12         I've been working on this case for several years.

13   And I still can't figure out why Ms. Newman was brought into

14   the case.  Andy Chapman, one of the first witnesses that we

15   had, and he was the initial lead agent on this case, said

16   Ms. Newman was never even a target in the investigation.  She

17   only worked there for five months.  She never saw an undercover

18   informant.  They never even saw her car in the parking lot

19   during the months and months of surveillance of the clinic.

20         It never really hit home to me why she was in this

21   case until I heard the stories that the government told about

22   her, stories that eventually fell on their face.  And that if

23   the government had even bothered to do the least little bit of

24   detective work on, they would discover they were false from the

25   beginning.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

 1          First one I want to talk to you about is Scott

 2  Stockton.  You'll probably remember Mr. Stockton as a very

 3  pleasant, young man whose family runs a fudge business.  And

 4  his major concern when he testified was about getting to his

 5  son's football game this afternoon.

 6          In their opening argument, the government gave the

 7  ominous warning that you would hear testimony that Ms. Newman

 8  dated one of her patients.  Now, normally, that might be an

 9  issue for the board of nursing.  The rules say that a medical

10  provider should not have a relationship with a patient while

11  they're treating a patient.

12          However, in Mr. Stockton's case, he testified that he

13  and Ms. Newman began their short relationship only after she

14  stopped being his provider, and they stopped seeing each other

15  after a very short time.

16          Now, it may not have been ideal for them to have any

17  type of relationship while he was a patient at the clinic, but

18  Ms. Newman did the right thing.  She stopped being his

19  provider, exactly what the nursing board rules require.

20          As long as we're talking about Scott Stockton,

21  there's a couple of points I want to bring up.  First, he was

22  the only patient who testified about the treatment he received

23  from Ms. Newman.  None of the rest of them ever described what

24  happened in that room.  He was the only one.

25          He testified that she was professional.  Do you

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    remember, he said she was professional.  He said that she was

2    ethical.  He said that she was tough on pill counts and that

3    she was tough on patients who had track marks.

4            To me, this sounds like a medical professional who

5    was committed to her profession.  It does not sound like the

6    description of a medical professional who was willing to commit

7    a crime.

8            If these are the things that you're tough on, you're

9    not just throwing out pills.  You're actually practicing

10   medicine and that's what she was doing.

11           Now, another thing I want to talk about with Scott

12   Stockton is a story that Stephanie Puckett and Shannon Hill

13   both testified to.  Both Puckett and Hill told a story that

14   Courtney Newman tried to get Scott Stockton's aunt kicked out

15   of the Lovell Road clinic in retaliation for Scott breaking up

16   with her.

17           Now, Stockton had told the government in 2015 that

18   that story wasn't true.  But even knowing it wasn't true, the

19   government encouraged both Puckett and Hill to tell this false

20   story.  Remember they put him on the stand and they asked him

21   about Scott Stockton's aunt.  They both testified, yeah,

22   Courtney Newman tried to get her kicked out.  They even tried

23   to get Scott Stockton to talk about it before he finally shut

24   them down, telling them he didn't have an aunt that went to the

25   clinic.  The same answer he had told them in 2015.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1          Now, the last thing I'd like to say about Scott
2     Stockton is that he's the only patient who correctly identified
3     Courtney Newman.  Only one.

4          You'll remember every time a patient got on the
5     stand, the government would ask them if they knew the
6     providers.  Out of all of the patients that testified, only
7     five of them tried to even identify Ms. Newman.  And Scott
8     Stockton was the only one who got it right.  The other four
9     that tried to identify her identified her as Holly.  It passed
10    so quickly, you probably didn't even notice.

11         The most notable of these, and I'll say when they
12    identified her as Holly, probably talking about Holly Harrell
13    again.  The most notable of these was Gerritt Orrick.  You'll
14    remember that when Gerritt Orrick was on the stand, he was
15    asked, "Do you know any of these providers?"

16         And he said, "Holly, Cindy, Holli."

17         And the government quickly turned back to Ms. Newman
18    and said, "Are you talking about Courtney Newman back there?"

19         And even then, he wasn't sure.  He said, "I think I
20    know Courtney," but he wasn't even sure about that.

21         Ms. Newman did her job, and it was so unremarkable to
22    these people, they didn't even know who she was.  So she was
23    doing her job.  Scott Stockton said she was doing her job,
24    really the only person who said anything about what happened in
25    there.  She did her job, and it was so unremarkable to

UNITED STATES DISTRICT COURT

1    everybody else, that they couldn't even identify her.

2            This sort of brings me to the story that

3    Ms. Newman -- the story the government was trying to tell you

4    about Ms. Newman trying to get pain pills.  I think you'll

5    probably remember this story.

6            Remember, the government got Stephanie Puckett to

7    tell a story, and it's sort of convoluted, so bear with me

8    while I go through it.  The government got Stephanie Puckett to

9    tell this story that Ms. Newman had hurt her foot.  And that

10   she came to her, meaning Ms. Puckett, and asked about getting a

11   prescription for Percocets.

12           And Stephanie Puckett said, "Well, I can't do it,

13   because I'm already getting treated by Dr. Larson, and that

14   would be -- show up on the PMP, and it would look like I was

15   doctor shopping.  I can't do it.  Why don't you go over to

16   Shannon?"

17           So the story that Ms. Puckett tells is that

18   Ms. Newman goes to Ms. Hill and says the same thing, "I need

19   Percocets.  Can you get me some?"

20           And Shannon Hill says, "Well, I can't do it either

21   because I'm on Suboxone.  And they won't prescribe -- people

22   won't issue a prescription if I'm on Suboxone."

23           And I think it was the same story for Patty Newman,

24   the same exact story.

25           Eventually, Stephanie Puckett says that Courtney came

Closing Argument - Mr. Oldham

1    back to her and she said, "Well, I know where you can get these

2    drugs.  I'll call Gerritt Orrick up, and Gerritt Orrick can

3    bring you these pills."

4            And she says she called Gerritt Orrick, and Gerritt

5    Orrick immediately came to the clinic, and that he went back

6    into Ms. Newman's exam room.  And she didn't know what

7    happened, but she presumed that he sold her pills.

8            Now, to back up that story, the government called --

9    when they called in Shannon Hill, they asked her to recount

10   that story, her memory of the alleged event.  Shannon had a

11   little bit different recollection of it, though.

12           First, she said Courtney Newman never came to her.

13   Instead, Stephanie Puckett told her Courtney was looking for

14   Percocets.  That's a big difference.  When you're trying to

15   concoct a lie, and you don't have a lot of time together to

16   sort of make sure that the details dovetail with one another,

17   then you've got the big story, Courtney Newman is looking for

18   Percocets, and then you've got the details of the story.

19           And it's clear that they never got their story

20   together, because she said Stephanie Puckett told her that

21   Courtney Newman was looking for these pills.  That's a big

22   difference.  So we've got this story, and it lingers out there

23   for almost a month between the time that Stephanie and Shannon

24   testified and the time that the government brings in Gerritt

25   Orrick.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    So they bring in Gerritt Orrick to put a bow on this

2    entire story.  In addition to misidentifying Courtney as Holly

3    Harrell, Gerritt Orrick testified that he had never sold

4    Courtney Newman any drugs, and that he had never even had the

5    conversation with Stephanie Puckett that she had claimed him.

6    In short, Stephanie and Shannon lied about Ms. Newman

7    to help get favors from the government.  And the government

8    never even bothered to check with the main witness in this

9    story.  They never bothered to go to Gerritt Orrick and say,

10   did this happen?

11   They let them testify about this story to influence

12   you to think that Courtney Newman is a bad person.  That's

13   the -- that is the reason they had them tell this story.  Not

14   because it goes to whether or not she was prescribing drugs for

15   a legitimate medical purpose, not to go to show whether or not

16   this was usual scope of professional practice.

17   They wanted you to think Courtney Newman was a bad

18   person.  And they never even bothered to check with the one

19   person, the one person who could tell them whether or not this

20   story was true.  The first time we heard it was when Gerritt

21   Orrick got up on the stand.

22   Ladies and gentlemen, that's not how we do it in

23   America.  We expect better from our government, and they have

24   failed us here.

25   Now, I want to talk to you a little bit about

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    standard of care versus criminal acts.  You've heard a lot of

2    testimony throughout the trial of standard of care and medical

3    treatment, and the government has done its best to blur the

4    line between standard of care issues and criminal acts.

5            Ultimately, what you heard from the experts was that

6    they had problems with the charting that occurred in the

7    patient files, sometimes noting they weren't always able to

8    follow the reasons for the treatment plan proposed and whether

9    there was sufficient reasoning behind it.

10           As Dr. Browder testified, that goes to standard of

11   care, which is a nursing board issue or an issue of

12   malpractice.  These are not things you put people in jail for.

13   The things that you talk about is a licensure issue.

14           The judge is going to instruct you that this is not a

15   malpractice case.  You might think that there was not good

16   quality of care, but this case is not about that.  If there's a

17   quality of care issue, there are other agencies to deal with

18   that.  And you're not here -- and you're here to determine

19   whether criminal acts were committed, and the proof is clear

20   that Ms. Newman did not commit criminal acts.

21           And we've heard several people testify that the

22   health-related boards investigator Melanie Rucker was

23   constantly at the clinic and she reviewed patient files.  If

24   there had been a problem at these clinics that Ms. Rucker had

25   discovered, you can bet the government would have let you know

UNITED STATES DISTRICT COURT

1    that.

2              But there was never any action against the clinic or

3    any of these providers.  You should consider that the state

4    investigators are trained to look for these kind of issues and

5    they found nothing that caused them concern.  And compare that

6    with the picture the government tried to paint.  While there

7    may have been standard of care issues, it wasn't enough to

8    cause concern with the state, and it certainly isn't enough to

9    convict somebody of a crime.

10             Now, I want to take a few minutes to talk about the

11   individual counts that Ms. Newman is charged in and tell you

12   why you must find her not guilty on each of these counts.

13             Counts 2 and 4 are the allegations that Ms. Newman

14   conspired with all the other defendants to distribute

15   controlled substances outside the scope of professional

16   practice.

17             You can see that I'm reading.  My mother was right.

18   Sometimes you have to read these things.

19             And not for legitimate medical purpose.  The judge

20   will tell you that in order to be guilty of a conspiracy,

21   Ms. Newman would have had to knowingly and voluntarily entered

22   into an agreement with at least one other person to commit an

23   illegal act.  Without a knowing and voluntary agreement to do

24   an illegal act, Ms. Newman cannot be guilty of the conspiracy.

25             And the government has put on absolutely no evidence

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    that Courtney Newman ever agreed with anyone to commit a crime.

2          The government claims that Ms. Newman should have

3    known what was going on, but that's not the standard.  If you

4    don't find that Courtney Newman reached an agreement with

5    another person to commit illegal acts, you must find her not

6    guilty of the conspiracy charges.

7          The government can't prove that Ms. Newman agreed to

8    commit any crimes, and that she intentionally did something

9    against the law, so they're claiming that she was willfully

10   ignorant of things going on around her.

11         To do this, they've talked endlessly about the

12   parking lots and waiting rooms at the clinics.  They brought in

13   multiple addicts to say they saw other addicts in the waiting

14   room, and they could recognize them because they were addicts.

15   Of course, we know the providers aren't addicts, and we don't

16   know what addicts see in another person that makes them

17   convinced that that person is an addict.

18         But we know that their credibility is not pretty high

19   because they'll tell you that they don't remember anything.

20   When asked about what went on in the exam rooms, almost to a

21   person, "I don't remember, I don't recall."  You know, they

22   say, "I wasn't given an exam."  When confronted with it, "Well,

23   yeah, maybe that did happen."  These are people with, let's

24   just call it, less-than-perfect memories, less-than-trustworthy

25   testimony.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1          On the other hand, there were addicts out there that
2   testified that there was no bad behavior in the waiting rooms
3   of the parking lots because they knew it would get them kicked
4   out of the clinics.  Gerritt Orrick in particular, he testified
5   that there was nothing going on in the parking lots, because
6   patients were told to stay inside and not go into the parking
7   lot.

8          So you're sort of forced to believe two groups of
9   competing people, people saying something happened, people
10  saying nothing happened.  That's literally, literally what
11  reasonable doubt is.

12         But I can tell you how to remove all doubt about this
13  issue, all doubt.  The government had the clinics under
14  observation for hundreds of hours.  And the only pictures they
15  would show you are the lonely pictures of the clinics from
16  across the street.  It's the Lovell Road clinic right there.
17  These are the parking lots.

18         The government had more than 40 undercover visits to
19  these clinics.  You only heard one of their agents come up and
20  testify about that.  They wouldn't show you any videos except
21  for the short clips of the visits with Ms. Clemons.  It took
22  Mr. Reagan to show you some pictures from those wait -- the
23  videos -- pictures from the videos, showing that the waiting
24  rooms weren't crowded.

25         I want to show you three pictures that we put on.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    Showed what the inside of the clinics looked like from the

2    government's undercover office visit to these clinics.

3            I want you to see the only person sitting in that

4    clinic in the waiting room at the clinic, empty chairs.  Does

5    this look like what people described about people jam-packed in

6    there?

7            The next one, another picture of the clinic, does

8    this look like a picture of a jam-packed waiting room?  Quite

9    frankly, we can't see -- we can't see the tops of these people.

10   But do these look like addicts?  These look like the people

11   that were described by the other people in there?

12           These are empty chairs, relatively well-dressed

13   people.  Quite frankly, I can't tell you that that's much

14   different than how I dress when I go to the doctor, jeans, a

15   polo shirt, and a jacket.  I don't wear this to go to the

16   doctor.  I go wear something comfortable.  That's what it looks

17   like this guy did.

18           This does not look like the scene that these people

19   described.  Of course not.  And there's a reason they didn't

20   want to show you the videos of these 40 undercover visits, is

21   because if they did, it would destroy their case, because

22   they -- the clinics weren't overflowing with addicts, the

23   waiting rooms weren't crowded, and the parking lots weren't

24   like they described.

25           If the government had photos to back up their claims,

UNITED STATES DISTRICT COURT

1    you can bet you would have seen them over and over and over

2    again.

3            Can we go back to the Lovell Road slide?  How many

4    times did we see this picture?  I'd say almost every day we saw

5    this picture, at least once, if not twice or three times.  If

6    the government had photos to back up their claims, you would

7    have seen them as much as you saw this photo.

8            The reason the government hasn't shown you these

9    videos or photos of the waiting rooms is because they don't

10   support the claims they are making.  The reason you don't see

11   photos or videos of the dirty diapers and needles in the

12   parking lot is because they don't exist.

13           And if the government can't show you these things,

14   how in the world can they claim the providers should have been

15   aware of them?  They were under surveillance for almost three

16   years, hundreds and hundreds of hours of observation.  They

17   could have gone and taken pictures of anything that they wanted

18   to before hours, after hours, during hours.

19           They could have sent people in there to take pictures

20   in the clinic at any time they would have wanted to.  Yet not a

21   single picture showing these crowded, nasty waiting rooms or

22   the crowded with diapers and the needles and the bad conditions

23   going on in the parking lots.

24           They can't show you them because they don't exist.

25   They don't exist.  If they had them, you would have seen them,

Closing Argument - Mr. Oldham

1    but they don't exist.  And then they expect you to say, well,

2    the providers should have seen these things that we can't

3    provide you proof of.

4            Because the government can't prove their case,

5    because they don't have sufficient evidence to do it, you have

6    to find Ms. Newman not guilty of these charges.

7            Now, Count 14 alleges that Ms. Newman distributed

8    controlled substances outside the usual source of professional

9    practice and without a legitimate medical purpose.  This is a

10   charge that's totally without merit.

11           You heard from Dr. Joe Browder and nurse practitioner

12   Darren McCoy.  Medical professionals from Knoxville who the

13   government had wanted to be their own witnesses in this case.

14   And both testified that there was no doubt that the

15   practitioners were prescribing for legitimate medical

16   conditions and within the usual course of professional

17   practice.

18           In fact, all the parties agreed that pain is a

19   legitimate medical condition.  This is not something that's

20   just made up out of air.  Pain is a legitimate medical

21   condition, and opioids are approved as an appropriate treatment

22   for pain by the Food and Drug Administration.  We all agree

23   with that.

24           Every patient who was treated at these clinics

25   presented with a legitimate pain generator.  I think you heard

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    Darren McCoy talk about what pain generators are.  And there
2    was also a radiology report to support these complaints.  As
3    you heard from almost every witness, pain is subjective,
4    meaning that only the person who has pain can tell you how much
5    it hurts.
6           And I'm here to tell you right now, I've got pain.
7    I've got pain in my hip right now as we speak.  And only I can
8    tell you how much it hurts.  But what might hurt a little bit
9    for me might be the worst thing in the world for somebody else.
10          Conversely, what's -- what might absolutely just
11   terrorize somebody else, another person with a high tolerance
12   for pain could go through the day without even complaining
13   about it, maybe just a couple of ibuprofen.
14          Pain is individualized.  It's individualized.  And
15   these providers relied, relied on the patients to tell them
16   these things, which goes back to my initial point.  If you lied
17   about that, how would the providers have known that you were
18   lying, period?
19          In fact, every government witness who was a patient
20   at these clinics, every single one of them, they all told us
21   they were in legitimate pain.  They talked about things, like
22   car wrecks, falling downstairs, falling off roofs, work-related
23   injuries, and the only thing that they said that they did was
24   exaggerate the level of pain to ensure that they were able to
25   maintain the levels of medications.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1          Both Dr. Browder and Darren McCoy pointed out the

2    medical decisions that took place in the clinics.  There's no

3    doubt that the providers, including Ms. Newman, were operating

4    within the confines of professional medical practice, and

5    everything they did was for a legitimate medical purpose.

6          Now, Dr. Blake was less believable as he clearly made

7    up his mind to support the government's position and simply

8    dismissed all the medical activities undertaken by the

9    providers and others at the clinic as window dressing.  You

10   heard Mr. Burks and everybody talk about that.  But he

11   acknowledged that the clinics were following the laws of the

12   State of Tennessee.

13         But he clearly believed, and he said this, he clearly

14   believed that the clinics were only following the law so that

15   they could break it.  That's an absolutely absurd contention.

16         I don't drive the speed limit on the interstate --

17   well, quite frankly, I don't drive the speed limit on the

18   interstate no matter what.  But you don't drive the speed limit

19   on the interstate just so you can drive 110 when you think

20   you're out of sight.  You follow it because that's the law.

21   That's what you do.  You don't follow it just because you

22   intend to break it.  You follow it because that's what it is.

23         And that's what they did here.  They followed the

24   laws here of the State of Tennessee.  They did what they were

25   required to do.

UNITED STATES DISTRICT COURT

1          Now, the one useful piece of information that

2    Dr. Blake did give us, there's no rule, regulation, or law, or

3    any other guidance on what's considered an illegal prescription

4    in the treatment of pain.  You never heard that once.  There's

5    no guidance of any kind on what's considered an appropriate or

6    inappropriate MED.

7          Only the provider was to use their best judgment when

8    treating that patient.  That's the guideline.  There's nothing

9    that says that 180 MEDs inappropriate.  There's nothing that

10   says 45 MEDs are inappropriate.  There's nothing that says 300

11   is inappropriate.  What is said is that the provider must use

12   their best judgment when treating a patient, and that's the

13   guideline that they're given.

14         You might recall that I asked Dr. Blake about the

15   example of traveling on the interstate, and I talked to you

16   about this, looking for a speed limit sign.  And that speed

17   limit sign will give you guidance on how fast you could go down

18   the road without breaking the law.  And Dr. Blake admitted that

19   without that guidance, a person wouldn't know that they might

20   be breaking the law.  Because, quite frankly, there's just

21   nothing that says, if you do this, then you're breaking the

22   law.

23         Dr. Blake admitted it was up to the individual

24   provider to determine what was considered a legitimate

25   prescription amount, and that reasonable people could disagree

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    about that.  Once again, that's the textbook definition of

2    reasonable doubt.

3            Think about this, if two people -- if two reasonable

4    people could hold differing opinions about the same subject,

5    about the same facts, without either of them being wrong, and

6    Dr. Blake said that about Dr. Browder, said he was a good

7    doctor, and he valued his opinion, and Dr. Browder held his

8    opinions, he just disagreed with him.  But if two people can

9    hold differing opinions about the same subject, the same facts

10   without either of them being wrong, you simply cannot find a

11   person guilty of that crime based on differing opinions,

12   because that is reasonable doubt.  And because of that, you

13   have to find Ms. Newman not guilty of these charges.

14           Ms. Newman is charged with maintaining a drug-related

15   premises.  This really should be an easy one for you to find

16   Ms. Newman not guilty of.  Ms. Newman was an independent

17   contractor who only worked at these clinics about five months.

18   We think based on the testimony that she worked at the Lenoir

19   City clinic for maybe half a day on March the 26th.

20           Remember, this is all six years ago, and everybody's

21   memory has faded.  That was the day before she left the

22   employment of the clinics altogether.  She never worked at

23   Gallaher View Road.  So Lenoir City and Gallaher View are sort

24   of easy.  She just didn't work there.

25           When she worked at the Lovell Road clinic, she never

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    had an ownership interest in the clinic.  She never paid rent,
2    and she never maintained the clinic.  She wasn't responsible
3    for those clinics.  And you should find her not guilty of these
4    ridiculous charges.

5          Lastly, you've heard Mr. Whitt talk about the
6    overdoses that are alleged in this indictment.  I won't go into
7    much further detail other than to say that in every instance,
8    the patients were not taking the medications as they were
9    prescribed.  Every single one of them, we heard, snorted or
10   injected their medications.

11         And everybody admitted that if anybody had ever told
12   the providers that they were snorting or injecting the
13   medications, they would have been kicked out of the clinic
14   immediately.  There's no doubt about that.

15         As to Ms. Vann-Keathley specifically, we heard
16   testimony from her husband that she had been out trading and
17   swapping her prescriptions, and that she ended up with the
18   multiple benzos that she took throughout the day and likely
19   were the cause of her death, according to Dr. Mileusnic.  It's
20   sad Ms. Vann-Keathley told her husband she hoped she went to
21   sleep and never woke up.  It's even sadder that her last words
22   were "me too."  I can't imagine the burden of living with that
23   the rest of your life.

24         But it's Ms. Vann-Keathley's who's responsible for
25   her own bad behavior.  Ms. Newman did her job in good faith.

UNITED STATES DISTRICT COURT

1    She didn't tell her to go out there and swap pills and take

2    benzos and do all the things that she was doing.  She did her

3    job in good faith.

4              If she had known all this, she would have found a way

5    either to get help to Ms. Vann-Keathley or cut her off from the

6    drugs that she would have been provided from the medications.

7    She did her job in good faith and for legitimate medical

8    purpose.  We know Ms. Vann-Keathley had a legitimate medical

9    purpose.

10             But you have to find Ms. Newman not guilty for these

11   enhancements.

12             Now, in closing, I just sort of want to go back over

13   some stuff.  Ms. Newman only worked at clinics at Lovell Road,

14   what we say, five months.  During that time, she only

15   prescribed medications for legitimate medical purposes and

16   within the scope of professional medical practice.

17             The medications she prescribed were for the purpose

18   for which they were intended, and every patient she saw

19   provided some proof of a pain generator, usually in the form of

20   a radiology report or other records.  There never was a person,

21   there never was a person who came through the clinic doors and

22   said, "I have no pain, but give me drugs anyway."  That did not

23   happen.  And any person who had attempted this would have never

24   made it past the front counter.

25             Ms. Newman and the other providers prescribed

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Oldham

1    medications only to persons presented with legitimate medical

2    complaints of chronic pain.  And the parties agree that chronic

3    pain is a legitimate medical condition for which opioids are an

4    accepted treatment.  Sometimes, as we heard from the experts,

5    sometimes opioids are the only treatment that works for some of

6    these people.

7         While there's some disagreement over whether proper

8    charting was done, that's a nursing board issue, not a criminal

9    issue, not something someone goes to jail over.

10        While Ms. Newman worked at the clinic, she was an

11   independent contractor, paid an hourly rate, not per patient,

12   and therefore had no incentive to see more than the 24 or so

13   patients she saw each day.  She was paid the same hourly rate

14   whether or not a prescription for medication was written.

15        And there is no incentive to commit a crime.  None.

16   There was no incentive for her to put her livelihood or her

17   freedom on the line at this clinic.  Because of that, she

18   couldn't have formed the intent that -- the requisite intent

19   needed to be convicted of crimes.

20        Remember, you need intent.  You need for a person to

21   have intended to commit a crime.  And Ms. Newman did not intend

22   to commit a crime.

23        As such, you must find Ms. Newman not guilty on all

24   the charges in the indictment.

25        Thank you.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1          THE COURT:  Thank you, Mr. Oldham, for closing

2    argument on behalf of Ms. Newman.

3          Mr. Rodgers, are you ready to go?

4          MR. RODGERS:  Yes, sir.

5          THE COURT:  Everybody okay?  Anybody need a break?

6    All right.  We'll keep going.

7          Closing argument by Mr. Rodgers on behalf of the

8    defendant, Ms. Womack.

9          MR. RODGERS:  It's been three months since I talked

10   to you people, I think.  It's -- waiting is truly the hardest

11   part.  Tom Petty was on to something, I think.

12         When I talked to you last time, I stood up here and I

13   said I spent two and a half years with this case, and I

14   couldn't figure out why Holli was charged or why she's sitting

15   at that table.  Now, I've sat here for three more months, and I

16   can honestly say that I have no idea why Holli was charged and

17   why she's sitting at that table.

18         I just -- why is the question.  Why is the question I

19   think you should pose to yourself on so many different levels.

20   Why?  Why is this prosecution going forward?  Is it the idea to

21   clean up the streets from the criminal niceness of Holli

22   Womack?  Because I'm just not sure what we're trying to

23   accomplish.

24         We had bad -- we've seen criminals.  I mean, the

25   entire government's case was filled with criminal.  They put

UNITED STATES DISTRICT COURT

1    criminal, after criminal, after criminal on the stand to try to

2    convince you that she's a criminal, because they were able to

3    con her.

4            So now the victim of the con is sitting over here at

5    this table, and they want you to -- they're prosecuting her for

6    being the victim of a con, everybody at these tables.  It blows

7    my mind.  I have a headache for three months.  I can't -- my

8    brain is mush.  I can't grasp it.  I don't understand it.

9            And so it's -- you know, if I'm all over the place, I

10   apologize.  But it's just blowing my mind.  And how can the

11   victim of a con be the criminal?  And they don't make -- the

12   government doesn't even make any bones about it.  Their proof

13   is that they -- she should have known.  Right?  I mean, that's

14   basically the argument is that she should have known.  And the

15   reason why she should have known is because I guess the

16   standard that they're trying to set or the standard we want to

17   set with healthcare providers is that we start with from a

18   place of distrust.

19           So if I have a toothache, and I go to my dentist and

20   I say, "I'm in excruciating pain," and if you've ever had

21   dental pain, it's -- you wish for death.  It's horrible.

22           And I go in and I say, "I have excruciating pain,"

23   and he opens my mouth, he goes, "Well, there is a little cavity

24   down there, maybe something.  I can see where the cause of the

25   pain is.  I'm going to prescribe you these hydrocodones or

Closing Argument - Mr. Rodgers

1    these OxyContin to help you sleep or get rid of the pain or

2    whatever.  But tell you what, I can't do that till you roll up

3    your sleeves, pee in this cup, and let me do a criminal history

4    background check on you."

5          Is that the standard we're trying to set for a

6    healthcare professionals?  Because I'm not sure I would go back

7    to that dentist.  Would you?

8          So what do people without health insurance have to

9    do?  What do people that need to pay cash for their health care

10   need to do?

11         They can't go to Dr. Blake.  He actually listed that

12   as one of the reasons why you could discharge a patient.  He

13   was all over the place with discharges.  If you saw track marks

14   and didn't discharge, that was bad.  If you did discharge them,

15   you shouldn't have discharged them.

16         But one of the reasons why he said you could

17   discharge is for financial reasons.  If they can't pay you, you

18   can get them out of there.  Because these are businesses.

19         I still keep going back to why is Holli here?  I

20   still don't know.  So let's talk about what she did.  She

21   raised two children.  She was raising two children.  She

22   completed nursing school.  That's not an easy task.  She went

23   back and got her master's.  While she was getting her master's

24   and certifications, she got a part-time job at this clinic two

25   days a week.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1     They have her listed as 11 months.  That is -- you

2 know, 11 months working there.  Those first two months, I think

3 it was a total of four or five days training in those first two

4 months.  So I think you can kind of cut that out.  The rest of

5 the time, she was a part-time employee.  She worked there for,

6 I think, 35 or $40 an hour while she was studying.  It fit her

7 schedule.  She was training.

8     And if you look at the charts that she was on, most

9 of the charts you saw her name on, which that was, you know --

10 most of the evidence in this case was, let's go flip through a

11 chart and see where we can find Holli's name and point it out

12 over and over and over again, sometimes without even any

13 explanation of what we were looking at.  Just, "Oh, there's

14 Holli's name, there's Holli's name."

15     She couldn't even prescribe medication in most of

16 those files at that point in time.  She was being supervised

17 twice over and was doing her job the way she was trained to do

18 it.

19     Zero incentive to -- are you kidding me?  Even the

20 people that got up on the stand and talked about what they --

21 what Holli, you know, these bad things about Holli, what was

22 their testimony?  She nice, and she listened to me.  Right?

23     And the most telling thing was Stephanie Puckett, the

24 last question I asked her, and she agreed with me, she was easy

25 to con.  Stephanie Puckett said yep, she was easy to con.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1          So criminally gullible, I guess.  Right?  She was

2     criminally gullible maybe, at worst.  Is that a thing that we

3     prosecute people for now, is trusting your patient when they

4     come in and tell you they're in pain and back it up?  Back it

5     up.

6          You're supposed to dig deeper.  That's -- that is a

7     horrible standard to set for healthcare provider.  So I'll get

8     back to what I was talking about a second ago about what Holli

9     did.  She got a part-time job.  She worked a couple of days a

10    week while she finished her degree and got her certification

11    and studied for -- to get her -- pass the test to get her

12    certification.  That happened around April when she finally got

13    her certification and her DEA license.

14         She immediately started looking for a full-time job

15    with benefits.  Again, this is 1099 employee.  They're not

16    taking out taxes.  They're not paying half your taxes.  They're

17    not paying half your Social Security.  You're going to pay all

18    that stuff at the end of the year.

19         So she's a 1099 employee.  She's looking for a

20    full-time job with benefits, health care, all that stuff, and

21    she is interviewing and looking for jobs, and she finds one.

22         She could have started immediately.  She didn't.  She

23    gave a notice and worked out a three- or four-week notice.

24    Stephanie Puckett agreed to that too.  Remember that?  She

25    worked out a three- or four-week notice at this clinic, because

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1    that's what good people do.  You don't want to burn a bridge.

2    So the entire time at this clinic, she's a part-time employee

3    finishing school, gets her DEA license, and works there for

4    about, I guess, prescribing for about three months.

5          You guys have been impaneled as a juror longer than

6    she prescribed at these clinics.  She went and got another job.

7    She got contacted by Sylvia Hofstetter because when they

8    started doing the audits and digging into this stuff with

9    Stephanie Puckett and Shannon Hill, they find this cream, this,

10   you know, medicated cream or whatever it is.  Calls her, and

11   come to find out that they've been issues prescriptions in

12   Holli's name, forging prescriptions.

13         Chapman confirmed that, one of the first witnesses up

14   here.  What did Holli do when she found out that they were

15   sending out prescriptions in her name?  She called the

16   pharmacists and canceled those prescriptions.  She did

17   everything she was supposed to do.  She went to the FBI and

18   reported it.  Agent Nocera confirmed that when I asked him,

19   because there was a line out that no one ever tried to say

20   anything about Stephanie Puckett.

21         As soon as Holli found out there was something funny

22   going on, she went to the feds.  Does that sound like something

23   a criminal does?  It's ludicrous.

24         She did exactly what you're supposed to do.  And so

25   their entire case is, she should have known.  She should have

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1   known.  Red flags.  Right?

2          Let's talk about red flags.  Red flags are red

3   herrings, I don't know.  They're calling them red flags.  And

4   the red flags are the crowded -- we've gone through this.  I

5   can beat this dead horse all day long.  Okay?

6          Where's the crowded rooms?  Where are all these

7   different license plates?  I mean, Chris Oldham, everyone has

8   said it.  If they had that evidence, they would show you that

9   evidence.  It's their burden to prove beyond a reasonable doubt

10  what they're saying.  This is just the government narrative.

11  They're asking you to convict somebody on speculation based

12  upon their speculation.

13         It's the most ironic trial I've ever been a part of

14  in my life where you put criminals on the stand and convict the

15  person that they criminalized.

16         That's not how this is supposed to work.  I don't

17  know what we're trying to accomplish.

18         When we're talking about the

19  beyond-a-reasonable-doubt standard, everybody can tell you what

20  beyond a reasonable doubt is.  I think we intuitively know what

21  beyond a reasonable doubt is.  And it's to a moral certainty.

22  It's so you can lay your head on your pillow and know you made

23  the right decision.

24         My question to you at the beginning of this trial is,

25  why do we have that standard?  We're back to the why question.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1    Right?  Why do we have that standard.  We have this high

2    standard, because we -- and one answer might be because we want

3    to get it right.

4            I think a more correct answer would be because we

5    don't want to get it wrong.  We hold our freedom in such

6    high -- up here that we do not want to get it wrong.  The idea

7    of convicting somebody of something that they didn't do should

8    pain us such that we make the government and the state prove

9    beyond a reasonable doubt, the highest standard in all the

10   legal system, beyond a reasonable doubt that they committed the

11   crime.

12           And what they have to prove for her is that she

13   knowingly or intentionally did something illegal.  There's

14   absolutely zero reason to think that.  There's no proof about

15   that.  There's nothing.  They're trying to get you to jump to

16   conclusions because basically opioid epidemic.  That's the key,

17   opioid epidemic, pill mill, pill mill, pill mill, pill mill,

18   pill mill, pill mill, pill mill, Holli Carmichael, Holli

19   Carmichael, Holli Carmichael, Holli Carmichael, Holli

20   Carmichael.  They can keep saying it.  It doesn't make it true.

21   They're supposed to put on evidence.

22           And their evidence was a bunch of liars.  And you can

23   believe what they said about Holli because they didn't say

24   anything bad about her.  Right?  Even the liars got on the

25   stand and said we lied to her.  And she was nice, and she

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1    listened to me.  And she did the test, and she did the things,

2    all the stuff she's supposed to do during her brief period of

3    time at the clinic, which by all the counts, all the proof,

4    it's a legitimate clinic.  It's a suggestion by the government.

5    They're trying to scare you.  That's what this whole thing is

6    about.

7         And how far do you want them to reach?  How far do

8    you want the U.S. government to reach into your job or anybody

9    that has anything to do with anything that's possibly dangerous

10   if misused.  And you can fill that gap with anything you want.

11   How far do they reach with the person that sells it, to the

12   person that manufactures it, to the person -- if it -- when

13   misused is wrong, can be -- you know, dangerous.

14        But that's when used properly, it's therapeutic in

15   this case.  We're talking about opioids.  Right?  So where's

16   the self -- is anybody personally responsible for their own

17   actions anymore?  We just got to reach out and find -- well,

18   yeah, of course, I wasn't taking the medication like I was

19   supposed to take it.  I was snorting it.  I was shooting it,

20   and I was selling it.

21        How many people got on the stand and admitted they

22   went so into the clinic -- oh my God, Elliott or whatever her

23   name was, got up there and giggled the whole time she was

24   explaining to you that she went to the clinic because she just

25   got divorced and needed money.  That's a drug dealer.  Just not

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1    an addict or any other thing.  She needed money.  She decided

2    to go in and con these people for pills to sell.  And laughed

3    through the whole thing in street clothes.

4         These are not good people that they put on the stand,

5    and they all were admitted con artists, admitted.

6         When the government starts to diminish what they have

7    to prove, any time the government or the state or whoever the

8    prosecutor is stands up and starts telling you, "We don't have

9    to prove this, we only need to prove this," you should be

10   scared.

11        Their job is not to hide the ball.  Their job is to

12   prove beyond a reasonable doubt that a crime was committed, not

13   diminish.  Ignore the good-faith argument.  Come on.  It's --

14   you're going to get those instructions.  Good faith is a

15   defense.  You can't ignore that.  You shouldn't ignore any of

16   it.  You're supposed to pay attention to all of it.

17        And really what you're supposed to pay attention to

18   all the stuff that they said and all the stuff they didn't say.

19   What did we not see?  What would you like to see to prove

20   somebody be guilty of a crime beyond a reasonable doubt?  We

21   didn't see any physical evidence of anything.

22        We didn't see -- I mean, basically, the evidence

23   against Holli Womack is she allowed herself to be conned.  We

24   can say that word over and over again, because it's what this

25   case is about.  She allowed herself to be conned by a handful

UNITED STATES DISTRICT COURT

1    of people who were doing bad things.  And because of that, the

2    government wants you to put her in jail.  They want to

3    prosecute her.  They want you to find her guilty of a federal

4    crime, because she listened and was caring and trusting.

5         And she didn't -- maybe she didn't recognize addicts

6    like other addicts do.  We had a couple of them tell you an

7    addict can recognize -- an addict can recognize another addict.

8    That was pretty clear.  These same addicts that, you know, it's

9    so obvious, whatever, were getting their parents to pay, give

10   them money to go to the pain clinics.  They were convincing

11   their parents and their friends and everybody else to just keep

12   them money to whatever.  If they convince their parents, why

13   couldn't they convince a provider that they hurt?

14        By the way, what does a chronic pain patient look

15   like?  Would it be odd for them to be disheveled or maybe not

16   in the best repair?  They are in chronic pain.  So even the

17   testimony about people what they look like, it's -- it was -- I

18   found it very -- first part of this trial, it was -- I thought

19   was kind of offensive, honestly.

20        I mean, the comparison of trying to compare clinics,

21   right, it's like trying to compare the free clinic or the --

22   what do you call it, the health department to a gold-standard

23   clinic.  Your patient population looks different.  People that

24   don't have health insurance or need to pay cash for health care

25   look different than people who have good jobs with good health

Case 3:15-cr-00027-TAV-DCP   Document 886   Filed 04/09/20   Page 87 of 138   PageID #: 61079

1    insurance that cover everything.

2            And they shouldn't be treated differently.  They

3    shouldn't just be distrusted right off the bat, which is the

4    standard I think we're trying to set, as you just got to start

5    from a place of distrust, because clearly they're wearing blue

6    jeans and shop at Walmart, they must be lying.  Right?

7            That's not what they're supposed to do.  They're

8    supposed to care for them.  They're supposed to try to help

9    them when they say they're in pain.  And, instead, what the

10   standard we're trying to set is that -- is now they have to do

11   background checks and make them pee in a cup and check their

12   sleeves and everything else.  I mean, if that was happening to

13   you, would you go back to that doctor?  You would not go back

14   to that doctor.  It's ludicrous for them to be looking at a

15   case like a detective.  They're not.  They're nurses.

16           And McCoy told you what a -- I mean, people go into

17   nursing because they care for people.  Just like teach, you --

18   you don't want people going into teaching for the money.

19   Right?  People don't go into nursing for the money.  Right?

20           And so now they're telling you how you're supposed to

21   do your job.  You're supposed to do your job by starting in a

22   place of distrust.  And that's the exact opposite of what I

23   think you probably would be taught in medical school or in

24   nursing school.  That's not care.

25           So I keep going back to why.  Incentive, money -- you

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

 1    know, money, we're talking about money.  She never even made

 2    $65 an hour.  She never even got up to that high standard of

 3    $65 an hour as a 1099 employee.  She made 30-something dollars

 4    an hour for most of the time she was there, and I think they

 5    brought her up to 55 or 60.  I can't remember.

 6         But the government provided those numbers for you.  I

 7    think the total amount of money she made was

 8    50-something-thousand dollars for that 11-month period.  And

 9    she had to may a lot of that back in taxes and Social Security

10    and every other thing.

11         So where is her incentive?  I mean, that seems to be

12    what the argument is, is, you know, her greed of wanting that

13    1099 hourly wage and maintaining that job for the three or four

14    weeks that she stayed to work out her notice when she could

15    have left three or four weeks before to -- is a sign that she

16    just wanted to dish out opioids for some reason.  For no reason

17    what -- she gained nothing.

18         I mean, I just don't understand.  It makes no sense.

19    None of this makes any sense.  None.  And we spent three months

20    doing it.  She's had three years of her life doing it.

21         They show these big pill numbers.  What the heck was

22    that mean?  You know, break those down by the number of

23    patients and they're just big giant numbers they want to show

24    you.

25         Just like the 135 -- what -- $135,000 a year, you

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1  know, is above average for a nurse practitioner.  Nobody made

2  that.  Nobody made that.  Where did that number come from?

3  They did some math.  They found $65 an hour times 40, times

4  whatever.  Nobody worked that many hours.  Nobody made that

5  much money.  But they threw that number out at you.

6         Why is the government trying to puff up their case so

7  much?  Y'all know what puffing is?  When you blow things out of

8  proportion a little bit to make it sound better than it is or

9  you build it up a little more than it is.  This is the United

10  States government with all the power of the United States

11  government, and they are throwing things at you that just

12  aren't right.  Sometimes wrong, sometimes misleading in order

13  to convict the good guy by listening to the bad guy.  You can't

14  do that.  It's just not -- it's just not how it works.

15         I'm going to talk about a specific count now.

16  Count 2, she's charged in Count 2, which the government showed

17  it's supposed to be Gallaher View 1 and Lenoir City.  She never

18  stepped foot in Gallaher 1.  And she trained a couple of days

19  at Lenoir City.  Somehow that makes her a drug dealer.  That

20  makes her a drug dealer at Lenoir City.

21         You shouldn't even consider that count.  It's crazy.

22  She never even worked there.  She trained there a couple days.

23  She worked at Lovell Road part time most of the time that she

24  was there.

25         Their job is to paint her as a drug dealer.  They

UNITED STATES DISTRICT COURT

1    didn't even try to do that really.  I mean, they said it a

2    bunch of times, but they didn't even try to do it.  I mean,

3    what they tried to do was point out that she should have seen

4    this.  She should have known that all these people were lying.

5         You know, so if you grew up in a good family, and you

6    didn't hang out with drug dealers during high school, and, you

7    know, maybe your friends weren't wild, and, you know, maybe you

8    didn't hang around with a bunch of people that lied to you all

9    the time, and you're not used to it, maybe you think the best

10   of people.  That's not a criminal act.  That's not a criminal

11   act.

12        It's -- I have no idea what happens.  Like Mr. Oldham

13   says, I have no idea what happens in this back room because

14   I'll never get to be on a jury.  I have no idea what you're

15   thinking.  I have no idea what you talk about when you go back

16   in the back.  I can only assume.

17        This is the last time I get to talk to you.  And I

18   didn't get to talk to you very much throughout the trial

19   because a lot of it seemed like nonsense to me, to be honest,

20   and I didn't want to -- I didn't want to credit it or give it

21   credence when it had nothing to do with anything.

22        And most of this trial is not about Holli.  But they

23   tried to insert her name as many times as possible, didn't

24   they?  Every chance they got, they tried to show you that Holli

25   Carmichael signed a -- you wonder why they did all that.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1           And then they ended up with 30-minute cross of McCoy
2    about what was his name, Ernest something or another?  I'll
3    find it.  Ernest Johnson.  Right?  They crossed McCoy for 30
4    minutes, I think it was, about Ernest Johnson, about Holli
5    Carmichael, if she would have checked that PMP, she would have
6    seen that he was doctor shopping.  Except that if she actually
7    checked the PMP, she would have seen that he wasn't doctor
8    shopping, because the other person was Mitchell Johnson.
9           The government missed that and then crossed -- asking
10   if that was professional.  Well, I mean, they missed it.  They
11   were wrong on that.  And they were asking whether she was
12   professional for being right about that.
13          And that's just one example of what's gone on here,
14   an attempt to paint a picture of a person that is nothing but a
15   nice, good person.  And trying to paint her as some kind of
16   drug dealer, because she wrote opioid prescriptions, which, by
17   the way, is not illegal and actually helps people sometimes.
18   And she did her job the way she was trained to do it.  And then
19   she moved onto another job.  And then she went to the feds.
20   And then she got arrested.
21          You have to find her not guilty because she's not
22   guilty.
23          Thank you.
24          THE COURT:  All right.  Thank you, Mr. Rodgers, for
25   closing argument on behalf of the defendant, Ms. Womack.

UNITED STATES DISTRICT COURT

Closing Argument - Mr. Rodgers

1        We'll take a break now.

2        Government otherwise prepared to go forward with --

3        MR. STONE:  Yes, I can.  If it was up to me, I would

4   leave it to the jury and the Court as to when we take lunch.

5        THE COURT:  I'm trying to debate.  We probably would

6   take a break, and then about an hour left of argument, or we

7   can take a lunch break now, a little bit earlier lunch break,

8   and then come back for final rebuttal argument and closing.

9        Does the jury have a preference?  Would you rather go

10  to lunch now as opposed to maybe -- might be after one o'clock?

11       THE JURY PANEL:  Small break?

12       THE COURT:  Well, we'll take a small break and then

13  do the closing, and then take lunch, and then come back for the

14  charge?  Okay.  All right.

15       (Jury out at 11:42 a.m.)

16       THE COURT:  Take about ten minutes then.

17       THE COURTROOM DEPUTY:  This honorable court stands in

18  recess until 11:50.

19       (Recess from 11:43 a.m. to 11:58 a.m.)

20       THE COURTROOM DEPUTY:  This honorable court is again

21  in session.

22       THE COURT:  Thank you.  Let's bring our jury in.

23       (Jury in at 11:58 a.m.)

24       THE COURT:  Thank you.  Everyone please be seated.

25  Double-check the connections here.  Just a moment.

UNITED STATES DISTRICT COURT

1     MR. STONE:  Technical difficulties, of course.

2     THE COURT:  Okay.  Now, we're ready for closing

3 rebuttal argument offered by Mr. Stone on behalf of the

4 government.

5     MR. STONE:  It did eat into my time.  And I don't

6 know if it's just me, it seems like I'm always the guy making

7 you guys hungry.  That's why I said let the jury decide.  And

8 then I remembered I'm not in charge, and I had to let the Court

9 decide.

10     But, yes, we sat here the last couple days and

11 especially today, and I'm sitting there over in the chair and

12 listening.  And to hear the comments over the last couple days,

13 I don't know, if you're asking yourselves did the government

14 put on 50-something, almost 60 witnesses, an investigation that

15 goes back to 2012, 30-whatever days of proof over a three-month

16 period, and we're being accused of hiding the ball from you,

17 from puff -- you know, puffing, puffing our case up, just

18 throwing stuff up on the wall.

19     This one is always tough, buying witnesses off.

20 Right?  Just making an agreement with them so they can perform,

21 and suddenly I get to choose their punishment?

22     And it just -- it strikes me, and I don't know how it

23 strikes you, but, you know, what do you do when you're backed

24 into a corner?  What do you do when you're desperate?  You

25 start pointing fingers and lashing out and blaming everybody

1    else but yourself.

2           And that's -- that's what we've heard.  Now, you know

3    we've heard about RICO and Washington.  Listen, I'm from here.

4    There are two people in this courtroom who have been here from

5    the beginning of this case.  You're looking at one of them.

6    The other one is my paralegal, Julie Patterson, sitting right

7    there.  That's it.  That's it.

8           Hundred and whatever convictions later that Andy

9    Chapman testified to, second, third witness.  Mr. Burks says we

10   just stumbled across this case.  We were buying from Jason

11   Butler, and we just stumbled into this.

12          Andy Chapman testified that Lenoir City Police

13   Department, Loudon County Sheriff's Department, when the Lenoir

14   City pill mill opened up, they knew a pill mill opened up in

15   their area.  They didn't know what to do about it.  They were

16   getting all these complaints and they asked for the help of the

17   FBI.  That's how this case started.

18          Now, here's what I'm going to do.  Because it was a

19   lot of proof over a lot of days over a long period of time, and

20   so maybe it does seem like to you, well, it's a little

21   haphazard, I get that.  That's totally understandable.  You saw

22   that we accommodated the defense and put one of their witnesses

23   in our case in chief to accommodate them.  Right?  To

24   accommodate their witness.  Right?  So I get that.

25          So I'm not going to go over all the proof again.  I'm

                   UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1  going to touch on some things, and I'm going to go fast in

2  certain part, because I'm trying to get from A to B to C to D.

3  Right?  Building blocks.  Right?  That's what I'm going to do

4  with you.  And we're going to start at the basic level.  We're

5  going to start at the foundational level, and we're going to

6  see if we can tie all this together.  Okay?  And we're going to

7  see where we end up today.

8         Because you remember, the very first time I spoke to

9  you when I was starving you to death in voir dire, as it was

10 about the lunch hour, right, I talked about truth.  And I

11 talked about our system of justice.  Right?  And I talked about

12 trusting the system.

13        And you've heard -- and I'm going to talk about it.

14 You've heard some things that were thrown out that they know

15 that I can't talk about with you, about charging other people.

16 Right?  They bring things up that they know that the rules

17 don't allow, because Judge Varlan is going to tell you, you

18 can't consider all that.  Right?  Putting the government on

19 trial.  Right?  That's what you do.

20        But I would like you to look at this picture.  Now,

21 I'll tell you, this past Sunday, Ms. Patterson and I were

22 sitting in a Starbucks out on Northshore about halfway between

23 our houses working on this.  And she said, well, we need

24 something just to put up.  I grabbed the lady of justice.

25 Didn't think anything else about it.

UNITED STATES DISTRICT COURT

1          And last night, I'm sitting at my house, and I'm kind

2     of going through this, and I look at it for the first time

3     really closely.  And I want you to look at it.

4          You know, first, notice she's blind.  You've talked

5     about sympathy, passion, biasness.  Right?  Justice is blind.

6     Right?  Justice looks at the facts.  Justice looks at the law.

7     Was it violated or wasn't it?  Right?  The oath that you-all

8     took.  Right?

9          Let's continue.  The scales, she's weighing the

10    scales.  Where are they?  The fair balances.  These aren't --

11    where is justice?  Right?

12         But then you got to look closely.  Look at the

13    bottom.  This is what really caught my attention.  I don't know

14    that I've noticed it before.  Her foot is on the head of the

15    serpent.  See the serpent coiled up there?  It's the law book

16    there between her foot and the serpent.  The serpent represents

17    lies.  The serpent is the liar.

18         But what is she holding in her left hand?  A sword of

19    truth.  Blind, blind justice, neutral, unbiased, weighing the

20    scales, has her foot on the serpent, holding the sword of

21    truth.

22         That's what a trial is.  That's what we're here for.

23    We're here to search for the truth.  We didn't hide anything

24    from you.

25         They talk about hiding.  Stephanie Puckett, Shannon

1    Hill, we put them up.  We didn't hide anything from you.  We

2    wanted to show you what these places were and what was going

3    on.  Right?

4            So let's -- let's start there.  Kind of what is

5    truth?  You-all know this.  The truth loves light and hates

6    darkness.  Right?  You use your everyday experiences throughout

7    your lives.  You've seen that.  Lies don't stay hidden forever,

8    do they?  You can try, you can cover them up, you can push them

9    in the corner, you can try to keep them in the shadows.  They

10   do not stay there.

11           Think about a big building in a downtown area.

12   Sometimes they put floodlights on them at night.  Right?  And

13   they -- and from a distance, standing back, you don't see where

14   the light is coming from.  You just see what's being

15   illuminated.  You just see the building.

16           As a matter of fact, the rest -- everything else

17   seems more dark than had that light not been on at all.  Right?

18   The truth operates that way, much the same way.  You don't know

19   where it's coming from.  But when it -- when it's there, it

20   illuminates what used to be dark.

21           And so I suggest to you that trials are like that.

22   You know, we start out in the dark.  You come in here, and you

23   don't know what's going on.  You say, "What?  We're going to be

24   here two months, three months?  What?"  And you don't know

25   anything about this.  And you go through the process, you hear

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    opening statements.  It all seems pretty dark.

2              But then the witnesses start hitting the stand, and

3    lights start splashing in, a little here, a little there.  Lies

4    start getting uncovered.  Right?  And before you know it, you

5    start to see kind of everything.

6              So what's the first -- just kind of start this.

7    What's the first truth in this case.  Well, I'm going to start

8    you out with an easy one.  You guys are darn sick and tired of

9    hearing lawyers talk.  Am I right?  And who's the guy who gets

10   to go last.  Right?

11             So we're going to start with that truth, because

12   that's an easy one.  But that's what we're going to do.  We're

13   going to do -- we're going to kind of do that.  And so as sort

14   of a mental device, I'm going to ask you to imagine a couple

15   piles.  I'm going to ask you to imagine a lie pile over here

16   and a truth pile over here.  Okay.  Just -- we're going to kind

17   of use that as mental device as we go along.  I'm going to ask

18   you questions, and we're going to figure out which pile it goes

19   in.

20             Okay.  And we're going to go through some proof.

21   We're going to figure out, is this the truth or is this a lie?

22   And we're going to see where we end up.  Okay?

23             So you had your first easiest one.  You are sick of

24   hearing lawyers.  I am going to point out to you, Parker Still

25   is a lawyer.  All right?  Y'all.  Okay.  He's a lawyer.  But I

UNITED STATES DISTRICT COURT

1    get it.  I'd feel the same way.

2            Remember, as we get into this, that every single fact

3    witness you heard of, like they put up two opinion witnesses

4    and an investigator to talk about some stats, every fact

5    witness, every person who saw something, smelled something,

6    felt something, did something, heard something, someone who was

7    there, somebody with knowledge, those -- every single one of

8    those witnesses was put on by the United States.  Okay?

9            And we're going to start there, and we're going to

10   start with one that's probably almost as easy as the first one.

11   And that is, let's talk about Florida.  Because that's where

12   all this started.  Was this place a pill mill?  The Hollywood,

13   Florida clinic, was it a pill mill?  Well, that's pretty easy.

14   You know, the defense has sort of latched onto a hypertechnical

15   definition, superficial.  That's going to be a theme,

16   superficiality, meaningless superficial differences.

17           They even sort of jumped onto, "Well, it had a

18   dispensary, so, okay, that one's a pill mill."  Right?

19           But there really isn't a lot of disagreement in this

20   trial.  The only proof you've heard is that it was.  But this

21   is where I'm going to go a little bit fast, just going to

22   summarize some of the proof, because I know y'all are tired of

23   hearing of it.  I do know you are.

24           But start with Ben Rodriguez.  Mr. Burks wants to

25   beat up on him.  We're going to talk about the different

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

 1  witnesses and what they have to gain and all that.  But he said

 2  it was.  Right?  You know that South Florida, you've heard from

 3  a number of witnesses, was just packed full of pill mills at

 4  that time.  You know what a huge problem it was.  You know we

 5  put -- just happened to have three people -- or five people

 6  come in and testify in this trial, and this was one of the

 7  things we asked them, it just so happened that they had been to

 8  pill mills in that area.  Right?  All of these people.

 9          You know, they said they were everywhere.  You

10  couldn't throw a rock without hitting one down there.  Gerritt

11  Orrick, remember he got pulled over by a local police officer

12  down there, and said, "Hey," something like, "Florida is in the

13  shape of a gun.  Have you ever known that?  You need to get

14  back to Tennessee, son."  Right?  Huge problem down there.

15          You have to decide, but certainly you heard proof

16  that Hofstetter took bribes from customers while she was

17  working at this place.  You heard that she was fired and then

18  brought back from stealing customer money, and they started

19  docking her paycheck.

20          You know -- I'm not going to go through all the red

21  flags, but the classic ones are there, cash only, high volume,

22  young patients, people traveled long distances,

23  high-dose-opioids only treatment.  You know the DEA raided that

24  place in December of 2010.  They want you to believe nobody was

25  prosecuted.  I beg to differ.  Ben Rodriguez pleaded guilty.

UNITED STATES DISTRICT COURT

1          And you heard about the RICO unit coming in.  And you

2     know when they came in?  When we had convicted over a hundred

3     people and thought we could make a case on the Italians, that's

4     when the RICO unit came in.  RICO is there to get to people who

5     try to insulate themselves.  Ben Rodriguez visited Tennessee

6     two or three times.  Two or three times, that's it.  And

7     pleaded guilty.

8          Okay.  The Italians, Sartini, Palma, fled to Rome,

9     tried to get out of this thing, and still fighting extradition

10    to this today.  Okay?  Ben Rodriguez told you after the DEA

11    raid, they kind of shut it down down there.  Not completely

12    shut down, but changed things, and they started losing money.

13    Right?

14         We know that Palma and Sartini had already planned an

15    extent -- an expansion to the area where their customers were

16    coming from.  You know where that is?  Here, this region of

17    Appalachia, the region that was so hard hit, from Dr. Arden to

18    Dr. Mileusnic to everybody else you've heard from this trial.

19    What did Jimmy Palma call it?  Something like the Bible belt,

20    something or another.

21         You know that Palma and Sartini kept their money

22    offshores -- offshore and had always planned to run when things

23    went south.  They discussed it, they planned it out, and they

24    did.

25         So was this place a pill mill?  You know we're not

1   going to spend a lot of time, but that one is pretty easy.  Of

2   course it was.  I would suggest to you that's the first lie

3   that was uncovered in this trial, and we can put it over here

4   in the truth pile.  Okay?  Hollywood was a pill mill.

5           And the next question is just almost as easy as well.

6   Were these places pill mills?  These Tennessee locations,

7   Gallaher View, two versions of it we'll talk about, Lenoir

8   City, and Lovell Road.  Every single fact witness you heard

9   from in this trial said so, every single one.

10          Rodriguez said so.  As I noted he only visited

11  Tennessee two or three times.  He said they were always meant

12  to be pill mills.  Now, look, he had a different agenda than

13  Sartini and Palma.  Palma especially, who just get my money and

14  get me out of here.  Right?

15          Rodriguez kind of wanted to have his cake and eat it

16  too.  He wanted to kind of have the money, but then maybe not

17  run it so illegitimately and maybe have a business for the

18  future.  That doesn't sound crazy.  It's criminal.  It's

19  criminal.  Right?  So he had a little bit of a different

20  viewpoint.

21          But he acknowledges, yeah, you know, once all the

22  money came in, it's kind of like Tipton, once all the money

23  started coming in, yeah, it was a pill mill.  They were all

24  pill mills.

25          And where was the money coming from?  It wasn't

Rebuttal Closing Argument - Mr. Stone

1    coming from Hollywood anymore.  It was coming from these

2    places, and you saw the checks.  Right?  We'll talk about

3    money.

4         Likewise with Chris Tipton.  Right?  Now, when he

5    came in, he had never been involved with pain clinics before.

6    He's contacted, he manages medical practices, he sets -- he

7    helps set up the first clinic.  Remember Riley Senter was

8    supposed to be the medical director, and Claudia Mulberry was

9    supposed to come up and backed out.  And they had to totally

10   redo everything and find a different location.  It was supposed

11   to be in Riley's office, and they found Gallaher View.

12        They had to regroup.  And who did they get to come up

13   and run their pill mills?  Sylvia Hofstetter, who they accused

14   of stealing money from them at the pill mill in Florida.  Okay.

15   That's who they picked.

16        Now, the defense wants to say, well, that's just the

17   government trying to make her look bad.  I didn't make up that

18   fact.  It came from the witness stand.  Right?  And it's

19   relevant.  It's relevant to whether these places were intended

20   to be pill mills.  That's why it was brought to you.  It's for

21   you to decide.  It's relevant.  It's not to smear

22   Ms. Hofstetter.  If it's true, and you decide that, it says

23   something, doesn't it?

24        Now, I noted every customer who -- and you know I

25   don't call them patients, and that's not to be snide or

UNITED STATES DISTRICT COURT

1   anything.  That's based on the testimony you heard.  They're

2   customers.  They were drug customers.  And they stated

3   unequivocally all these places were pill mills.  And some of

4   them had been to the pill mills in Florida, Georgia, and the

5   other pill mills around Tennessee, East Tennessee, the other

6   ones that got shut down.  What did they say about these places?

7   They're all the same.  They're all exactly the same.

8           So I guess the defense's argument would have to be,

9   well, they're just -- they're just a figment of the

10  government's imagination that the idea of pill mills even

11  exists.  Right?  If these are all the same, but these aren't

12  pill mills?

13          When we asked the patients, the customers, it was --

14  whether -- it was almost a joke to them whether these were pill

15  mills.  Right?  And there's a special joke that the defense

16  doesn't like, and it was at Lovell Road, you could get your

17  pills, pancakes, and porn all in one stop.  And I didn't make

18  that up.  That came from the witness stand.  Right?  This was a

19  joke to these -- it was a joke to these people.  It was a joke

20  to some of the employees.  Right?

21          And speaking of employees, we put several on, didn't

22  we, and they all said some version of the same thing.  These

23  weren't legitimate places.  Right?  These were pill mills.

24          And I'm going to highlight one person for you.  But

25  on the joke, let's talk about Lee Jenkins.  Right?  Lee

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    Jenkins, you know, the defense likes our witnesses when they

2    say what they want them to say, but when they don't, they're

3    liars.  Right?  Did you notice that?  Kind of all these

4    patients, particularly, did you notice it didn't matter who was

5    asking them the questions?  They just answered.  They just

6    answered.  The defense liked some of their answers.  Right?

7         Lee Jenkins is kind of a good example of that.

8    Country boy from Coalfield, star football player, could have

9    gone to the University of Kentucky, fell in with bad friends,

10   and ended up here.  Right?

11        Came in here and sat there in chains.  Right?  You

12   know, we don't judge people's hearts.  Seemed like he had had a

13   pretty good one, though.  What did he say on cross-examination?

14   Remember how kind he was to Mr. Burks, how respectful he was?

15        This is what he said in answer to Mr. Burks about

16   whether these were pill mills.  He was like, "Yeah.  What I

17   could see and I'm sure she could see," referring to

18   Ms. Hofstetter, "these clinics, if you've ever been to one and

19   you probably ain't, there's addicts there, and the reason I'm

20   saying it's addicts is because they can't even hold their head

21   up."

22        Now, you saw Lee Jenkins.  Is that purchased

23   testimony or was he just telling you what he saw?

24        And the employee I want to highlight is Crystal

25   Lattimore.  Now, you remember her, and I'm only saying this to

UNITED STATES DISTRICT COURT

1   orient you, you'll remember her because she's the one who kind

2   of talked about Ms. Hofstetter getting the new Lexus and coming

3   and showing it off.

4          And Ms. Cravens asked her, "Well, that's not

5   criminal, is it?"

6          And she said, "No, but it's rude or obnoxious," or

7   whatever she said.  Right?  That's who this is.

8          Here's what's important about Crystal Lattimore.  She

9   started at Lovell Road after Puckett and Hill were already

10  gone.  Right?  And we're going to talk about whether this is

11  Puckett and Hill's fault.  Right?

12         After Puckett and Hill were already gone, she

13  started.  And what did she do, she went through all the same

14  red flags.  She talked about patients having track marks.  She

15  talked about how she and other employees checked websites,

16  looking for patients who had been arrested.  Remember the Just

17  Busted as well?  You know, lots of employees talked about the

18  Just Busted, kind of little newspaper you get down at the Pilot

19  or the Weigel's.

20         And, you know, they all said Hofstetter didn't like

21  that.  She chastised them.  Said it's none of their business,

22  not supposed to be looking at that stuff.  Right?

23         But we didn't stop with just customers and employees.

24  We brought you some providers.

25         You've heard a lot about Gayle Fristoe.  Came here

UNITED STATES DISTRICT COURT

1    from Texas.  Her son was having a hard time, as she had just

2    gone through bad divorce.  He was living here in Knoxville, and

3    he was having a rough time.  So she went through a temp service

4    and found a job here.

5           Talked to Sylvia Hofstetter on the phone.  And what

6    did Sylvia Hofstetter tell her?  Lenoir City was a post

7    surgical and wound clinic.  Her first day -- we talk about what

8    people know.  Her first day, what did she say?  What was her

9    impression?  She thought she walked into the only homeless

10   shelter in Tennessee and everybody was there.  Her first day.

11          She had her contract.  She works out her 24 shifts.

12   And remember what happened on her last shift?  She did her 20th

13   patient.  That's what she was contractually obligated to do.

14   She left at lunch.  The patient -- she was only one there.  The

15   customers all sort of freak out, "Wait, I need my scripts."

16   They start chasing her out to her car.  She gets in her car,

17   jumps in her car.  They run her out of the parking lot.  She

18   goes straight to the hotel room and calls DEA.

19          This is Lenoir City.  We're going to talk about

20   Gallaher 2 and Lovell Road.  This is just Lenoir City.

21          Kim Chambers, she was a provider.  She worked only

22   five shifts.  Do you remember what happened with her?  She saw

23   customers faking limps.  Five shifts at Lenoir City, the least

24   busy of all the places.  Okay.  Customers faking limps.

25          And remember Gayle Fristoe, too.  She caught in on

1    the UDS business.  Remember she double-checked and did a

2    customer twice, figured out within a few shifts that there was

3    some funny business with UDS's?

4              Okay.  But, here, faking limps and she's cutting

5    people's scripts.  Hofstetter and Larson pull her aside and

6    say, "Look, you may not -- you need to go home and think about

7    whether you want to work here.  Get with the program or don't

8    come back."  Right?  That's what they said.

9              What's between the lines there?  "Hey, lady.  This is

10   a pill mill.  This is what we do.  If you're not cool with it,

11   maybe you should work somewhere else."  Right?

12             You know, certainly no paragons of medical

13   professionalism.  But Valley and Blakely even said this was a

14   pill mill, these were pill mills.  Right?

15             All those Blumenthal e-mails that Ms. Pearson went

16   through with you yesterday, they told Ms. Hofstetter she was

17   running pill mills.  Right?  They're already beating them down

18   our doors, we need to tone this down.  This stuff is crazy.

19   It's going to get us in trouble.

20             Remember the Valley letters?  Severe and immediate

21   risk?  This meets classic definition of a pill mill.  And all

22   the red flags, I'm not going to go through them all.  I'm going

23   to highlight one, that drug addict grapevine, I kind of call

24   it.  Remember how some of the customers would say, you know,

25   one opens up and word is out overnight across the region, this

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1   is the place to go to get pills.  Right?  Best advertising

2   there is, word of mouth.  None of these places advertised.  Not

3   formally.  Because the best advertising is word of mouth.

4   Right?

5          The other clinics you've heard about from Browder,

6   from Blake, what do they do to keep that from happening?  No

7   opioids first visit.  Thirty days, no opioids.  Right?  These

8   places advertise the opposite.  Neon flashing lights, get your

9   opioids, like a beer sign.

10         So, of course, I would suggest to you, unequivocally,

11  not going through all the proof, you remember, unequivocally,

12  these places are pill mills.  So let's move another one into

13  the truth pile.  The Tennessee locations were pill mills.

14         So, now, the next question, did Hofstetter know she

15  was running pill mills?  Right?  I know this sounds elementary,

16  but we're building.  So let's start with Hollywood again.

17         Now, you heard about DEA Agent Lunsford and the whole

18  weirdness about Dalgleish wanting his phone number to go to the

19  zoo or something after he finds out that Lunsford is going to

20  sell all his pills.  Right?  But do you remember that tape,

21  that video?  What was Hofstetter mad about?  Remember what

22  Lunsford testified to?  She said, "You know you better than

23  talk like that in here."  Talk like that in here.  Right?

24         It's theater.  Everybody has a role to play.  He

25  wasn't playing that role that day.  Right?

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1            We already talked about her taking bribes and

2    stealing money.  And when everything falls apart with Senter

3    and Mulberry, her second chance comes, right, Tennessee.

4            And the partners decide to send somebody up here who

5    stole money from them.  Does that sound legitimate to you?  And

6    Rodriguez did testify they all knew.  They all openly talked

7    about it, including Hofstetter.  And you know she had one focus

8    and one focus only, if nothing else has been clear in this

9    trial, and that was money.  People were money to her.  Patient

10   volume.  She didn't deny it.

11           "What are you doing up there in the country?"

12           "It's all about the money.  Party on the weekends.

13   Work hard in the week.  All about the money."

14           What about staff turnover?  I've kind of talked about

15   it.  Remember when Alan Pecorella got arrested in Sevier County

16   by the state for selling opioid pills or something like that?

17           This one is out of order.  Oh, I'm sorry, I'm out of

18   order.  I missed on my outline.  Talking about Gallaher View 1.

19   Right?  All the outlandish complaints there, some of them

20   crazy, mulch fires, men urinating in front of the sliding glass

21   door in the beauty shop where the women are inside.  Right?

22   People selling stolen goods out of their cars.

23           You know, the defense would have you believe all that

24   was made up by everybody who hit the stand.  Right?  The

25   litigation over them getting evicted, having to hire an armed

UNITED STATES DISTRICT COURT

1    security guard to keep the peace.  Right?  All that is just

2    made up, I guess.

3           But we know it wasn't, because one of -- in

4    Hofstetter's terms, one of the drug addicts broke in and stole

5    the TV.  Whose words?  Sylvia Hofstetter to Dion Davis, the

6    security company guy, boyfriend, whatever.  Drug addicts broke

7    in and stole the TV.  She doesn't know?  She doesn't know?

8           Talked about the staff turnover, Pecorella gets

9    arrested, Lindsay's last day is coming up, Stephanie Carmichael

10   is working through the end of the month.  "After what Alan did,

11   Pecorella, no one wants to risk working with us.  Shaking my

12   head.  Here we go again.  Here we go again.  Having to keep" --

13   you can't keep staff there.  Right?  Everybody leaves.  Nobody

14   wants to work there.  After what Alan did, nobody wants to risk

15   working with us.  Her words.

16          Heck, she ran off three medical directors.  Think

17   about that.  Blumenthal, Valley, and Blakely, ran them off.

18   Ran them off.  They all -- Blumenthal is dead.  Right?  But you

19   saw the text and the -- or the e-mails.  She undermined him.

20   He wanted to tone things down, because they were already

21   beating down the doors.  Ran him off.  Valley, ran him off.  He

22   stayed a little while longer.  Blakely stayed three weeks and

23   broke his contract.  Ran him off.

24          She finally goes to Brickhouse, who's now dead, was

25   indicted and died, and who has almost 80-year-old Richard

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    Larson on dialysis twice a week, waiting for a kidney

2    transplant, as his medical director.  Ms. Hofstetter goes to

3    Brickhouse and comes up with an agreement to share Larson.  He

4    was indicted.  I indicted him, and he died.

5           But if all that proof wasn't enough to Hofstetter's

6    knowledge, you know, they talk about the secret pain clinic,

7    like that's some word.  It was secret.  Tipton and Hofstetter

8    opened Gallaher View 2 in secret from the Italians and from

9    Rodriguez.  And they seeded it, remember, purely, purely with

10   previously discharged patients.  By this time, Gallaher View 1

11   had closed down.  Lenoir City was open.  Valley was over there.

12   She brought Larson in.  She sent Puckett over.

13          Remember, Puckett, her background, she goes to work

14   at Lenoir City, she works there two weeks.  Former prostitute,

15   crack addict, and convicted felon, she's put in charge of a new

16   pill mill after two weeks on the job at Lenoir City, and that's

17   her experience.

18          What did I ask her?  "What did you do after high

19   school?"

20          "I got on crack."

21          Spent about 20 years on crack, walking the streets,

22   in and out of prison, stealing church money.

23          Who interviewed Puckett?  It was Dion, the security,

24   all black, tactical gear, gun on the hip, the security guy for

25   the place.  And he didn't do a background check.  Use your

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    common sense.  Picks Puckett out of thin air, two weeks at

2    Lenoir City, sends her to Gallaher View Road to start a pill

3    mill based on discharged patients, all those patients Valley

4    was discharging.  Right?  And you know that, because Sylvia

5    Hofstetter told you.

6         The guy that's -- talking about a customer giving us

7    all that trouble earlier is being discharged by Valley.  That's

8    Dion.  Sylvia says, "Wow.  Too much.  Do you think we should

9    start letting all the discharges know we have a new one -- a

10   new MD working out of Knox and they can go there"?

11        That's Gallaher View 2.  The new MD is Larson.

12   Right?  Puckett said she had a file cabinet of discharged

13   patients to call back.  She does that.  New lightbulb, Sylvia

14   Hofstetter has, well, we'll send the Lenoir City discharges

15   over there too.  What did Dion say?  He's kind of like, I don't

16   know, this guy has gotten meds from across the board.  You know

17   what that means.  That's all the other pill mills around here.

18        THE COURTROOM DEPUTY:  Thirty.

19        MR. STONE:  And if it's legitimate, why open it in

20   secret?  Why move into an old bar with mirrored windows between

21   a Waffle House and a porn store?  Right?  They think it's

22   gratuitous.  It's the truth.  It's because they're not going to

23   get complaints there, or so they thought.  But, remember,

24   Jessica Watson said even the Waffle House didn't want the

25   Lovell customers there.

UNITED STATES DISTRICT COURT

1    Now, listen, I love me some Waffle House, right, but

2  if the Waffle House doesn't want you over there, that says

3  something too.  You know, and the reason is, it's a dirty

4  business.  It's a lie.  Hofstetter new exactly what she was

5  doing.  She embraced it with every bank deposit and pull of the

6  slot machine arm.

7    So the next question, if the Tennessee locations were

8  pill mills, was it only because of Puckett and Hill.  Right?

9  That was what you heard today.  Was that noise or signal.

10  Right?

11    Well, we've already established they were pill mills.

12  Right?  We know that Puckett didn't -- she worked at Lenoir

13  City two weeks, and it stayed a pill mill.  Right?  So that

14  couldn't have been her fault.  It was -- they were pill mills

15  before they got there.  Right?

16    Some customers chose to stay at Lovell.  Randy

17  Garrett stayed, Lisa Elliott stayed, Charles Webb stayed,

18  Michael Canada stayed.  Lattimore, as I pointed, worked there

19  after Puckett and Hill.

20    So is it all Puckett and Hill's fault?  You know, I'm

21  going to suggest to you they were symptoms of the disease, not

22  the cause of the disease.  Right.  Kind of talking health care.

23  Symptoms, not the cause.  The disease was the environment.

24  Right?  And it was -- and the environment was a reflection of

25  Sylvia Hofstetter, the boss.

UNITED STATES DISTRICT COURT

1    You talk about the scorpion and the fox, Mr. Burks,

2    it was just her nature.  They were drug houses.  It was about

3    the money.  Patients aren't people.  It's full of drug addicts

4    and dealers, stupid rules.

5        So, of course, there were scams there.  It was full

6    of scams, the UDS kickback scams, the pain creams, the, you

7    know, DMA.  People aren't kicking down the door, beating down

8    the door for $300 cash to get told they need some heat and ice

9    or get a back brace or a TENS unit.  Right?  And over half the

10   customers had insurance.  Right?  That was the testimony.  They

11   didn't have to be there.

12       Scams, Dion's security company was a scam.  He was

13   never there.  The discharge shell game, discharge here, you can

14   go over there.  It was all a scam from top to bottom.

15       So when you can't deny all the horrible things that

16   was going on, you got to blame somebody else.  They blame

17   Puckett and Hill.  Sure, they contributed.  Right?  But they

18   never wrote a single prescription.  Who chose to write loads of

19   opioid prescriptions with no UDS's in the files?  Right?  It

20   was the providers.  It was these providers who were at the

21   worst of the worst place.  Right?

22       And you know it was the worst of the worst, because

23   all you have to do is look at -- look at the money.  Right?

24   Follow the money.  That top blue line, that's Gallaher View 2,

25   going into Lovell Road.  And you see everywhere else, Lenoir

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

City and the first Gallaher View, those patients moved to Lenoir City, you see that profit declining all the way down, all the while Lovell Road, Gallaher View 2, Lovell Road increasing.

And you see the big drop here?  The big drop in money back in the Valley time period.  You can put up all the stats you want about discharges, money or people, those are discharges.  That's why Valley didn't last.  That's why Gallaher 2 was opened.  Right?  And that's why Gallaher View took off.

It was one giant scam.  And, you know, Puckett, Hill, yeah, sure, they've been convicted.  Right?  Came here in chains.  But Hofstetter did the same thing in Florida.

But this one is really -- really telling.  Here's a big truth.  When Puckett and Hill left and started KPC, a competing pill mill, and started siphoning off patients from Lovell Road, that's exactly -- exactly what Hofstetter did to Palma, to Sartini, and Rodriguez by opening up.  You can see it.  You can see the money.  Right?  You can see where the patients went.  That's exactly what she did to them.  But only Puckett and Hill are the bad guys.

So we know Hollywood was a pill mill.  We know all Tennessee locations were pill mills.  We -- Hofstetter knew it. She made millions.  Puckett and Hill were symptoms and not the cause.

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    So here's the big question in this trial.  Right?

2  Ms. Newman, Ms. Clemons, and Womack, did they betray their

3  oaths and become de facto drug dealers working for a drug lord?

4  Right?  That's the big question.  That's the big truth.  Did

5  they know they were helping flood the streets with about

6  2 million opioid pills to thousands of customers?

7    This is good for you, because I'm jumping ahead.  So

8  let's talk about who figured it out and who had no prior

9  experience.  Brandon and Danielle Ledford had never been to a

10  pill mill.  Went to Gallaher View Road.  Their first impression

11  was, was this even a doctor's office?  They had no experience.

12  Right?  They had never seen a pill mill before.

13    Blakely, his first day on the job at Lenoir City,

14  he's waiting outside, he doesn't know which door to go in.

15  This is the three-week temp from Texas.  And all these

16  customers are out there and they're talking about drugs.

17  Right?  This is the guy who was fired from the previous job

18  from falling asleep during surgery.

19    Gayle Fristoe knew it immediately.  We went through

20  all that.  The customers knew it.  The providers who testified

21  knew it.  The neighboring businesses knew it.  The landlords

22  knew it.  Security guard Mike Daignault knew it.  Rodriguez

23  knew it.  Sartini and Palma knew it.  They fled.  Tipton knew

24  it.  The labs paying the kickbacks knew it.  Blumenthal warned

25  of it, so did Valley.  The employees knew it.  The community

UNITED STATES DISTRICT COURT

1    knew it.

2              You heard Dr. Blake.  These all had reputations as

3    pill mills.  All the previously discharged patients should have

4    been a clue.  Right?  All the people with track marks should

5    have been a clue.

6              You know, they talk about 2,000 discharges, but

7    you've heard the testimony, at Hofstetter's instructions,

8    they're supposed to sanitize the charts, to remove all evidence

9    of discharge for that shell game to work.  Right?

10             Well, they missed 290.  Nobody will ever know how

11   many of those 2,000 actually kept moving around between the

12   different pill mills.  You heard from a lot of them.  A lot of

13   them testified.

14             So thousands of people knew it, and they didn't.  And

15   you got to ask yourself, which pile does that go in?  They go

16   there every day, every day.  I don't care if it's 86 shifts, 11

17   months, 14 months, whatever it is.  Every day, and they're not

18   seeing what everybody else sees?

19             And they want to talk about lying witnesses, as we

20   just talked about, only when it suits them.  And how many

21   witnesses did we put on the stand, how many customers, right,

22   who either had been to prison, gotten out, had nothing to gain,

23   or were just citizens?  We didn't know about them because they

24   were random defense charts.  We went and found them, but we

25   didn't know about them ahead of time.  Right?  And they said

1    the same thing.  Everybody says the same thing.  And they've

2    got nothing to gain.

3           You know you talk about the experts.  Here's the

4    takeaway from the experts.  Mr. Oldham is right.  You know,

5    they're going to get up here and disagree.  But what did they

6    agree about?  Talk about objective versus subjective.  Right?

7    What did they disagree -- what did they actually agree about?

8    Browder and McCoy agreed that what they saw was really bad.

9    Right?  Some of it really, really bad.

10          Some of it they could not -- you know, Browder

11   changed his mind on -- on one guy.  He did his report and said

12   it was outside the scope and not legitimate.  But comes back

13   and after talking to the defendants, I guess, changes his mind

14   and says, no, that one's now legitimate.

15          But they have to parse words.  They have to use words

16   like activities and structure and quality in these things.  But

17   they agree, don't they, with everybody else, this was all

18   really bad?  Right?  They just want to step into your shoes and

19   say, but it's not criminal.  It's not their place.  They try to

20   get into intent.  Remember all that subjective stuff?

21          But when they're objective, they said it's all really

22   bad, didn't they?  Everything they saw was bad.

23          And remember those 15 random charts that the defense

24   selected that were supposed to be representative of the entire

25   six, 7,000 patient files.  Right?  We went out and found five

UNITED STATES DISTRICT COURT

1    of them.  Right?  One of them had been convicted, Melissa

2    Mulkey, in this case.

3           So do some odds on that.  If 15 are supposed to be

4    representative of 7,000, and one of them, we caught one of

5    them, right, but the five we found came in and they all said

6    the same thing, these are all pill mills.  They said the same

7    thing everybody else said.  Right?  What does that tell you

8    about the other 7,000?  It's consistent.  Every fact witness

9    who we put on told you the same thing.

10          So the question is, you know, there's no dispute that

11   they did have their own independent duty of care, they had

12   their own license, their own DEA numbers.  Right?  They knew

13   Larson was incompetent, old, and in poor health.  They

14   previously ignored all of his red notes.  We're going to talk

15   about that in a minute.  Even if they're inconsequential, they

16   ignored them.

17          You know, they can't hide behind him.  They can't

18   have it both ways.  All those charts you saw, all those charts

19   the experts went through, they either didn't review them before

20   writing the prescriptions, they reviewed them, or they reviewed

21   them and they ignored or disagreed with Larson or they just

22   didn't care.

23          So if they didn't care, why?  Well, for

24   Ms. Hofstetter, it's easy, isn't it?  Greed.  She loved money

25   more than people.  She loved gambling more than people.  She

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    loved jewelry more than people.  She loved big houses and Lexus

2    cars more than people, and showing them off to

3    12-dollar-an-hour staff.  But, sadly, that was easy for her,

4    because she didn't see the so-called patients as people, did

5    she?  They were beneath her.  They were trash to her.

6    Tennessee water makes you slow and stupid.  She said that to

7    everyone.  So it's easy.  Right?  They're like slaves to her,

8    serving her purpose, getting her rich.

9            What about the other three.  Right?  We've talked

10   about Gayle Fristoe.  We've talked about Kim Chambers.  They

11   refused to be deliberate -- they just, no, we're not going to

12   be deliberately ignorant, we're not going to do this.  Right?

13           So I'm going to highlight just three or four to make

14   this point.  Richard Gregory, a random defense chart now,

15   supposed to be representative of all 7,000.  He's discharged

16   from Courtney Newman's previous pill mill.  Right?  According

17   to Blake, that was a pill mill.  Browder talked about it.  It

18   had the name that tried to act like their name, looked like

19   their name.

20           He was sneaking in fake urine in a Whizzinator.  He

21   goes from there to Clemons, and she writes him high-dose

22   opioids for month.  And all those records from that previous

23   pill mill are in the chart.

24           And, remember, this is the one where Browder leaned

25   back in his chair, wrung his hands, said it was his least

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1   favorite file, but then begrudgingly said it was legitimate,

2   even though he previously had written in his written report

3   months before that it wasn't.

4           You don't need a doctor to tell you about that one.

5   And Clemons was fine with it.  The question is, are you?

6           What about Ms. Womack?  Let's visit Lee Jenkins

7   again.  Right?  It doesn't take a medical license and a fancy

8   degree to know what the word "high" means.  Remember, they say,

9   oh, that just means the cap.  Right?  Well, let's look at that.

10          I don't see a down arrow there.  Do you see a down

11  arrow?  Any down arrows?  Right?

12          Is that one ambiguous, "MED too high, exclamation

13  point, exclamation point."  Scribbles all over it.  Did Lee

14  ever fail to get his scripts?  Was his MED ever cut?  Do you

15  recall he never had any UDS results in his chart?  No UDS

16  results.  They want to say they cared.

17          What about Ms. Newman?  Heather Alred, who we all

18  know so well, this poor girl was an opioid addict, recovering

19  opioid addict for two years.  Over two years, she's getting

20  monthly Suboxone prescriptions.  Only purpose to treat opioid

21  addiction.  She's off for six months, she falls off the wagon,

22  she on the streets, buying it off the streets.

23          She tries to go to -- she's got insurance.  Right?

24  Could go anywhere for her pain.  Right?  She tries a clinic in

25  Oak Ridge that accepted insurance.  They say, "No.  You've got

UNITED STATES DISTRICT COURT

1  an opioid addiction.  You've been on Suboxone for two years.

2  We're not writing you."

3          So she talks to her drug friends.  Remember that

4  network, the grapevine?  What do they say?  "Lovell is the

5  place to go."

6          Well, you know what happens.  You see it right there.

7  She shows up.  Who does she see?  Courtney Newman, who checks

8  that she checked the PMP and the chart.  What does she do?

9  Loads her up with opioids.

10          An opioid addict, plain as day, all the drug

11  community, "Go to Lovell, you'll get what you want."

12          Did Courtney Newman care?  And you saw what happened?

13          And this is the point.  It goes back to Puckett and

14  Hill.  That's what these places were.  This is where you meet

15  people who take you out and abduct you and inject you and rape

16  you over and over and over till you've got to run away and hide

17  under a car and beg somebody to call 91.  And you come back

18  here and you tell Cindy Clemons about it.  And according to

19  Heather Alred, she was made to feel like dirt when she did

20  that.  And she became a liability, and they ran her off, and

21  kicked her to the curb.

22          You know they want to say they care.  People matter.

23  Heather matters.

24          We're going to talk about addiction.  Are you fine

25  with that?

1    What about Jessica Watson? How much do you think she

2    weighs right there? When they were done with her, she had lost

3    30 pounds. She didn't have a pound to spare to start with.

4    Right? All three women wrote to this girl, 20 years old, 21,

5    whatever. She loses 15 pounds in four months or something like

6    that. By the time she's -- they're done with her, she loses

7    30 pounds.

8    And they're supposed to care about her. They never

9    said a single word. She could have had cancer. Right? Well,

10   she didn't. She's at a pill mill. They would have known.

11   She's just a strung-out junkie. She's a strung-out junkie.

12   But does she get her script? She gets her script.

13   Holli Womack wrote her in the waiting room, you know,

14   the Holli with the BMW. Remember that? Scolded her for

15   calling Opanas half moons. Not supposed to use street slang in

16   here. But upped her Opanas at this little girl's request, so

17   did Courtney Newman.

18   She said Sylvia Gil, you heard about her, worked at

19   the front desk, she referred to the patients as junkies. This

20   is the girl that Gerritt Orrick and all his bling. Talked

21   about the bling picture from Halloween. Of course that's the

22   joke. It's telling, though, what she chose as her little

23   costume, wasn't it?

24   Who else told you he dressed like that, Gerritt

25   Orrick? He had all his rings, his gold teeth, thugged out.

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

 1   He'd come and he said he put his little booty up on the desk,

 2   next to Sylvia Gil.  Brought her cupcakes because he thought

 3   she was cute.  Right?

 4          When he's bringing his sponsored patients in, he's

 5   not being seen.  He said he did that all that time.  He's in

 6   there all the time.  Somebody in the back even asked him,

 7   "You're in here all the time.  Why are you in here all the

 8   time?"

 9          And big shock, they found track marks on Jessica.

10   No, they didn't care.

11          And all you have to do is think about those names,

12   Urgent Care & Surgery Center, Comprehensive Healthcare Systems,

13   East Knoxville Healthcare.  Right?  They're supposed to care.

14   Those are all lies too.  This was exploitation, not health

15   care.

16          But you still have to ask yourself why.  Now, look,

17   we don't have to prove motive.  You'll see it's not an element.

18   But you're going to, and that's okay, because we're not trying

19   to hide anything from you.  You were told this morning why they

20   did it.  Daytime hours and no weekends.  Daytime hours and no

21   weekends to do this.

22          It almost makes it worse, doesn't it?  At least

23   Hofstetter got rich.  No nights and weekends.  Sell their

24   licenses, betray their oaths.

25          You know, we all have our own reasons for doing

UNITED STATES DISTRICT COURT

1    things.  Usually, this is everybody in this room, when we

2    choose to do something wrong, what's at the bottom of it?

3    Selfishness.  Right?  No one knows -- truly knows the depths of

4    his or her own selfishness.  We saw that come out in this

5    trial.  And this applies to everybody, not just to the

6    defendants.  This is all of us.

7            But it usually starts small.  Right?  Well, just this

8    one time.  It might not be so bad.  It's okay just this once.

9    Everyone else is going it.  Right?  But roots become shoots

10   become trees become forests.  Right?  And so it goes until an

11   entire forest --

12           THE COURTROOM DEPUTY:  Fifteen.

13           MR. STONE:  -- crops up from a single acorn.  It's

14   how forests happen.

15           Tipton did that.  He told he you did.  Debra Kimber

16   told you he did.  It was the money.  The money changed him.  He

17   was a good man.  The money changed him.

18           Puckett and Hill did that.  Got their little 50 bucks

19   coming in, and they grew it into sponsoring patients and all

20   that.  Right?

21           It's part of the human condition.  One script becomes

22   another script becomes a hundred scripts becomes a thousand

23   scripts.  And at some point along the way, they chose to become

24   pill mill script writers.  7,000 of these people, every one of

25   them getting their scripts.

                    UNITED STATES DISTRICT COURT

1       And they stick their heads in the sand and start

2   blaming everybody else.  Blame the patients, blame Puckett and

3   Hill, they blame Larson, they blame the government, they lash

4   out, they blame me.  All so they don't have to face the truth.

5       Who were the gatekeepers?  For any of this to work,

6   for any of those 7,000 to get it, what has to happen?  Somebody

7   has got to write the script.  Right?  And who do we trust in

8   this country to not do that?  Health-care professionals.  They

9   talk about trusting the patient.

10      You know, this is an important day for them.  There's

11  no doubt about it.  It's hugely important for them.  But I can

12  about promise you this.  No, I can promise you this.  At least

13  for not what goes on in this courtroom, and God forbid anybody,

14  but whatever happens in this courtroom today, nobody is going

15  to die from it.  Right?

16      You got professionals, you got more lawyers than you

17  can swing a cat at in this room.  Right?  We're all

18  professionals or supposed to be.  And they're passionate, and

19  they saw it, and they're doing their best, and they care.

20  That's what they're supposed to do.  All these defense lawyers

21  did that.  Right?

22      And it is an important day.  But when one of these

23  7,000 walks in, it's an important day for that professional

24  too.  Right?  And on that day, whether it's 50 times, 80 times,

25  a hundred times a day, somebody could die.

Rebuttal Closing Argument - Mr. Stone

1          Nobody is going to die from this today.  They're

2    supposed to be professionals.

3          A whole lot in this case about appearance and

4    reality.  You know, what were they?  Were they shams?  You just

5    scratch the surface and you figure out what it is?  Were they

6    legitimate?  You were told today they were legitimate.

7          Sincerity means that appearance and reality are

8    exactly the same.  That's what the word "sincerity" means.  And

9    to everybody except the addicts and the drug dealers, these

10   pill mills tried to look legitimate, of course, but they failed

11   miserably.  All of that was just meaningless.  It was just

12   superficial.

13         Why is Holli Womack here?  She thinks she gets a free

14   pass for going to the FBI when she finds out somebody is

15   issuing scripts in her name after she leaves Lovell Road.

16   That's self-preservation, trying to save her license.  Right?

17         And Puckett told you, Holli Womack was good with

18   presigning scripts and let them photocopy them.  And anybody

19   who had insurance, right, another scam, anybody who had

20   insurance, give them out for pain creams.  Right?

21         Well, of course, Puckett kept doing that after Holli

22   Womack left because she had the stack of scripts.  Right?  Well

23   of course she goes to the FBI and says, "It wasn't me.  I don't

24   want to get in trouble for that."

25         That doesn't get you a free pass.  That gets you a --

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    what we've seen in the trial, that should get you a free pass?

2    Remember, she was the number one preferred provider by

3    customers and by Puckett.  And it wasn't because she was nice.

4    It's because she didn't care.  Remember?  She didn't care about

5    UDS.  She never checked UDS.  Of course the customers love her.

6    Of course Puckett loved her.

7            Remember the next pain clinic she went to after

8    Lovell Road?  Lisa Elliott said, "Yeah, I contacted her on

9    Facebook and said, hey, can I come and can I bring one of my

10   people, Brandon, can he come with me?"

11           "Sure."

12           And she did.  And they did.  And they still got

13   opioids.

14           Why is she here?  Come on.

15           Scott Willis, remember he's the one Burks --

16   Mr. Burks fought with so much, said these were dope houses.

17   Right?  What did he say?

18           "So it's my fault, you know, the line patient, so

19   it's my fault."

20           He was asked this question.  Don't take my word.

21   Take somebody who was there.

22           "It's my fault, them giving me what I needed.  They

23   were the professionals here, not me.  I was the junkie walking

24   in.  They're supposed to be the professionals.  Just walked in,

25   junk out, yeah, set there, get a dirty, dirty drug screen, pass

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    out in their office.  And, yeah, and they even talked to me

2    about it and still write me my script.  They still give me my

3    pills.  Yeah, I'm the truthful patient.  These places were dope

4    houses."

5           He wasn't wrong.  In the name of pain, these

6    defendants fed addiction, destroyed lives, destroyed families,

7    tore communities apart, fueled an epidemic, and killed people.

8    They were hurters, not healers.  They hurt people.

9           Let's talk about addiction.  You heard them.  You

10   heard the patients.  Why do they start using these things?

11   They want to make their problems go away.  They want to feel

12   better.  Right?  But then they got to take more and more.

13   Right?  Because then they get bigger, because they're addicts

14   now.  Bigger and bigger problems.  They got to take more and

15   more.  And then they just got to start taking them so they

16   don't get sick.  That's what addiction is.  It's a lie that

17   promises something it can't deliver.

18          You've heard a lot about freedom.  Right?  Like it or

19   not, we're all slaves to something.  The question is, what do

20   we enslave ourselves to?  Is it money, it is prestige, is it

21   power, is it pills, is it not having to work nights and

22   weekends?  We all choose something.

23          And if you've seen anything else in this trial,

24   you've seen that.  So what's real freedom?  Right?  Said we all

25   enslave ourselves -- real freedom is when you enslave yourself

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    to something true, and then something weird happens.  When you

2    become a slave to truth, and that's what I'm going to ask

3    you-all to do when this is over, you become free.

4           Not many people figure that out.  But when you pick

5    something true, something true, and you enslave yourself to

6    that, you become free.  We saw a bunch of slaves in this trial.

7           And I'm going to try to illustrate a point to you

8    about appearances versus reality.

9           Above the Arctic Circle, the native Americans who

10   live up there are called Inuits.  When I was a kid, we called

11   them Eskimos.  Inuits is the right term.  And they live on fish

12   mainly.  Right?  Stay with me.  They live on fish.  I don't

13   know what all they eat.

14          But about a couple weeks a year, I've seen this on a

15   nature show, they get to hunt whale.  Right?  They get to hunt

16   whale.  And the men -- men, women, I don't know who all.  They

17   go out in these little boats, little boats that look like

18   they'd capsized if you moved wrong.  Right?

19          And they get these harpoons, and they harpoon this

20   whale.  And they all drag it back up onshore.  And the whole

21   village turns out, and they start carving up this whale.

22          They don't have commercial freezer.  The outdoors is

23   their freezer.  It's fifty below zero.  Right?

24          But there's one problem.  Right?  There are wolves.

25   And they're just being wolves.  They're following their own

UNITED STATES DISTRICT COURT

1   law, the law of nature.  Right?

2           Well, what happens?  They can't harvest, they can't

3   butcher this giant whale, and they have nowhere to put it.

4   Right?  So the wolves come and they eat it.

5           So the Inuits, what they do, remember the sword of

6   truth?  They get this long, two-sided, two-edged sword, really

7   sharp, and they bury the hilt in the snow.  They get that rich

8   whale blood, and they start pouring it over the stop, and that

9   freezes.  And they do it again and that freezes.  And they do

10  it again and that freezes.  They make like a whale blood

11  popsicle.  Right?

12          They go to bed at night and the wolves come and start

13  licking it.  You know where this is going.  Right?  They lick

14  it, and their tongue gets frozen.  They can't feel anything.

15  They keep licking it.  It's so good.  It's just so good.

16  Right?

17          And they get down to the blade, and you know what

18  happens, their tongues become ribbons.  They can't drink, and

19  they can't eat, and they starve to death.  That looked so good.

20  Right?

21          Think about these pill mills to the addicts.  Think

22  about these pill mills.  They look so good.  You can go there

23  for 300 bucks, get all these pills.  If you're sponsored, you

24  can do it for free, get half a script.  Sell some of your own,

25  keep the rest, if you're not sponsored.  Right?  Pay for it

UNITED STATES DISTRICT COURT

 1    that way.  Looks so good.  But you saw them, it left them in

 2    ribbons.  It can appear good, but in reality, its terrible.

 3            We're going to close with a little brain exercise

 4    about a single pain.  You heard about Roxi 30s.  There's a Roxi

 5    30.  It's a generic.  It's what folks are getting, what

 6    Dr. Browder called poison.

 7            THE COURTROOM DEPUTY:  Five.

 8            MR. STONE:  Right?  Let's talk about a single Roxi

 9    30, worth $30 on the street.

10            Why do we have criminal laws?  And you're here, it's

11    important.  Right?  I mean, it's nothing I really thought about

12    much before I became a prosecutor.  It's really simple.  It's

13    to keep people, human beings from hurting other human beings.

14    Right?

15            Now, somebody is going to say, oh, animal cruelty.

16    Okay.  Yeah.  In our society -- and I'm a dog lover.  I'm an

17    animal lover.  We sort of raise animals up to almost human

18    status, and that's fine.

19            But, you know, the point of criminal laws are, to

20    keep human beings from hurting other human beings, whether it's

21    money, theft, murder, whatever, drug dealing, that's why we

22    have criminal laws.

23            There's no denying that these defendants hurt lots of

24    people.  There's no denying it.

25            Here's the numbers.  They don't like these numbers.

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1    Over 11 million pills to over 7,000 customers.  Right?  These

2    defendants themselves, 2 million pills.  And do some quick

3    math, right, you add all this up, and it's over 2 million

4    opioid pills just between the three of them.  That's

5    60-million-dollar street value, conservative, because you know,

6    the half-moons, the Opanas are worth a lot more.  Right?

7    60 million bucks.  Right?

8           And the question is, when did they choose to close

9    their eyes to the obvious?  Right?  First pill, second pill,

10   hundredth pill, thousandth pill, hundred-thousandth pill,

11   five-hundred-thousandth pill, for Ms. Clemons, the millionth

12   pill?  When did they choose to close their eyes?

13          Okay.  Here's the brain exercise.  Imagine this, you

14   guys walk in every morning.  What if any one of these

15   defendants, any one of them, are caught down there on the

16   street selling just one of these, just one?  There isn't a

17   person sitting to your right or to your left or you who would

18   hesitate to convict them.  One pill.  Right?

19          But you put them in a place with health care in the

20   name, give them a prescription pad, and from 2012 until today,

21   we got to go through all this, all this to untangle all the

22   lies.

23          The street dealer can't hide behind those lies.  It's

24   bad, it's wrong, but he's honest.  Right?  There's no denying

25   it.  He gets caught, he gets convicted.  Besides the massive

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1   amount of drugs they dealt in comparison to street dealers, the

2   only thing separating these defendants and them are all those

3   lies.

4           Now, I suggest to you that's truth.  I'm going to

5   suggest to you that professionals shouldn't betray their oaths.

6   You were given an oath.  You're not going to betray it.  Right?

7           So after all this, it comes down to one question.

8   And it's your choice.  You got the lies over here and then all

9   the truths over here that we've revealed.  What are you going

10  to do?  Choose truth.  Choose truth.

11          Thank you.

12          Thank you, Your Honor.

13          THE COURT:  Thank you, Mr. Stone.  Thank you, all

14  counsel, for your closing arguments.

15          As you may have -- as some of the counsel referenced,

16  the Court does have a lengthy charge or jury instructions to

17  give you.  So I'm go I think to do that after lunch.

18          Closing arguments are done, but deliberations don't

19  begin until after the Court instructs you on the law.  So take

20  a lunch.  Is 1:15 okay?  Does that give you enough time for

21  lunch?

22          THE JURY PANEL:  2:15.

23          THE COURT:  I'm sorry, 1:15 does not give you enough

24  time.  2:15 does.  We'll come back at 2:15.

25          But what I was going to say is, do not discuss the

UNITED STATES DISTRICT COURT

Rebuttal Closing Argument - Mr. Stone

1   case.  Do not begin deliberations in any fashion.  Just take a

2   breather, and we'll see you back here 2:15, 2:20.  Why don't we

3   just say 2:20.  That will give you normal time.  We'll start

4   back up, and I'll give you your charge, and then give you

5   further instructions in that regard related to the beginning of

6   your deliberations.

7           So we'll break for lunch at this time.  Thank you.

8       (Jury out at 1:08 p.m.)

9           THE COURT:  Okay.  We'll see everybody back here, I

10  think, let's be ready to go right at 2:20.

11          THE COURTROOM DEPUTY:  This honorable court stands in

12  recess.

13      (Recess from 1:09 p.m. to 2:21 p.m.)

14      (Excerpt of proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

       I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing excerpt of proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

    I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

    IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida this 9th day of April, 2020.

_____
REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida