UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:   3:15-CR-27-TAV-DCP |
| | ) | |
| SYLVIA HOFSTETTER, | ) | |
| COURTNEY NEWMAN, | ) | |
| CYNTHIA CLEMONS, and | ) | |
| HOLLI WOMACK, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This criminal case is before the Court on two motions for judgment of acquittal and a new trial, one by defendant Hofstetter [Doc. 890] and the other jointly submitted by defendants Newman, Clemons, and Womack [Doc. 870].  The government responded in opposition [Doc. 891], and defendants did not timely reply.[1]  Also before the Court is defendant Hofstetter's motion [Doc. 892] for oral argument on her motion for judgment of acquittal and a new trial, which the government opposes [Doc. 893].  After considering the record and controlling law, for the reasons that follow, the Court will **DENY** defendants' motions [Docs. 870, 890, 892].

---

[1]   Defendant Hofstetter filed a "supplement" [Doc. 899] to her motion, along with a motion [Doc. 898] seeking leave to do so.  As opposed to a supplement, the Court interprets defendant's filing as an untimely reply to the government's response to her motion.  *Compare* LR 7.1(c), *with* LR 7.1(d); *see also* E.D.TN. LR 7.1(a).  The government has not responded to defendant's filing, and the time for doing so has passed.  In light of the lack of objection, the Court will excuse the untimeliness of defendant's reply and consider the arguments set forth therein.  To that extent, defendant's motion [Doc. 898] is **GRANTED**.

## I. Background

This case arises out of the operation of pain management clinics by the Urgent Care & Surgery Center Enterprise ("UCSC") in Hollywood, Florida and East Tennessee. According to the Fourth Superseding Indictment [Doc. 320], the clinics at issue were in fact "pill mills" where medical providers wrote unreasonable and medically unnecessary prescriptions for opioids and other narcotics [*Id.* ¶ 2].

Defendant Sylvia Hofstetter, who had previously worked at UCSC's clinic in Hollywood, Florida, administered and managed two (2) clinics owned and operated by UCSC in East Tennessee, the Comprehensive Healthcare Systems ("CHCS") clinics [*Id.* ¶¶ 20, 54.4, 54.21–23]. She also owned, administered, and managed East Knoxville Healthcare Services ("EKHCS"), a clinic in Knoxville, Tennessee [*Id.* ¶ 20]. Defendants Courtney Newman and Cynthia Clemons were employed as nurse practitioners at CHCS and EKHCS [*Id.* ¶¶ 23–24], and defendant Holli Womack was employed as a nurse practitioner at EKHCS [*Id.* ¶ 25].

An investigation into UCSC and these pain clinics ultimately resulted in the return of a twenty-one-count indictment [Doc. 320]. Defendant Hofstetter was charged with a RICO conspiracy (Count One), conspiracies to illegally distribute and dispense controlled substances (Counts Two and Four), money laundering conspiracies (Counts Three and Five), money laundering (Counts Six through Ten), maintaining drug-involved premises (Counts Eleven through Thirteen), and illegally distributing and dispensing controlled

2

substances (Counts Fourteen through Nineteen). Defendants Newman and Clemons were charged with conspiracies to illegally distribute and dispense controlled substances (Counts Two and Four), maintaining drug-involved premises (Counts Eleven and Thirteen), and illegally distributing and dispensing controlled substances (Counts Fourteen and Seventeen as to defendant Newman; Counts Fifteen, Sixteen, Eighteen, and Nineteen as to defendant Clemons). The indictment charged defendant Womack with conspiracies to illegally distribute and dispense controlled substances (Counts Two and Four) and maintaining a drug-involved premises (Count Thirteen).

Defendants proceeded to a jury trial on October 21, 2019. At the close of the government's case-in-chief, all defendants moved for a judgment of acquittal [Docs. 818, 828], which the Court denied. Rough Draft Transcript, Jan. 27, 2020, p. 209–17. After a nearly forty-day long trial and several days of deliberation, the jury found defendant Hofstetter guilty on the RICO conspiracy charge, the two drug conspiracy charges, the two money laundering conspiracy charges, two counts of money laundering, the three counts charging maintenance of a drug-involved premises, and one count of illegally distributing and dispensing controlled substances (i.e., Count Fourteen) [Doc. 860]. Defendants Newman, Clemons, and Womack were acquitted on several charges, but all three were found guilty on Count Thirteen, charging maintenance of a drug-involved premises. Additionally, defendant Clemons was convicted of a second count of maintaining a drug-involved premises (i.e., Count Eleven).

3

Defendants now renew their motions for acquittal and alternatively request a new trial [Docs. 870, 890].

## II.    Legal Standards

When reviewing a motion for judgment of acquittal based on insufficiency of the evidence under Rule 29 of the Federal Rules of Criminal Procedure, the Court must decide "whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In doing so, the Court may not weigh evidence, assess witness credibility, or "substitute its judgment for that of the jury." *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). This standard places a "very heavy burden" on defendants. *Id.*

Alternatively, the Court "may vacate any judgment and grant a new trial" under Rule 33 "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A Rule 33(a) motion "may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence," *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007), but such motions should be granted only "in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Id.* (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)). In contrast to a Rule 29 motion, however, a district judge considering a Rule 33 motion "may act as a thirteenth juror,

4

assessing the credibility of witnesses and the weight of the evidence." *Id.* (citing *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)).

## III.  Analysis

The Court first turns to defendant Hofstetter's motion [Doc. 892] for oral argument on her motion for judgement of acquittal and a new trial.  The government has responded in opposition [Doc. 893].  For the reasons discussed by the government in its response, the Court does not find that the issues raised in defendant's motion necessitate oral argument.  Rather, the relevant facts and legal arguments are adequately presented in the parties' extensive filings [*see* Docs. 890, 891] such that the decision process would not be significantly aided by oral argument.  Accordingly, defendant's motion for oral argument [Doc. 892] is **DENIED**.

Next, turning to defendants' opposed motions for acquittal and a new trial [Docs. 870, 890; *see* Doc. 891], each of defendants' arguments falls into one of three different categories of challenges: (1) challenges to the jury's verdict (including alleged inconsistencies in the verdict, erroneous jury instructions, and the unconstitutionality of 21 U.S.C. § 856(a)(1), the statute proscribing maintenance of a drug-involved premises), (2) issues arising from the trial of this case (including alleged evidentiary errors and prosecutorial misconduct), or (3) challenges to pre-trial rulings (including rulings on venue, spoliation, the admissibility of alleged thefts by defendant Hofstetter, and the requested trial continuance).  The Court will address each category in turn.

A.     Challenges to the Verdict

1.     Inconsistent Verdicts

Defendants Newman, Clemons, and Womack (the "nurse practitioner defendants") argue that it was inconsistent for the jury to acquit them of Counts Two, Four, Fourteen, Sixteen, and Eighteen yet also find them guilty of Counts Eleven and Thirteen [Doc. 870 p. 6–8]. Although inconsistent verdicts are generally not reviewable as the government argues [Doc. 891 p. 3–4], defendants contend that this case falls into one of the two exceptions to this rule because the jury verdicts are sufficiently inconsistent to indicate arbitrariness or irrationality [Doc. 870 p. 10]. The Court finds that the verdicts are not logically inconsistent and that even if they were, they would not be reviewable.

Inconsistent verdicts in a criminal case "generally are not reviewable." *United States v. Randolph*, 794 F.3d 602, 610 (6th Cir. 2015). Indeed, "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *United States v. Powell*, 469 U.S. 57, 62 (1984) (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932) (affirming the continuing validity of this rule)). Even where verdicts are inconsistent, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Id.* at 64–65 *(citing Dunn*, 284 U.S. at 393). As the Supreme Court has noted, "inconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the

6

Government at the defendant's expense" because "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id.* at 65. But the government is precluded from correcting such an error in defendant's favor by the Constitution's Double Jeopardy Clause. *Id.* (citing *Green v. United States*, 355 U.S. 184, 188 (1957), and *Kepner v. United States*, 195 U.S. 100, 130, 133 (1904)). Thus, even where the jury evidently failed to follow the court's instructions, uncertainty as to which party the inconsistent verdicts benefitted, and the government's inability to challenge an acquittal, "militate[] against review of such convictions at the defendant's behest." *Id.*

The Sixth Circuit has recognized two exceptions to the general rule of verdict non-reviewability, which is also known as the "*Dunn* rule." *Randolph*, 794 F.3d at 610–11; *see also Powell*, 469 U.S. at 63. First, where jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality, . . . relief may be warranted." *Randolph*, 794 F.3d at 610 (quoting *United States v. Lawrence*, 555 F.3d 254, 263 (6th Cir. 2009)). *But see Lawrence*, 555 F.3d at 263 (stating that in light of *Powell* and other authorities, "the district court was on shaky footing to even entertain [defendant's] inconsistent-verdicts challenge"). Second, "where a guilty verdict on one count necessarily excludes a finding of guilt on another," producing a "mutually exclusive" verdict, a court may review the verdict. *Randolph*, 794 F.3d at 610–11 (quoting *United States v. Ruiz*, 386 F. App'x 530, 533 (6th Cir. 2010)). In formulating the second

7

exception, the Supreme Court "contemplated a situation in which a defendant receives two guilty verdicts that are logically inconsistent, for example if a jury convicted a defendant of both larceny and embezzlement based on the same underlying conduct." *Ruiz*, 386 F. App'x at 533; *see also Powell*, 469 U.S. at 69 n.8 (citing *United States v. Daigle*, 149 F. Supp. 409, 414 (D.D.C. 1957)).

Defendants argue that this case falls within the first exception: the "not guilty" verdicts in Counts Two, Four, Fourteen, Sixteen, and Eighteen are "marked by such inconsistency" with the "guilty" verdicts in Counts Eleven and Thirteen "as to indicate arbitrariness or irrationality" [Doc. 870 p. 10].[2] For this reason, defendants contend, the Court should grant them a judgment of acquittal on Counts Eleven and Thirteen under Rule 29 [*Id.*].

Defendants advance several arguments in support of their argument these verdicts are extraordinarily inconsistent. First, they assert that because it was uncontested that the defendants prescribed the Schedule II controlled substances referenced in Counts Two and Four and that they worked at the clinics, the jury's acquittal of defendants on those

_____

[2] Counts Two and Four, as described on the verdict form, charged defendants Hofstetter, Newman, Clemons, and Womack with conspiracy to distribute certain Schedule II controlled substances at the Gallaher View Road and Lenoir City clinics in Count Two and the Lovell Road Clinic in Count Four [Doc. 860 p. 1, 4]. Counts Fourteen, Sixteen, and Eighteen, as described on the verdict form, charged defendants Hofstetter and Newman (Count Fourteen) and defendants Hofstetter and Clemons (Counts Sixteen and Eighteen) with distributing or causing to be distributed, outside the usual course of professional practice and not for a legitimate purpose, Schedule II controlled substances on specific dates [*Id.* at 10–12]. Finally, Counts Eleven and Thirteen, again as described on the verdict form, charged defendants Hofstetter, Newman, and Clemons (Count Eleven) and defendants Hofstetter, Newman, Clemons, and Womack (Count Thirteen) with maintaining a premises for the purpose of illegally distributing Schedule II controlled substances [*Id.* at 8–9].

8

counts must logically have rested on the conclusion that defendants did not prescribe the substances unlawfully [Doc. 870 p. 7].  Similarly, defendants argue that it was uncontested that defendants wrote the prescriptions at issue in Counts Fourteen, Sixteen, and Eighteen, so logically-speaking, the jury must have concluded that defendants did not illegally prescribe the controlled substances.  Thus, defendants conclude that it is illogical and irreconcilable for the jury to acquit defendants on "the only logical basis for the underlying charges [the illegal nature of the prescriptions] only to convict on another count that required them to find" the substances were issued illegally, i.e. Counts Eleven and Thirteen [*Id.* at 8].

Defendants' arguments rest on a mistaken assumption that betrays the speculative nature of their conclusion that the verdicts are illogical and irreconcilable.  Defendants' characterization of the verdicts in Counts Two and Four and Counts Fourteen, Sixteen, and Eighteen as inconsistent with the verdicts in Counts Eleven and Thirteen assumes that the jury's verdicts in Counts Two, Four, Fourteen, Sixteen, and Eighteen reflect the jury's finding that defendants did not prescribe "outside the usual scope of professional practice and without a legitimate purpose," i.e. illegally [*Id.* at 9–10].  Yet, the elements of these offenses as described in the jury charge reveal this assumption does not follow necessarily from the verdicts returned.  Rather, in Counts Two and Four, the jury was charged that it must find two things for each defendant: (1) "that two or more persons conspired, or agreed, to distribute" the substances at issue, and (2) "that the person knowingly and voluntarily joined the conspiracy."  *See* Closing Jury Charge, p. 59–60.

9

The instructions for Counts Two and Four incorporated the instructions regarding the law of conspiracy, *id.* at 59, which charged, among other things, that if the jury was convinced a criminal agreement existed, then the government must prove that a defendant "knew the conspiracy's main purpose, and that she voluntarily joined it intending to help advance or achieve its goals." *Id.* at 30. As the government suggests [Doc. 891 p. 4], it is perfectly possible that the jury concluded that the nurse practitioner defendants did not satisfy the second element on Counts Two and Four, i.e. the jury could have found that defendants did not knowingly and voluntarily join the conspiracy.

As to Counts Fourteen, Sixteen, and Eighteen, the jury was charged that they must find: (1) that the defendant knowingly or intentionally distributed or caused to be distributed a controlled substance by writing prescriptions outside the scope of professional medical practice and not for a legitimate medical purpose, and (2) that the defendant knew at the time of distribution that the substance was a controlled substance. *See* Closing Jury Charge, p. 83. Although it is possible, as defendants argue, that the jury found defendants did not write prescriptions illegally as a general matter and so they did not do so on the occasions specified in Counts Twelve, Fourteen, and Eighteen, it is also possible that the jury decided the government had not established beyond a reasonable doubt that the charged practitioners prescribed illegally on November 14, 2013, to Anna Vann-Keathley, on February 10, 2014, to Sandra Boling, and on September 8, 2014, to Henry Reus, *id.* at 95–97, or as the government speculates [Doc. 891 p. 4], the jury might have acquitted defendants on these counts because they did not find the death

10

enhancements applied,[3] or the jury might have decided to exercise lenity toward the nurse practitioner defendants on the drug distribution counts.

As the above discussion reveals, defendants' construction of the reasoning underlying the verdicts in Counts Two, Four, Fourteen, Sixteen, and Eighteen—and thus their conclusion that those verdicts are inconsistent with the verdicts in Counts Eleven and Thirteen—is not logically compelled but speculative. Much less can it be said that the jury verdicts "are marked by such inconsistency as to indicate arbitrariness or irrationality." *Randolph*, 794 F.3d at 610 (quoting *United States v. Lawrence*, 555 F.3d 254, 263 (6th Cir. 2009)). Because no exception to the general rule of nonreviewability applies, the rationales for preserving the jury verdicts in Counts Eleven and Thirteen, despite any conjectural inconsistency with other verdicts, carry their full force in this case. *Powell*, 469 U.S. at 64–65.

Indeed, as the government argues [Doc. 891 p. 6–7], any inconsistency in the verdicts resembles the inconsistency that the Supreme Court preserved from review in *United States v. Powell*. There, the defendant argued the jury could not have acquitted her of conspiracy to possess cocaine and possession of cocaine and consistently found her guilty of using the telephone to facilitate those offenses. 469 U.S. at 69. Yet, the Court held that the *Powell* defendant's proposed exception to the *Dunn* rule for cases where the jury acquitted defendant of a predicate felony but convicted of the compound felony

---

[3] The Supreme Court has repeatedly affirmed "the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons." *Powell*, 469 U.S. at 63 (quoting *Harris v. Rivera*, 454 U.S. 339, 346 (1981), and citing *Standefer v. United States*, 447 U.S. 10, 22–23 (1980)).

11

"threaten[ed] to swallow the rule." *Id.* at 67–68. The *Powell* court noted that the Supreme Court articulated the *Dunn* rule in a case with facts not dissimilar to *Powell*: "In *Dunn*, the defendant was acquitted of unlawful possession, and unlawful sale, of liquor, but was convicted of maintaining a nuisance by keeping unlawful liquor for sale at a specified place." *Id.* And the Court acknowledged the persuasiveness of the dissent's argument that "the jury could not have convicted on the nuisance count without finding that the defendant possessed, or sold, intoxicating liquor." *Id.* at 68. Recognizing that the government, in *Powell*, did not dispute the inconsistency of the verdicts, the Supreme Court found that defendant was "given the benefit of her acquittal on the counts on which she was acquitted" and that it was "neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted." *Id.* at 69. *Powell* exemplified, the Supreme Court wrote, the case where "all we know is that the verdicts are inconsistent," and the defendant's argument "necessarily assumes that the acquittal was proper—the one the jury 'really meant,'" but "[t]his, of course, is not necessarily correct." *Id.* at 68.

Applying *Powell* here, even assuming defendants' assumption that the jury can only be viewed as having convicted them in Counts Eleven and Thirteen based on a finding they rejected in Counts Two, Four, Fourteen, Sixteen, and Eighteen, namely that defendants wrote prescriptions illegally, this inconsistency falls squarely within the protections of the *Dunn* rule. And, defendants have not identified a precedent that supports their proposed application of an exception in this case. The only case

defendants cite in support of reviewing the verdict here did not involve inconsistent verdicts, as is alleged here, but "internal inconsistency in the same count, as it relates to the same defendant, in the same verdict" [Doc. 870 p. 10 (citing *Randolph*, 794 F.3d at 613)]. *See Randolph*, 794 F.3d at 611.[4] Accordingly, the Court rejects defendants' challenge to the verdicts based on inconsistency.

_____

[4] The government, perhaps trying to address all possible arguments for reviewing the verdicts, generously interprets defendants' motion as also citing *United States v. Lawrence*, 555 F.3d at 263, and *United States v. Ruiz*, 386 F. App'x at 533, in support of defendants' verdict inconsistency argument. But, as the government contends [Doc. 891 p. 7–9], neither of these opinions support review of the verdicts here.

The Sixth Circuit panel in *Lawrence* overruled the district court's finding that a sentence of life imprisonment on one count and a sentence of death on the other were reviewable because they could only be explained by "complete arbitrariness." 555 F.3d at 261–62. Most of the Court's reasoning and its holding pertained to whether inconsistent juror findings, as opposed to inconsistent verdicts, could justify subjecting the verdicts to review, *id.* at 263–68; thus, *Lawrence* is distinct factually and legally from this case.

In *Ruiz*, the Sixth Circuit found that *Powell* controlled and precluded review of jury verdicts where the jury acquitted the defendant of conspiracy to distribute cocaine and convicted her of violating the Travel Act, 18 U.S.C. § 1952(a)(3), which prohibits traveling in interstate commerce with the intent to promote or facilitate an unlawful activity. 386 F. App'x at 532–33. The unlawful activity underlying the Travel Act charge was identified as "a business enterprise involving an unlawful conspiracy to possess with the intent to distribute a controlled substance," and defendant argued that the conspiracy charge and Travel Act were "mutually exclusive crimes" because the jury could not have convicted her of the Travel Act charge without finding that a conspiracy existed, but, she argued, her acquittal on the conspiracy charge demonstrated that they did not so find. *Id.* at 532. Quoting *Powell*, the Sixth Circuit held, "[t]here is no reason to vacate a conviction 'merely because the verdicts cannot rationally be reconciled.'" *Id.* at 533–34 (quoting 469 U.S. at 69). As the government contends, "the facts in the instant case are conceptually indistinguishable from the Travel Act conviction in *Ruiz*" [Doc. 891 p. 9], in that defendants here argue the jury found defendants not guilty in certain counts of a necessary element of offenses of which the jury found them guilty in other counts. Thus, *Ruiz* cuts against review of the verdicts in this case.

Moreover, even if the government is correct that defendants intended to argue the verdicts in this case were mutually exclusive, *Ruiz* makes clear that the mutually exclusive exception applies to inconsistency between two guilty verdicts, rather than inconsistency between an acquittal on one count and a guilty verdict on another. *See Ruiz*, 386 F. App'x at 533.

13

Defendant Hofstetter advances a similar argument as to the inconsistency of the jury's acquittal of defendant Newman on Count Fourteen and conviction of defendant Hofstetter on the same count [Doc. 890 p. 22]. Although defendant Hofstetter does not support her contention that this inconsistency provides a basis for acquittal with any authority, the government's response, which quotes *United States v. Lawrence* and *Powell* [Doc. 891 p. 27], correctly assumes that the rule of verdict nonreviewability applies similarly to inconsistent verdicts between different defendants. Indeed, as the government argues [*id.*], the jury's acquittal of defendant Newman is quite as curious as its conviction of defendant Hofstetter on Count Fourteen. As the parties agree [*id.*; Doc. 890 p. 22], defendant Newman wrote the prescription at issue in Count Fourteen. But the inconsistency of finding defendant Hofstetter guilty but not the defendant who wrote the prescription could indicate that the jury decided to exercise lenity toward defendant Newman. It does not "show that they were not convinced of . . . defendant [Hofstetter]'s guilt." *Powell*, 469 U.S. at 64–65 (citing *Dunn*, 284 U.S. at 393). Thus, the Court will also decline to vacate defendant Hofstetter's conviction on Count Fourteen.

## 2.    Plainly Erroneous Jury Instructions

Both the nurse practitioner defendants and defendant Hofstetter also argue that the jury instructions for Counts Eleven through Thirteen were plainly erroneous and that this

plain error provides a basis for granting defendants a new trial on these counts [Doc. 870 p. 10–14; Doc. 890 p. 6–8].[5] The contested instruction reads as follows, in part:

> (4)    In order to prove the defendant guilty of opening, using, or maintaining a drug involved premises, the government must prove each of the following elements beyond a reasonable doubt as to each of Counts Eleven, Twelve, and Thirteen:
>> (A)    First, that the defendant knowingly opened, used, or maintained a place, whether permanently or temporarily; and
>> (B)    Second, that the defendant did so for the purpose of distributing any controlled substance.

Closing Jury Charge, p. 76.  Defendants contend that it was plain error that the jury was not instructed that it must find a third element beyond a reasonable doubt to convict defendants under 21 U.S.C. § 856(a)(1), that is that defendants' conduct under these counts was unlawful, in that they prescribed outside the usual course of professional practice and without a legitimate medical purpose [Doc. 870 p. 11].  The government argues that the instructions are not plainly erroneous [Doc. 891 p. 10].

"A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection" prior to jury deliberation.  Fed. R. Crim. P. 30(d).  "Failure to object . . . precludes appellate review, except as permitted under Rule 52(b)."  *Id.*  Defendants do not contend that they objected to the Court's jury instruction prior to jury deliberation, that they did not receive the opportunity to object to the instructions, or that they

---

[5]    As acknowledged by defendant Hofstetter [Doc. 890 p. 6], defendant Hofstetter's argument on this issue draws almost verbatim from the nurse practitioners' motion although defendant Hofstetter challenges her convictions on Counts Eleven through Thirteen, while the nurse practitioner defendants challenge their convictions on Counts Eleven and/or Thirteen. Thus, the Court principally references the nurse practitioners' motion under this section.

15

proposed an alternative instruction that was not adopted over their objection. In fact, defendants received multiple opportunities to request instructions and object to the closing jury charge. At an informal charge conference and two (2) formal charge conferences, the Court discussed a series of jury charge drafts, the first of which generally incorporated the Court's typical instructions, defendants' requested instructions [Docs. 676, 677, 812, 829, 830, 842], and certain instructions submitted pretrial [Doc. 675] into the comprehensive jury charge proposed by the government [Docs. 671, 813, 838]. Prior to each conference, the Court provided a copy of the then-proposed jury charge to the parties for their review, and the parties had the opportunity at each conference to raise any objections to the jury charge, to propose alternative wording, and to advocate for their proposed instruction when another party opposed it. The first jury charge draft included identical language to that quoted above, language that came from the government's proposed instructions for Counts Eleven through Thirteen [Doc. 671 p. 53], and defendants do not suggest that they objected to this language or proposed alternative language that the Court later rejected. Thus, as the government argues [Doc. 891 p. 10], and as defendants impliedly acknowledge, a plain error standard applies [Doc. 870 p. 14]. *See* Fed. R. Crim. P. 30(d), 52(b); *see also United States v. Thomas*, 11 F.3d 620, 629 (6th Cir. 1993) ("Because defendants failed to object to the jury instructions, we review only for plain error.").

16

To demonstrate plain error, defendants must show: "1) an error 2) that is plain and 3) that seriously affects [their] fundamental rights." *United States v. Balark*, 412 F. App'x 810, 814 (6th Cir. 2011) (quoting *United States v. Aaron*, 590 F.3d 405, 408 (6th Cir. 2009)). If defendant satisfies these requirements, the court "has discretion to 'correct the error only if the error seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Id.* (quoting *Aaron*, 590 F.3d at 408). "An instruction is not plainly erroneous unless there was an egregious error, one that directly leads to a miscarriage of justice." *Id.* (quoting *United States v. Yang*, 281 F.3d 534, 551 (6th Cir. 2002)). Defendants cannot meet this standard.

First and fatally, defendants do not show that the Court erroneously instructed the jury. Defendants appear to argue that the Court's charge as to Counts Eleven through Thirteen should have instructed the jury that they must find (1) each defendant knowingly opened, used, or maintained a premises, (2) for the purpose of distributing any controlled substance, and (3) she did so unlawfully or outside the scope of professional practice and without a legitimate medical purpose. Defendants seem to argue that because Congress enacted § 856(a)(1) to address the problem of distributing substances "commonly understood to be illegal in any circumstance, such as crack cocaine" [Doc. 870 p. 12], the absence of an instruction that substances must be distributed illegally under § 856(a)(1) is confusing and misleading [*Id.* at 12–13]. If the jury followed the instructions only as written, defendants contend, "they had little choice but to convict the Defendants, even if

17

they believed that the Defendants had done nothing unlawful" [*Id.* at 13]. Yet, as defendants appear to acknowledge [*Id.* at 11–12], the Court's instruction tracks the language of the statute. Title 21, § 856(a)(1) of the United States Code states, "it shall be unlawful to—(1) knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."

And, although the Sixth Circuit does not have a pattern instruction for § 856(a)(1), precedent and other circuits' pattern instructions support the Court's formulation of the elements for finding a defendant guilty under § 856. In *United States v. Chaney*, a case involving allegations of a pain clinic unlawfully distributing controlled substances, namely oxycodone and hydrocodone, the Sixth Circuit stated that convicting a defendant on charges of maintaining drug-involved premises in violation of 21 U.S.C. § 856 required the government to "prove beyond a reasonable doubt that the defendant (1) knowingly (2) maintained any place, whether permanently or temporarily, (3) for the purpose of distributing a controlled substance." 921 F.3d 572, 589–90 (6th Cir. 2019) (quoting *United States v. Lang*, 717 F. App'x 523, 545 (6th Cir. 2017)); *see also Lang*, 717 F. App'x at 545 (applying this formulation of the § 856 elements to a defendant accused of operating a Tennessee pain clinic as a "pill mill"). The Court's charge folded the first element into the second element, but it is otherwise nearly identical to the formulation in *Chaney*, and the Court's instruction is practically indistinguishable from

18

the Seventh Circuit's and the Eighth Circuit's pattern instructions for § 856.[6]  The other circuits with published pattern instructions for this provision have slightly different formulations, but none includes the element defendants suggest it is legal error to omit.[7]

Defendants cite two cases in support of their contention that the Court erred by failing to include language clarifying that § 856 "require[s] an unlawful purpose" [Doc. 870 p. 12], both of which are non-controlling district court opinions outside this circuit.  In support, defendants cite opinions from the Middle District of Pennsylvania and the Southern District of West Virginia involving opioid prescriptions that specified that a conviction under § 856(a)(1) requires the government to show that defendant maintained the premises for the purpose of distributing outside the usual course of professional practice and not for a legitimate medical purpose.  *See United States v. Li*, No. 3:16-cr-194, 2019 WL 1126093, at *8 (M.D. Penn. Mar. 12, 2019) (government must

---

[6]  *See* Committee on Federal Criminal Jury Instructions of the Seventh Circuit, 21 U.S.C. § 856(a)(1) Maintaining Drug-Involved Premises–Elements, Pattern Criminal Jury Instructions of the Seventh Circuit 720 (2012 ed. plus 2015–2017 and 2018 changes) ("The government must prove both of the following elements beyond a reasonable doubt: 1. The defendant knowingly [opened; leased; rented; used; maintained] a place; and 2. The defendant did so for the purpose of [manufacturing; distributing; using] a controlled substance.  The government is not required to prove that was the defendant's sole purpose."), and Judicial Committee on Model Jury Instructions for the Eighth Circuit, Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit (2017 ed.) ("The crime of maintaining a place for the purpose of [distributing] a controlled substance as charged in [Count ___ of] the Indictment has two elements, which are: *One*, the defendant knowingly [maintained] a[n] (describe place as charged in the Indictment); and *Two*, the defendant did so for the purpose of [distributing] a controlled substance (describe controlled substance as charged in the Indictment).").

[7]  3 Modern Federal Jury Instructions-Criminal P 56.06 (2020); *see also* Ninth Circuit Jury Instructions Committee, Model Criminal Jury Instructions for the District Courts of the Ninth Circuit, 9.31 Controlled Substance—Maintaining Drug-Involved Premises (21 U.S.C. § 856(a)(1)), at 430.

19

show that defendant "maintained [the premises] for the purpose of distributing or dispensing outside the usual course of professional practice and not for a legitimate medical purpose any controlled substance"), and *United States v. Nasher-Alneam*, 399 F. Supp. 3d 561, 565 (S.D. W. Va. 2019) (government had to show that defendant maintained the premises "for the purpose of illegally distributing the controlled substances identified in the indictment[,] not for legitimate medical purposes in the usual course of professional medical practice and beyond the bounds of medical practice.").

Although defendants could have cited *Li* and *Nasher-Alneam* prior to jury deliberations as a basis for modifying the government's proposed instruction on Counts Eleven through Thirteen, neither opinion establishes that failure to include an "illegal purpose" element in the jury charge is legal error in an opioid prescriptions case. This is especially true considering the Sixth Circuit's contrary formulations of the § 856 elements in *Lang* and *Chaney*. Both cases involved similar facts to those before the Court—pain clinics allegedly distributing controlled substances illegally—and yet the Sixth Circuit adopted the same list of elements that it applied to convictions under § 856(a)(1) involving controlled substances commonly understood to be illegal. *See Lang*, 717 F. App'x at 545 (citing *United States v. Russell*, 595 F.3d, 633, 644 (6th Cir. 2010) (a case in which the Sixth Circuit upheld convictions under § 856(a)(1) involving crack cocaine) for the § 856 elements). Indeed, the *Li* court signaled with a "*cf.*" that its formulation differed from that offered in *Lang*. 2019 WL 1126093, at *8; *see also Lang*, 717 F. App'x at 545 (holding that convicting a "pill mill" defendant under § 856(a)(1)

required the government to show a defendant "(1) knowingly (2) maintained any place . . . , (3) for the purpose of distributing a controlled substance"). Thus, defendants fail to demonstrate that the contested language as to Counts Eleven through Thirteen is legally erroneous because, like the formulations of the elements of § 856 in *Lang* and *Chaney*, it does not use the language "unlawful" or "illegal" or "outside the usual course of professional practice and not for a legitimate medical purpose."

Moreover, as the government emphasized in its response [Doc. 891 p. 10], the jury charge *did* instruct the jury that a conviction under § 856 rests on a finding that the controlled substances at issue in Counts Eleven and Thirteen were prescribed illegally. *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001) (instructing that "no single provision of the jury charge may be viewed in isolation, rather, the charge must be considered as a whole" (citing *United States v. Lee*, 991 F.2d 343, 350 (6th Cir. 1993))). First, in its summary of the fourth superseding indictment, the Court stated that Counts Eleven through Thirteen charged defendants with "maintaining drug-involved premises, that is knowingly and intentionally opening, using, and maintaining businesses for the purpose of *illegally* distributing controlled substances *outside the usual course of professional practice and not for a legitimate medical purpose* in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2." Closing Jury Charge, p. 22 (emphasis added). Then, immediately above the contested language in the section of the charge pertaining to Counts Eleven through Thirteen, the Court stated that the indictment charged defendants in Counts Eleven through Thirteen with maintaining premises "for the purpose of

21

*illegally* distributing Schedule II controlled substances." *Id.* at 75–76 (emphasis added). Finally, as the government notes [Doc. 891 p. 10], the Court repeatedly mentioned the legal standard for illegally distributing controlled substances, including twelve (12) instances that used the language of distributing "outside the usual course of professional practice and not for a legitimate medical purpose" or words to that effect. Closing Jury Charge, p. 22, 23, 60, 61, 84, 87, 89, 94, 95, 96, 97. The Court's charge also included a "general statement of the law regarding distribution of a controlled substance," which included a section on the "manner and issuance of prescriptions" outlining "how controlled substances must be prescribed under federal law in order for such prescriptions to be legal" and how the jury must determine whether a defendant prescribed controlled substances illegally, that is "without a legitimate medical purpose, and outside the usual course of professional practice." *Id.* at 82–90.

And, of course, as the government notes [Doc. 891 p. 10], the Court gave its charge after the jury had heard testimony from four (4) medical experts whose testimony focused on the standard for legal distribution of controlled substances, as well as extensive arguments as to whether defendants distributed controlled substances without a legitimate medical purpose and outside the course of professional practice. It is simply inconceivable, as the government argues, "to think that the jury misunderstood that the prescriptions underlying the convictions in Counts Eleven through Thirteen had to have been written outside the usual course of professional practice and not for a legitimate medical purpose" [Doc. 891 p. 11]. Thus, even if the Court were to find that the

22

instructions were erroneous and plainly so, satisfying the first two elements of the plain error doctrine, it does not believe the instructions affected the substantial rights of defendants. *See United States v. Sherrod*, 33 F.3d 723, 726 (6th Cir. 1994) (finding that any potential ambiguity did not affect defendant's substantial rights where "the way the case was litigated" evidenced the more probable interpretation given to the instruction by the parties and the court).

Defendants' argument that the instructions were so confusing and legally flawed as to leave the jury with no choice but conviction of defendants, even if the jury believed them innocent of illegal distribution, is unpersuasive. Rather, the jury instructions mirrored the statutory language, Sixth Circuit precedent, and pattern instructions issued by other federal appellate courts. *United States v. Haynes*, 98 F. App'x 499, 504 (6th Cir. 2004) ("Because the jury instruction accurately incorporated the pertinent federal statute and accurately incorporated a pattern jury instruction that is consistent with circuit precedent on the elements of aiding and abetting, it was not plainly erroneous." (citing *United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir. 1995)), *vacated on other grounds*, 543 U.S. 1112 (2005). Moreover, the instructions clearly conveyed that Counts Eleven through Thirteen charged defendants with knowingly and intentionally opening, using, and maintaining businesses for the purpose of illegally distributing controlled substances and instructed the jury as to the legal standard for illegal distribution. Defendants have not demonstrated that the charge was "erroneous . . . or misleading," much less that the Court's instructions regarding Counts Eleven through Thirteen "affecte[ed] the

23

defendant[s'] substantive rights or the fairness, integrity, or public reputation of the judicial process." *Balark*, 412 F. App'x at 818. Accordingly, the jury instructions on these counts do not provide a basis for granting defendants a new trial.

Defendant Hofstetter also objects to the Court's failure to include certain of her proposed instructions in the final charge [Doc. 890 p. 17–20]. The government counters that defendant Hofstetter fails to specifically identify deficiencies in the jury charge that her proposed instructions would have resolved, deficiencies that defendant Hofstetter made on the record in compliance with Rule 30(d) and thus preserved for review; thus, it argues the Court should reject this point of error as "unpreserved, undeveloped, and non-specific" [Doc. 891 p. 30]. The government is correct that the failure to include defendant Hofstetter's proposed instructions is not reversible error.[8]

First, defendant Hofstetter points to four (4) instructions that she proposed but that the Court did not include in its final charge [Doc. 890 p. 17–18]. Defendant Hofstetter does not point to a place in the record where she objected to the final charge on the ground that it did not include these instructions. Nor does she articulate what standard of

---

[8] Defendant Hofstetter argues in her reply that the government is mistaken that the issues concerning the jury instructions were "unpreserved, under developed and non-specific and therefore should not be considered by this Court," pointing to the fact that defendants submitted proposed jury instructions and that she "set out that the submitted Jury Instruction Charges were important to the issues in this case" [Doc. 899 p. 3]. As the text of Rule 30(d) suggests, proposing jury instructions does not constitute an objection to the final charge sufficient to preserve the issue for appellate review, and defendant Hofstetter points to no place in the record where she objected to the final charge's language as to Counts Eleven through Thirteen. Thus, if defendant Hofstetter intends to argue that a plain error standard does not apply to evaluating the jury instructions on those counts—she does not specify the standard she believes applies—she fails to do so persuasively. Because defendant Hofstetter arguably did preserve the issue of the instruction on deliberate ignorance, the Court applies an abuse of discretion standard to that issue. *See supra* p. 25–26.

24

review she believes applies to the alleged error of failing to include them. Nor, as the government points out, does she identify any deficiency in the Court's final charge. Rather, she simply states that her proposed instructions came from *United States v. Zolot*, No. 11-10070, 2014 WL 2573984 (D. Mass. June 6, 2014), and that defendants believed these instructions "necessary and essential" apparently in light of the publicity the opioid crisis has received and the government's characterization of the nurse practitioner defendants as drug dealers [*Id.* at 18]. This barebones recital of defendant's preference for certain instructions does not satisfy the standard for plain error. *Balark*, 412 F. App'x at 814.

Similarly, defendant Hofstetter notes that she proposed a different instruction for reasonable doubt than that finally adopted by the Court [Doc. 890 p. 18], but she does not state that she objected to the failure to include this instruction prior to jury deliberation, illuminate how the Court's instruction was deficient, or even explain why her instruction was preferable. Thus, defendant has not shown that the failure to adopt her language was erroneous.

Finally, defendant believes the Court erred by overruling defendants Newman and Clemons's objection [Doc. 830] to a "deliberate ignorance" instruction and failing to adopt defendant Hofstetter's requested willful blindness instruction [Doc. 890 p. 19–20]. Defendant Hofstetter did not join defendant Newman and Clemons's filed objection, and she does not point to a place in the record where she objected to the Court's giving an instruction about deliberate ignorance or objecting to the final instruction because it did

25

not incorporate defendant Hofstetter's preferred willful blindness language. At one point, defendant Hofstetter's attorney stated that she was not suggesting the Court give a deliberate ignorance instruction, just that if it did so, it should use defendant Hofstetter's proposed willful blindness language [Doc. 929 p. 14], but defendant Hofstetter did not clearly raise an objection. Thus, the plain error standard likely applies, but even if defendant Hofstetter successfully preserved this objection, she cannot establish reversible error.

Defendant Hofstetter does not show that either the Court's decision to give a deliberate ignorance instruction or the language it employed were erroneous. "A trial court has broad discretion in drafting jury instructions and does not abuse its discretion unless the jury charge 'fails accurately to reflect the law.'" *Beaty*, 245 F.3d at 621 (quoting *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999)). The Sixth Circuit will reverse a judgment based on an improper jury instruction "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999)). Moreover, when a district court gives a deliberate ignorance instruction "that does not misstate the law but is unsupported by sufficient evidence, it is, at most, harmless error." *Id.* (citing *United States v. Mari*, 47 F.3d 782 (6th Cir. 1995)).

Defendant does not demonstrate that the Court's jury instructions failed accurately to reflect the law. In support of her contention that the Court should not have given a deliberate ignorance instruction, defendant cites *United States v. Gonzalez-Pujol*, No. 13-

26

40, 2016 WL 590219 (E.D. Ky. Feb. 10, 2016), highlighting the court's caution therein that giving a deliberate ignorance instruction "creates a risk that the jury 'might misunderstand the instruction and convict a defendant based on what he *should* have known rather than on what he *did* know, thereby relieving the government of its constitutional obligation to prove the defendant's knowledge beyond a reasonable doubt.'" [Doc. 890 p. 19 (citing 2016 WL 590219, at *1)]. Additionally, defendant submits that the Court erred by failing to use the willful blindness language for which defendant advocated from *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) [Doc. 890 p. 19–20]. Neither case provides a basis for reversal.

As the Court noted in ruling on defendant's objection at the second formal charge conference, *United States v. Gonzalez-Pujol* is not applicable to the context in which this Court gave the deliberate ignorance instruction [Doc. 930 p. 6–7]. The district court in *Gonzalez-Pujol* examined the propriety of a deliberate-ignorance instruction in the context of a single-aim conspiracy. 2016 WL 590219, at *2–3. But the deliberate ignorance instruction the government requested and the Court gave in this case applied only to the knowledge element of the substantive drug distribution charges, Counts Fourteen, Sixteen, and Eighteen, and the Court added language to the charge clarifying that the deliberate ignorance instruction applied only to those counts and not the conspiracy counts. Closing Jury Charge, p. 85. And the Court rejected defendant Hofstetter's proposed instruction from *Global-Tech* because that decision pre-dated the most recent Sixth Circuit pattern instruction for deliberate ignorance, which the Court

adopted [Doc. 929 p. 13]. *See* Sixth Circuit Pattern Instruction 2.09. And, as the government stated in objecting to defendant Hofstetter's language at the charge conference [Doc. 929 p. 12], the Sixth Circuit Pattern Criminal Jury Instruction Committee adopted the language used by the Court after concluding that this standard incorporates the "two basic requirements" for willful blindness articulated in *Global-Tech. Id.*, Committee Commentary 2.09. Thus, defendant has not demonstrated that the Court erred either by giving a deliberate ignorance instruction or by employing the Sixth Circuit pattern instruction for deliberate ignorance. Rather, the Court's instruction accurately reflects the law and is far from plainly erroneous.

### 3. Constitutionality of 21 U.S.C. § 856(a)(1)

The nurse practitioner defendants also contend, without citation, that 21 U.S.C. § 856(a)(1) is overly broad and therefore unconstitutional as applied to them [Doc. 870 p. 15]. Defendants appear to argue that this statutory provision is unconstitutional as applied in the jury instructions, absent language specifying that the underlying prescriptions must have been prescribed illegally [*Id.*]. The government notes the Court's repeated instructions that the controlled substances at issue in this case and specifically in Counts Eleven through Thirteen must have been distributed illegally, and it argues that courts have consistently upheld the constitutionality of § 856(a)(1) [Doc. 891 p. 11 (string citing cases including *United States v. Rosa*, 50 F. App'x 226, 227 (6th Cir. 2002)).

28

Defendants do not identify a court that has found § 856(a)(1) to be generally unconstitutional or unconstitutional as applied, and the Sixth Circuit has not ruled on the question. *Cf. Rosa*, 50 F. App'x at 227 (rejecting defendant's argument that § 856(a)(2) was unconstitutionally vague). Moreover, the courts that have examined the issue of § 856(a)(1)'s constitutionality appear to have uniformly found it to be constitutional. *See, e.g.*, *United States v. Lancaster,* 968 F.2d 1250, 1253–54 (D.C. Cir. 1992) (rejecting vagueness challenge to § 356(a)(1) as applied to defendant's conduct); *United States v. Clavis,* 956 F.2d 1079, 1094 (11th Cir. 1992) (finding that challenge to § 856(a)(1) as void for vagueness failed and noting that "[t]he presence of the two intent elements, 'knowingly' and 'for the purpose' does much to eliminate the contention of vagueness or unfairness in application"); *United States v. Rodriguez*, No. CR10-384, 2011 WL 675541, at *2 (W.D. Wash. Feb. 15, 2011) (stating that all courts to examine whether § 856(a)(1) is unconstitutionally vague have found it constitutional). Finally, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)). Here, it is unclear even whether defendants intend to challenge § 856(a)(1) as void for vagueness or under some other constitutional standard. And, the Court will not speculate as to the issue they intend to raise. Accordingly, the Court finds this constitutional argument does not provide a basis for granting a new trial.

29

**B.** **Issues Arising from the Trial**

Next, the Court turns to alleged trial errors arising from the Court's decisions to admit certain evidence, from the testimony of certain witnesses, or from alleged prosecutorial misconduct. Defendant Hofstetter's motion raises most of the errors examined in this section, but the Court discusses the nurse practitioners' arguments where applicable.

**1.** **Alleged Errors Related to Evidence and Witness Testimony**

**a.** **Alleged *Brady* Violation Regarding Stan Jones's Testimony**

Proceeding chronologically through the trial, the Court first examines defendant Hofstetter's objection to the testimony of Stan Jones. Defendant Hofstetter argues that her due process rights were violated because the prosecution failed to disclose information about a reported Department of Justice (DOJ) investigation of Walmart, Mr. Jones's employer at the time of his testimony [Doc. 890 p. 14]. Defendant first learned about the investigation from a ProPublica article published on March 25, 2020 [*Id.*; *see also* Doc. 890-1], which reported that DOJ officials intervened to prevent criminal prosecution of Walmart for opioid dispensing practices that violated the Controlled Substances Act. Defendant contends that Mr. Jones "knew or should have known" about the investigation and that the information should have been disclosed "as exculpatory evidence under *Brady v. Maryland*[,] 373 U.S. 83 (1963)," so that defendants could have challenged Mr. Jones's credibility as "a key witness for the government to explain the red flags of pill mills" [Doc. 890 p. 15].

30

The government argues: (1) Mr. Jones was not an agent for the government when he testified and was never involved in this case or the underlying investigation prior to his retirement from the Drug Enforcement Administration (DEA), which is why Mr. Jones testified as an unbiased expert in drug diversion based on his DEA experience, not his experience at Walmart; (2) the prosecution team in this case was not involved in the DOJ investigation reported in the ProPublica article and has no knowledge of whether any such investigation exists or existed beyond the article; (3) the ProPublica article does not indicate—and defendants provide no information about—when the alleged bad behavior at Walmart occurred, and Mr. Jones was hired in November 2018, months after Walmart announced a plan to implement new opioid prescription limits [Doc. 891 p. 25 (citing Vanessa Romo, *Walmart Will Implement New Opioid Prescription Limits By End of Summer*, NPR, May 8, 2018, https://www.npr.org/sections/thetwo-way/2018/05/08/609442939/walmart-will-implement-new-opioid-prescription-limits-by-end-of-summer)]; and (4) numerous news articles in the months leading up to this trial reported on lawsuits filed against Walmart based on its alleged role in fueling the opioid epidemic, so "there was already plenty of information about Walmart's opioid dispensing practices in the public domain prior to trial" to enable effective cross-examination of Mr. Jones.

Violation of a defendant's Fifth Amendment due process rights under *Brady* involves a three-part test: "The evidence at issue must be favorable to the accused, either

31

because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Showing prejudice means proving the evidence was material, that is that the "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* (quoting *Strickler*, 527 U.S. at 281); *see also United States v. Paulus*, 952 F.3d 717, 726 (6th Cir. 2020). "There can be no *Brady* violation where a defendant 'knew or should have known the essential facts permitting him to take advantage of any exculpatory information.'" *Id.* (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)).

Defendant does not satisfy any part of the *Brady* test. First, defendant has not established that the information about Walmart would be impeaching because defendant has not shown that Mr. Jones was working at Walmart while it was operating pursuant to allegedly criminal distribution policies. Defendant appears to suggest that she would have used the investigation to impeach Mr. Jones when he responded "No" to the question "You all wouldn't dispense anything that you all didn't consider safe and effective?" [Doc. 890 p. 14], but the trial transcript makes clear that Mr. Jones was testifying about Walmart's present prescribing practices [Tr., Oct. 28, 2019, Doc. 917 p. 88]. Thus, it is unclear how an investigation of practices that likely predated Mr.

32

Jones's arrival at Walmart could have been used to impeach him, especially because Mr. Jones testified based on his experience not as a Walmart employee but as a DEA agent, except for the brief exchange above, which defendant instigated on cross-examination [*See id.* at 15, 20–21].

Second, the defendant has not shown—and the government contests—that the government had information about the investigation in its possession, so it could not have suppressed the evidence willfully or inadvertently. *See Castano*, 906 F.3d at 466 ("This is not a *Brady* violation because the government did not suppress evidence in its possession . . . . As to [witness's] 2005 conviction, it did not appear in the FBI printout, and the government cannot be accused of suppressing evidence it did not have.").

Third, defendant has certainly not shown that the nondisclosure was material, i.e. that the ability to *attempt* to impeach Mr. Jones, who was one of numerous government witnesses and who was not a fact witness, would have produced a different verdict. Additionally, defendant had access to numerous news stories reporting lawsuits based on alleged distribution misdeeds by Walmart, information she could have used to impeach Mr. Jones in the manner she suggests she would have used the undisclosed investigation. *See id.* (stating that there was no *Brady* violation nondisclosure of government witness's convictions in part because defendant "had the 'essential facts' of [witness's] indictments, from which the defense could have learned of his convictions").

33

Accordingly, defendant has failed to show entitlement to relief based on a *Brady* violation involving Mr. Jones.[9]

### b. The Failure to Strike Michael Carter's Testimony

Defendant Hofstetter contends that the Court improperly denied defendants' oral motion to strike the testimony of Dr. Michael Carter, one of the government's expert witnesses, and argues this error entitles her to a new trial [Doc. 890 p. 5]. Defendant fails to raise any new issues or engage with the Court's extensive and detailed ruling denying defendants' motion [Doc. 794]. Rather, she simply states that Dr. Carter had no qualifications upon which to provide expert testimony in pain management, that he was permitted to opine on whether a legitimate medical purpose existed for prescriptions issued at the clinics in this case, and that his testimony was therefore "erroneous and prejudicial" to defendant Hofstetter, such that she is entitled to a new trial [Doc. 890 p. 5]. The only authority defendant cites in support of her argument is a Sixth Circuit opinion that merely states the standard for admissibility of expert testimony and the advisability of a cautionary jury instruction if a witness testifies as both a fact witness and an expert witness [*Id.* (citing *United States v. Lopez-Medina*, 461 F.3d 724, 725 (6th Cir. 2006))]. Yet, defendant does not allege that Dr. Carter testified as a fact witness, merely that he was unqualified, and she does not address the Court's lengthy discussion of Dr.

---

[9] In her reply, defendant Hofstetter argues that the government does not indicate whether Mr. Jones had information regarding this investigation and that the Court should hold an evidentiary hearing at which Mr. Jones would testify under oath about his knowledge of the investigation [Doc. 899 p. 2–3]. Defendant offers no legal authority for granting her request, and the Court will accordingly deny it.

34

Carter's qualifications to testify to his "expertise area, the practices of nurse practitioners across specialties and, specifically, the nurse practitioner standard of care" [Doc. 794 p. 2–4]. Nor does she acknowledge the Court's finding that the government confined Dr. Carter's testimony to his specialty area.

While defendant claims Dr. Carter opined on the legitimacy of prescriptions for pain medications and whether they were provided in violation of the standard of care [Doc. 890 p. 5], she does not point to any places in the record where he did so or address the Court's examination of Dr. Carter's testimony for opinions he expressed beyond his expertise [Doc. 794 p. 4–6]. Indeed, the Court specifically addressed this argument in its order:

> While the government did repeatedly ask the witness whether there was a legitimate medical purpose for prescriptions in certain medical files, . . . [t]he context of these questions and responses makes clear that the government was not eliciting opinions from the witness as a pain management expert, which he admittedly is not, but rather asking him to testify to whether he could identify a legitimate medical purpose for the prescription based on the content of the files. Each exchange took place immediately after the government took the witness through a specific file and asked him questions about the file's adherence to the standard of care. Thus, by testifying that he could not identify such a legitimate purpose for the prescription, the witness was testifying to a failure of the standard of care, i.e. an "[in]adequate history, [in]adequate physical, [in]adequate assessment and an [in]adequate plan."

[*Id.* at 5–6 (citing Rough Draft Transcript for Dec. 9, 2019, at 169)].

Moreover, the Court's order carefully applied Rule 702 to Dr. Carter's testimony, finding that his testimony was admissible under the test articulated by the Sixth Circuit in *U.S. v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993), and that defendants' principal

35

arguments went to the weight the jury should give Dr. Carter's opinion. The Court noted that this was a matter for cross-examination, and that defendants vigorously cross-examined Dr. Carter [Doc. 794 p. 6–8]. Defendant does not address any of these conclusions or observations. Accordingly, defendant does not demonstrate that the failure to strike Dr. Carter's testimony was reversible error.[10]

### c. Failure to Strike Testimony of Jon West

Defendant Hofstetter also contends that the Court erred by failing to grant a defense motion joined by defendant Hofstetter to strike Jon West's testimony and that she is entitled to a new trial on this basis [Doc. 890 p. 21–22]. Mr. West was the government witness who analyzed and testified about the DOMEX analyses of patient files seized from the pain clinics in these cases [Doc. 891 p. 21]. It became apparent on cross-examination of Mr. West that he was testifying about a dataset comprised of 7,000 patient files and that defense counsel was cross-examining him about a different data set, one based on 700 patient files [Doc. 891 p. 22]. The Court recessed for the day [Tr., Dec. 18, 2020, at 228]. The next morning, the government explained that it had mistakenly provided defendants with a spreadsheet based on the 700 patient files, believing the

---

[10] Additionally, as the government notes [Doc. 891 p. 21], defendant arguably forfeited her challenge to Dr. Carter's testimony. Defendants did not raise any arguments regarding Dr. Carter's qualifications in their *Daubert* motion [Doc. 444], even though they reviewed his report, as demonstrated by their objection to the files he reviewed and the relevance of a regulation his report cited [*Id.* at 11, 17–18]. *See In re Bayer Healthcare & Merial Ltd. Flea Control Prods. Mktg. & Sales Practices Litig. v. Bayer Health*, 752 F.3d 1065, 1078 (6th Cir. 2014) (holding that plaintiffs forfeited any *Daubert* challenge by failing to raise it before the district court). Thus, defendant Hofstetter may have forfeited her challenge to Dr. Carter's testimony by failing to raise an issue she could have raised in her *Daubert* motion until the testimony was heard at trial.

36

spreadsheet it had received from DOMEX that it sent to defendants contained the 7,000-patient dataset [Rough Draft Transcript, Dec. 19, 2020, at 6]. Defendant Clemons subsequently moved to strike Mr. West's testimony, and defendant Hofstetter moved to join the motion [*Id.* at 13]. After the parties conferred and failed to agree on a solution, the Court suspended Mr. West's testimony and ordered that defendants would have the two-week trial break to review the spreadsheet the government had not previously provided to defendants [*Id.* at 37–38].

Defendant Hofstetter now argues she is entitled to a new trial because the government did not provide a DOMEX spreadsheet standardizing raw data from the 7,000 patient files in discovery but only a DOMEX spreadsheet standardizing data from 700 patient files and because the Court's order did not provide defendants adequate time to "defend against this new evidence" [Doc. 890 p. 21–22].

As a preliminary matter, defendant was not entitled to the spreadsheet she objects she received late. The magistrate judge found that the DOMEX reports, the spreadsheets discussed above, were not subject to the July 2 discovery deadline because "the Court consider[ed them] to be expert or summary materials, analyzing information already disclosed" [Doc. 348 p. 8 n.8]. Later, the magistrate judge reiterated, "the Court agrees with the Government that the spreadsheets requested by the Defendants are likely not discoverable, at least not at this juncture." Accordingly, Magistrate Judge Debra C. Poplin denied the motion because defendants had not followed the Court's procedure for

seeking discovery, holding that she also found the motion to be moot because the government represented that it had disclosed the spreadsheets to defendants [Doc. 372 p. 2–3].

Although the magistrate judge qualified her conclusion that the spreadsheets were "likely" not discoverable "at least not at this juncture," defendant presents no arguments now suggesting that the spreadsheets were discoverable. The magistrate judge's conclusion that the DOMEX reports were non-discoverable comports with the undersigned's conclusion in ruling on the motion to strike that the spreadsheet supplied to defendants at the time of their motion qualified as a summary chart of previously disclosed voluminous writings under Federal Rule of Evidence 1006 [Rough Draft Transcript, Dec. 19, 2020, at 37], and defendant does not challenge that ruling. Thus, the government's accidental withholding of the spreadsheet containing the 7,000 patient files does not provide a basis for a new trial. Nor does defendant cite any authority for finding that the Court's discretionary decision to give defendants two (2) weeks to review the new spreadsheet constitutes reversible error, and the Court finds no reason to do so. Defendant is not entitled to relief on this ground.

### d. The Admission of an Email Allegedly Containing Hearsay

The Court turns next to the admission of an email containing alleged hearsay, which both the nurse practitioner defendants and defendant Hofstetter contend was error

38

to some degree [Doc. 870 p. 14; Doc. 890 p. 13–14]. The email at issue, Exhibit 2086,[11] was sent by Dr. Mark Blumenthal, whom the government alleged was a coconspirator, to defendant Hofstetter on February 6, 2011 [*Id.*; *see also* Tr., Jan. 6, 2020, Doc. 927 p. 84]. The email referenced a chance meeting between Dr. Blumenthal and Knox County Criminal Court Judge Mary Beth Leibowitz, during which Dr. Blumenthal said Judge Leibowitz warned him about increasing law enforcement attention to patients and prescribers [*Id.*]. Specifically, as defendant Hofstetter notes, the email said: "Knox County had a tremendous drug problem. Legal authorities, pharmacy authorities, and medical authorities are all up a tree about what to do. Everyone involved with scheduled medications is under close scrutiny, and that inherently includes us" [*Id.*].[12] Defendant Clemons objected to the admission of the email at the time it was offered because it contained inadmissible hearsay, namely the statements attributed to Judge Leibowitz, and she also objected to the general admission of emails written by Dr. Blumenthal as hearsay [*Id.* at 51–52, 53]. Defendant Hofstetter also made a somewhat unclear objection to the

---

[11]   The nurse practitioner defendants do not reference an exhibit number, and defendant Hofstetter references Exhibit 2085 [Doc. 890 p. 13], but the government states, and defendants' description of the email makes clear, that defendants intended to object to the admission of Exhibit 2086.

[12]   Although defendant Hofstetter appears to object generally to the admission of the email, she and the nurse practitioner defendants only identify the statements that could have been attributed to Judge Leibowitz as prejudicial [Doc. 870 p. 14; Doc. 890 p. 13–14]. The Court notes for background that Blumenthal also wrote, "She told me to be exceedingly careful. Law enforcement does understand that patients have legitimate needs that have been poorly met, but they are more concerned right now about patients and prescribers who are out of compliance. We cannot afford the appearance of impropriety" [Tr., Jan. 6, 2020, Doc. 927 p. 85]. Dr. Blumenthal went on to suggest that they should "[t]ighten up our prescribing . . . techniques" because they were "simply seeing too many patients who represent a hazard to [their] practice" and "[b]roaden [their] practice as rapidly as possible to include other management—pain management modalities" [*Id.* at 85–86].

39

admission of the email related to the government's characterization of Dr. Blumenthal as a coconspirator [*Id.* at 56–57].

The Court found that the email was admissible, based on consideration of all the proof before the Court, because the statements by Dr. Blumenthal were non-hearsay, co-conspirator statements under Rule 801(d)(2)(E) [Tr., Jan. 6, 2020, Doc. 927 p. 82]. The Court also found that, in the alternative, the statements would be admissible to show the impact on the listener, in this case defendant Hofstetter, by illuminating "her knowledge and what further actions she might have taken after receiving the information" [*Id.*]. In other words, the Court found that any statement attributed to Judge Leibowitz was not offered to prove the truth of the matter asserted and was thus not hearsay under Federal Rule of Evidence 801(c)(1). The Court also overruled any objection under Federal Rule of Evidence 403 to the admission of Judge Leibowitz's alleged statements because it had instructed the jury that they should not take the statements as offered for the truth of the matter asserted and because it did not find the probative value of those statements, offered for the impact on the listener, to be substantially outweighed by the danger of confusion or unfair prejudice [*Id.*].[13]

Here, the nurse practitioner defendants assert without development or citation of rule or case law that it was error to permit "any testimony and explanation by the Court [as to] who Judge Leibowitz was" because this "may have influenced [the jury] to believe

---

[13]    The Court instructed the jury that "anything that was said by Mary Beth Leibowitz [was] not being offered for the truth of the matter asserted, but [they] should just consider it for the impact it may have had on either Dr. Blumenthal or to whomever he related that information . . . ." [Tr., Jan. 6, 2020, Doc. 927 p. 85].

that there was a judgment by another court that some or all of the activities of the Defendants may have been previously judged unlawful [Doc. 870 p. 14]. Defendant Hofstetter merely restates the parties' positions as to the admissibility of the letter and the hearsay statements by Judge Leibowitz and cites a Seventh Circuit case and Federal Rule of Evidence 801(d)(2)(E) for the standard for admitting a coconspirator statement. Then she states without further explanation that admitting the email was error and "created an impermissible prejudice against her through the hearsay statements" of Judge Leibowitz [Doc. 890 p. 13–14].

Without further elaboration by defendants as to why the admission of the email or the statements attributed to Judge Leibowitz was erroneous, the Court finds no reason to reconsider its prior ruling. *Cf. El-Moussa*, 569 F.3d at 257 (quoting *McPherson*, 125 F.3d at 995–96) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). For a court to properly admit coconspirator statements as non-hearsay, the government "must show by a preponderance of the evidence that (1) the conspiracy existed, (2) the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) the hearsay statement was made in the course of and in furtherance of the conspiracy." *United States v. Smith*, 320 F.3d 647, 654 (6th Cir. 2003) (citing *United States v. Enright*, 579 F.2d 980, 986–87 (6th Cir. 1978)). "This preliminary finding is the sole province of the judge who may, as was done here, admit the hearsay statements subject to a later ruling that the government has met its burden." *Id.* (citing *United States v. Vinson*, 606 F.2d 149, 153

41

(6th Cir.1979)).  The Court made such an initial finding as to Dr. Blumenthal [Tr., Jan. 6, 2020, Doc. 927 p. 82], and it also made *Enright* findings after the close of the government's case that "the government has demonstrated by a preponderance of the evidence that a conspiracy existed, that the defendants were participants, and that the statements made by the various alleged coconspirators were made in the course of and in furtherance of the conspiracy" [Tr., Jan. 8, 2020, Doc. 928 p. 157].  Defendants have presented no reason to reconsider this ruling as it applies to Dr. Blumenthal's February 6th email.

Furthermore, defendants do not even attempt to explain how Judge Leibowitz's alleged statements were hearsay under Rule 801(c), given that they were not offered for the truth of the matter asserted.  And defendants' conclusory arguments that Judge Leibowitz's statements were highly prejudicial and potentially confusing because they were made by a judge, even though the government made clear that Judge Leibowitz made the comments in the context of a conversation with her friend Dr. Blumenthal and even though the Court instructed the jury they should not consider her statements for their truth, are unpersuasive.  Thus, neither the admission of Dr. Blumenthal's email nor the statements attributed to Judge Leibowitz provide a basis for relief.

### e.     Objection to Rebuttal Witness Testimony

Defendant Hofstetter contends that the Court mistakenly overruled defendants' objection to the government's four (4) rebuttal witnesses and that she is thus entitled to a new trial [Doc. 890 p. 4–9].  Specifically, she argues that the witnesses were patients who

42

did not "rebut new evidence or new theories proffered in the defendant's case in chief" but rather repeated similar testimony to those patients who testified during the government's case in chief about their history of drug abuse [*Id.* at 4 (quoting *United States v. Bland*, No. 06-5876, 2007 WL 2781114, at *3 (6th Cir. Sept. 25, 2007) (unpublished))]. Yet, as the Court stated in its ruling denying defendants' objection, *see* Rough Draft Transcript, Jan. 14, 2020, at 67, and as the Sixth Circuit noted in the case cited here by defendant, the court has broad discretion to define the scope of rebuttal testimony. *See Bland*, 2007 WL 2781114, at *3. As the Court recognized in its ruling, "[t]he proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party," and contrary to defendant's seeming suggestion, it is within the Court's discretion to limit it to rebutting new evidence or new theories proffered in the defendant's case in chief, meaning that it does not have to do so. *Id.*

Here, the rebuttal testimony offered by the government's four (4) patient witnesses defused the impact of the opinion testimony offered by defendants' witnesses that the prescriptions those four (4) patients received at the clinics in this case were prescribed for a legitimate medical purpose and within the usual course of professional practice. Thus, the witness testimony fell within the proper scope of rebuttal testimony. And, defendant points to no place in the record and presents no authority that supports a finding the Court abused its discretion by overruling defendant's objection to the government's rebuttal testimony. Thus, the Court does not find that overruling defendant's objection to

43

admitting the testimony of the four (4) rebuttal witnesses provides a basis for granting a new trial.

### f.  Insufficiency of the Evidence

Although she does not mention a specific conviction she seeks to challenge, defendant Hofstetter appears to argue the Court should acquit her of all her convictions based on insufficiency of the evidence under Federal Rule of Criminal Procedure 29 [Doc. 890 p. 23–25].  As noted above, the jury found defendant Hofstetter guilty on Count One (RICO), Counts Two and Four (conspiracy to distribute controlled substances), Counts Three and Five (conspiracy to commit money laundering), Counts Six and Seven (violations under 18 U.S.C. § 1957(a)), Counts Eleven, Twelve, and Thirteen (maintaining a drug-involved premises), and Count Fourteen (substantive drug distribution) [Doc. 860].  Yet, defendant Hofstetter challenges the sufficiency of the evidence supporting these convictions by generally discussing evidence offered at trial, without specifying why the evidence she highlights undermines a specific conviction or how the Court erred in considering the evidence in its ruling on defendants' Rule 29 motions.  The government responds with a general overview of the evidence, noting that the Court issued a comprehensive ruling on defendant Hofstetter's Rule 29 motion at trial and that the government continues to rely on the record in support of defendant Hofstetter's convictions [Doc. 891 p. 27].

As noted above, defendant "bears a very heavy burden" in a sufficiency of the evidence challenge to her conviction.  *United States v. Davis*, 397 F.3d 340, 344 (6th Cir.

44

2005) (citing *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). The court "will sustain a jury's guilty verdict so long as, 'after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Ware*, 282 F.3d 902, 905 (6th Cir. 2002)); *see id.* (noting that the same standard for sustaining a jury verdict applies to the district court's denial of defendant's Rule 29 motion for a judgment of acquittal).

Defendant Hofstetter does not meet her burden. First, defendant Hofstetter seems to challenge her conviction on Count Fourteen, stating that "[n]o witness testified that defendant Hofstetter ever engaged in prescribing the medication outside the usual course of professional practice and without a legitimate medical purpose or instructed anyone to do so" and that the testimony of the government's expert witnesses regarding the medical files did not provide proof that defendant Hofstetter knew of the clinic prescribers' practices [Doc. 890 p. 23].[14] Yet, the jury instructions charged the jury that they could find defendant Hofstetter guilty of Count Fourteen if they found she had "intentionally helped or encouraged others to commit the crime," i.e. aided and abetted, and the instructions stated that the government "must prove that the defendant did something to help or encourage the crime with the intent that the crime be committed." Closing Jury Charge, p. 79, 99. The government marshaled considerable evidence that defendant

---

[14] Defendant Hofstetter raised the issue of insufficiency of the evidence underlying the substantive drug charges against her in a general manner in her Rule 29 motion at trial [Doc. 828 p. 1–2].

45

Hofstetter, like the other defendants, knew she was working at a pill mill and thus helped or encouraged the crime of illegal drug distribution. Specifically, the government presented evidence that the clinics did not accept insurance and charged $300 per visit, that the waiting rooms were packed, patients were nodding off in the waiting rooms, neighboring businesses complained about the clinics' patients' behavior, and other evidence indicating the clinics were operating to distribute controlled substances illegally. Viewing the evidence in the light most favorable to the government, a rational jury could find that even the most absentee manager would have known she was helping others commit the crime of illegally distributing controlled substances. And, the testimony of multiple witnesses, including defendant Hofstetter's business partner Christopher Tipton, coconspirator Benjamin Rodriguez, and clinic employees such as Stephanie Puckett and two nurse practitioner witnesses, contradicts defendant Hofstetter's characterization of her involvement in the clinics. They and others testified that defendant Hofstetter, contrary to her suggestion here, had a controlling management style, had sufficient contact with the clinics' clients to make frequent derogatory comments about them, sought to increase profits at the clinics by active oversight of the doctors ostensibly in charge of maintaining clinic standards, was made aware by Dr. Blumenthal and others that the clinics needed to improve their practices to avoid legal enforcement action against them, and laundered money from the clinics for her personal financial benefit. Thus, viewing the evidence in the light most favorable to the

government, a rational jury could also find that defendant Hofstetter intended that the crime charged in Count Fourteen be committed.

Defendant also seems to suggest that the jury's acquittal of the nurse practitioner defendants on the substantive drug distribution counts undermines her conviction on Count Fourteen, but the jury's decision does not demonstrate that a rational jury could not have found the nurse practitioners guilty on these counts, simply that this jury found the nurse practitioners not guilty, perhaps out of leniency. Indeed, in its original ruling, the Court held:

> Although there has been evidence that patient files were manipulated by some clinic staff, the Court finds after reviewing the testimony presented by the government, both [in] its case in chief as well as the testimony presented in the entirety of the trial, that a rational jury could conclude beyond a reasonable doubt that defendants were prescribing controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. Among other things, . . . the government's witnesses opined that charting, assessment of patients' risk of abuse, physical examination, and other practices at the clinics were inadequate and that the treatment plans [at] the clinics were generally limited to the prescription of high dose opioids written for patients despite, among other factors introduced by the government, . . . minimal findings on their MRIs, their relative young age, and potential for drug abuse. . . . The Court . . . finds that this and other evidence presented by the government is sufficient for a rational jury to find the government proved the other elements of the distribution counts, those being Counts Fourteen, Sixteen, and Eighteen, beyond a reasonable doubt.

Rough Draft Transcript, Jan. 27, 2020, p. 216–17. Defendant presents no evidence or argument that would persuade the Court to overturn its initial Rule 29 ruling on this issue.

Secondly, defendant Hofstetter appears to renew her argument at trial that the government failed to prove conspiratorial agreement regarding the conspiracy counts

(Counts One (RICO), Two, and Four) [Doc. 890 p. 24–25]. The evidence defendant offers now (without citation to the record)—apparently to show there was insufficient evidence to demonstrate defendant's involvement in a RICO conspiracy or conspiracy to distribute controlled substances unlawfully—merely indicates that some of defendant Hofstetter's coconspirators testified that some of the prescriptions issued at the clinics were issued legally [*Id.*]. The evidence does not undermine the Court's conclusion in its ruling at trial that the government presented sufficient evidence of conspiratorial agreement to sustain convictions when the evidence was viewed in a light most favorable to the government. Rough Draft Transcript, Jan. 27, 2020, p. 212–13. The Court notes again the "pill mill" proof discussed above in support of its finding at trial that "a rational jury could find that defendants had at least a silent, mutual understanding that by working at the clinics, they were agreeing to participate in the unlawful distribution of controlled substances," as well as the other elements of the charged conspiracy offenses. *Id.* And, defendant does not marshal any support for or develop her argument that the government did not prove conspiratorial agreement as to the RICO Count. Thus, the Court will not address this challenge or defendant Hofstetter's cursory insufficiency-of-evidence challenge to her other convictions. *See El-Moussa*, 569 F.3d at 257 (quoting *McPherson*, 125 F.3d at 995–96) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

48

## 2. Prosecutorial Misconduct

The Sixth Circuit has held that a prosecutor's comments "may not have the effect of shifting the burden of proof from the government to the defendants or abrogating the presumption of innocence to which (defendants) are entitled." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981) (internal citation omitted). The Sixth Circuit applies a two-step analysis in determining whether prosecutorial misconduct has occurred. *United States v. Wimbley*, 553 F.3d 455, 461 (6th Cir. 2009) (internal citation omitted). First, a court "determine[s] whether a statement by the prosecutor was improper," and second, "[i]f the statement was improper, [a court] must next decide whether the statement was so 'flagrant' as to warrant reversal." *Id.* The Court weighs four (4) factors to determine whether the statement was sufficiently flagrant to justify reversal: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).

Specifically, in examining whether a prosecutor improperly commented on a defendant's failure to testify, thus violating the defendant's Fifth Amendment privilege against compelled self-incrimination, the Sixth Circuit applies a similar four-prong analysis. *United States v. Wells*, 623 F.3d 332, 338 (6th Cir. 2010). The Court considers: (1) "whether the comments were manifestly intended to reflect on the accused's silence

49

or are of such a character that the jury would 'naturally and necessarily' construe them as such"; (2) "whether the comments were isolated or extensive"; (3) "whether there was otherwise overwhelming evidence of guilt"; and (4) "whether appropriate curative instructions were given." *Id.* (quoting *United States v. Gonzalez*, 512 F.3d 285, 292–93 (6th Cir. 2008)).

Defendant Hofstetter and the nurse practitioner defendants object to comments made by the prosecution that allegedly shifted the burden of proof to defendants [Doc. 870 p. 14; Doc. 890 p. 8–11]. The nurse practitioners' arguments raise this issue in a perfunctory manner that could permit the Court to deem the issue waived as to them. *See El-Moussa*, 569 F.3d at 257 (quoting *McPherson*, 125 F.3d at 995–96). Defendant Hofstetter, however, develops the issue more fully, pointing to three (3) specific instances of alleged prosecutorial misconduct [Doc. 890 p. 8–11]. The Court notes that it previously considered and rejected defendants' arguments in denying their motions to declare a mistrial. Rough Draft Transcript, Jan. 28, 2020, p. 19–22, 131–32.

Defendant Hofstetter first argues that Assistant United States Attorney Kelly Pearson improperly shifted the burden to defendants in her closing argument when she said, "guilt you never heard about from these three defendants." The statement appears in the following context:

> I want you to think about the raw emotion you saw especially from Ms. Fristoe when [she] talked about working at these places years after the fact. You can tell with Ms. Fristoe she felt the emotion of being a small part in perpetuating these places. Guilt you never heard about from these three defendants.

50

Rough Draft Transcript, Jan. 27, 2020, p. 53. Defendant Hofstetter suggests this statement improperly shifted the burden of proving guilt beyond a reasonable doubt to defendants by commenting on the fact that they did not testify and suggesting that they had some obligation to present evidence or prove their innocence to the jury [Doc. 870 p. 14; Doc. 890 p. 8–11]. The government argues that the context of this comment makes clear that the government intended to draw attention to the absence of evidence from any of the many trial witnesses to suggest that the nurse practitioner defendants had "any qualms or reservations about prescribing vast quantities of opioids at pill mills" [Doc. 891 p. 14]. Ms. Pearson's use of the word "guilt," the government contends, referenced "emotional contrition during the operation of the pill mills, not legal guilt at trial" [*Id.* at 15].

Defendant Hofstetter does not counter the Court's legal reasoning in finding at trial that Ms. Pearson's statement did not impermissibly shift the burden of proof. She simply restates the standard of law and the defense arguments in moving for a mistrial and does not present any authority for finding either that the government's statement was "improper" or that the statement was "so 'flagrant' as to warrant reversal" [Doc. 890 p. 10–11]. Thus, the Court finds no basis to reconsider its ruling that Ms. Pearson's comment was not "improper," in that the context of the statement made clear that it was not an attempt to shift the burden of proof but rather a comment on the absence of evidence that the nurse practitioner defendants felt "emotional contrition" for their criminal acts, in contrast to witnesses, such as Ms. Fristoe, who deeply regretted even

51

their short employment at the clinics. *See* Rough Draft Transcript, Jan. 28, 2020, p. 21. And, assuming arguendo that the comment was improper, it does not satisfy the factors articulated in *Carter* for overturning the verdict. First, the remark did not have a tendency to mislead the jury or prejudice the defendant because the context of the statement made it extremely unlikely that the jury would understand the government to be suggesting defendants should have presented evidence of their innocence, and the Court instructed the jury in its opening charge and its closing charge about the burden of proof. Second, the remark was isolated and minor—less than a sentence in two (2) hours of closing argument. Third, defendant does not suggest it was deliberately made, and the government argues persuasively that it did not intend the meaning defendants attribute to it. And, fourth, the evidence against the defendants, especially defendant Hofstetter, was strong, so it is unlikely that Ms. Pearson's statement, even if improper, would have changed the verdict against defendant Hofstetter or the other defendants. Thus, Ms. Pearson's statement does not provide a basis for reversal.[15]

---

[15] Defendant Hofstetter argues in her supplement to her new trial motion that the government failed to address the argument in her motion that Ms. Pearson's statement represented an impermissible comment on defendants' election not to testify [Doc. 899 p. 1–2]. In fact, defendant Hofstetter did not make this argument in her new trial motion, instead arguing only that Ms. Pearson's comments shifted the burden of proof. However, the Court notes that even if defendant had made this argument, it would have failed for similar reasons to those underlying the Court's ruling on her argument that Ms. Pearson improperly shifted the burden of proof: (1) Ms. Pearson's comments did not manifest the intent to "reflect on the accused's silence" and were not "of such a character that the jury would 'naturally and necessarily' construe them as such"; (2) they were isolated and not extensive as discussed; (3) there was significant evidence of guilt; and (4) the Court instructed the jury in its opening and closing charges that they should not consider or discuss defendants' election not to testify. *See Wells*, 623 F.3d at 338.

52

Second, defendant Hofstetter contends that Assistant United States Attorney Tracy Stone improperly shifted the burden of proof twice—first during defendant Hofstetter's closing argument and second during the government's rebuttal argument. Defendant Hofstetter objects to Mr. Stone's comment, "They have subpoena power, they did not subpoena Ms. Rucker" [Doc. 890 p. 9]. Defendant does not explain how this comment was improper when Mr. Stone made it as an objection to the speculation—as the government characterized it—of defendant Hofstetter's counsel as to the findings and manner of Ms. Rucker's investigation. *See* Rough Draft Transcript, Jan. 27, 2020, p. 191. Mr. Stone's comment on defendant's subpoena power immediately succeeded Mr. Stone's saying, "There are no facts in evidence." *Id.* Thus, the context makes clear that Mr. Stone was arguing that defendant could not make arguments based on facts not in evidence by speculating about the findings of a witness she chose not to call. And, the Court notes that it permitted defense counsel to continue his argument after the government's objection, *id.* at 191–192, so it is unlikely the jury focused on Mr. Stone's objection to defendant's detriment. Defendant identifies no basis for finding this comment improper, and the Court finds none.

Defendant also objects to the following statement by Mr. Stone on rebuttal: "Remember, as we get into this, that every single fact witness you heard of, they put up two opinion witnesses and an investigator to talk about some stats. Every fact witness, every person who saw something, smelled something, felt something, did something, heard something, someone who was there, somebody with knowledge, those—every

53

single one of those witnesses was put on by the United States" [Doc. 890 p. 9]. *See also* Rough Draft Transcript, Jan. 28, 2020, p. 91. Citing no authority for the alleged impropriety of this statement and failing to address the reasoning of the Court's previous ruling on this issue, defendant merely says, "This statement is a clear comment on the fact that the defendants did not call a fact witness and an attempt to shift the burden from the government onto the defendants to present evidence, or in some way prove innocence" [Doc. 890 p. 10].

Yet, as the government suggests, the Sixth Circuit's decision in *Moore v. Mitchell*, 708 F.3d 760, 806–807 (6th Cir. 2013), makes clear that Mr. Stone's statement was not an improper burden-shifting comment. The defendant in Moore argued that the prosecutor improperly shifted the burden of proof by commenting on the defense's failure to present an expert witness. *Moore*, 708 F.3d at 806. While contending that the victim was on his knees when he was shot, the prosecutor said, "The defense has every ability to subpoena in any expert they want to prove otherwise. Where were they? Where were they?" *Id.* Although the court found that defendant had defaulted the claim, it also found that the underlying claim was meritless because "[t]here is "nothing impermissible about the prosecutor's commenting on the defendant's failure to rebut evidence, so long as he does not violate the defendant's Fifth Amendment rights by commenting implicitly or explicitly on the defendant's failure to testify." *Id.* The court elaborated, "Where there are witnesses other than the defendant who could have been called to refute a point made by the prosecution, it is permissible for the prosecution to comment on the defendant's

54

failure to rebut that proof." *Id.* Moreover, the court emphasized, the trial court "properly instructed the jury that the prosecution had the burden of proof and Moore did not have to present a defense." *Id.* at 807.

Mr. Stone's comment about the witnesses called by defendant and the witnesses called by the government did not improperly shift the burden of proof; rather, it was a permissible comment on defendants' failure to rebut the evidence offered by the government through its numerous fact witnesses.

Moreover, as the Court noted in its original ruling, *see* Rough Draft Transcript, Jan. 28, 2020, p. 132, Mr. Stone made this statement in direct rebuttal to defense suggestions in their closing arguments that the government was concealing or obfuscating certain aspects of proof. For instance, the over-arching theme of defendant Hofstetter's closing argument was that the government "want[ed the jury] to convict [her] on the noise," which defense counsel defined as "the stuff that distracts you, the flashing lights, the extras, the things you get caught up in" but that "don't really impact what is the fact." Rough Draft Transcript, Jan. 27, 2020, p. 162. Defendant Hofstetter also stated that the government "didn't bother to look at all the documents" related to the case in their investigation and that they "gave [the jury a] few emails, not a lot" and suggested that the government had not provided the kind of information upon which the jury could rest a conviction. *Id.* at 173. Defendant also argued that the government's case was "built upon 20[/]20 hindsight and a 30,000 view from the sky looking down, not looking at the evidence as it took place on a daily basis," suggesting that the government's witnesses

55

were motivated by the desire for personal benefit and fear of prosecution. *Id.* at 188–89. Counsel for defendant Womack characterized the government as "trying to puff up" its case and "throwing things at [the jury] that just aren't right, sometimes wrong, sometimes misleading." Rough Draft Transcript, Jan. 28, 2020, p. 82. Counsel for defendant Newman said the "government's case sort of amounts to throwing things up against the wall to see what sticks." *Id.* at 51.

Given these statements by defense counsel, it was not improper for Mr. Stone to comment on the number of fact witnesses put on by the government and the fact that defendants had only put on opinion witnesses and an investigator. Rather, Mr. Stone's statement was "a fair response to the defense's assertions, which 'opened the door to [the] rebuttal.'" *United States v. Wimbley*, 553 F.3d 455, 461 (6th Cir. 2009) (discussing *United States v. Newton*, 389 F.3d 631 (6th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005), in which "the defense asserted that the government had withheld an audiotape from the jury [and t]he prosecutor responded by arguing that [the defendant] could have played the audiotape for the jury if he deemed it crucial the case" and the Sixth Circuit held that the prosecutor's response was appropriate); *see also United States v. Hunt*, 278 F. App'x 491, 497 (6th Cir. 2008) (holding that the prosecutor did not improperly shift the burden of proof where the prosecutor asked the defendant, "[I]f you think there is other evidence you need to get in, that's kind of your job, right?" because the exchange immediately followed defendant's "insinuat[ion] that the government was deliberately withholding evidence from the jury"). And if this was not clear from the

56

words of the contested statement itself, the context of the government's statement illuminates that the government's remarks "were not intended to shift the burden of proof or otherwise mislead the jury or prejudice the defendant." *Hunt*, 278 F. App'x at 497. As the government points out [Doc. 891 p. 16–17], the contested statement followed Mr. Stone's opening remarks, in which he directly addressed defense accusations of puffing and throwing things up against the wall, and his comment that the government "didn't hide anything from [the jury]." Rough Draft Transcript, Jan. 28, 2020, p. 86, 89, 91. The Court also notes again that it instructed the jury as to the burden of proof in its opening and closing charges. Thus, the statement to which defendant Hofstetter objects was not improper and did not constitute prosecutorial misconduct.[16]

### C. Challenges to Pre-Trial Rulings

#### 1. Venue

Defendant Hofstetter also assigns error to the magistrate judge's denial of successive motions for change of venue filed by defendant Hofstetter [Doc. 890 p. 15–16]. As the government notes [Doc. 891 p. 28], this issue was fully litigated before the

---

[16] Defendant Hofstetter argues in her reply that the government failed to address the argument in her motion that Mr. Stone's statement represented an impermissible comment on defendants' election not to testify [Doc. 899 p. 1–2]. In fact, defendant Hofstetter did not make this argument in her new trial motion, instead arguing only that Mr. Stone's comments shifted the burden of proof. However, the Court notes that even if defendant had made this argument, it would have failed for similar reasons to those underlying the Court's ruling on her argument that Mr. Stone improperly shifted the burden of proof: (1) Mr. Stone's comments did not manifest the intent to "reflect on the accused's silence" and were not "of such a character that the jury would 'naturally and necessarily' construe them as such"; (2) they were isolated and not extensive, in that they represented a few sentences in two-hour-plus closing arguments by the government; (3) there was significant evidence of guilt; and (4) the Court instructed the jury in its opening and closing charges that they should not consider or discuss defendants' election not to testify. *See Wells*, 623 F.3d at 338.

57

magistrate judge.  Magistrate Judge C. Clifford Shirley denied defendant's first motion for a change in venue in February 2018 after a thorough examination of the parties' arguments and legal analysis [Doc. 309 p. 37–42], holding that defendant had not established a presumption of prejudice and that accordingly defendants must show they had suffered actual prejudice, which the Court found must be determined "shortly before the jury [was] empaneled" [*Id.* at 41–42].  Defendant Hofstetter sought leave to pursue a second motion for change of venue in February 2019, which led Judge Poplin to set a hearing on defendant's second venue motion [Doc. 440].  Judge Poplin ultimately denied the motion, echoing Judge Shirley's reasoning and holding that defendants failed to show presumed prejudice from pretrial publicity and that voir dire would be "sufficient to expose any actual prejudice" against defendants [Doc. 610 p. 10].

Defendant does not explain why the magistrate judges' rulings were in error, superficially rehearsing the arguments that the magistrate judges rejected in their orders [Doc. 890 p. 15–16].  Without more, the Court finds no reason to reconsider the magistrate judges' well-reasoned conclusions.  Accordingly, the Court does not find that the denial of defendant's venue motions constitutes reversible error.

### 2.    Spoliation

Similarly, defendant Hofstetter assigns error [Doc. 890 p. 3] to the Court's adoption of the pretrial report and recommendation (R&R) of Judge Poplin [Doc. 474] denying defendant Hofstetter's motion and amended motion to suppress evidence based on spoliation [Docs. 405, 410].  Once again, the government notes that this issue was

fully litigated [Doc. 891 p. 28] and once again, defendant Hofstetter points to no legal error in the magistrate judge's R&R or the Court's adoption of the R&R [Doc. 523]. Indeed, defendant Hofstetter refers only generalities to the magistrate judge's finding that the destroyed evidence was not materially exculpatory and argues her due process rights were violated because government witnesses testified about the Hollywood clinic and defendant Hofstetter could not review the files seized from that clinic [Doc. 890 p. 3]. However, defendant does not challenge the legal reasoning supporting Judge Poplin's conclusion that the evidence was not materially exculpatory or her analysis of the case under *Arizona v. Youngblood*, 488 U.S. 51 (1988). Once again, defendant Hofstetter has presented no basis for the Court to reconsider its prior ruling.

### 3.    Trial Continuance

Defendant Hofstetter argues that the Court erred by granting only a brief continuance to allow defendant Clemons's co-defense counsel, Jeff Whitt, to prepare for trial. Mr. Whitt was appointed after Cullen Wojcik, original co-counsel with Randall Reagan, experienced a health crisis preventing him from appearing [Doc. 890 p. 16–17]. Defendant argues that the Court's decision to continue the trial until October 21, 2019, left Mr. Whitt with too little time to prepare for his assigned trial role, that of preparing defendants' expert witnesses to testify and preparing to cross-examine the government's expert witnesses, given the complexity of the case [*Id.*]. The government counters that Mr. Whitt proved himself to be "highly effective in matters relating to expert witnesses" and that the verdicts reflect that: "No defendant was found liable for a death

enhancement," "none of the providers were convicted of a drug conspiracy," and "no prescriber-defendant was convicted of a specific drug distribution" [Doc. 891 p. 29]. The government also contends that the expert testimony was "less critical" to defendant Hofstetter than to the prescribers because she was an owner-manager of the clinics [*Id.*].

The Court agrees with the government that defendant Hofstetter's bare assertions of "great disadvantage in [trial] preparation" do not support a finding that the Court abused its discretion in granting a continuance of the length it did. *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009) (citations omitted) (noting that the denial of a continuance is only an abuse of discretion amounting to a due process violation when it represents "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay"). In addition to recognizing, as the government did, Mr. Whitt's high level of preparation and competence in cross-examining the government's expert witnesses and preparing defendants' expert witnesses, the Court highlights three (3) aspects of its original order denying a continuance. First, the Court noted in summarizing the case that the trial date had been continued seven (7) times previously, several times at defendant Hofstetter's behest, including a continuance of five (5) weeks to allow Mr. Whitt to prepare for trial [Doc. 673 p. 1–2]. Mr. Whitt had advised that he believed the earliest he could be prepared for trial would be six (6) weeks after his appointment, but the magistrate judge noted in her order that Mr. Whitt would likely receive an additional four (4) to six (6) weeks after the start of trial to prepare before the government presented its experts based on the government's projected schedule [*Id.* at 3].

60

Second, the Court noted the government's efforts to reduce the evidence Mr. Whitt would need to review, by decreasing the number of files its own experts reviewed, significantly reducing the number of overdose deaths it intended to prove, and reducing the estimated length of its case in chief [*Id.* at 9, 13]. Finally, the Court highlighted the number of days the Court planned not to hold trial principally during the government's case in chief, thus providing additional time for Mr. Whitt to review files and otherwise prepare [*Id.* at 11–12]. In light of these considerations and defendant Hofstetter's failure to present any legal authority for finding the Court abused its discretion, the Court does not find its denial of a continuance to be reversible error.

### 4. Thefts

Defendant Hofstetter argues that the Court erred in admitting evidence of uncharged thefts of clinic monies [Doc. 890 p. 11–12]. As the government notes [Doc. 891 p. 29], this issue has twice been litigated [Docs. 641, 718], and each time the Court concluded that evidence of defendant's alleged thefts was admissible for certain purposes. Defendant's arguments in the instant motion do not reveal error in the Court's previous rulings and, as a result do not entitle her to the relief sought.

First, defendant argues that, under Federal Rule of Evidence 404(b), evidence of her alleged thefts was admitted in error because the government's purpose in proffering it "was to introduce propensity evidence of Ms. Hofstetter's alleged criminal character to label the defendant as a criminal in order to prove the defendant's character to show that on a particular occasion [she] acted in accordance with [that] character" [Doc. 890 p. 12].

61

But the Court has previously found this evidence probative of material issues other than character and thus admissible as evidence pertaining to those material issues. Specifically, the Court held, "evidence that defendant was embezzling monies from her alleged co-conspirators is admissible to prove defendant's knowledge that the UCSC clinics were not legitimate pain clinics and defendant's motive and intent in joining the conspiracies alleged in the indictment" [Doc. 718 p. 8–9]. Ultimately, defendant's 404(b) argument in the instant motion merely parrots her Rule 404(b) argument previously raised—and rejected—on this issue and does not identify any error in the Court's reasoning behind its prior rejection of this same argument. Moreover, the Court repeatedly instructed the jury that it was to consider any such evidence only for the specific, permissible purposes cited by the Court and not as evidence of bad character to show a propensity to act in conformity therewith. *See United States v. Bradley*, 917 F.3d 493, 508 (6th Cir. 2019) ("[J]urors are presumed to follow the trial court's instructions." (quoting *United States v. Hynes* 467 F.3d 951, 957 (6th Cir. 2006))). For these reasons, the Court finds defendant's argument without merit and will otherwise decline to again reconsider its prior Rule 404(b) ruling on evidence of defendant's alleged thefts.

Second, seemingly in support of a Rule 403 argument, defendant points to the testimony of co-conspirator Christopher Tipton regarding her alleged thefts. Defendant states that this witness testified that the owners of the UCSC clinics became aware of defendant's alleged thefts through "a comment made by an employee to them" but that they "did not know" whether the allegation was true [Doc. 890 p. 12]. Defendant claims

62

that the admission of this testimony "resulted in confusion of the issues, misleading the jury and unfair prejudice" [*Id.*].

The Court does not agree. Evaluating the probative value of this evidence as compared to the danger of unfair prejudice it posed, the Court does not find it erred in admitting this evidence. Evidence that the clinic owners, despite their knowledge of allegations that defendant had stolen clinic monies, had hired her to open and manage their Tennessee clinics carries significant probative value with respect to several material issues. Specifically, as the Court discussed in its prior written opinion on the admissibility of evidence of defendant's alleged thefts, this testimony tends to show that defendant "knew she could continue to embezzle money from the clinics with little consequence" and "supports a finding that [defendant] knew the enterprises clinics were not legitimate pain clinics," reflecting on defendant's "motive and intent in allegedly joining the conspiracy" [Doc. 718 p. 9]. This, in combination with the fact that the alleged thefts are not collateral to the charged offenses [*Id.* (citing *Lang*, 717 F. App'x at 531)], leads the Court to again conclude that the prejudice resulting from the admission of this testimony was not unfair and did not substantially outweigh the probative value of the evidence.

Defendant's other Rule 403 arguments, i.e., those related to confusion of the issues and misleading the jury—arguments that were not raised in defendant's initial motion [*see* Doc. 585]—are especially conclusory and perfunctory. *See El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–96

(6th Cir. 1997)).  And in light of the probative value of the evidence, as just discussed, as well as Rule 403's favoring admission, *Lang*, 717 F. App'x at 531, the Court is unconvinced that the probative value of this evidence was substantially outweighed by these other dangers.  For these reasons, defendant has not shown that she is entitled to relief on these grounds either.

Lastly, defendant points to the testimony of co-conspirator Benjamin Rodriguez, a co-owner of the UCSC clinics, regarding the alleged thefts.  She claims his testimony, which provided that some unspecified individual had alleged defendant was "accepting tips," was "a bad element," and "was stealing money from the business," included inadmissible hearsay and constituted a "direct comment on her character" in violation of Rules 403 and 404(b).  With respect to defendant's Rule 403 and Rule 404(b) arguments, the Court relies on the discussion herein, *supra*, as well as its prior orders, to conclude that this evidence was not erroneously admitted under these Rules.  With respect to defendant's hearsay objection, more context is helpful.

Immediately prior to the witness tendering the objected-to testimony, the witness relayed that due to "another problem" involving defendant, of which the owners had become aware, defendant, as opposed to the individual the owners had originally selected, was to come to Tennessee to open and operate pain clinics on behalf of the enterprise.  The government then asked the witness to explain what the problem was with defendant to which he had referred.  In response, the witness supplied the objected-to testimony.  Defendant objected on the basis of hearsay.  The government responded in

64

opposition, clarifying its intended purpose for eliciting testimony related to defendant's alleged thefts (i.e., to explain how defendant ended up opening and operating the owners' clinics in Tennessee) and noting that it would otherwise concede as to hearsay objections not involving a co-conspirator statement. The Court permitted the government to proceed with direct examination.

At the outset, the Court notes that the parties seemingly agreed that the testimony would be inadmissible to prove the truth of the matter asserted if the declarant was not a co-conspirator, but defendant did not provide further argument on this point at trial. As a result, the record is unclear with respect to whether the testimony involved a co-conspirator statement and thus whether the statement was admissible as such. But even assuming the declarant was not a co-conspirator, the Court finds no error in admitting the statement because it was not offered to prove the truth of the matter asserted, i.e., that defendant was stealing money from the clinics. Rather, as the government asserted in responding to defendant's objection at trial, this testimony was admitted for permissible, non-hearsay purposes as repeatedly discussed by the Court.[17]

In sum, for the reasons discussed herein, as well as in prior orders, the Court does not find that the evidence regarding defendant's alleged thefts was admitted in error.

---

[17] Similarly, the Court notes that the context in which the testimony was provided makes plain that the government did not offer this testimony as impermissible character evidence. Rather, the government's stated purpose for eliciting testimony related to defendant's alleged thefts aligned with the permissible purposes for such evidence identified by the Court. Specifically, the Court has consistently held that evidence that the owners hired defendant to run their Tennessee clinics despite their knowledge of theft allegations against her is probative of her knowledge of the conspiracy's objective and her motive and intent in participating in the operation of the enterprise's Tennessee clinics [*see* Doc. 718 p. 9].

65

## IV.     Conclusion

For the reasons explained above, defendants' motions for a judgment of acquittal and a new trial [Docs. 870, 890] are hereby **DENIED**; Defendant Hofstetter's motion for oral argument [Doc. 892] is likewise **DENIED**; and Defendant Hofstetter's motion [Doc. 898] for leave to file a supplement is, to the extent discussed *supra*, note 1, **GRANTED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE